```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

  In re:                          :
                                           Docket #22cv518
  MARTINENKO, et al.,             :

                  Plaintiffs,     :

    - against -                   :

  212 STEAKHOUSE, INC., et al.    : New York, New York
                                    April 4, 2023
                  Defendants.      :

------------------------------------ :

                   PROCEEDINGS BEFORE
            THE HONORABLE ROBERT W. LEHRBURGER,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          JOSEPH & KIRSCHENBAUM LLP
                        BY:  MICHAEL DIGIULIO, ESQ.
                             DENISE SCHULMAN, ESQ.
                        32 Broadway, Suite 601
                        New York, New York 10004

For Defendants:         LAW OFFICE OF MITCHELL S. SEGAL P.C.
                        BY:  MITCHELL SEGAL, ESQ.
                        1129 Northern Boulevard, Suite 404
                        Manhasset, New York 11030
```

```
Transcription Service: Carole Ludwig, *Transcription Services*
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**<u>INDEX</u>**

## **<u>E X A M I N A T I O N S</u>**

| **<u>Witness</u>** | **<u>Direct</u>** | **<u>Cross</u>** |
|---|---|---|
| Nikolay Volper | 16 (by the Court) | 23 (by Schulman_ |

## **<u>E X H I B I T S</u>**

| **Exhibit**<br>**<u>Number</u>** | **<u>Description</u>** | **<u>ID</u>** | **<u>In</u>** | **Voir**<br>**<u>Dire</u>** |
|---|---|---|---|---|
| None | | | | |

```
 1                         PROCEEDINGS                    3
 2            THE COURT:  So apologies, folks, we are here
 3   for Martinenko v. 212 Steakhouse and Nikolay Volper,
 4   22cv518.  Again, apologies for the prior proceeding
 5   running long and thank you for being flexible in terms
 6   of pushing this time back.
 7            So we are here because really for the motion
 8   for sanctions which certainly is something that deserves
 9   a hearing and an opportunity to appear and say
10   something, and I actually have a few questions.  And
11   then I also have the correspondence about the
12   allegations made by the defense that the plaintiffs have
13   improperly contacted the potential members of the
14   collective.
15            I want to start there, but why don't you put in
16   your appearances first please.
17            MR. DIGIULIO:  Good afternoon, Your Honor,
18   Michael Digiulio for the plaintiff.
19            MS. DENISE SCHULMAN:  Deni Schulman for the
20   plaintiff.
21            MR. MITCHELL SEGAL:  Good afternoon, Your
22   Honor, Mitchell Segal for the defendants.
23            THE COURT:  All right, good afternoon.  So, Mr.
24   Segal, when I got your, you know, these allegations, I
25   read them, I looked at the texts, and I immediate
```

```
 1                        PROCEEDINGS                    4
 2  thought was, well, this is just sending the notice
 3  that's authorized by the collective order just as the
 4  plaintiffs have pointed out.  Am I missing something?
 5         MR. SEGAL:  Well, yes, Your Honor, in my
 6  opinion.  So the order did authorize a text message of
 7  the notice.  However, the preface of that text message
 8  with the quotes of employees' attorney I think skews the
 9  notice and gives more credence to the fact that was not
10  in the notice.  It provides an intimation that there are
11  more than, you know, more narrative than what the notice
12  was required to have and what the Court ordered.  So
13  that is employees' attorneys, it leaves an inference
14  that it's for all employees and you need to join this
15  action because we represent everybody, and that was not
16  allowed or ordered pursuant to the notice, the court-
17  ordered notice.
18         Additionally, I have a problem with, you know,
19  the phone call to Dag Maja Huk, the second plaintiff,
20  and that came out during her deposition, and that was
21  not authorized by the notice.  In fact, I think that
22  occurred prior to the notice being sent out.  And I
23  probably should've called the Court at that point in
24  time during the deposition to get some more leeway and
25  some more questions.  Their counsel stymied that, and I
```

```
 1                         PROCEEDINGS                    5
```

 2  left it alone at that point.  But I think that's also a

 3  violation of the rules, and that's the second plaintiff

 4  that came into the action.

 5         THE COURT:  Yeah, okay.  Plaintiff want to

 6  respond?  Ms. Schulman.

 7         MS. SCHULMAN:  Yes.  So Judge Liman granted our

 8  motion for, our 216(b) motion including notice by text

 9  message.  Our motion included a proposed text message

10  notice.  He did not make any alterations to that.  He

11  only altered the mailing notice.  So the proposed text

12  message notice was exactly what you have before you now,

13  and it had a link to the full notice because, of course,

14  you can't possibly put a multipage notice into a text

15  message.

16         As for the opt-in plaintiff, Dag Maja Huk, I

17  never called her.  She said she was contacted by

18  plaintiff's counsel which she was because we sent the

19  court-authorized notice.

20         THE COURT:  And I just want to make sure I

21  understand something.  Are you saying that the actual

22  text of the text, apart from the link to the notice, was

23  that language that was approved by Judge Liman?

24         MS. SCHULMAN:  This is our proposed text notice

25  in our motion.

```
 1                       PROCEEDINGS                    6
 2              THE COURT:  All right, well, that doesn't that
 3    take care of it, Mr. Segal?
 4              MR. SEGAL:  I don't believe that I ever saw
 5    that text message notice.  I'd have to review that.  I
 6    don't believe employees' attorneys was approved by the
 7    Court.
 8              THE COURT:  Did you submit it with your request
 9    --
10              MS. SCHULMAN:  Yes, it's on the docket.
11              THE COURT:  Yeah.  And Judge Liman didn't, he
12    did make changes to the attachment but he didn't make
13    changes to the other part.  So I find, based on the
14    order that has been previously issued in regard to the
15    notice to be given to the collective, that there was no
16    violation or impropriety on the part of the plaintiffs
17    and that they were simply adhering to what Judge Liman
18    had permitted.  So I'm denying the relief that it
19    requested in defendants' letter application at docket
20    84.
21              So I want to go on to the sanctions motion,
22    and, again, I have a number of questions.  So I'm going
23    to dive in there.  If you all have things you want to
24    say after I get some answers to these questions, I have
25    no problem with hearing from you.
```

| | PROCEEDINGS 7 |
|---|---|
| 1 | |

```
 1                         PROCEEDINGS                    7

 2              So, first, and apologies for the order.

 3    There's no particular order that make rhyme or reason

 4    necessarily but there is a reason for it.  The

 5    Department of Labor issue I recall Mr. Segal saying

 6    that, in representing to the Court, that that was no a

 7    wage and hour issue, it was an insurance issue, so

 8    really there was nothing there to produce.  Do I have

 9    that right, Mr. Segal?

10              MR. SEGAL:  Yes, I was told from my client that

11    it was a worker's compensation insurance issue and had

12    nothing to do with the labor law.

13              THE COURT:  Okay, so it seems like there's

14    nothing else to do there, and that really is not a part

15    of the sanctions motion.  Do I have that right, do I

16    have that wrong?

17              MR. JULIO:  That's correct.

18              THE COURT:  Okay, great.  I just wanted to

19    confirm.  All right, and then I'm going to actually ask

20    a question of plaintiff first because it's just a

21    question I think I might know the answer to but I don't

22    know because it's your doing.  With respect to the – let

23    me make sure I describe this – with respect to the pay

24    records and such, you asked for the Court to make a

25    finding based on the failure to comply, but with respect
```

2  to the hours and the tip records, you asked for coercive

3  sanctions as opposed to asking for the same relief as

4  requested for the pay records.  Is there a particular

5  reason for that?

6           MR. JULIO:  Yes, Your Honor, in terms of the

7  time records, it's really important when you're doing

8  damage calculation of class-wide to see how much the

9  class members worked.  And so without those records

10  we're really guessing.  The tip records also can show

11  just in a general sense how much people are working, so

12  that's why we seek those.

13           THE COURT:  Okay, that's what I surmised

14  essentially which is that the, for the documents that

15  essentially establish policies, since it's a policy-wide

16  point, you were asking for the findings to be made.  But

17  for the time and tip records, that those are more

18  individualized and, as you said, go to damages.

19           All right, so then, Mr. Segal, well, actually

20  one more question for the plaintiff.  Since, at any time

21  since the filing of this motion for sanctions have you

22  received any additional documents from the defense?

23           MR. JULIO:  No.

24           THE COURT:  Okay.  All right, and what's the

25  status of discovery?

```
 1                      PROCEEDINGS                    9

 2          MR. JULIO:  It closed in January, Your Honor.

 3          THE COURT:  Okay, thank you.  This year?

 4          MR. JULIO:  Yes.

 5          THE COURT:  Thank you.  All right, so, Mr.

 6  Segal, let me ask you a few things.  So the revenue and

 7  ownership documents, and, by the way, we have your

 8  client back there?

 9          MR. SEGAL:  Yes, that's Nikolai Volper.

10          THE COURT:  So we have the named defendant.

11          MR. SEGAL:  Yeah.

12          THE COURT:  Okay.  All right, and depending on

13  what is said, I may ask Mr. Volper to come up and answer

14  under oath.  So, Mr. Segal, with respect to the revenue

15  and ownership documents, the issue joined essentially

16  was on the 2021 and 2022 records, and I understand that

17  there were no tax returns prepared at that time, which

18  could be understandable, particularly for 2022 but even

19  for 2021, but that doesn't necessarily obviate the

20  obligation to produce other records that provide that

21  information.  And so you were on due notice certainly

22  with the filing of this motion and earlier that those

23  records should be produced.

24          Has any effort been made to go back and find,

25  locate, and produce any revenue and ownership records
```

 1

 2  for 2021 or 2022?

 3          MR. SEGAL:  We have not provided any additional

 4  records.  However, we are on the record I believe in

 5  some of this paperwork that gross sales exceeded

 6  $500,000 in 2021 or '22 --

 7          THE COURT:  Correct, and so that particular

 8  issue is off the table because you're agreed to it, off

 9  the table in terms of being somewhat mooted.

10          MR. SEGAL:  As well as ownership.

11          THE COURT:  Oh, so you are now agreeing to

12  that?

13          MR. SEGAL:  Yeah, I think I agreed to that --

14          THE COURT:  You did not --

15          MR. SEGAL:  I stated that in the --

16          THE COURT:  -- you did not stipulate to that

17  part of it.  Are you stipulating to that now, that is,

18  that the, that Mr. Volper is the sole owner of the

19  business in 2021 and 2022?

20          MR. SEGAL:  I would have to let Mr. Volper

21  answer that, but I believe the answer to that is yes.

22          THE COURT:  Well, I'm asking if you're

23  stipulating to it.  You said you were going to look more

24  into it, so now is not the time really to be --

25          MR. SEGAL:  Right, well, I don't have those tax

1

2    returns, and I've never received any additional

3    documents as to --

4              THE COURT:  Did you file - when was the last

5    time you followed up to inquire whether there was any

6    documentation with respect to 2021 and 2022 in terms of

7    ownership?

8              MR. SEGAL:  I always ask Mr. Volper about that

9    and when the tax returns are going to be filed.

10             THE COURT:  Well, but as I said, the obligation

11   goes beyond tax returns.  It doesn't ask for tax

12   returns.  The order was based on a request for

13   information showing ownership; it was not specifically

14   and only to be tax returns.  So if there weren't tax

15   returns, there were to be other records.

16             MR. SEGAL:  I don't believe there's any other

17   paperwork that indicates that ownership for '21 and '22.

18             THE COURT:  Have you made an attempt to search

19   for and look for any such documents?

20             MR. SEGAL:  I've requested, but there is no

21   other paperwork.

22             THE COURT:  So your position is the only place

23   there'd be information in documentation on ownership

24   would be in a tax return?

25             MR. SEGAL:  Correct.

```
 1                          PROCEEDINGS              12
 2              THE COURT:  As opposed to ownership documents
 3  or something of that nature?
 4              MR. SEGAL:  They don't exist.
 5              THE COURT:  Plaintiff want to say anything
 6  abouts this?
 7              MR. JULIO:  I mean during Mr. Volper's
 8  deposition we asked him who owns it.  He said he didn't
 9  know.
10              THE COURT:  Right.
11              MR. JULIO:  So we're at an impasse I guess.
12              THE COURT:  Okay.
13              MS. SCHULMAN:  Can I add one thing?
14              THE COURT:  Yeah.
15              MS. SCHULMAN:  If the information would be in
16  the tax returns, it has to come from somewhere else.
17  The tax returns don't pull it out of the air.
18              THE COURT:  Arguably.  I mean to represent that
19  you're a hundred percent owner, you could just represent
20  that in some way.  But surely there's, it's, you know,
21  well, I don't know if it's documented somewhere.  But in
22  any event, to the point that he was asked at deposition
23  and he didn't know, I recall that being the case.
24              (pause in proceeding)
25              THE COURT:  The problem is, Mr. Segal, going to
```

1
2   the point about the deposition, either he could answer
3   that question or he couldn't.  And if there's no
4   additional information, then what is he basing, you
5   know, on one hand – you're going to have to give that
6   answer or provide that information in some way in the
7   tax return.  He says at the deposition I don't know
8   essentially if he's the hundred percent owner, and if
9   it's not in any documentation and he doesn't know, where
10  else is it going to come from?
11          MR. SEGAL:  It can't come from me if he doesn't
12  have it.  All I'll say is this, Your Honor, you know,
13  during the deposition my client might've been a little
14  confused, a little nervous, and some of the comments
15  that came out I don't think were a hundred percent
16  correct.  But as far as, you know, where that answer
17  came from, I can't respond to that.  I don't know why
18  that answer came out, so to speak.  According to my
19  knowledge and my investigation and my files, he's the
20  owner of the entity a hundred percent.
21          THE COURT:  Okay, are you stipulating to that?
22          MR. SEGAL:  I can't stipulate to that.
23          THE COURT:  Okay.  All right.  All right, then
24  let's see.  So with respect to pay records, what effort,
25  Mr. Segal, has been made to retrieve and produce any pay

```
 1                         PROCEEDINGS                    14
 2   documents following the July 22, 2022 conference order?
 3           MR. SEGAL:  Again, Your Honor, during that
 4   deposition my client said, well, there might be --
 5           THE COURT:  No, my question is what effort has
 6   been made, if any, since July 22, 2022 to search for and
 7   produce pay records?
 8           MR. SEGAL:  My client did search, and there's
 9   no additional pay records.  We do have bank records now
10   that we didn't have which we could provide that he just
11   showed me today which I didn't know that was obtained.
12   But as far as my knowledge, I have no knowledge of any
13   additional pay records being found after search.
14           THE COURT:  Even though --
15           MR. SEGAL:  And tip records.
16           THE COURT:  All right, so at his deposition I
17   believe defendant did say he was aware of some pay
18   records and that that included confirmations by
19   employees of having received their money and to some
20   other payroll information.
21           MR. SEGAL:  I've not received any documentation
22   to support that, and, once again, I think Mr. Volper was
23   a little nervous during the deposition, and some of the
24   responses were not a hundred percent correct in that
25   light because I have not received any additional
```

1

2  documentation to that effect, and I know he's looked for

3  that.

4          THE COURT:  And when was the last time you

5  asked him for that?

6          MR. SEGAL:  A week ago.

7          THE COURT:  All right, what effort has been

8  made at all, and I know you mentioned this, but I want

9  to get an answer, to search for tip sheets, what efforts

10 have been made since July 22, 2022 to locate and produce

11 tip sheets?

12         MR. SEGAL:  I believe the same efforts that

13 were, as related, same efforts as to the payroll

14 records, you know, no other tip sheets that have been

15 produced and I know he has looked for them.

16         THE COURT:  All right, I'm going to need him to

17 take the stand.

18         MR. SEGAL:  Sure.

19         THE COURT:  Mr. Volper, hi, can you please

20 raise your right hand.  Do you swear or affirm that

21 everything you testify to today will be the truth, the

22 whole truth, and nothing but the truth?

23         MR. VOLPER:  (no audible response)

24         THE COURT:  Yes?

25         MR. VOLPER:  Yes.

```
 1                        PROCEEDINGS                    16

 2            THE COURT:  You need to speak up for the

 3   recording.  Thank you.  Please be seated.

 4            MR. VOLPER:  Thanks.

 5            THE COURT:  I'm going to ask you some

 6   questions, and then I'll give the opportunity to attys

 7   for both sides to ask follow-up questions if they have

 8   any.

 9   EXAMINATION BY THE COURT:

10            THE COURT:  So on July 22, 2022 Judge Liman I

11   think, yes, Judge Liman at the time was the one who

12   ordered certain documentation be produced and also gave

13   permission to the plaintiffs to bring a sanctions motion

14   if certain orders were not complied with.  So I'm just

15   trying to find out what was done or not done.

16            So let me ask you, since July 22 of last year,

17   so July 22, 2022, have you made any efforts to look for

18   additional documents responsive to the requests in this

19   litigation?

20            MR. VOLPER:  Yes, Your Honor.

21            THE COURT:  And when was the first time after

22   July 22, 2022 that you did that roughly?

23            MR. VOLPER:  First time?

24            THE COURT:  Yeah.

25            MR. VOLPER:  Well, I looked for this documents,
```

```
 1                     VOLPER (by the Court)          17
 2  most of the documents were in the restaurants were –
 3  during my testimony I specified specifically that was
 4  (indiscernible) especially during the COVID I have a lot
 5  of --
 6            THE COURT:  Let me cut you off, I'm sorry.  The
 7  question is when was the first time that you, after July
 8  22, that you looked for additional documents?
 9            MR. VOLPER:  Probably much immediately after
10  (indiscernible).
11            THE COURT:  Pretty much immediately, okay.  And
12  what did you do to look for the additional documents?
13            MR. VOLPER:  So I went to the office, I look
14  around.  I ask the employees what's going on with all
15  the tip sheets, the rest of the documents.  They say we
16  put them in the garbage because they were staying there
17  for years and years and years because I was often very
18  much out of the restaurant pretty much the last three
19  years.  I went like maybe three, four times due to my
20  health issues.  Basically, I can't locate any additional
21  documents, Your Honor.
22            THE COURT:  And you say you asked the
23  employees.  Do you know, did you look personally in
24  places where you would expect to find documents?
25            MR. VOLPER:  Yes, Your Honor, that's in the
```

```
 1                     VOLPER (by the Court)              18
 2   office, in the basement.  I went pretty much all the
 3   shelves, tried to look at everything requested by the
 4   Court.  Absolutely, it was not there.  I suspect the
 5   reason is they put it in the garbage because there was
 6   pile, pile, pile from documents, tip sheets, tip
 7   records, whatever they have, schedule.  Because during
 8   that time basically all the employees run the business.
 9   I was not very involved, I don't write any payroll,
10   checks.  I have recently suffer, still suffering
11   depression, anxiety which is – that's why some documents
12   was like very late to provide because I was not able
13   basically to function for five, six months to severity
14   of depression and anxiety.
15          I'm still on medications, Your Honor, but I
16   display that very well in the position.  My lawyer also
17   mentioned that.  So I have very limited interaction with
18   the business, probably my mistake, but --
19          THE COURT:  So one thing – I'm sorry to cut you
20   off, but I think you're getting off topic.  One thing
21   you said in there that I heard you refer to was that
22   employees maybe discarded documents, didn't keep them,
23   etc.
24          MR. VOLPER:  Yes.
25          THE COURT:  Do you know if that, in fact,
```

```
 1                    VOLPER (by the Court)              19

 2  happened?

 3          MR. VOLPER:  I'm sure a hundred percent that's

 4  happened.

 5          THE COURT:  And did you have any particular

 6  policy or practice with respect to how long documents

 7  like that would be kept?

 8          MR. VOLPER:  No, we don't.

 9          THE COURT:  Okay.

10          MR. VOLPER:  We don't.  But basically they said

11  (indiscernible) to destroy these documents because it

12  was piled in the office.  Our office is very small.

13  Basically they just discard these documents which is

14  they thought is not necessary to keep anymore because

15  there was like for years and years and years.

16          THE COURT:  All right, so at your deposition –

17  do you recall being deposed, by the way?

18          MR. VOLPER:  I'm sorry?

19          THE COURT:  Do you recall being deposed where

20  you were asked questions under oath by plaintiffs'

21  attys?

22          MR. VOLPER:  Yes.

23          THE COURT:  Okay, so at your deposition I

24  understand that you testified that the restaurant

25  maintains certain pay records particularly of employees
```

```
 1                    VOLPER (by the Court)          20

 2   confirming that they received their payments and then

 3   some related payroll information.  Did you go back and

 4   look for any of that?

 5           MR. VOLPER:  Yes, Your Honor, we provide

 6   (indiscernible) this which is (indiscernible) checks for

 7   Dag Maja Huk as well as Nino Martinenko.  The rest --

 8           THE COURT:  Right, but what about pay records

 9   related to --

10           MR. VOLPER:  Yes, we issue pay records --

11           THE COURT:  -- all the other front of house

12   employees?

13           MR. VOLPER:  Yes, we – no, that we provide and

14   then we ask for the bank records to show the checks with

15   images, they don't appear.

16           THE COURT:  So did you look, when you looked

17   for the records of Ms. Martinenko and Huk, did you also

18   look for the pay records for the other front of house

19   employees?

20           MR. VOLPER:  No, I don't.

21           THE COURT:  But you testified that you have

22   those records available, right?

23           MR. VOLPER:  I have at a certain point but I

24   don't know where they are.

25           THE COURT:  And did you look at those since –
```

```
 1                    VOLPER (by the Court)              21
 2  since July 22, 2022 did you look for those additional
 3  pay records?
 4          MR. VOLPER:  Yes, (indiscernible) pay records,
 5  I can't find anything, any pay records.  Multiple times
 6  I went to the basement, I went to the office, I can't
 7  find (indiscernible) records.
 8          THE COURT:  Okay, what about time records?  I
 9  remember that or recall from the papers that there was a
10  so-called point of sale keeping system and that that
11  clocked, that would have the times that employees
12  clocked in and clocked out, is that right?
13          MR. VOLPER:  Correct, Your Honor.
14          THE COURT:  And since July 22, 2022, did you go
15  back to that system to see if you could pull information
16  for all front of house employees?
17          MR. VOLPER:  After July 22, 2022?
18          THE COURT:  Yes.
19          MR. VOLPER:  We provide Nino Martinenko --
20          THE COURT:  Right, but my question is whether
21  you went back to then look for and obtain the time
22  records, same type of time records for all other front
23  of house employees, not just Martinenko and Huk.
24          MR. VOLPER:  No, I did not.
25          THE COURT:  Okay.  Did anyone ask you to go get
```

```
 1                    VOLPER (by the Court)          22

 2   that?

 3            MR. VOLPER:  Was somebody else --

 4            THE COURT:  Yeah, were you asked, did anyone

 5   ask you to your knowledge to go and see if you could get

 6   those time records from the POS system?

 7            MR. VOLPER:  Did everything else --

 8            THE COURT:  Yeah, did anyone direct, ask you to

 9   go, to look for them?

10            MR. VOLPER:  No, no, no.  All I know, Your

11   Honor, all the employees current and former employees

12   are against any personal information to be released.  I

13   spoke with many of them --

14            THE COURT:  But that's not an issue about

15   whether personal information can be released, sir --

16            MR. VOLPER:  Well --

17            THE COURT:  That can be dealt with by

18   protective order.  There was material that was required

19   to be directed to be produced, and there are obligations

20   to do that.

21            MR. VOLPER:  Yes, Your Honor.

22            THE COURT:  Let me just make a note here of

23   something.

24            (pause in proceeding)

25            THE COURT:  All right, is there - I'll turn it
```

```
 1                      VOLPER (by the Court)            23
 2   over to counsel.  Plaintiffs, do you have questions for
 3   the, for Mr. Volper?
 4            MS. SCHULMAN:  Just a couple.
 5   CROSS-EXAMINATION
 6   BY MS. SCHULMAN:
 7       Q:  Mr. Volper, you produced paystubs for Ms.
 8   Martinenko and Ms. Huk, correct?
 9       A:  Correct.
10       Q:  And that's different from the checks you were
11   talking about that are in the bank statements?
12       A:  Well, paystub or the checks, we produced
13   documents, paystub is (indiscernible) proof of payments
14   where everything, taxes has been deducted, the payroll
15   records are associated with this particular payroll,
16   different check.
17            MS. SCHULMAN:  May I approach and show a
18   paystub?
19            THE COURT:  Sure.
20       Q:  So I'm showing the document Bates stamped DA87.
21   It was part of exhibit 11.  Is that a paystub?
22       A:  That's a paystub, correct.
23            MR. SEGAL:  I'm familiar with the record
24   basically.  I just want to see - okay, this is for Maja
25   Huk, okay.
```

1

2      A:   So maybe --

3           THE COURT:  Wait until she asks a question.

4      Q:   Isn't it true that you have paystubs for other

5  employees at the restaurants besides --

6      A:   Sure.

7      Q:   Besides Ms. Martinenko and Ms. Huk.

8      A:   Yes.

9      Q:   Okay, and you have not produced those, correct?

10     A:   We produced these two documents, correct.

11     Q:   Right.  You have not produced any paystubs for

12  any other employees.

13     A:   As I mentioned, they don't want to be, any of

14  employees, this personal information to be distributed.

15  They don't want to be represent by you, by any cross-

16  action suit.  Yes, correct.  We have affidavits from

17  everybody, former, former and current employees that

18  don't want to get represented by you in (indiscernible).

19     Q:   Yes, I have seen the affidavits.

20     A:   Yes.

21     Q:   But you have --

22     A:   You should follow --

23          THE COURT:  One at a time.  And you need to

24  focus on the question that she's asking, and your lawyer

25  can ask you question after --

 1 

 2       THE WITNESS:  No, but I just explain why it's

 3 not produced.

 4       THE COURT:  I think you've explained it, but if

 5 there's more to it, go ahead.

 6       THE WITNESS:  Correct.

 7    A:  So I have to obey privacy rules and laws.  You

 8 don't have a right to provide these documents if

 9 somebody doesn't want to admit it, doesn't want to be

10 part of this lawsuit, he doesn't participate, he don't

11 want to be represented by you, you don't have that

12 right.

13    Q:  Okay, so if I understand you correctly, you

14 have the paystubs for --

15    A:  Correct --

16    Q:  Let me finish my question.

17    A:  Please finish your question.

18    Q:  You have the paystubs for those other employees

19 and you're refusing to turn them over to us.

20    A:  I don't refuse.  They refuse.  I was very

21 clear.  This is their refusal, privacy laws apply here.

22 They don't want any financial representation to be

23 distributed to your law firm, especially they're not

24 represented by you, they don't have any intention to be

25 represented by you.  Correct.

```
 1                        PROCEEDING                    26

 2              MS. SCHULMAN:  Nothing else.

 3              THE WITNESS:  Or you can ask me much more

 4  questions if you like.

 5              THE COURT:  I think she's done.  Anything you

 6  wanted to ask, Mr. Segal?

 7              MR. SEGAL:  No, thank you, Your Honor.

 8              THE COURT:  All right.  All right, you may step

 9  off.

10              MR. VOLPER:  Thank you so much, Your Honor.

11              THE COURT:  Thank you.  And what I'm going to -

12  is there anything else that counsel wants to say in

13  regard to the sanctions motion?  Plaintiff.

14              MR. JULIO:  Your Honor, you didn't touch on the

15  numerosity issue in terms of the class list and the

16  deficiencies there.  I just wanted to make sure that the

17  Court is aware of that.

18              THE COURT:  I am aware.

19              MR. JULIO:  Okay, thank you, Your Honor.

20              THE COURT:  Anything else from you, Mr. Segal?

21              MR. SEGAL:  Yes, Your Honor, thank you.  All

22  I'll say is this, at no time willfully or with gross

23  negligence or even negligence has defendants tried to

24  thwart the lawsuit, thwart discovery, and prevent

25  plaintiffs from getting what they wanted.  To be honest
```

1
2  with you, the case isn't, it's a '22 case.  I have a lot

3  of cases that are several years.  We've had three or

4  four motions to compel and sanctions --

5         THE COURT:  Which the Court granted, so

6  obviously there was grounds there.

7         MR. SEGAL:  The deposition that was missed was

8  a one-time deposition that was missed.  I never got a

9  confirmation.  You know, that's never happened in my 35

10  years of practice.

11         So, you know, plaintiff's been aggressive,

12  that's fine.  That's okay.  That's their position in

13  this case.  But I don't think sanctions are really

14  warranted in this case.  We've also, as my client told

15  you, he had, he has a condition, and that condition has

16  lasted, and that definitely slowed down the discovery

17  process in the beginning.  We also went through COVID

18  and I also had a, you know, my father passed away.

19         THE COURT:  I'm sorry about that.

20         MR. SEGAL:  Thank you.  And, you know, I guess

21  plaintiff's counsel, you know, provided condolences for

22  48 hours, but then I got a letter thereafter, you know,

23  that we should respond.

24         So, you know, we've never consciously tried to

25  stop or thwart the lawsuit, and I don't think sanctions

```
 1                          PROCEEDING                    28

 2   are warranted in this instance.

 3            THE COURT:  All right.  All right, thank you.

 4   I think we're done with that.  We'll close the hearing.

 5   I do have a question for counsel.

 6            (Whereupon, the matter is adjourned.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

29

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of MARTINENKO v. 212 STEAKHOUSE, Docket #22cv518, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

                  Carole Ludwig

Date:    June 5, 2023