# EXHIBIT 5

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
NINO MARTINENKO, on behalf of herself and
Others similarly situated,

                              Plaintiff,


          -against-          Case No:   22-CV-518


212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

                              Defendants.
------------------------------------------------x




          EXAMINATION of a Non-Party Witness

               DAGMARA HUK

            December 20, 2022










TENEJA THWEATT, Notary Public
489178






barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez          (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn          (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------------------x
   NINO MARTINENKO, on behalf of herself and
3  Others similarly situated,

4                         Plaintiff,

5           -against-      Case No:  22-CV-518
6

7  212 STEAKHOUSE, INC., and NIKOLAY VOLPER,
8                         Defendants.
9  ------------------------------------------------x

10        EXAMINATION of a Non-Party Witness,

11  DAGMARA HUK, taken by the Defendants, pursuant to

12  Court Order, held at the Law Offices of Mitchell S.

13  Segal, P.C., 137 5th Avenue, 9th Floor, New York,

14  New York 10010, on December 20, 2022, at 1:38 p.m.,

15  before a Notary Public of the State of New York.

16

17  ***********************************************

17            BARKLEY COURT REPORTERS
18

19

20

21

22

23

24

25

                         1

BARKLEY
Court Reporters

```
 1    A P P E A R A N C E S:

 2      JOSEPH & KIRSCHENBAUM, LLP
                Attorney for Plaintiff
 3              32 Broadway, Suite 601
                New York, New York 10004
 4              (212)688-5640

 5      BY:     MICHAEL DiGIULIO, ESQ.
                Mike@jk-llp.com
 6

 7

 8      LAW OFFICES OF MITCHELL S. SEGAL P.C.
                Attorney for Defendants
 9              1129 Northern Boulevard, Suite 404
                Manhasset, New York 11303
10              (516)415-0100

11      BY:     MITCHELL S. SEGAL, ESQ.
                Msegal@segallaw.com
12

13

14      ALSO PRESENT:

15      NIKOLAY VOLPER, Defendant

16

17

18

19

20

21

22

23

24

25
```

DAGMARA HUK

BARKLEY
Court Reporters

1    S T I P U L A T I O N S :

2    IT IS STIPULATED AND AGREED by and between the
     attorneys for the respective parties herein, and in
3    compliance with Rule 221 of the Uniform Rules for
     the Trial Courts:

4
     THAT the parties recognize the provision of Rule
5    3115 subdivisions (b), (c) and/or (d).  All
     objections made at a deposition shall be noted by
6    the officer before whom the deposition is taken,
     and the answer shall be given and the deposition
7    shall proceed subject to the objections and to the
     right of a person to apply for appropriate relief
8    pursuant to Article 31 of the C.P.L.R.;

9    THAT every objection raised during a deposition
     shall be stated succinctly and framed so as not to
10   suggest an answer to the deponent and, at the
     request of the questioning attorney, shall include
11   a clear statement as to any defect in form or other
     basis of error or irregularity.  Except to the
12   extent permitted by CPLR Rule 3115 or by this rule,
     during the course of the examination persons in
13   attendance shall not make statements or comments
     that interfere with the questioning.

14
     THAT a deponent shall answer all questions at a
15   deposition, except (i) to preserve a privilege or
     right of confidentiality, (ii) to enforce a
16   limitation set forth in an order of a court, or
     (iii) when the question is plainly improper and
17   would, if answered, cause significant prejudice to
     any person.  An attorney shall not direct a
18   deponent not to answer except as provided in CPLR
     Rule 3115 or this subdivision.  Any refusal to
19   answer or direction not to answer shall be
     accompanied by a succinct and clear statement on
20   the basis therefore.  If the deponent does not
     answer a question, the examining party shall have
21   the right to complete the remainder of the
     deposition.

22
     THAT an attorney shall not interrupt the deposition
23   for the purpose of communicating with the deponent
     unless all parties consent or the communication is
24   made for the purpose of determining whether the
     question should not be answered on the grounds set
25   forth in Section 221.2 of these rules, and, in such

3

DAGMARA HUK

BARKLEY
Court Reporters

1   event, the reason for the communication shall be
    stated for the record succinctly and clearly.

2

3   THAT the failure to object to any question or to
    move to strike any testimony at this examination
    shall not be a bar or waiver to make such objection

4   or motion at the time of the trial of this action,
    and is hereby reserved; and

5

6   THAT this examination may be signed and sworn to by
    the witness examined herein before any Notary
    Public, but the failure to do so or to return the

7   original of the examination to the attorney on
    whose behalf the examination is taken, shall not be

8   deemed a waiver of the rights provided by Rule 3116
    and 3117 of the C.P.L.R, and shall be controlled

9   thereby; and

10  THAT the certification and filing of the original
    of this examination are hereby waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                4

DAGMARA HUK

BARKLEY
Court Reporters

```
 1   D A G M A R A   H U K,  the witness herein, having
 2   been first duly sworn by a Notary Public of the
 3   State of New York, was examined and testified as
 4   follows:
 5   EXAMINATION BY
 6   MR. SEGAL:
 7   Q.      State your name for the record, please.
 8   A.      Dagmara Huk.
 9   Q.      State your address for the record, please.
10   A.      342 East 62nd Street, Number 19, New York,
11   New York 10065.
12   Q.      Good afternoon.  My name is Mitch Segal.  I
13   represent the defendants in this action.  I'm here
14   to depose you pursuant to this lawsuit.  I'm going
15   to ask you questions.  We'll try not to talk over
16   each other.  And just give an audible answer so the
17   transcriber can record the answer.
18           Have you ever been in a deposition before?
19   A.      Yes.
20   Q.      I'm sorry?
21   A.      Yes.
22   Q.      When was that?
23   A.      My previous case, not related to this.
24   Q.      Another labor case?
25   A.      No.
```

5

BARKLEY
Court Reporters

D. Huk

1
2  Q.     Okay.  So you have.  You understand.

3         Okay.  So Dagmara, when did you come to the

4  U.S.?

5  A.     In 2008.

6  Q.     And where were you from originally?

7  A.     I'm Polish.

8  Q.     So you're from Poland?

9  A.     Mm-hmm.

10 Q.     And what's your educational background?

11 A.     Healthcare.

12 Q.     Did you go to high school?

13 A.     In Poland.

14 Q.     Did you to college?

15 A.     Yes.

16 Q.     In Poland?

17 A.     Here.

18 Q.     Where did you go?

19 A.     Private college, then Hunter College, then

20 City Tech in Brooklyn.

21 Q.     And what did you study?  Healthcare?

22 A.     Healthcare.

23 Q.     To do what?

24 A.     To work in healthcare in a hospital.

25 Q.     To be a...

6

BARKLEY
Court Reporters

D. Huk

1

2    A.       Healthcare administrator.

3                      (Reporter clarification.)

4    Q.    Okay.  And when did you graduate?  When

5    were you done with your college studies?

6    A.       Not sure.  I'm not sure.  It was a while

7    ago.

8    Q.    Okay.  Did you work in healthcare?

9    A.       Yes.

10   Q.    And where did you work?

11   A.       Healthcare clinic in Brooklyn and then

12   Sloan Kettering.

13   Q.    Okay.  What was the healthcare clinic in

14   Brooklyn?

15   A.       Multispecialty.

16   Q.    Where are they located?

17   A.       In Greenpoint.

18   Q.    You have the address?

19   A.       Yes, 145 Nassau.

20                      (Reporter clarification.)

21   Q.    Nassau Street?

22   A.    Mm-hmm.

23   Q.    Okay.  And how long did you work there for?

24   A.    A while.  Five, six years.

25   Q.    Okay.  When did you leave there?

7

BARKLEY
Court Reporters

D. Huk

1

2    A.      Don't remember.  A while ago.

3    Q.      You need to be a little more specific on

4    your answers.

5    A.      I can't give you -- I can't give you a year

6    if I don't remember it.  It was years ago.  I've

7    been here over -- like, while so --

8    Q.      You've been here 14 years?

9    A.      Yeah.

10   Q.      You went to school.  And thereafter you

11   worked.  So --

12   A.      I did both.

13   Q.      Correct.  So --

14   A.      I worked and go to school at the same time.

15   Q.      How many years did you go to school?

16   A.      Sixish.

17   Q.      Okay.  So 2014, then you graduated or you

18   were done with school?

19   A.      Possibly.

20   Q.      Okay.  And so possibly you graduated in

21   2014, maybe, possibly you worked at the Brooklyn

22   healthcare place for five years.  So maybe 2019?

23   A.      I start working there before I started

24   school.

25   Q.      Okay.  So how many years after school did

8

BARKLEY
Court Reporters

1                          D. Huk

2    you work there for?

3    A.      How many years?  I don't remember.  It was

4    a while ago.  I don't remember if I -- no.  I

5    didn't finish.  I left the clinic before I

6    graduated school.

7    Q.      By the way, I forgot to ask two questions.

8    Are you under the influence of any thing today?

9    A.      No.

10   Q.      Did you take any drugs?

11   A.      No.

12   Q.      Any alcohol in the last 24 hours?

13   A.      No.

14   Q.      Okay.  So when did you start at Sloan

15   Kettering?

16   A.      Can I pull up my resume so I can give you

17   exact dates?

18                  MR. DiGIULIO:  No.

19   Q.      No.  Just from your best recollection.

20   A.      2017 maybe.

21   Q.      And you worked there for how long?

22   A.      Year and a half.

23   Q.      Okay.  And what did you do after that,

24   before you started at 212 Steakhouse?

25   A.      I worked at the restaurant.  I worked at

9

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2   the other restaurant.
3   Q.      What's the other restaurant?
4   A.      Bistango.
5   Q.      Bistango?
6   A.      Bistango, yes.
7   Q.      Where is that?
8   A.      Between 29th and 3rd.
9   Q.      And when did you start there, do you
10  remember?
11  A.      I worked there throughout the school.  I
12  worked at the healthcare clinic.  I went to school,
13  and then I was working at Bistango as well.
14  Q.      When was the last time you worked at
15  Bistango?  How do you spell that, by the way?
16  A.      B-I-S-T-A-N-G-O.
17  Q.      Bistango.  Okay.
18  A.      They shut down.
19  Q.      Is that why you left there?
20  A.      Mm-hmm.
21  Q.      Do you know when that was?
22  A.      During COVID.
23  Q.      Oh, okay.  In the beginning, March of 20 --
24  A.      Mm-hmm.
25                  (Reporter clarification.)

10

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1

2   A.      Yes.

3   Q.      What was your next job after Bistango when

4   they closed?

5   A.      After Bistango, I worked at Jue Lan.

6   Q.      Jue Lan?

7   A.      Mm-hmm.

8   Q.      Right here?

9   A.      Yes.

10  Q.      When did you start there?

11  A.      The summer after things were opened

12  outdoors.  But I didn't stay --

13                  (Cell phone interruption.)

14  Q.      What was your position at Jue Lan?

15  A.      Server.

16  Q.      When did you start?  I'm sorry.  What did

17  you say, summer of '20?

18  A.      July.

19  Q.      And that was because they had the outdoor

20  thing going on?

21  A.      Mm-hmm.

22  Q.      July of '20?

23  A.      Yes.

24  Q.      How long did you work there for?

25  A.      Maybe two months.

11

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2    Q.      Why did you leave there?
3    A.      I didn't like the environment.
4    Q.      What do you mean by that?
5    A.      Just didn't like the environment.
6    Q.      The staff, the patrons?
7    A.      It was long hours.
8    Q.      You didn't work lunch though, did you?   I
9    don't even think they had lunch back then.
10   A.      I did work lunch there.
11   Q.      You did.  Okay.
12           So that was from July '20 to August '20?
13   A.      Right before I started working at the
14   steakhouse.  Yes.
15   Q.      So when did you start at 212 Steakhouse?
16   A.      End of summer, August 2020.
17   Q.      And at Bistango you were a server also?
18   A.      Server, bartender, manager.
19   Q.      And Jue Lan you were just a server?
20   A.      Mm-hmm.
21           Yes.  Sorry.  Just a habit.
22   Q.      That's okay.  Not a problem.
23           And what was your position when you started
24   at 212 Steakhouse?
25   A.      Bartender.

12

BARKLEY
Court Reporters

```
 1                        D. Huk
 2   Q.      How did you find out about the position at
 3   212 Steakhouse?
 4   A.      Through craigslist.
 5   Q.      You started in August 2020, and when did
 6   you work until?
 7   A.      October -- September, October 2021.
 8   Q.      How many days a week did you work?
 9   A.      Depending how many days they needed me for.
10   I would say five, six.
11   Q.      What days were those?
12   A.      I'm sorry?
13   Q.      Which days?
14   A.      Depending on the schedule.  The schedule
15   changes every week.
16   Q.      Would you work weekends every week?
17   A.      Sure.  Always Saturdays.
18   Q.      Sundays?
19   A.      Sundays.
20   Q.      And how many hours a week did you work --
21   how many hours per day did you work?
22   A.      Depending on the need, from opening through
23   closing.
24   Q.      Well, did you --
25   A.      Sometimes we stayed longer.
```

13

BARKLEY
Court Reporters

D. Huk

1

2   Q.      Did you work lunch hours?

3   A.      We didn't have lunch back then.  We just

4   started towards the end.

5   Q.      Okay.  So on average, when did you start

6   work?

7   A.      Can you repeat the question?

8   Q.      Yes.  Generally what time did you start?

9   A.      We would start at 3:00.

10  Q.      3:00?

11  A.      3:00 or 4:00, yes.

12  Q.      Well, 3:00 or 4:00 is two different -- what

13  do you think?

14  A.      Sometimes we had to come in early, like, to

15  take care of -- unpack the liquor or help with

16  something.  So most of the time it was 3:00,

17  sometimes it was 4:00.

18  Q.      What time did you leave?

19  A.      I would say 11:00, 11:30 sometimes.  If we

20  had a party, maybe 12:00.

21  Q.      How many times did you have a party there

22  on average?

23  A.      When it happened.

24  Q.      You have to try to be succinct with your

25  answers.

14

BARKLEY
Court Reporters

```
 1                         D. Huk
 2              MR. DiGIULIO:  Objection.
 3    Q.    You can't just be general.
 4              MR. DiGIULIO:  Objection.  She's
 5          answering the best that she can.
 6    Q.    Sometimes is not going to work.
 7          In your opinion, how many parties did they
 8    have per week, if any?
 9              MR. DiGIULIO:  Objection to the
10          form.  You can answer, if you know.
11    A.    You can't generalize how many parties a
12    week.  It's a restaurant business.
13    Q.    I'm familiar.
14    A.    I'm glad you are.
15    Q.    How many parties a week?
16    A.    I don't know how many parties.  I can't
17    answer that question.
18    Q.    Zero, once every week, two every week?
19    A.    I can't answer that question.
20    Q.    You can't answer that question?
21    A.    It always depends on a season or the --
22    Q.    Well, you didn't work there for that many
23    seasons, right?  So you worked there from --
24              MR. DiGIULIO:  All four, I think.
25    A.    Yeah.
```

DAGMARA HUK

D. Huk

Q.     At best.  So what seasons were busier for
parties?

A.     Holidays are busier.  Easter, maybe, was
busier, birthdays.  It all depends.  There's no --

Q.     Birthdays isn't a season.  Easter is one
week.

A.     Like, January is usually slower, as you
know.  Then it picks up around March, April, May,
then September when kids are in school.  It all
depends on the season.

Q.     Okay.  So you really don't know.  All
right?

A.     I didn't say I don't know.

Q.     Well, you were answering (unintelligible).

       Okay.  What were you paid?

              MR. DiGIULIO:  Objection to the
       form.  You can answer.

Q.     Withdrawn.  I'll change the question.

       How much per hour did you work?

              MR. DiGIULIO:  Objection to the
       form.  You can answer.  You can answer.

A.     How much per hour, $10.

Q.     Was that through the whole time you worked?

A.     Yes.

16

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1

2    Q.      Okay.  And did you earn tips on top of

3    that?

4    A.      Yes.

5    Q.      And what was your average tips per day?

6    A.      You mean cash tips?

7    Q.      Well, both credit card and cash?

8    A.      Average per day?

9    Q.      Or week, whatever is easier for you --

10   A.      Week, below -- on my paycheck, below a

11   thousand.

12   Q.      A thousand?

13   A.      Below usually.  It was like 800, 900.

14   Q.      Eight hundred to a thousand; is that fair

15   to say?

16   A.      Yes.

17   Q.      And that is both credit card and cash, or

18   just credit card?

19   A.      Credit card.

20   Q.      What about cash?

21   A.      I don't really keep track of -- I don't

22   really keep track of my cash.  Maybe 400.

23   Q.      So you don't count your cash when you get

24   the cash?

25   A.      No, I don't.

17

BARKLEY
Court Reporters

D. Huk

1

2   Q.      That's interesting.

3           Okay.  And that's per week, 400, or per

4   day?

5   A.      Per week.

6   Q.      And why did you leave?

7   A.      Because I was hired as bartender, and I got

8   demoted to a server without my permission.

9   Q.      Who demoted you?

10  A.      The owners.

11  Q.      Who is that?

12  A.      Nikolay.

13  Q.      And why do you feel the -- I'm sorry.  Why

14  do you feel the server is a demotion from the

15  bartender?

16  A.      Because that's not position I was hired

17  for.

18  Q.      And why were you demoted?

19  A.      Because --

20              MR. DiGIULIO:  You can answer if

21      you know.

22  A.      I'm not -- honestly, I'm not sure.

23  Q.      What do you think?

24  A.      Because they hired another person.

25  Q.      Okay.  Why would they do that?

18

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2    A.    I'm not sure.

3    Q.    How did you find out about this lawsuit,

4    craigslist?

5    A.    No.  I don't think it was on craigslist.

6    Q.    How did you find out?

7    A.    Through my lawyer.

8    Q.    Through your lawyer?

9    A.    Yes.  I got contacted by my lawyer.

10   Q.    Your lawyer contacted you about the

11   lawsuit?

12   A.    (No verbal response.)

13   Q.    And what did your lawyer say?

14              MR. DiGIULIO:  Objection.  Don't

15         answer that.

16   Q.    Okay.  That's interesting.

17         Did you clock -- well, let's go back for a

18   second.

19         So when you were paid, you received payroll

20   checks?

21   A.    You mean the printout?

22   Q.    Yeah.

23   A.    Not all the time.  Most of the time we

24   didn't.

25   Q.    The checks that you received, were they

19

BARKLEY
Court Reporters

D. Huk

1  
2   handwritten, or they were from a payroll company?

3   A.      Handwritten.

4   Q.      Did you ever get a check from a payroll

5   company?

6   A.      No.

7   Q.      No?

8   A.      (No verbal response.)

9   Q.      When you went to work, did you clock in and

10  clock out?  In other words, when you walked in, did

11  you have to put your ID, and you clocked into the

12  POS system?

13  A.      Yes, you have to use your number.

14  Q.      And you clocked out also when you left?

15  A.      Sure.  Yes.

16  Q.      And were you served a meal during the time

17  you were there?

18  A.      Family staff meal.

19  Q.      Yeah.  Right.

20          When did that happen?

21  A.      Usually at the beginning of the shift.

22  Q.      4:00?

23  A.      Mm-hmm.  But we didn't really have time to

24  do it because there were things we had to take care

25  of.  So it wasn't consistent.

20

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2    Q.      Well, was the time that they served the
3    meal consistent, or it depended on your schedule
4    and what you had to do?
5    A.      Depending on the schedule.
6    Q.      But they served it normally at 4:00?
7    A.      Depends how busy the kitchen is.  Sometimes
8    it was 5:00; sometimes it was 4:00.
9    Q.      5:00 the restaurant opened up though, yes?
10   A.      Mm-hmm.
11           MR. DiGIULIO:  Yes?
12           THE WITNESS:  Yes, I'm sorry.
13   Q.      That's okay.
14           But you clocked in at 4:00.  And when they
15   served you, you never clocked out when they served
16   the meal if you ever sat down and ate, did you?
17   A.      No, because we didn't have a formal break.
18   Q.      Well, the meal --
19   A.      Meaning that if the meal was served, I
20   would start eating.  But if there was something --
21   I had to answer phone, I had to get up and answer
22   the phone call, meaning work, not have a break.
23   Q.      What other things did you do besides
24   bartending there?
25   A.      Order supply, order liquor, go to the

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2   liquor store, buy stuff.  Go to do pay -- write the
3   checks, clean, helping the kitchen, anything they
4   needed.
5   Q.     Was there one particular person in charge
6   of payroll?
7   A.     Yes, Imran.
8   Q.     What about writing the checks?
9   A.     He -- most of the time he would not write
10  the checks.  He would ask the staff to write the
11  check.
12  Q.     Who wrote the checks, primarily, out of the
13  staff?
14  A.     There was no primary person.  It was
15  sometimes me, sometimes Nino, some- --
16               (Cell phone interruption.)
17               (Whereupon, a discussion was held
18         off the record.)
19  Q.     Sometimes Nino, sometimes you?
20  A.     So it depends who was working that day.
21  Q.     Other than Nino and you, was there anybody
22  else?
23  A.     Sometimes Sasha.
24  Q.     Sasha?
25  A.     Sometimes Imran.

22

BARKLEY
Court Reporters

D. Huk

1

2  Q.      What was the tip process at the end of the

3  evening?  How did that work?

4  A.      It was a points system.  You want me to

5  explain it to you?

6  Q.      No, I kind of know it.

7          And how did that work?  Was there someone

8  in charge of that or just at the end of the night?

9  A.      Whoever was available.

10  Q.      And did you get paid your credit card tips

11  at the end of the week or every day?  How did that

12  work?

13  A.      Weekly.

14  Q.      Weekly?

15  A.      Mm-hmm.

16  Q.      And when you did the tips, was cash

17  included in the tip sheets or not?

18  A.      Was the cash included in the tip sheet?

19  Q.      In other words, let me give you a

20  hypothetical.  Let's say you made $200 in credit

21  card tips.  Let's say you made $50 in cash tips.

22  Was that included in everyone's analysis?  Everyone

23  said how much cash they made or just the credit

24  cards?

25  A.      Yes, it was written as well.

23

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2   Q.      I'm sorry?

3   A.      It was written.

4   Q.      It was written?

5   A.      Yeah.

6   Q.      Did you report the cash tips?

7   A.      Yes.

8   Q.      How did you do that?

9           I understand on the analysis.  Did you

10  report the cash tips to the owners of the

11  restaurant?

12  A.      Yes, it was written -- they could open the

13  book and see how much we made.

14  Q.      Do you know that you have to report your

15  cash tips to owners of the restaurant so they can

16  file a form with the IRS?  Did you report that to

17  them?

18              MR. DiGIULIO:  Objection.  Asked

19          and answered.  You can go again.

20              MR. SEGAL:  I don't think it was,

21          actually.

22              MR. DiGIULIO:  You can answer his

23          question again.

24  A.      I don't think that's -- I mean, that's --

25  to my knowledge, that's the manager's

24

BARKLEY
Court Reporters

```
 1                         D. Huk
 2   responsibility to report whatever is there, because
 3   the evidence was visible to the manager.  So that's
 4   not my duty.  I was -- again, I was a bartender.
 5   So that's not my duty to report this to anybody.
 6   Q.      Did you report the cash tips on your tax
 7   return?
 8   A.      Yes, I did.
 9   Q.      So your tax return has cash tips on it?
10                   MR. DiGIULIO:  Objection.  Asked
11              and answered.  You don't have to answer
12              again.
13                   MR. SEGAL:  Yes, she does.  Your
14              objection is noted.  She's got to answer
15              again.
16                   MR. DiGIULIO:  Sure.  One more
17              time.  Go ahead.
18   A.      Yes, I reported cash tips.
19   Q.      Okay.  When you got your wage statement at
20   the end of the year, what was it: a W-2 or -- was
21   it a W-2?
22   A.      W-2, yes.
23   Q.      That W-2 included the hourly wage plus your
24   credit card tips; is that correct?
25   A.      Yes.
```

DAGMARA HUK

BARKLEY
Court Reporters

```
 1                         D. Huk
 2  Q.     Okay.  But it didn't include the cash tips?
 3  A.     No.
 4  Q.     Okay.  But you reported that, as you said,
 5  on top of that?
 6  A.     Well, my accountant takes care of that.
 7  Q.     Did he report it?
 8  A.     Yes.  I believe so.
 9  Q.     Did you work full-time for 212 Steakhouse
10  throughout your whole tenure?
11  A.     Yes.
12  Q.     Yes?
13         You never worked part-time for them?
14  A.     No.
15  Q.     After you left 212 Steakhouse, did you work
16  part-time for them sometimes?
17  A.     If I left, why would I work for them?
18  Q.     I don't know.
19  A.     Can you please rephrase the question.
20  Q.     Well, you just answered it.  So the
21  answer's no, I guess?
22  A.     I guess.
23  Q.     Yes or no?
24              MR. DiGIULIO:  Objection to the
25         form.  You answer.
```

26

BARKLEY
Court Reporters

```
 1                        D. Huk
 2   A.      (No verbal response.)
 3   Q.      Okay.
 4                        (Whereupon, a discussion was held
 5           off the record.)
 6   Q.      So I show you what was labeled as
 7   Defendant's Exhibit 4.  And this is -- he'll
 8   explain it to you.  And this is a page of your time
 9   records from August 31st to December 30th.  So I
10   want to show you this.
11           So that is your clock-in and clock-out; is
12   that correct?
13   A.      Yes.
14   Q.      Okay.  And so you never took a break,
15   right?  So there was only a beginning clock-in and
16   an ending clock-out?
17   A.      Correct.
18   Q.      And this line here is the hours that you
19   worked.  Okay.  And this period covers September,
20   October, November and December.
21   A.      Mm-hmm.
22   Q.      And -- so if you look at the hours, are
23   there many days that you worked over eight hours?
24                   MR. DiGIULIO:  Objection.  The
25           document speaks for itself.  You can
```

27

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2          answer.

3  A.     As you can see (indicating).

4  Q.     Not really?

5  A.     I didn't say not really.  I'm just saying

6  the document speaks for itself.

7  Q.     You're saying the document speaks for

8  itself.  Excellent.  Very good.

9          There's only a couple of days where you

10  worked more than eight days.  So are you seeking

11  claims for overtime wages?

12  A.     Yes.

13  Q.     How?

14              MR. DiGIULIO:  Objection to the

15          form.  You can answer.

16  Q.     Tell me how.  Those are the hours that you

17  worked.

18  A.     I --

19  Q.     Show me one week where you worked over 40

20  hours.

21  A.     I can't do the math right now.

22  Q.     There probably is not one, to be honest

23  with you.

24              MR. DiGIULIO:  Objection.

25  Q.     Did you ever work --

BARKLEY
Court Reporters

D. Huk

1

2          (Whereupon, a discussion was held

3          off the record.)

4  Q.    Was there ever a day where you worked in

5  excess of ten hours?

6  A.    I worked overtime.

7  Q.    Well, we just went through it.  You really

8  didn't, but...

9          MR. DiGIULIO:  Objection.

10 Q.    All right.  So let's go back to it then.

11 Show me one week where you worked in excess of 40

12 hours.

13 A.    I need more reference than that.  I'm not

14 going to do the math.  I did work over 40 hours.

15 Q.    Based on what?  Those are your time

16 records.

17 A.    On the hours.

18 Q.    Are those correct?  Are those the right

19 clock-in and clock-out?

20 A.    Would you like me to do the math right now?

21 Q.    You can.

22 A.    I worked overtime.

23 Q.    Based on what?

24 A.    On the time.

25 Q.    Based on overtime?

29

BARKLEY
Court Reporters

1                          D. Huk

2    A.      Based on the time that I spent at the

3    restaurant.

4    Q.      Okay.  All right.  And was there any days

5    that you worked in excess of ten hours per day?

6    A.      Ten hours per day?

7                   MR. DiGIULIO:  Are you going to

8            show her the exhibit?

9    Q.      (Handing.)

10   A.      11:45 on that page, 11:44.

11   Q.      That's not yours --

12                  MR. DiGIULIO:  The top pages.

13   Q.      So two days, basically?

14   A.      Well, based on one page that you're showing

15   me right now.  So yes, I did work more than ten

16   hours, to answer your question.

17   Q.      Twice?

18   A.      Still.

19   Q.      Who exactly told you that they were

20   changing your position from a bartender to a

21   server?

22   A.      Nikolay.

23   Q.      And did he give a reason?

24   A.      Did he give me a reason?  He said he hired

25   this guy that won the award in Vegas, and he's

30

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2      going to be a bartender from now on.  But he's not
3      going to take responsibilities of a server, which I
4      was doing.  Like, he's not going to help.  He's
5      going to get the same points, and he's going to be
6      a bartender from now on.
7      Q.      How long did you work at 212 as a server?
8      A.      From the time that he hired another
9      bartender.
10     Q.      When was that?  You only worked there a
11     year, and it was only a year and a half ago, if
12     that.  So it's not that hard to remember.
13     A.      Yeah.  Well, it was a while ago.
14     Q.      So you only -- you can't remember --
15     A.      I can't give you exact month because I
16     can't remember.  Whenever he was hired, and you
17     should know when he was hired.
18     Q.      Well, you should know because it affected
19     your employment, not mine.
20             How long did you act as a server until you
21     left?
22     A.      Few months.
23     Q.      Two months, three months?
24     A.      Maybe three months.  I'm not going to
25     answer that because I don't want to give you an

31

BARKLEY
Court Reporters

```
 1                        D. Huk
 2   answer that's not right.  Few months.
 3   Q.      No.  That's fine.
 4           We'll take a two-minute break.  All right?
 5                   (Whereupon, a recess was taken at
 6           this time.)
 7                   (Defendant's Exhibit 1, payroll
 8           records, was marked for identification.)
 9   Q.      So I show you Defendant's Exhibit 1.
10           Dagmara, please review Defendant's
11   Exhibit 1.
12   A.      Sure.
13   Q.      Do you know what these are?
14   A.      Yes.
15   Q.      What are they?
16   A.      Pay stubs.
17   Q.      So earlier, I believe you said that you
18   didn't receive pay stubs; you only received written
19   checks?
20                   MR. DiGIULIO:  Objection.
21           Mischaracterizes the testimony.  You can
22           answer.
23   Q.      Well, let's go back then.
24           So did you receive these pay stubs every
25   time you were paid?
```

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2   A.      Not every time.

3   Q.      When did you not receive these?

4   A.      Depending if I was sent it or not.  It was
5   no rule.

6   Q.      Well, what is the -- well, look at the
7   dates.  Go through the whole file.

8   A.      Sure.

9   Q.      Isn't it true -- and the dates are on the
10  top right.  Isn't it true that this covered your
11  full time that you worked at the restaurant?

12  A.      Repeat the question.

13  Q.      I said if you look at the dates on the top
14  right and go through that whole exhibit --

15  A.      Mm-hmm.

16  Q.      -- isn't it true that this covered the
17  complete dates that you worked at the restaurant?

18  A.      (Perusing.)

19          (Unintelligible.)

20          Possibly.  I'm not sure.

21  Q.      So if it possibly showed the full tenure at
22  the restaurant, then you did receive wage
23  statements every time you were paid; is that
24  correct?

25  A.      What do you mean by "wage statement"?

33

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1

2   Q.      This is called a wage statement?

3   A.      No, I didn't.

4   Q.      You never received this every time you got

5   paid?

6   A.      No.  No, I didn't.  Sometimes we would

7   receive only a --

8                   (Reporter clarification.)

9   A.      Sometimes we would receive just an amount

10  to write the checks without the pay stubs.

11  Q.      The times that you supposedly did not

12  receive this, did you request this?

13  A.      No.

14  Q.      And the times that you did receive this,

15  who gave this to you?

16  A.      Imran.

17  Q.      Based on this, the restaurant had wage

18  statements every time you were paid; is that

19  correct?

20                  MR. DiGIULIO:  Objection.

21          Mischaracterizes the exhibit.

22  A.      Wait.  I also want to go back because you

23  said based on the date.  I have Nino's here, so why

24  am I looking at Nino's pay stub?

25  Q.      Nino's you don't have to look at.  So just

34

BARKLEY
Court Reporters

D. Huk

1
2   look at yours.

3   A.     So why would you say it shows my entire

4   tenure if it's only a few pages of my pay stubs and

5   the rest is Nino's?

6   Q.     Well, let's look at yours.

7   A.     There's only few of them.

8   Q.     There's not a few of them.  There's a lot

9   of them.

10  A.     You said it's my entire tenure.

11  Q.     So it started at 9/28/20, and it goes to --

12             MR. DiGIULIO:  Missing a lot of

13          weeks.

14  A.     Yeah, I just realized it.  The rest is

15  Nino.  I thought it was mine.

16  Q.     It goes to June of 2021.  Did you work the

17  weeks that it states that you have under your name?

18  A.     Well, yes.  But I don't think it's the full

19  thing.

20  Q.     Okay.

21  A.     Because we're going from 11/08, and then

22  next one is 12/07.  So we're skipping a month here.

23  Q.     Well, let's look --

24  A.     Then 12/07, and then 2/22.  So we're

25  skipping two months.  Then another month, 3/01.

35

BARKLEY
Court Reporters

D. Huk

1
2    Then we have a following week, 5/03.  So we're
3    skipping months here -- a lot of months actually.
4    Q.    Okay.  These weeks that you worked, though,
5    did you receive these statements?
6    A.    Like I said before, not all the time.
7    Q.    And when you closed out a check, was that
8    only checks at the bar?
9              MR. DiGIULIO:  Objection to the
10             form.  You can answer, if you know.
11   Q.    In other words, when you closed -- you had
12   an employee ID, right?  And you could ring up
13   items, right?  People at the bar, or you did a meal
14   at the bar, you closed out those checks?
15   A.    I don't understand the question.
16   Q.    Okay.  I'll try it again.
17             Let's say you had a couple at the bar, and
18   they decided to eat at the bar.  Is that your
19   check?  Did you open up that check on the POS
20   system?
21   A.    Yes.
22   Q.    And then when they were done, you closed it
23   out, and you gave them the check, right, and took
24   their payment?
25   A.    That's how it works.

36

DAGMARA HUK

BARKLEY
Court Reporters

                              D. Huk

1
2    Q.      Okay.  Yeah.  Okay.
3            And if they paid you in cash, did you
4    report that as cash?
5                    MR. DiGIULIO:   Objection to the
6            form of the question.  You can answer.
7    Q.      No.  Let's say they paid -- the bill was 80
8    bucks, and they give you a hundred bucks.  Would
9    you report that as a cash --
10   A.      Well, how else would you report it?
11   Q.      I don't know.  I'm asking you.
12   A.      I don't know either.  How else can you
13   report it if people are paying cash?
14   Q.      Well, you don't know or --
15   A.      No.  I'm asking you.
16   Q.      I'm not under questioning.  You are.  So I
17   don't really care what I said.
18   A.      Yes, people pay cash.  You close it as
19   cash.  If people pay as a credit card, you close it
20   as credit card.  That's just how it works.
21   Q.      In that instance, so they paid $80, and
22   they gave you $20, did you report that as a cash
23   tip in the system?
24   A.      Report it as a cash tip in the system?
25   Q.      Yes.

                                37

BARKLEY
Court Reporters

D. Huk

1

2    A.       There was no way to report cash tip in the

3    system.

4    Q.       There was no way to report the cash tip --

5    A.       We didn't do that.

6    Q.       So the only way to report the cash tip,

7    that $20, was at the end of the night, that tip

8    sheet?

9    A.       Correct.

10   Q.       So if it wasn't in the system as a cash

11   tip, how would the management know how much cash to

12   report?

13   A.       Like I said, at the end of the night we

14   would write it down at the back of the page.

15   Q.       And did they ever ask you -- forget about

16   at the end of the night, did they ever ask you at

17   the end of the week how much cash tip you earned?

18   A.       No one asked me that question.

19   Q.       So you assumed that management would go

20   through those cash sheets and report those cash

21   tips; is that correct?  The tip sheets, I'm sorry,

22   and report the cash tips?

23   A.       Again, I'm a bartender.

24   Q.       Well, you're also a manager at your prior

25   restaurant and a server?

38

BARKLEY
Court Reporters

```
 1                          D. Huk
 2   A.       Yeah, but that's not my --
 3   Q.       Well, you're a jack-of-all-trades.  You do
 4   everything, right?  And according to you, you did
 5   everything at this restaurant too, right?
 6                  (Simultaneous speakers.)
 7   A.       I did.
 8   Q.       You did payroll --
 9   A.       Yeah, but it's not my --
10                  MR. DiGIULIO:  Objection.
11          Mischaracterizes testimony.  You can answer
12          it if there's a question.
13   Q.       Did you ever file for unemployment during
14   any period of time while you were working at the
15   restaurant?
16   A.       No.
17   Q.       Did you file for unemployment right after
18   you stopped working at this restaurant?
19   A.       No.
20   Q.       No.  So you never filed for unemployment
21   related to 212 Steakhouse?
22   A.       No.
23   Q.       Okay.  And as far as working during the
24   pandemic, did you ever get COVID while you were
25   working in the restaurant?
```

39

BARKLEY
Court Reporters

```
 1                           D. Huk
 2   A.      Did I get COVID when I was working?
 3   Q.      Right.   During your employment at the
 4   restaurant towards -- at any time?
 5   A.      I don't think so.   I don't remember that,
 6   but I don't think so.
 7   Q.      Did any other employees get COVID, that you
 8   know of?
 9   A.      Well, a lot of people were getting sick,
10   and it wasn't necessarily related to COVID because
11   people get sick during -- like now.
12   Q.      Did you speak to anybody else, any of the
13   other employees about --
14                   MR. DiGIULIO:   Objection.
15   Q.      -- getting COVID or them getting COVID?
16                   MR. DiGIULIO:   I'm going to object
17           to this whole line of questioning around
18           this.   It's totally irrelevant
19           (unintelligible) invasion of privacy.
20                   MR. SEGAL:   I'm not sure it's
21           invasion of privacy, but...
22                   MR. DiGIULIO:   I instruct her not
23           to answer.
24                   MR. SEGAL:   All right.   Give us one
25           more break.   We'll come back, and we'll
```

DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

2      wrap this up.

3            (Whereupon, a recess was taken at

4      this time.)

5  Q.    So Dagmara, I'm going to show you

6  Defendant's Exhibit 2 one more time.  I guess this

7  is from the earlier deposition.

8      Do you see your name on that tip sheet?

9  A.    Yes.

10  Q.    Okay.  And is this a weekly tip

11  declaration?

12  A.    Yes.

13  Q.    And does it contain both credit card tips

14  and cash, or just credit card tips?

15  A.    This is credit cards.

16  Q.    Okay.  And then I want to show you -- this

17  is -- we don't have one of those marked already?

18            MR. DiGIULIO:  I think we do.

19      Yeah.  But you can mark it again, if you

20      want.

21            (Whereupon, a discussion was held

22      off the record.)

23  Q.    So I'm going to show you Exhibit 3.  Are

24  you one of the servers listed on this sheet?

25  A.    I'm sorry.  Repeat the question.

41

BARKLEY
Court Reporters

D. Huk

1

2   Q.      Are you one of the servers listed on this

3   sheet?

4   A.      Correct.

5   Q.      And this is a daily, instead of the weekly

6   that we just looked at?

7   A.      Yes.

8   Q.      And this contains solely credit card tips

9   and noncash tips; is that correct?

10  A.      Yes.

11  Q.      Okay.  Was there ever a time that you were

12  unable to work at 212 Steakhouse due to COVID?

13               MR. DiGIULIO:  You can answer.

14  A.      Unable to work at the restaurant due to

15  COVID?  I don't -- no, I don't think so.

16  Q.      Were you familiar with the law that

17  required restaurant employees to wear masks and be

18  vaccinated?

19  A.      Yes.

20

21               (Continued on next page to

22       accommodate jurat.)

23

24

25

42

DAGMARA HUK

BARKLEY
Court Reporters

1    Q.      Did you comply with that law?

2                   MR. DiGIULIO:  Objection.  I'm

3           going to instruct her not to answer again

4           for the same reasons you did before.

5                   MR. SEGAL:  I have no further

6           questions.  Thank you for your time.

7                   MR. DiGIULIO:  I have no further

8           questions either.

9                   (Time Noted:  3:03 p.m.)

10

11          _____

12                        DAGMARA HUK

13

14   Subscribed and sworn to before me

15   this _____ day of _____ 20__.

16

17   _____

18                  Notary Public

19

20

21

22

23

24

25

43

DAGMARA HUK