# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
NINO MARTINENKO, on behalf of herself and
others similarly situated,

                     Plaintiff,

        -against-     Case No:  22-CV-518


212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

                   Defendants.
---------------------------------------------x




        EXAMINATION BEFORE TRIAL of the Plaintiff

              NINO MARTINENKO

             December 20, 2022




TENEJA THWEATT, Notary Public
489177




BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine  (858) 455-5444 San Diego
(310) 207-8000 Century City  (408) 885-0550 San Jose  (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento  (800) 222-1231 Martinez  (702) 366-0500 Las Vegas  (800) 222-1231 Monterey
(951) 686-0606 Riverside  (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson  (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn  (518) 490-1910 Albany  (914) 510-9110 White Plains
(312) 379-5566 Chicago  00+1+800 222 1231 Paris  00+1+800 222 1231 Dubai  001+1+800 222 1231 Hong Kong

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ---------------------------------------------x
   NINO MARTINENKO, on behalf of herself and
3  others similarly situated,

4                          Plaintiff,

5           -against-    Case No:  22-CV-518

6

7

   212 STEAKHOUSE, INC., and NIKOLAY VOLPER,
8
                         Defendants.
9  ---------------------------------------------x

10        EXAMINATION BEFORE TRIAL of the Plaintiff,

11  NINO MARTINENKO, taken by the Defendants, pursuant

12  to Court Order, held at the Law Offices of Mitchell

13  S. Segal, P.C., 137 5th Avenue, 9th Floor, New

14  York, New York 10010, on December 20, 2022, at

15  10:10 a.m., before a Notary Public of the State of

16  New York.

17  ***********************************************
18                BARKLEY COURT REPORTERS

19

20

21

22

23

24

25

1

BARKLEY
Court Reporters

```
1   A P P E A R A N C E S :

2    JOSEPH & KIRSCHENBAUM, LLP
              Attorney for Plaintiff
3             32 Broadway, Suite 601
              New York, New York 10004
4             (212)688-5640

5    BY:     MICHAEL DiGIULIO, ESQ.
             Mike@jk-llp.com
6

7

8   LAW OFFICES OF MITCHELL S. SEGAL P.C.
             Attorney for Defendants
9            1129 Northern Boulevard, Suite 404
             Manhasset, New York 11303
10           (516)415-0100

11   BY:     MITCHELL S. SEGAL, ESQ.
             Msegal@segallaw.com
12

13

14   ALSO PRESENT:

15   NIKOLAY VOLPER, Defendant

16

17

18

19

20

21

22

23

24

25
```

2

BARKLEY
Court Reporters

1              S T I P U L A T I O N S :

2    IT IS STIPULATED AND AGREED by and between the
     attorneys for the respective parties herein, and in
3    compliance with Rule 221 of the Uniform Rules for
     the Trial Courts:
4
     THAT the parties recognize the provision of Rule
5    3115 subdivisions (b), (c) and/or (d).  All
     objections made at a deposition shall be noted by
6    the officer before whom the deposition is taken,
     and the answer shall be given and the deposition
7    shall proceed subject to the objections and to the
     right of a person to apply for appropriate relief
8    pursuant to Article 31 of the C.P.L.R.;

9    THAT every objection raised during a deposition
     shall be stated succinctly and framed so as not to
10   suggest an answer to the deponent and, at the
     request of the questioning attorney, shall include
11   a clear statement as to any defect in form or other
     basis of error or irregularity.  Except to the
12   extent permitted by CPLR Rule 3115 or by this rule,
     during the course of the examination persons in
13   attendance shall not make statements or comments
     that interfere with the questioning.
14
     THAT a deponent shall answer all questions at a
15   deposition, except (i) to preserve a privilege or
     right of confidentiality, (ii) to enforce a
16   limitation set forth in an order of a court, or
     (iii) when the question is plainly improper and
17   would, if answered, cause significant prejudice to
     any person.  An attorney shall not direct a
18   deponent not to answer except as provided in CPLR
     Rule 3115 or this subdivision.  Any refusal to
19   answer or direction not to answer shall be
     accompanied by a succinct and clear statement on
20   the basis therefore.  If the deponent does not
     answer a question, the examining party shall have
21   the right to complete the remainder of the
     deposition.
22
     THAT an attorney shall not interrupt the deposition
23   for the purpose of communicating with the deponent
     unless all parties consent or the communication is
24   made for the purpose of determining whether the
     question should not be answered on the grounds set
25   forth in Section 221.2 of these rules, and, in such

                              3

BARKLEY
Court Reporters

1    event, the reason for the communication shall be
      stated for the record succinctly and clearly.
2
      THAT the failure to object to any question or to
3    move to strike any testimony at this examination
      shall not be a bar or waiver to make such objection
4    or motion at the time of the trial of this action,
      and is hereby reserved; and
5
      THAT this examination may be signed and sworn to by
6    the witness examined herein before any Notary
      Public, but the failure to do so or to return the
7    original of the examination to the attorney on
      whose behalf the examination is taken, shall not be
8    deemed a waiver of the rights provided by Rule 3116
      and 3117 of the C.P.L.R, and shall be controlled
9    thereby; and

10   THAT the certification and filing of the original
      of this examination are hereby waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

BARKLEY
Court Reporters

1  N I N O   M A R T I N E N K O,  the witness herein,

2  having been first duly sworn by a Notary Public of

3  the State of New York, was examined and testified

4  as follows:

5  EXAMINATION BY

6  MR. SEGAL:

7  Q.    State your name for the record, please.

8  A.    Nino Martinenko.

9  Q.    State your address for the record, please.

10  A.    8309 3rd Avenue, 2nd Floor, Brooklyn, New

11  York 11209.

12  Q.    My name is Mitch Segal.  I represent the

13  defendants in this matter.  Good morning.

14  A.    Morning.

15  Q.    So I'm going to ask you several questions.

16  Have you ever been in a deposition before?

17  A.    No.

18  Q.    Okay.  So I'll ask you questions.  Please

19  wait until I'm done stating the question.  You have

20  to give an audible answer, yes or no, so the

21  transcriber can report that.

22        Let me ask you a question:  Did you meet

23  with your attorney prior to this deposition?

24  A.    We met a couple of times in general.  And

25  you mean to prepare for the deposition?

5

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    Q.     When was that?
3    A.     No.  I'm making sure I'm getting the
4    question correctly.
5    Q.     Okay.
6    A.     Are you asking me if I met him to prepare
7    for this?
8    Q.     Yes.
9    A.     I met him about a month ago.  And he -- I
10   just -- because I wasn't familiar what it was
11   about.  He just took me through the, you know, how
12   it usually goes.  That's all.
13   Q.     Did you speak with him subsequent or after
14   the month ago about the deposition and potential
15   questions and responses?
16   A.     Not that I remember, but maybe.  I just had
17   few questions --
18   Q.     Well, it was only a month ago, so your
19   memory has -- we're going to be talking about
20   several years ago, right?
21   A.     Okay.
22   Q.     So if you can't remember 30 days ago, how
23   are you going to remember several years ago?
24   A.     No.  Well, we didn't go through questions.
25   I just had questions myself, what was it going to
```

6

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2  be about.  And he kind of took me through the
 3  process.
 4  Q.    Okay.  When was the last time you did that?
 5  A.    That was one and only time we did, about a
 6  month ago.
 7  Q.    Okay.  That's fine.  Are you able to
 8  testify truthfully today?
 9  A.    Yes.
10  Q.    Did you have any alcoholic beverages in the
11  last 24 hours?
12  A.    No.
13  Q.    Any drugs?
14  A.    No.
15  Q.    Are you on any prescription medications?
16  A.    Nope.
17  Q.    You said you lived -- what was the address?
18            THE REPORTER:  8309 3rd Avenue, 2nd
19        Floor, Brooklyn, New York 11209.
20  Q.    You said second floor.  Is there an
21  apartment?
22  A.    Yes.
23  Q.    Can we have the apartment?
24            MR. DiGIULIO:  Objection to
25        relevancy.
```

7

BARKLEY
Court Reporters

N. Martinenko

1

2          MR. SEGAL:  Addresses, we need a

3     correct address.

4   Q.    So second floor.  What apartment number is

5   that?

6   A.    It's just one apartment on that floor.

7   Q.    Okay.  That's fine.

8         Okay.

9         So Nino, where were you -- are you a U.S.

10   citizen?

11   A.    Yes.

12          MR. DiGIULIO:  Objection.  You can

13     answer.

14   A.    Yes, I am.

15   Q.    And when did you come to the U.S.?

16   A.    2012.

17   Q.    And what's your educational background?

18   A.    I have a bachelor's degree on economics and

19   finances.

20   Q.    On what?  I'm sorry?

21   A.    Economics and finances.

22   Q.    Where was that?  Where did you get that?

23   A.    Back in my country, in Georgia, the

24   republic of Georgia.

25   Q.    So you're from where originally?

8

BARKLEY
Court Reporters

```
 1                          N. Martinenko
 2   A.     I am from the country Georgia.
 3   Q.     Georgia in Russia, is that --
 4   A.     It's not in Russia.  It's next to Russia.
 5                  (Reporter clarification.)
 6   Q.     When you came to the U.S., what has been
 7   your occupation from 2012 on?
 8   A.     Well, I worked different places for about a
 9   couple of months.  And then I started a server job
10   at the restaurant.
11   Q.     Okay.  So -- okay.  So a couple of places
12   just for a couple of months?
13   A.     Yeah.  Before I found where I wanted to
14   stay for longer than couple of months.
15   Q.     Okay.  And when was that?
16   A.     I don't understand the question.
17   Q.     In other words, so you did a couple -- what
18   were the prior jobs?
19                  MR. DiGIULIO:  Objection to form.
20          Prior to what?
21                  MR. SEGAL:  The prior jobs.  She
22          said she worked at three different jobs --
23                  (Simultaneous speakers.)
24   A.     I didn't mention any job.
25   Q.     Okay.  So let's go through that.
```

NINO MARTINENKO

BARKLEY
Court Reporters

```
1                        N. Martinenko

2            Where did you work first?

3    A.    I worked for a store that would sell fur

4    coats.  I was just bag consultant -- like

5    consulting people.

6    Q.    And what store was that?

7    A.    It was called Premier Fur, I think.

8    Q.    And where was that located?

9    A.    It was in Brooklyn on 86th Street and

10   Bensonhurst.  I don't exactly remember the address.

11   Q.    Okay.  And when did you start there?

12   A.    I would say I started probably at, like --

13              MR. SEGAL:  Off the record.

14              (Whereupon, a discussion was held

15        off the record.)

16   A.    Okay.  Yeah, I don't exactly remember.  It

17   was probably September when I started there.

18   Q.    Okay.  Of 2012?

19   A.    No.  I'm sorry.  2013.

20   Q.    Okay.  And how long did you work there for?

21   A.    Couple of months.  I would say until

22   November.

23   Q.    Okay.

24   A.    And then --

25   Q.    Yeah.  Okay.  Why did you leave, or what
```

10

BARKLEY
Court Reporters

                            N. Martinenko
1
2    was the --
3    A.     It wasn't enough income.  So I was looking
4    for something else.
5    Q.     And what was your next position?
6    A.     My next position was a server.
7    Q.     And where was that?
8    A.     It was a Georgian restaurant in Manhattan.
9    It's called Oda House.  O-D-A House.
10                   (Reporter clarification.)
11   A.     That's where I started working as a server.
12   Q.     And how long did you stay there for?
13   A.     Until 2015 May, I'm assuming.  Yeah, May.
14   Q.     So roughly two years or so?
15   A.     Yeah.
16   Q.     And why did you leave Oda House?
17   A.     I just did not feel good there, meaning,
18   like, certain people would not make me feel good
19   there.  So I just had to leave.
20   Q.     What does that mean exactly?
21   A.     Well, there were a couple of employees that
22   would just go gossiping.  And one of them -- I
23   don't know if it's appropriate to say.  One of them
24   had crush on me, which would really make me feel
25   uncomfortable there, so I just had to leave.

                            11

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2    Q.      Did you report that --
 3    A.      No.
 4    Q.      -- to Oda House?
 5    A.      Nobody was harassing me.  Why would I
 6    report it?  I just decided to leave myself.
 7    Q.      Did you sue Oda House?
 8    A.      No.
 9    Q.      What was your next position?
10    A.      My next position was a server at 212
11    Steakhouse.
12    Q.      Okay.  So let's talk about that.  When did
13    you start?
14    A.      It was -- I'm assuming the end of June or
15    beginning of July of 2015.
16    Q.      When did you complete your --
17            Well, withdraw.
18            When did you last work at 212 Steakhouse?
19    A.      I have two terms working there.  The first
20    time when I left 212 Steakhouse was 2018 December,
21    and then I got back there in 2020 -- I mean '21,
22    beginning.  I lasted until December '21.  It was
23    about New Year's when I got fired.
24    Q.      What was your position at 212 Steakhouse?
25    A.      My position was called a server.
```

BARKLEY
Court Reporters

N. Martinenko

1

2  Q.    Why do you say it was called --

3  A.    Because I would do more than servers would

4  do.

5  Q.    What would you do that was more than

6  servers do?  Well, let me -- what do servers do

7  normally?

8  A.    Well, they serve people.  They take orders,

9  they put that in the POS system.  They send orders.

10 They make sure they serve drinks.  They order

11 drinks for the customers.  They, you know, make

12 sure the food comes out on time.  They present food

13 to the customers when it comes out, and they check

14 on them if they have been enjoying the food.  And

15 at the end, they present the check, and they charge

16 their cards or they take cash (unintelligible).

17            (Reporter clarification.)

18 Q.    What was the ending of that, they charge

19 their cards and what?

20 A.    They charge their cards or take the cash

21 payment depending on how they're paying.

22 Q.    So you did that as a server?

23 A.    Yes.

24 Q.    What else did you do?  You said you did

25 more than a server, so what else did you do?

13

```
 1                    N. Martinenko
 2    A.    Okay.  Well, I also did take phone calls,
 3    take reservations.  Okay.  I actually was spending
 4    a lot of hours just doing that, which was not my
 5    position.  I would also be in charge to, let's say,
 6    order desserts to certain places where they
 7    would -- you know, if I had -- if I would forget,
 8    let's say, ordering desserts, and we were out of
 9    desserts, I would be in trouble because that was my
10    responsibility to do --
11    Q.    Who gave you that responsibility?
12    A.    I -- I mean, there was nobody else to do
13    it, and then -- there was a girl there that would
14    do it before me, but then just because she wasn't
15    there anymore, it just automatically became my job.
16    Q.    Okay.  Let's go back.  Someone must have --
17               (Reporter clarification.)
18    Q.    Let me ask the questions.
19               (Reporter clarification.)
20    Q.    I'll ask the question again.
21          Who told you to order desserts?
22    A.    Imran Sajid.
23    Q.    Who?
24    A.    Imran.
25    Q.    And who is Imran?
```

                              14

BARKLEY
Court Reporters

N. Martinenko

1

2   A.    He's the person that works there as well.

3   I don't exactly know what his position is, but he

4   acts as if he's an owner too of the restaurant.

5   Q.    You said that a prior girl was doing the

6   desserts and then you took that over.  Did someone

7   tell you to take that over?

8   A.    I just told you it was Imran.

9   Q.    And what did he tell you exactly?

10  A.    If I could start ordering desserts now that

11  the girl wasn't there anymore.

12  Q.    And how did you know how to order desserts?

13  A.    Well, he gave me a phone number, and I

14  started calling that number and ordering desserts.

15  Q.    How long did that take you?

16  A.    Depending on how busy that dessert place

17  was, it would have been ten minutes, fifteen or

18  twenty.

19  Q.    Okay.  Other than ordering dessert, what

20  else did you do that wasn't a server

21  responsibility?

22            MR. DiGIULIO:  Objection.

23      Misrepresents testimony.  You can answer.

24            THE WITNESS:  Should I answer?

25            MR. DiGIULIO:  Yes, please answer.

15

BARKLEY
Court Reporters

N. Martinenko

1

2      A.      Well, I also mentioned the phone calls.

3      That's not a server position.  Besides ordering

4      desserts, I would also be in charge to write

5      paychecks, like, for the -- for the other

6      employees.

7      Q.      Okay.  That's fine.

8              Let's go back to the phone calls.

9      A.      Mm-hmm.

10     Q.      How many phone calls did you take per day?

11     A.      I didn't count, but it was at least 50.

12     Q.      How long was each phone call?

13     A.      Depending on what they wanted, it would

14     have been two minutes, three minutes or more.

15     Q.      So what were your hours that you worked?

16     A.      If I was doing double, like double shift,

17     it would've been starting from 1:00 and then

18     finishing up until closing, which was never a

19     certain time because it depended what -- like what

20     was the latest reservation and what time last

21     customer would walk in, and then what time they

22     would decide to leave.  So basically, I can say it

23     was maybe until 12:00 a.m., sometimes longer.

24     Q.      What time did you come in to the

25     restaurant?

16

BARKLEY
Court Reporters

1                          N. Martinenko

2    A.    If I was opening, meaning if it was a

3    double shift, I would have been there 11:30,

4    somewhere that time.  Yeah.

5    Q.    11:30.  So let's focus on the double shift

6    for a second.  So you came in at 11:30, and when

7    did you work until?

8    A.    Double shift means that I was staying there

9    until closing.  So it would have been 12:00 a.m.,

10   1:00 a.m.  I don't know.  If it was -- if we were

11   super lucky maybe until 11:00 p.m.  But usually

12   that's how long it would have been.

13   Q.    On average, what was it?  11:00 p.m.?

14   A.    Average, I would say 12:00 a.m.

15   Q.    And how many days -- how many days a week

16   did you do a double shift?

17   A.    Two mostly.  Two or three.

18   Q.    Okay.  What was it, two or three?

19   A.    Well, schedule would change.  So it could

20   have been two or three.  It wasn't same exact thing

21   every week.

22   Q.    Would you say that fifty percent of the

23   time, you did two or three, or was it --

24   A.    Fifty percent of the --

25   Q.    Eighty, or what do you think?

                              17

BARKLEY
Court Reporters

1                          N. Martinenko

2    A.      I would do fifty percent of the time, it

3    would have been two days, double.

4    Q.      Was the restaurant closed during that

5    double shift at all?

6    A.      If there was no customers doing lunch

7    there -- which is basically -- that's how it would

8    go, like there were no customers -- officially we

9    would announce it was closed at 4:00 because that's

10   when the other staff would come in for the dinner

11   shift.  And that's when we would start preparation

12   for dinner.  So it was basically closed from 4:00

13   to 5:00.

14   Q.      Okay.  I'm familiar with the restaurant, as

15   you know.

16   A.      I've served you couple of times.

17   Q.      Yes, you did.  And it's not a busy lunch;

18   is it?

19   A.      There's basically no business for lunch, at

20   least for those days when I worked there.

21   Q.      Am I incorrect to state that lunch

22   wasn't -- that was always an issue, to open for

23   lunch or not, because it wasn't that busy?

24   A.      Issue --

25   Q.      In other words, didn't the restaurant close

                              18

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    sometimes for lunch, and in the beginning it wasn't
3    really open for lunch, and then it opened up for
4    lunch later, and it wasn't successful, and it
5    closed again?  Is that not the truth?
6    A.    Yeah, it was couple of times that they
7    didn't do lunch.  But then they would reopen it
8    again.  Yes.
9    Q.    Okay.  So let's focus on that for a second.
10          So during your tenure, right, how many
11   times --
12          Withdrawn.
13          During the time you worked there --
14   A.    Mm-hmm.
15   Q.    -- which was according to your complaint --
16   well, actually let's take a step back.
17          So really the years that we're talking
18   about here are two thousand -- even though you said
19   you worked from 2016 to 2018, the years we're
20   talking about are 2016 to '18, and then from '21 --
21   January '21 to December '21.  So forget about 2015
22   because that's not really applicable.  It doesn't
23   go back six years, which is the complaint's
24   statute.
25          So during 2016 to 2018, right -- which is,
```

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                       N. Martinenko
 2   I guess, three years; let's assume that for the
 3   time being -- and then another year from '21 to --
 4   from '21, so four years, how many months was the
 5   restaurant closed for lunch?
 6   A.     I can't really answer that question.  I
 7   don't know exactly.
 8   Q.     Can you speculate --
 9                    MR. DiGIULIO:  Objection.  Calls --
10   A.     I can't.
11                    MR. DiGIULIO:  -- speculation.  You
12          can answer, if you can.
13   Q.     Can you guess?
14   A.     I can't.
15   Q.     To the best of your recollection, was it
16   five months, ten months, a year?
17   A.     I can't remember.  I can't answer that
18   question.  Like, I might make a mistake.  So I
19   can't answer that question.
20   Q.     That's all right.  I don't want you to make
21   a mistake.  So you don't have any recollection
22   whether the restaurant was opened or closed from
23   2016 to 2018 for lunch?
24   A.     Maybe it wasn't open all the time, but
25   most -- most of those time, it was open for lunch.
```

20

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2   Q.     But you can't determine the amount of
 3   months?
 4   A.     I can't tell you exact amount of months how
 5   many days it was closed or how many months.
 6   Q.     Okay.
 7   A.     But a lot of time, it was open, and I
 8   worked.
 9   Q.     But you can't tell me that either.  If you
10   don't know when it was closed, you can't tell me
11   when it was open; is that correct?
12   A.     Well, I remember working there for lunch.
13   Q.     No one's saying you didn't --
14   A.     But --
15   Q.     All I'm saying is if you can't tell me the
16   amount of months it was closed from 2016 to 2018 --
17   A.     Okay.
18   Q.     Then the reciprocal, you can't tell me when
19   it was open --
20              MR. DiGIULIO:  Objection to form.
21         No one's saying you didn't work.
22   A.     The only thing I'm saying right now is that
23   I would never think this would happen, and I didn't
24   just decide to memorize when it was open and when
25   it was closed.  So it was just --
```

21

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   Q.    What do you --
 3   A.    -- as a human being, I'm telling you I
 4   don't remember exactly how many months it was
 5   closed.  But most of it, it was open for lunch.
 6   Q.    What do you mean you didn't expect this to
 7   happen?  What does that --
 8   A.    I mean I wasn't planning on suing anybody.
 9   Why would I start remembering when was it open?
10   Q.    So what determined that you were suing?
11   A.    I'm sorry?
12   Q.    What was the decision that made you sue?
13   A.    Because it was very unfair how I got fired.
14   Q.    So it's about the firing; is that correct?
15   A.    It's about the firing, about me not getting
16   paid, whatever the labor law is about.
17                  (Simultaneous speakers.)
18   Q.    Well, just to be honest with you -- so
19   you've made statements in this complaint.
20   A.    Mm-hmm.
21   Q.    And you said it was opened, you worked this
22   time.  But if you don't remember, these statements
23   can't carry weight, so to speak.
24                  (Simultaneous speakers.)
25                  MR. SEGAL:  Objection.  There's no
```

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2        question.
 3   A.    I do remember it.
 4   Q.    Are these your statements as to when you
 5   worked in this complaint?
 6   A.    I don't understand the question.
 7   Q.    Okay.  Have you read this complaint?
 8   A.    Yes.
 9                 MR. DiGIULIO:  Objection.  It's not
10          in evidence.  You're not showing it to her,
11          this complaint.
12   Q.    Okay.  Let's -- you want to do this?  We'll
13   do this.  Okay.  This will be Exhibit 1 for
14   defendants.
15                 (Defendant's Exhibit 1, complaint,
16          was marked for identification.)
17                 (Whereupon, a discussion was held
18          off the record.)
19   Q.    I show you Defendant's Exhibit 1.
20        Are you familiar with this complaint?
21   A.    I've seen it, yes.
22   Q.    Did you read it?
23   A.    I did.  It's -- yeah, I just.
24   Q.    What was the last --
25   A.    Long time ago I --
```

BARKLEY
Court Reporters

1                    N. Martinenko

2    Q.    When was the last time you read it?

3    A.    I only read it once, and it was probably

4    like a month and a half ago or maybe a month ago.

5    Q.    I'd like you to take some time and review

6    that complaint.

7    A.    The whole thing?

8    Q.    Well, let --

9    A.    You want me to pay attention to the

10   particular --

11   Q.    We're talking over each other.  I don't

12   want to do that.

13   A.    Sorry.

14   Q.    That's okay.  Let's focus on -- let's focus

15   on the facts, which is paragraph 20 --

16   A.    Mm-hmm.

17   Q.    -- until paragraph 32.  Why don't you just

18   read those over.

19   A.    (Perusing.)

20         Okay.

21   Q.    Okay.  So in anywhere on these facts, do

22   you state that the restaurant was closed during the

23   time that you worked for lunch?

24   A.    It doesn't say it here.

25   Q.    Just -- that's it.  Just answer the

                        24

BARKLEY
Court Reporters

```
1                      N. Martinenko
2    question, please.  Okay.  And anywhere in these
3    facts, do you state that during the time period
4    that you worked, approximately 50 percent of the
5    time you did double shifts?  It's a yes-or-no
6    question.
7    A.     Can you --
8                      MR. DiGIULIO:  Objection.  The
9          exhibit speaks for itself.  You can answer.
10   A.     And can you repeat your question because --
11   Q.     Sure.  Is there anywhere in this complaint
12   or these facts, the paragraphs that you just read,
13   does it state that during the time you were
14   employed, you worked double shifts, meaning the
15   restaurant was open for lunch 50 percent of the
16   time?
17                     MR. DiGIULIO:  Same objection.  You
18         can answer.
19   Q.     Yes or no?
20   A.     I still -- I mean, I'm trying to understand
21   what the question is about.
22   Q.     I mean, I can't be clearer.
23   A.     Fifty percent of the time meaning -- who
24   said it was 50 percent of the time I was doing
25   double shifts?
```

BARKLEY
Court Reporters

1                         N. Martinenko

2    Q.     Does it say that --

3    A.     It doesn't --

4                   (Simultaneous speakers.)

5    Q.     Because that's what you just told me.

6    A.     I told you I was doing 50 percent of --

7    Q.     You said two to three times --

8                   (Simultaneous speakers.)

9    Q.     -- per week.  Does it state that in here?

10   A.     It says here two to three lunch shift

11   lasting about two hours.  It's paragraph 24.

12   Q.     Okay.  Does it say that the restaurant was

13   closed at any time during that time period that you

14   worked?

15   A.     It doesn't say --

16   Q.     Okay.

17   A.     But it was couple of months maybe that it

18   was just closed.  Most of the time it was open for

19   lunch.

20   Q.     Well, you just said you didn't remember

21   when it was closed?

22   A.     Because it was so -- it was such a minor --

23   it was a little bit when it wasn't open.

24   Q.     So do you remember, or you don't remember?

25   A.     I remember at some point it was closed for

                          26

```
 1                    N. Martinenko
 2   a bit for lunch.  But most of the time, it was
 3   open.
 4   Q.    What does for a bit mean?
 5   A.    Like couple of months.
 6   Q.    Do you know what year that was?
 7   A.    No.  I don't remember exactly what year was
 8   that.
 9   Q.    Okay.  Does it state in here anywhere that
10   you ordered desserts?
11   A.    I don't think so.
12   Q.    But you read this right prior to filing?
13   A.    I didn't -- I'm repeating.  I read it once,
14   and it was probably a month ago.  And I don't
15   remember reading desserts.
16   Q.    You read this only a month ago?
17   A.    Yeah.
18   Q.    Did you read it prior to 1/20/22?
19   A.    1/20 -- what's --
20   Q.    When the complaint was filed?
21   A.    Oh, prior to that, we just spoke, me and my
22   lawyer.  And I was familiar with what was going on
23   here, but I didn't read it.
24   Q.    I'm not sure what that means, what was
25   going on here?
```

N. Martinenko

1

2  A.    I mean, I know what we spoke about, but I

3  didn't read the thing.

4  Q.    You didn't read the complaint prior to its

5  filing; is that correct?

6  A.    It was sent to me, and I -- I read it, but

7  I didn't really go into the details.  Like I --

8  Q.    Did you read it, or you didn't read it?  In

9  other words --

10  A.    So I didn't have a printed copy.  It was on

11  my phone.  So it was kind of impossible for me to

12  read the whole thing.  So I kind of went over it.

13  But one month ago, I read the whole thing.

14  Q.    But you didn't really read it prior to its

15  filing --

16  A.    No.

17  Q.    Is that correct?

18  A.    No.  I mean, I did read it but not

19  thoroughly.

20  Q.    Okay.  Thank you.  When you started working

21  here, was that when the restaurant first opened?

22  A.    It was open before -- before I started.

23  Q.    How many years before; do you know?

24  A.    As I know, they opened in 2014.  But I

25  wasn't there.

28

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   Q.     Okay.  So relatively in the beginning you
 3   started; is that correct?
 4   A.     Yeah, correct.  A year later, yeah.
 5   Q.     And I'm familiar with the restaurant
 6   because I live nearby.  It wasn't that busy; is
 7   that correct?
 8   A.     It was okay, I think.
 9   Q.     Isn't it true that it took a decent amount
10   of time to pick up at some point?
11   A.     It was -- when I started, it was pretty
12   busy, and it got busier afterwards.  But I don't
13   think it was slower or bad business.
14   Q.     When were -- because you say you worked
15   until 12:00 a.m., that restaurant was never open
16   that late during the initial years that you worked.
17   So I'm curious why you say 12:00 a.m.?
18   A.     Restaurant being open doesn't mean that
19   there are no customers inside.  You might not
20   receive new customers at 12:00, but somebody that
21   worked inside the restaurant at 9:30 or 10:00 could
22   stay longer than 12:00 a.m.  You can't really kick
23   the customers out.
24   Q.     What time did the kitchen closed?
25                    MR. DiGIULIO:  Objection to form.
```

29

BARKLEY
Court Reporters

                         N. Martinenko

1

2          You can answer.

3                    (Whereupon, a discussion was held

4          off the record.)

5    A.    It was I think 10:30.

6    Q.    Okay.  So let me ask a practical question,

7    and please let me finish.  If the kitchen closed at

8    10:30 --

9    A.    Mm-hmm.

10   Q.    -- why were you there until 12:00 a.m.?

11   A.    Working at the restaurant -- I guess you

12   have never done that -- 10:30 is -- when your

13   kitchen is open until 10:30, that means if you

14   receive -- if you start serving a customer that

15   orders their food at 10:00 or 10:30, they need time

16   to finish up their meal, have their drinks.  From

17   10:30 to 12:00, how long is that?  One hour and a

18   half.  So yeah.

19   Q.    So are you telling me that when the -- if

20   the -- and by the way, when you say the kitchen

21   closes, they're done?  Does the chef leave?

22   A.    I don't know.  Chef mean, like, if the

23   kitchen is closed, we don't order more --

24                    (Simultaneous speakers.)

25                    (Reporter clarification.)

                         30

BARKLEY
Court Reporters

N. Martinenko

1

2   A.     Okay.  So when the kitchen is closed, we

3   sent no more food orders.  But I don't know what

4   chef doing, if he's leaving or if he's somewhere in

5   there again.  Why would I start looking for him?  I

6   know the kitchen is done, finished.

7   Q.     Since you're a server, and since I don't

8   know because I've never worked in a restaurant,

9   according to you, but I've owned probably ten, but

10  that's okay --

11              (Simultaneous speakers.)

12  Q.     Since the kitchen closed and you've served

13  the patrons, are you saying that they take an hour

14  and a half before you give them a check and leave?

15  A.     Sometimes more than that.

16  Q.     And that was from during 2015 to 2018 when

17  the restaurant first started out and it was very

18  slow?

19  A.     It wasn't very slow.

20  Q.     Oh, it wasn't?

21  A.     It wasn't.

22  Q.     Okay.  Okay.  Were you ever hanging out at

23  the bar after you served your customers?

24  A.     After the restaurant was closed, I could

25  have stayed at the bar, yeah.

31

BARKLEY
Court Reporters

                        N. Martinenko

1

2   Q.    How about from the time of 10:30 to 12:00?

3   A.    If I was working, I was not hanging out

4   anywhere.

5   Q.    How about the time from 9:00 to 10:00 if

6   you didn't have any tables?

7   A.    Can you specify what does hanging out mean

8   at this point?

9   Q.    Yeah, standing at the bar?

10  A.    If I have nothing to do, I might stand

11  there and talk with my coworker.

12  Q.    How many days a week did you work on

13  average?

14              MR. DiGIULIO:  Objection.  Asked

15         and answered.  You can go ahead.

16  Q.    Go ahead, yeah.

17  A.    Well, five days -- five dinner shifts, plus

18  two lunch shifts.  So I had two days off.  So

19  basically --

20  Q.    What days were that?

21  A.    It wasn't permanent.  It was changing.

22  Q.    On average, any regularity?

23  A.    It was changing.  Mostly I would be off the

24  beginning of week, never at the weekend.

25  Q.    Monday, Tuesday?

                           32

```
 1                    N. Martinenko
 2   A.     Yeah, Monday, Tuesday; Tuesday, Wednesday;
 3   Wednesday, Thursday, something like that.  It would
 4   change.  Maybe not back to back.  Maybe Monday and
 5   Wednesday.  It was never the same.
 6   Q.     Do you think Wednesday and Thursday are the
 7   beginning of the week?
 8   A.     Did I start with Monday?
 9   Q.     Please answer my question --
10                  (Simultaneous speakers.)
11   A.     I started with Monday.
12   Q.     It's a yes-or-no question.
13   A.     Wednesday and Thursday is not the beginning
14   of the --
15   Q.     That's it.  That's all.  I just want
16   yes-or-no questions, please.  Okay.
17          What were you paid by the hour?
18   A.     Ten dollars.
19                  MR. DiGIULIO:  Objection to the
20          form of the question.  There's no time
21          frame.  But you can answer, if you know.
22   A.     The last year -- I'm speaking about the
23   last year.  It was $10 an hour.
24   Q.     Withdrawn question.  Your attorney is
25   right.
```

NINO MARTINENKO

BARKLEY
Court Reporters

                            N. Martinenko

1

2          In 2015, what were you paid by the hour?

3    A.      Five dollars an hour.

4    Q.      Five dollars an hour?

5    A.      Yes.

6    Q.      Do you have any proof that you were paid

7    five dollars an hour in 2015?

8    A.      No, because I wasn't getting any pay stubs.

9    Q.      But you only met a month ago to discuss

10   this right?

11                MR. DiGIULIO:   Objection.

12         Harassing the witness.

13   Q.      Okay.  2016, what were you paid by the

14   hour?

15   A.      I don't exactly remember when it changed.

16   But it was -- after we started at $5 an hour and

17   probably a year later, a little more after, it was

18   7.25, I think, or 7.50.  Not sure.

19   Q.      Okay.  In 2017, what were you paid by the

20   hour?

21   A.      It remained the same for, like, until I

22   left 212 Steakhouse in 2018.

23   Q.      So from two thousand -- because you state

24   here even though you didn't read the complaint --

25   you state that you worked from 2015 to 2018, and

                              34

BARKLEY
Court Reporters

```
1                      N. Martinenko
2   then you took time off, and then it was '21.  So
3   you're telling me from 2016, which is really the
4   only applicable period here, you earned 7.25 an
5   hour, and that never changed; is that correct?
6   A.    As far as I remember, yes, it didn't
7   change.
8   Q.    What do you mean as far as you remember?
9   A.    Again, I wasn't paid -- I wasn't shown pay
10  stubs.  So I don't know exactly how much I was
11  getting.  But it has never been --
12  Q.    Well, we'll get to that because you kind of
13  did payroll yourself, didn't you?
14  A.    I did payroll --
15              (Simultaneous speakers.)
16              (Reporter clarification.)
17  Q.    From 2016 to whenever you were terminated,
18  you were paid 7.25 an hour?
19              MR. DiGIULIO:  Objection.  That
20        misstates her testimony.
21  Q.    Plus tips; is that correct?
22              MR. DiGIULIO:  Objection.  Still
23        misstates --
24  Q.    Did you earn tips on top of 7.25 an hour?
25  A.    Yes.
```

35

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    Q.    Did you ever complain about the 7.25 to any
3    owner or manager?
4    A.    No.
5    Q.    Did you feel that that was the correct
6    amount of minimum wage or tip minimum wage that you
7    should get --
8    A.    I never thought --
9    Q.    Let me finish, please.  Let's satisfy
10   Teneja.  She's going to punch us both.  Okay.  I'm
11   getting there.
12         Did you complain to anybody about that?
13   A.    I didn't because I didn't know it was -- it
14   wasn't correct or something.
15   Q.    Did you ever speak to any other employee
16   about getting paid 7.25 per hour?
17   A.    I didn't.  At the time, I didn't.
18   Q.    Okay.  Well -- what do you mean at the
19   time?  You mean you didn't?
20   A.    I didn't.  By that time, I didn't.
21   Q.    By that time, you mean during your whole
22   employment; is that correct?
23   A.    No.  Can I say?
24   Q.    Yes, when did you --
25   A.    I had a conversation about not getting paid
```

BARKLEY
Court Reporters

N. Martinenko

1

2      overtime in 2021 with other coworkers.  But it

3      wasn't about an hour -- like $10 or 7.25 or

4      anything.  I just had a question, why were we not

5      getting paid overtime.

6      Q.      In what month of 2021 did you have that

7      conversation?

8      A.      I exactly don't remember.  It was probably

9      May -- May or maybe April.  It was not really a

10     conversation.  I just asked the question.

11     Q.      Who did you have that conversation with?

12     A.      Everyone was there, but mostly I kind of

13     had a conversation -- I kind of asked that question

14     to Sasha, which is Alexander Rinkovski (phonetic).

15     Q.      Who?

16     A.      Alexander Rinkovski.

17     Q.      And who is he?

18     A.      He's also a server.

19     Q.      Alexander Mikovski [sic]?

20     A.      Rinkovski.

21     Q.      Rinkovski.  And you just asked about

22     overtime?

23     A.      Yeah.

24     Q.      What did he say?

25     A.      He said he didn't know if we were supposed

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   to get any overtime at all.
 3   Q.    Were there ever any times since the kitchen
 4   closed at 10:30 where you left before 12:00 a.m.?
 5   A.    Well, could have been a couple of cases,
 6   maybe if it was a slow night, very slow, and we had
 7   to close a bit earlier.
 8   Q.    Would you call that restaurant a busy
 9   restaurant during the whole time you worked or slow
10   restaurant or --
11   A.    It's a busy restaurant.
12   Q.    It's a busy restaurant.  Okay?
13   A.    Dinner is busy.  I would say that.
14   Q.    Okay.  Let's focus on your tips now.
15         So you worked five days per week generally,
16   right?
17   A.    Mm-hmm.
18   Q.    Well, most the time, actually, five days
19   per week.
20         How much tips did you earn per week?
21   A.    It's -- it's never the same number.  It
22   just changes.
23   Q.    I understand.
24   A.    So I can't really give you exact number.
25   But it would have been somewhere from 900 to 1,200
```

38

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2   per week.  Maybe little less than (unintelligible).
 3   Q.      I'm sorry?
 4   A.      Maybe slightly less, but you know it was
 5   generally...
 6   Q.      So on average for the five days -- like 200
 7   and change per day; is that right?  Is that fair?
 8   A.      Yup.
 9   Q.      Now, were those credit card tips or cash
10   tips?
11   A.      Credit card tips.
12   Q.      What about cash tips?
13   A.      We had some which was --
14                  (Simultaneous speakers.)
15   Q.      But you're not including that in there; is
16   that correct?
17   A.      No.  That's the amount that would go on my
18   paycheck.
19   Q.      Okay.  How much do you think you earned in
20   cash tips?
21   A.      I don't remember that exactly.  But it
22   wasn't much.
23   Q.      Okay.  Did you ever keep any --
24           Withdrawn.
25           We'll get back to that.  Okay.
```

39

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2          How did you determine -- how did the tip
 3    process work at that restaurant?
 4    A.     Tip process meaning how did we split?
 5    Q.     Let me -- I'll withdraw the question.  I'll
 6    state it differently.  That wasn't a good question.
 7          Yeah.  So was there a process by which --
 8    well, let's start from the beginning.  Were tips
 9    shared at the restaurant?
10    A.     Yeah.
11    Q.     Who did you share the tips with, the other
12    servers?
13    A.     Other servers, runners and bussers and
14    bartender.
15    Q.     And how was that determined?
16    A.     Servers and the bartender would get one
17    point.  Bussers would get half a point, and I'm
18    assuming runners was point 6, I think, point 6 or
19    point 7.
20    Q.     I'm sorry.  Server and bartenders would get
21    one point?
22    A.     Yeah.
23    Q.     Runners would get what?
24    A.     Bussers would get half a point, and
25    runners, I think it was point 6.
```

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

Q.    Point six?

A.    Point six, I think.  Or point 7, but mostly
it's six.

Q.    And the bartender?

A.    One point.

Q.    So everybody's tips were compiled at the
end of the night?

A.    Mm-hmm.

Q.    In 2016 -- what time was that done every
night?

A.    After the restaurant was closed.
Everyone -- every customer would leave after that.

Q.    And who controlled that process?

A.    Okay.  So we would keep all our receipts at
us during the night.  And then at the end, every
single server would process their own -- count
their own tips in total.  There was like this
little paper that we would write down the numbers
of tables and how much tip it came -- like how much
they tipped and then total of the tip.

So every single server had the total of how
much tips they made.  And then we would put this
together, we would calculate, and according to how
many points was on the floor, we would split it.

41

BARKLEY
Court Reporters

1                       N. Martinenko

2    Q.     Was there one person in particular that

3    controlled that process, or was it a communal

4    thing?

5    A.     Well, everyone was doing their own tips.

6    But at the end we would do, like, total.  It could

7    be me or Sasha or someone else.  It depends on who

8    worked or who was willing to do it.

9    Q.     Were cash tips included in that process?

10   A.     Cash tips would go, you know, together on

11   the table.  And we would split it the same way, you

12   know, with the points system.

13   Q.     Let me ask you a question.  So if you're

14   telling me that you got 900 to 1,200 per week but

15   it was just credit card tips, why are you not

16   including the cash tips in that analysis?  Because

17   you said it was only credit cards?

18                  MR. DiGIULIO:  Objection to form.

19           You can answer, if you know.

20   A.     I thought you were asking me about the

21   paychecks.  That's why I answered you --

22   Q.     No.  Well, let's go back to the question.

23   A.     Mm-hmm.

24   Q.     How much -- my question was how much in

25   tips do you earn per week?  Let me finish.  You

```
 1                        N. Martinenko
 2   told me 900 to 1,200.  I said, Is that cash or
 3   credit card?  You said, Credit card.  Why don't you
 4   give me the real number including cash?
 5   A.    Okay.  Well, cash wasn't really much, so I
 6   would say 150 a week total.
 7   Q.    Okay.  So now it's 1,050 to 1,300 is what
 8   you're saying?
 9   A.    Yeah.  Including cash, yes.
10                  (Whereupon, a discussion was held
11          off the record.)
12                  (Whereupon, a recess was taken at
13          this time.)
14   Q.    In your opinion, how many customers, during
15   the five days you served, paid in cash?
16          Well, withdraw that question.
17          How about this:  In your opinion --
18                  (Whereupon, a discussion was held
19          off the record.)
20   Q.    So in your opinion, how many tables did you
21   serve during five days?
22   A.    Oh, that's -- I can't say really number.
23   How many tables during the week I served?
24   Q.    Yeah?
25   A.    I think -- oh, god.  I have to, you know,
```

43

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   kind of re-imagine.
 3   Q.     I'll withdraw the question.  How about the
 4   -- let's do it this way.  Were you assigned a
 5   certain -- not because I know nothing about the
 6   restaurant business, as you said, but how many
 7   tables were you assigned?  Were you assigned
 8   certain tables so --
 9   A.     There were sections.  Okay.  So one
10   section, let's say, would have, like, seven
11   tables -- six, seven, maybe more if it was super
12   busy.  And well, let's say I had to help out, like,
13   another server.  I might have taken one table from
14   their section too.  So it's just -- you know, it
15   would have been six, seven tables in my section,
16   maybe eight.
17   Q.     How many sections were there?
18   A.     One, two -- like depending on how many
19   servers were there.  Let's say if it was three, it
20   was one section, the second one, and the one in the
21   back.  So it would be three sections.  Yeah.
22   Q.     How many tables were there?  Do you know?
23   A.     In each section?
24   Q.     No, in the restaurant.
25   A.     Total.  I don't remember the number of
```

44

BARKLEY
Court Reporters

```
 1                     N. Martinenko
 2   tables (unintelligible).
 3               (Reporter clarification.)
 4   A.     I don't remember exact number of tables.
 5   Q.     When you served --
 6          Withdrawn.
 7          Did a runner ever come to you and ask you
 8   what table gets this?  Were they ever confused as
 9   far as the food that was ordered?
10   A.     No.  Runner had a ticket that would say --
11   Q.     And that had a table number on it, right?
12   A.     Yes.
13   Q.     And you don't know the number of tables in
14   the whole restaurant?
15   A.     I know -- I don't know how many tables are
16   there because also tables work in a way where you
17   can split them apart and put them together.  Okay.
18   So I knew the table numbers, but I don't know how
19   many are there, you know.
20   Q.     That's fair.  Let's focus on the evenings
21   that you worked, all right?
22   A.     Okay.
23   Q.     So you worked five days, and you had
24   roughly six to seven tables per day?
25   A.     That's not true.
```

45

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   Q.      In the section --
 3                   (Simultaneous speakers.)
 4   Q.      How many rounds, so to speak, occurred each
 5   night?  In other words, how many tables turned
 6   over?  Was it once, twice, three times?
 7   A.      Twice, I would say.
 8   Q.      Twice.  Okay.  That's fine.
 9           And did -- were the reservations consistent
10   with that?  We're going to turn over each table two
11   times.  Let's make it a 7:00, make it at 9:00.
12   Whatever it was?
13   A.      Yeah.  We didn't really have a person who
14   would kind of, like, assign the reservations at
15   that point, like, to be smoothly transitioned to a
16   second turn.  But we tried our best to do it that
17   way.
18   Q.      That's fine.  So if there were two times,
19   and let's take -- let's just choose the number six.
20   But I know you said six or seven.  I'm not trying
21   to confuse you.  Let's use six.
22           That's twelve tables a night, right?
23   A.      Mm-hmm.
24   Q.      That's sixty tables for the nights you
25   worked?
```

46

BARKLEY
Court Reporters

N. Martinenko

1

2   A.      Mm-hmm.

3   Q.      Just dinners.  Of those (unintelligible),

4   60 tables, how many paid in cash, in your opinion?

5   A.      Approximately -- because lately most people

6   paid with cards, and we were not happy about that

7   either, but that's how it goes so.  I would say

8   maybe six or seven throughout the week.

9   Q.      So ten percent roughly?

10  A.      Yeah.

11  Q.      What was the average check?

12  A.      I -- okay.  Again, this restaurant has very

13  expensive items on the menu.  So depending on --

14  it's just really hard to say.  Like what's the

15  average.  I would say -- let's say 200.

16  Q.      Per person or total?

17  A.      No, like per tab.

18  Q.      Okay.

19  A.      But it's only because I'm thinking about

20  those two-tab tables that would try to order, like,

21  less expensive things.  And let's say their bill

22  was 120, but then there is another table that would

23  order something that would cost them 600.  So I'm

24  just, kind of, like, balancing it out and saying

25  200.

47

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2    Q.    Two hundred to me seems on the low end for
 3    that menu.
 4    A.    No, I'm saying average.  Like...
 5    Q.    Well, what was the -- just refresh my
 6    recollection.  Not that it's that pertinent.  But
 7    the combination with the wagyu beef and this and
 8    that, how much did that cost?  Do you remember?
 9    A.    Um --
10    Q.    That steak platter, I don't remember
11    (unintelligible) --
12                    (Reporter clarification.)
13    Q.    Okay.  I'm sorry.
14          How much -- to the best of your
15    recollection, how much did the steak platter with
16    the wagyu beef and the different kind of
17    combination items cost?
18    A.    That wagyu beef platter is $225 with three
19    different slices of wagyu on it.  But it doesn't
20    mean that everybody gets it.
21    Q.    I understand.  And that was for one person,
22    correct?
23    A.    Mostly it would be shared between two
24    people.
25    Q.    Okay.  The tables that were in your
```

48

BARKLEY
Court Reporters

```
1                     N. Martinenko
2    section, were they two-tops or four-tops?
3    A.    Mixed.  Both.  Again, sections would
4    change.  So it's not the same thing.
5    Q.    I could do the math, but let's move on.
6          While you were working at 212 -- that's the
7    defendant.  I'll just call it 212 for purposes of
8    our conversation or discussion today at the
9    deposition -- did you work anywhere else?
10   A.    No.
11   Q.    You never had another job during the day,
12   night, or evening while you were -- during the
13   times you stated you worked here, had any other
14   employer?
15   A.    There was this one situation when I was
16   coming back to 212.  In 2021, I had another job
17   that I was, like, slowly, kind of, like, moving
18   from there to 212.  So --
19   Q.    You're talking in and about --
20   A.    2021, yes.  That's when I kind of had,
21   like, the other job.  But I've never had both
22   restaurants on the same day, like, I had to run
23   there and come here.  No, it was always, like,
24   scheduled in a way where I would be on time in both
25   places, and it was just for a little bit.  Then I,
```

49

BARKLEY
Court Reporters

N. Martinenko

1
2   you know, quit there, and I moved here, and I
3   didn't have any other job.
4   Q.    So at some point, you did have another job
5   during the transition period; is that correct?
6   A.    Yup.
7   Q.    And how long do you think that was?
8   A.    Maybe like two months.
9   Q.    And that was in 2021?
10  A.    Yeah.
11  Q.    The cash tips you received, did you ever
12  report those as income?
13              MR. DiGIULIO:  Objection.  Invasion
14        of privacy.  Irrelevant.
15              MR. SEGAL:  It's not irrelevant.
16              MR. DiGIULIO:  How is it relevant?
17              MR. SEGAL:  Cash tips go into the
18        tip (unintelligible).
19              MR. DiGIULIO:  We're not having any
20        allegations that there's misappropriated
21        tips here.
22              MR. SEGAL:  (Unintelligible) it's
23        misappropriated because you're talking
24        about nonpayment of minimum wage and
25        overtime.  The cash tips accord go into the

50

BARKLEY
Court Reporters

```
 1                     N. Martinenko
 2          minimum wage to see if they paid minimum
 3          wage or overtime.
 4                  MR. DiGIULIO:  The allegations
 5          (unintelligible) --
 6                  (Reporter clarification.)
 7                  MR. SEGAL:  This is not a
 8          judgement.  This is a complaint.  It's an
 9          allegation.  So I can ask that question.
10                  MR. DiGIULIO:  All right.  Go
11          ahead.
12   A.     What was the question again?
13   Q.     The question was:  Did you ever report as
14   income the cash tips that you received?
15   A.     No.
16   Q.     Did you ever --
17          Withdrawn.
18          Do you know that you're required to report
19   that?
20   A.     I did not.
21   Q.     Did you ever tell management or ownership
22   of the cash tips that you received?
23   A.     Tell, like -- tell meaning, like, to let
24   them know that I had cash tips today, every day?
25   Q.     Yes.
```

N. Martinenko

1

2    A.    No.

3    Q.    How were you paid your -- how were you paid

4    your wages, by check or cash?

5    A.    By check.

6    Q.    From the beginning of the time that you

7    worked until the end?

8    A.    Yes.

9    Q.    And those checks were handwritten checks or

10   payroll checks?

11   A.    Handwritten checks that would come with a

12   paper --

13   Q.    A pay stub?

14   A.    Pay stub, yeah.

15   Q.    So you received a pay stub during all the

16   time you worked?

17   A.    Not all the time.  Only on 2021.

18   Q.    Oh, okay.  So from 2016, which is the time

19   period we're dealing with, to 2018, you did not

20   receive a -- let's call it a pay stub?

21   A.    No.

22   Q.    What did you receive from 2016 to 2018?

23   A.    Only handwritten paycheck.

24   Q.    Okay.  And then in 2021, you received a

25   payroll check, not a handwritten check?

52

BARKLEY
Court Reporters

```
1                    N. Martinenko
2   A.    Handwritten check and a pay stub printed.
3   Q.    Okay.  In 2016 to 2018, were your --
4         Withdrawn.
5         Did you know the hours that you worked from
6   2016 to 2018 on a weekly basis?
7                  (Simultaneous speakers.)
8   Q.    I'm sorry.
9   A.    I didn't track them.  Like, I didn't
10  memorize the hours.  But I did work a lot,
11  meaning --
12  Q.    When you got the --
13  A.    I would clock in and clock out.
14  Q.    We'll get to that.
15  A.    Yeah.
16  Q.    When you got your check, did you look at
17  it?
18  A.    Well, I would look at the amount.  But what
19  else --
20  Q.    Did you quantify that it made sense with
21  the hours that you worked?
22  A.    I did not.  Because there was nothing to
23  look at.
24  Q.    But you just mentioned that you kind of
25  knew the hours you worked, right?
```

53

BARKLEY
Court Reporters

N. Martinenko

1

2  A.    Well, I knew approximately how much time I

3  spent in the restaurant for the whole week.  But I

4  couldn't count it because they have us clock in and

5  clock out, and they know it better than me.  So I'm

6  trusting them.  They writing the checks.

7  Q.    Let's go to, now, your -- your other

8  services, because according to you, you did a lot.

9  So did you do a payroll?

10  A.    Only on 2021, and I didn't do a payroll.  I

11  was just writing checks.

12  Q.    When?

13  A.    On 2021.

14  Q.    Well, how were you writing checks?  The

15  payroll company wrote the checks in 2021.

16            MR. DiGIULIO:  Objection.

17        Mischaracterizes the testimony.  You can

18        answer.

19  A.    Okay.  Paychecks were handwritten.  They

20  would do -- whoever the person that was doing the

21  payroll, calculating tips, deducting taxes and all

22  that, it was someone else, not me.  But then this

23  finished up paperwork would be sent to me so that I

24  have it.  When it's time to pay, I would just have

25  the checkbook, which I would write myself, with the

54

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   amount and the name of the employees.  I didn't do
 3   a payroll.  I was just writing checks.
 4   Q.    Okay.  And when was that, during --
 5   A.    2021.
 6               (Simultaneous speakers.)
 7   Q.    I'm sorry?
 8   A.    2021.
 9   Q.    That's it?
10   A.    Maybe couple of times before, but it wasn't
11   consistent.  Yeah.
12   Q.    You had access to the office, right?
13   A.    Everyone did.
14   Q.    You had access to the checkbook, was that
15   correct?
16   A.    Everyone did.
17   Q.    You had access to the tip sheets; is that
18   correct?
19   A.    Everyone did.
20   Q.    I'm just asking about you.
21   A.    Yes.
22   Q.    Did you take payroll information and make
23   copies from that office?
24   A.    No.
25   Q.    You didn't?
```

55

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   A.     I didn't.
 3   Q.     Did you take tip sheets and make copies?
 4   A.     No.
 5   Q.     You didn't?
 6   A.     I didn't.
 7   Q.     You're under oath, by the way.
 8   A.     So?
 9   Q.     And your attorneys showed us that at the
10   last deposition.
11   A.     But I didn't --
12                  MR. DiGIULIO:  Objection.  That's a
13          misrepresentation (unintelligible).
14                  MR. SEGAL:  You can object.
15   Q.     Were any tip sheets done for lunches?
16   A.     If there were any customers, yeah.  But if
17   there wasn't, then no.
18                  MR. SEGAL:  We can take a break for
19          three minutes or so.
20                  (Whereupon, a recess was taken at
21          this time.)
22                  (Defendant's Exhibit 2, tip
23          declaration, was marked for
24          identification.)
25                  (Defendant's Exhibit 3, daily tips,
```

56

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2           was marked for identification.)
 3                    (Defendant's Exhibit 4, time
 4           brackets, was marked for identification.)
 5    Q.      Showing you Defendant's Exhibit 2.  Do you
 6    know what that is?
 7    A.      Yeah, it's a weekly tips sheet.
 8    Q.      And were you involved in creating that
 9    sheet?
10    A.      Not the template.  But, you know, I
11    could -- I was involved putting numbers down, yes.
12    Q.      So this was for the week of 7/8 to 7/11/21,
13    correct?
14    A.      Yeah.
15    Q.      Okay.  Were you in control of that sheet?
16    A.      Again, I did not create the template, but
17    everybody who was finishing up the dinner shift,
18    whoever was calculating the tips for the day at the
19    end, they would write down the amount under -- on
20    each name so...
21    Q.      Did you provide that sheet to your
22    attorneys at some point?
23    A.      I did provide payroll, like, a pay stubs
24    that I had received.  I don't remember.  I might
25    have.  But I don't think so.  I don't think I sent
```

BARKLEY
Court Reporters

1                         N. Martinenko

2     it to them.

3     Q.      Well, that's an exhibit that was provided

4     by your attorney.

5     A.      Okay.  So I guess I sent it to them, yeah.

6     Q.      So how did they get that?

7     A.      Well, for me to -- okay.  For them to

8     calculate the tips for the week, I had to take a

9     picture of the -- of this on a Sunday night.  It

10    would have been me or Sasha or somebody.  So, like,

11    we were supposed to take a picture of it and send

12    it to Imran, who, by himself, would send it to

13    somebody else who was in charge to create the

14    payroll.  So it was in my phone.

15    Q.      That's not my question.  My question was

16    how did your attorneys receive that sheet?  Was

17    that from you?

18    A.      I sent it to them.  How else?

19    Q.      Was that -- did you take that from the

20    office, the restaurant's office?

21    A.      I had it in my phone already long time ago.

22    Q.      Do you have pictures of all the weekly

23    sheets in your phone?

24    A.      The ones that I sent to Imran, yes.

25    Q.      Did everybody take pictures of that?

58

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   A.     Yes.
 3   Q.     All the waiters -- all servers?  Excuse me.
 4   A.     Yeah.  I mean, sometimes maybe busboys or
 5   runners -- because it was right there in the
 6   drawer.  It was for people to see, like, how much
 7   are they making so...
 8   Q.     Let's look at the next exhibit, Exhibit 3
 9   which is...
10   A.     This one.
11   Q.     Now, this one doesn't look like a picture.
12   A.     Okay.
13   Q.     This you one looks like a form -- a copy of
14   a form.
15   A.     Okay.
16   Q.     Did you supply that form to your attorneys?
17   A.     I don't think so.
18   Q.     No?
19   A.     It's not -- I didn't have it.
20              MR. DiGIULIO:  You guys produced
21          that.
22              MR. SEGAL:  Oh, we produced that?
23              MR. DiGIULIO:  We put the Bates
24          stamp numbers and the defendant's names
25          (unintelligible) --
```

NINO MARTINENKO



```
 1                    N. Martinenko

 2                (Simultaneous speakers.)

 3                MR. SEGAL:  All right.  Withdraw

 4         the question.  Okay.  That's okay.  We have

 5         others.

 6    Q.    Can I see Exhibit 4 for a second.

 7          So I'll show you Defendant's Exhibit 4, and

 8    I refer you to Page 3.  Can you tell me what that

 9    is?

10    A.    It's not something that came from me for

11    sure.  But I'm assuming it's clock-in and

12    clock-out, right?

13                (Simultaneous speakers.)

14    Q.    So what's the top date that you see there?

15    A.    Which -- hold on.  What do you mean top

16    date?

17    Q.    On Page 3, so --

18    A.    The top date mean- --

19    Q.    Time in, what does it say?

20    A.    4:22.

21    Q.    Right?

22    A.    Right.  Okay.

23    Q.    And the time out?

24    A.    11:47.

25    Q.    Okay.  And the restaurant, as you stated,
```

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   is closed from 4:00 to 5:00.  Did you clock in and
 3   clock out during that time period?
 4   A.    Wait.  If I go there for dinner time and
 5   I'm preparing restaurant to be open at 5:00, when I
 6   go at 4:00, I clock in, and then I start working,
 7   right?
 8   Q.    Is there a meal break at any time?
 9   A.    Not really.  I mean, they would provide
10   food, but there was no break specifically --
11   Q.    What time did that occur?  Sorry.
12              (Simultaneous speakers.)
13   A.    It would be somewhere -- it would be
14   somewhere, like, before we opened up.  Like, 15
15   minutes early.  Like, let's say 4:40, 4:45, that
16   was when we would get the meal to eat and then get
17   ready to work.  But there was no particular break
18   for it.
19   Q.    Well, you weren't working during that time
20   period were you?
21   A.    Well, we were eating.  Yeah.
22   Q.    Well, I understand that.  But you were
23   eating?
24   A.    And?
25   Q.    You didn't clock in and clock out during
```

61

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   that meal break?
 3   A.     Okay.  So let me put the -- most of the
 4   time when the meal was ready, we were also, like,
 5   about to open up.  So I -- a lot of times I had to
 6   eat my meal inside the kitchen because there were
 7   already clients -- customers inside the restaurant.
 8   So, like, why would I clock out and clock in if I'm
 9   biting a meal and then I'm going and serving a
10   customer, so...
11   Q.     Did you sit and eat the meal?
12   A.     Sometimes if they prepared it on time,
13   meaning, like, if there was time for me to sit,
14   yes.
15   Q.     What time did the restaurant open up for
16   dinner?
17   A.     5:00.
18   Q.     5:00?
19   A.     Yes.
20   Q.     So there wasn't any customers from 4:00 to
21   5:00, was there?
22   A.     Yes.
23   Q.     So -- and that's when the meal was served;
24   is that correct?
25   A.     Meal wasn't served on time always.
```

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2    Q.    Well, it wasn't served at 6:00, was it?
 3    A.    No, but it was served sometimes, like, five
 4    minutes to 5:00, maybe at 5:00, so we already had
 5    doors open for the customers.
 6    Q.    Sometimes or always?
 7    A.    Sometimes.
 8    Q.    But what does "sometimes" mean?
 9    A.    I mean like two, three times a week at
10    least.
11    Q.    So you're stating that the meal would --
12    was served at five to 5:00 two or three times a
13    week?
14    A.    Yeah.  No, I mean -- I'm not saying at 5:00
15    exactly.  It was like close to 5:00.  So there was
16    no time for me to sit down.  Not only for me but
17    anybody.
18    Q.    Let's look at this page for a second.
19    A.    Mm-hmm.
20    Q.    How many days are on this page?
21    A.    On the whole page?  Do you want me to count
22    it?
23    Q.    I'll count for you.  How is that?  One,
24    two, three, four, five, six, seven, eight, nine;
25    ten.  One, two, three, four, five, six, seven,
```

63

BARKLEY
Court Reporters

```
1                    N. Martinenko
2  eight, nine; twenty.  One, two, three, four, five,
3  six, seven, eight, nine; thirty.  One, two, three,
4  four, five, six, seven, eight, nine; forty.  So I
5  got 46 days.
6  A.    Okay.
7  Q.    A month and a half roughly.  Okay.
8        Of the 46 days, how many days does the last
9  column show over eight hours?
10              MR. DiGIULIO:  Objection.
11        Misstates the document.  Every entry isn't
12        a distinct day.  But you can answer the
13        question.
14 A.    Okay.  So --
15              MR. SEGAL:  Wait, what?  Excuse me?
16              MR. DiGIULIO:  So there are times
17        for instance --
18              MR. SEGAL:  It's only when it's
19        over 12:00 that's (unintelligible).
20        They're all the same days.  And I believe
21        that only happened...
22              MR. DiGIULIO:  You're right.
23              MR. SEGAL:  -- on one day.
24 A.    Okay.  What's the question?
25              MR. SEGAL:  Can you repeat the
```

64

BARKLEY
Court Reporters

N. Martinenko

1

2          question?

3                    (Whereupon, the record was read by

4          the reporter.)

5    A.    It shows three -- four.

6    Q.    Let's look.  So the first one is on 4/10;

7    is that correct?

8    A.    Yes.

9    Q.    Actually I take that back.  4/9, I'm sorry.

10         How many hours -- we'll go back to that.

11   So 4/9, 5/7, 5/15.  So of 46 days, four of them,

12   less than ten percent, shows that you're entitled

13   to any of time --

14                   MR. DiGIULIO:  Objection.

15   Q.    Is that correct?

16                   MR. DiGIULIO:  Misstates the

17         document.  You can answer the question.

18                   (Simultaneous speakers.)

19   A.    We are only underlining one particular day.

20   But then if we count five shifts together where

21   there are so many days where it's over seven

22   hours --

23   Q.    We're talking about the document.  Let's

24   focus on this.  I'm not asking you your whole --

25                   (Simultaneous speakers.)

65

BARKLEY
Court Reporters

                          N. Martinenko

1

2    Q.    Let's focus on that, and please just answer

3    my question.

4    A.    Okay.  I'm trying.

5    Q.    Well, answer it.  It's not that difficult.

6          So four days out of 46 days, there's the

7    minimum overtime.  And the latest you've clocked

8    out -- the only other time is two hours over, if

9    that's correct.  And by the way, did you clock in

10   any time for lunch during these 46 days?

11              MR. DiGIULIO:  I'm going to object

12          to the statements made.  And they

13          misrepresent what overtime is.  But you can

14          answer the question.

15   A.    What I'm seeing here is that this is a

16   time -- the season of the year when the restaurant

17   is the slowest.  So I obviously was not really

18   staying that long.

19   Q.    March, April, and May?

20   A.    Yes, sir.  And also like -- that's pretty

21   much it.  And the reason I'm not clocked in for

22   lunchtimes here is that this is kind of -- like,

23   the time when I was transmitting from the previous

24   job to here, and then I started taking lunch

25   shifts.

                              66

BARKLEY
Court Reporters

1                     N. Martinenko

2    Q.    And so in your opinion, the end of March to

3    the beginning of June is the slowest time?

4    A.    Yes, sir.

5    Q.    Okay.  Do you know what spread of hours is

6    by the way?

7    A.    "Spread"?  You can explain if you'd like.

8    Q.    No.  Just do you know what it is?

9    A.    I don't know.

10   Q.    Okay.  Because you mentioned it in your

11   complaint.  So I would assume that you knew what it

12   was.  But you don't?

13   A.    Spread of hours?

14   Q.    Yes.

15   A.    Well, I'm not sure.  Yeah, I'm kind of --

16   Q.    That's okay.

17   A.    -- guessing.

18   Q.    Please just answer the question.

19         And would you say that -- well, in your

20   opinion what are the busiest months?

21   A.    Busy starts in September, October.

22   November, December.  These are, like, very busy

23   times, somewhat busy.  January gets a little

24   slower...

25   Q.    Okay.  So let's turn your attention to

67

BARKLEY
Court Reporters

1                         N. Martinenko

2     Page 4.

3     A.      Mm-hmm.

4     Q.      And why don't we go to -- well, that's

5     interesting.

6             So let's look at -- let's go with 9:24 on

7     Page 4 where it says 7:58, right?  And let's count

8     some days here.  So one, two, three, four, five,

9     six, seven, eight, nine, ten, eleven, twelve,

10    thirteen, fourteen, fifteen, sixteen, seventeen,

11    eighteen.  So there's eighteen days on this page.

12            And one, two, three, four, five, six,

13    seven, eight, nine, ten.  One, two, three, four,

14    five, six, seven, eight, nine, ten,

15    (unintelligible.)

16                   (Reporter clarification.)

17                   (Whereupon, a discussion was held

18          off the record.)

19    Q.      So there's 48 days on Page 5 of 5, and

20    we're looking at 18, Page 4 of 5, which, according

21    to you, is the busiest time period?

22    A.      I think you're missing 9/23.  That also --

23    Q.      You want to include that?  We can include

24    that.

25    A.      Isn't it September though?

                            68

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   Q.    Yeah.  So let's make it 19.  That's fine.
 3         So of these 19 days -- well, you want me to
 4   include eight hours and one minute, I
 5   (unintelligible).  Of these 19 days -- one, two,
 6   three, four, five, six, seven -- only eight days
 7   are over eight hours; is that correct?
 8   A.    Are we just looking at this page, right?
 9              MR. DiGIULIO:  I don't know.
10              THE WITNESS:  Because I don't know.
11         This is half of October.  This is half of
12         September.  So I don't know.
13              MR. VOLPER:  (Unintelligible.)
14   Q.    We can play this game all day long, but the
15   busiest time period, according to you, maybe some
16   days you've worked over eight hours.  But if we add
17   up the weeks, I don't think there's any overtime on
18   it.
19              MR. DiGIULIO:  Objection to the
20         form of the question.  Again, it misstates
21         the overtime requirements (unintelligible).
22         You can answer.
23              MR. SEGAL:  No, I agree with that.
24         I'd rather do the weekly to be honest with
25         you, but I'm just going through.
```

BARKLEY
Court Reporters

                        N. Martinenko

1

2    Q.    So you say you worked every week over 40

3    hours, but does this indicate that?

4                    MR. DiGIULIO:  Objection.  This

5            misstates what's written in the complaint.

6            You can answer if you know.

7    A.    I would not like to answer that.  The

8    numbers --

9                    (Reporter clarification.)

10   A.    I'm not understanding because the numbers

11   speak --

12   Q.    Well, you have to answer.

13   A.    Answer what?

14   Q.    Doesn't it indicate different than what you

15   stated in the complaint?

16   A.    I don't think so.

17   Q.    How is that?

18   A.    That's my opinion.

19   Q.    Do you want to go through the numbers?

20   A.    No.

21   Q.    Okay.  Is it your opinion, or is it based

22   on the time in and time out?

23   A.    Well, my opinion comes out of the numbers

24   that I see here.

25   Q.    Well, then let's do that, because I don't

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2   see that.  So show me -- show me that you worked in
 3   excess of 40 hours, and this is just one random
 4   time sheet.  We can do it all day long.  Show me
 5   where you worked in excess of 40 hours, which you
 6   stated in your complaint from Page 3 to Page 6
 7   or 5?
 8   A.     Where -- are we on Page 4 now?
 9              (Simultaneous speakers.)
10              MR. DiGIULIO:  Objection to the
11         form.
12   A.     I think we were counting September, and you
13   were putting me back to Page 3, which is, I think,
14   June or July.  So if we are counting September,
15   right here; 11 hours and 40 minutes, 7 hours and 58
16   minutes, 8 hours and 1 minute, 13 hours, and 11
17   hours plus minutes.  It already indicates it's
18   over -- way over 40 hours.  So I don't want to talk
19   about this because numbers are here.
20   Q.     No, it's really not.  What about the next
21   page?  You said every week.
22              MR. DiGIULIO:  Objection.  That
23         mischaracterizes the complaint.
24              MR. SEGAL:  How does it
25         mischaracterize the complaint?
```

BARKLEY
Court Reporters

N. Martinenko

1

2          MR. DiGIULIO:  Look at the

3     complaint.  It says, "regularly worked."

4     You said "every week."

5          MR. SEGAL:  This is not regularly

6     at all.

7          MR. DiGIULIO:  Sure.  Forgery.  Go

8     for it.

9          MR. SEGAL:  What?

10          MR. DiGIULIO:  Continue.

11   Q.    Do you have a good relationship with

12   Nikolay?

13   A.    I did.

14   Q.    What happened with that relationship?

15   A.    I don't know.  He knows better.

16   Q.    Well, I'm asking you, not him?

17   A.    Well, I was very respectful.  But then, you

18   know, just because I got sick, he was really mad at

19   me, and then it went south, our relationship.

20   Q.    When you say you got sick, what do you mean

21   by that?

22   A.    I was infected with COVID.

23   Q.    When did that happen?

24   A.    In December, closer to Christmas.  I don't

25   exactly remember the date.

72

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2  Q.     Did you go for a COVID test?
 3  A.     Yes, I did.
 4  Q.     Were you still working --
 5         Withdrawn.
 6         Were you still working at the restaurant
 7  when you got COVID?
 8  A.     When I learned I had COVID, I didn't go to
 9  the restaurant.  Before I worked there, yes.
10  Q.     Did you have any signs or symptoms when you
11  were at the restaurant prior to you learning that
12  you had COVID?
13  A.     No.
14              MR. DiGIULIO:  Objection to the
15         relevancy of the question.
16              MR. SEGAL:  It's relevant.
17              MR. DiGIULIO:  How is it relevant?
18              MR. SEGAL:  Because it affects her
19         employment at the restaurant, and it
20         affected the restaurant.  The restaurant
21         had to close due to her --
22              MR. DiGIULIO:  You withdrew the
23         allegations.  Are you going to bring them
24         up now again?
25              MR. SEGAL:  Yeah, I'll bring them
```

73

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2         up --
 3                 MR. DiGIULIO:  He, under oath --
 4                 (Simultaneous speakers.)
 5                 MR. VOLPER:  I don't withdraw
 6         anything.
 7                 MR. DiGIULIO:  You testified under
 8         oath that you did withdraw those claims.
 9                 MR. VOLPER:  No, we never -- we
10         said we're going to sue in a different
11         court.
12                 MR. DiGIULIO:  All right.  Well,
13         then we're not going to answer any
14         questions about this.  It's a discovery to
15         another pending action.
16                 MR. VOLPER:  Yeah, but the law
17         required she to be fully vaccinated in
18         order to work.  So it's relevant to any
19         labor-related cases.  It's a law --
20                 MR. DiGIULIO:  Please instruct your
21         client not to speak to me.
22                 MR. SEGAL:  Well, you asked him a
23         question.
24                 (Simultaneous speakers.)
25                 MR. VOLPER:  It's a law.  She have
```

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2        to (unintelligible).
 3                MR. SEGAL:  Well, let's everybody
 4        chill out.
 5                MR. DiGIULIO:  No.  I'm not going
 6        let you ask her about this.  It's an
 7        invasion of privacy, and it's irrelevant.
 8                MR. SEGAL:  It's not.  It's related
 9        to the restaurant.  It was a Cuomo law.
10        She had to get vaccinated.
11                MR. DiGIULIO:  Your employer had to
12        enforce Cuomo law.  We're not going to
13        answer this.
14                MR. VOLPER:  I'm not enforcement
15        agency, my friend.  I'm not enforcement
16        agency.
17                MR. DiGIULIO:  Oh, you didn't
18        enforce it?
19                MR. VOLPER:  I'm not a enforcement
20        agency.  It's my responsibility --
21                (Simultaneous speakers.)
22                MR. SEGAL:  If we have to call the
23        judge, we'll call the judge.  Let me ask
24        the questions.
25                MR. VOLPER:  It's my
```

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1
2     responsibility --
3                 (Simultaneous speakers.)
4                 MR. SEGAL:  Nikolay, let me ask the
5         questions.
6                 MR. VOLPER:  Call the judge.
7                 MR. SEGAL:  If I have to, I will.
8         You want to call him right now?
9                 MR. DiGIULIO:  I don't.  I'm
10        instructing her not to answer questions
11        about -- related to COVID.
12                MR. VOLPER:  Let's do it.
13                MR. SEGAL:  Okay.  You want to do
14        this?
15                MR. DiGIULIO:  I don't.
16                MR. SEGAL:  Let me ask a couple of
17        other questions.  Let's see.  Okay?  Let's
18        take it --
19   Q.    Talk to me about your -- what happened, how
20   were you terminated from the restaurant?
21   A.    I was terminated over phone that I was not
22   supposed to come back after -- actually it was,
23   like, I literately had to take these words out of
24   his mind -- mouth, because he wasn't telling me
25   that I was fired.  He was just lying to me that,

76

BARKLEY
Court Reporters

1                     N. Martinenko

2   oh, it's not busy now.  You can stay home.  Then I

3   had to tell him that it wasn't true because I could

4   see the reservation -- there are a lot of

5   reservations.  It's not slow.  And then at the end,

6   I finally got him to say, you know what, I don't

7   need you anymore.  You're fired.  So that's how I

8   got fired.

9   Q.     If you weren't at the restaurant, how did

10  you see the restaurant?

11  A.     Well, I worked.  After I recovered from the

12  COVID, I worked two shifts.  And then I could see

13  the reservation.

14  Q.     When did you get COVID?  Do you remember

15  the exact day?

16  A.     I don't remember the day, but it was like a

17  mid-December, like closer to Christmas so...

18  Q.     Okay.  And when you had COVID, you didn't

19  come into the restaurant?

20  A.     I didn't.

21  Q.     And then when you came back that one day,

22  you were done with COVID?

23  A.     Yes.

24  Q.     Okay.  And after -- and what was that, that

25  day?

                          77

N. Martinenko

1

2    A.    I'm not sure.  I might be -- it would be a

3    mistake.  But I think the last time I worked was

4    December 28, or 27.  28, I think.

5    Q.    And then is there a schedule that you

6    looked at and saw you weren't on on the 29th, or

7    how did that --

8    A.    I'm assuming I was just informed over the

9    text message to, you know, like that I was supposed

10   to go in work.

11   Q.    By the way, I never asked you this

12   question.  In 2018, how did you leave the

13   restaurant?

14   A.    I just had another job offer and I just

15   ended.

16   Q.    What job offer was that?

17   A.    It was another restaurant job.

18   Q.    Is that the same restaurant you mentioned?

19   A.    Which did I mention?

20   Q.    That you were working at both places at one

21   time?

22   A.    Oh, no.  It was the different one.

23   Q.    Okay.  And why did you leave that

24   restaurant?

25   A.    I couldn't get used to environment.  It

```
 1                    N. Martinenko
 2  was, like, very, kind of, like, ethnic racist kind
 3  of environment.
 4  Q.    What kind of restaurant is that?
 5  A.    It's called Nusr-Et Steakhouse.
 6  Q.    Nusr-Et --
 7  A.    Nusr-Et.  Nusr-Et is the name of the
 8  Turkish Salt Bae chef.
 9  Q.    Where is it located?
10  A.    It's on 53rd and 5th Avenue, I think.  It's
11  like an old China Grill.
12  Q.    Oh, the old China Grill location?
13  A.    Yes.
14  Q.    Did they terminate you, or you left on your
15  own?
16  A.    I was going to leave, but then they
17  terminated too.  Like I was -- it was a
18  termination.  But actually, I was going to put in
19  my two weeks that day, but they were --
20  Q.    What was the basis of that termination?
21  A.    They didn't really have any reasons.  They
22  just -- they said that they were overstaffed and
23  they didn't need me.
24  Q.    Did you file a lawsuit against them?
25  A.    No.
```

79

BARKLEY
Court Reporters

1              N. Martinenko

2                  (Whereupon, a discussion was held

3       off the record.)

4    Q.    When you first started working with the

5    restaurant, after your year-end wage statement, did

6    you receive a 1099 or a W-2?

7    A.    Are we talking about 212 Steakhouse?

8    Q.    Yeah.  I forgot about -- we're past the

9    other restaurant.

10   A.    At the end of the year?

11   Q.    Yes.

12   A.    The tax season, yeah, I got the 1099 form.

13   Q.    Do you know what a 1099 form is?

14   A.    I know that it -- what I know about 1099 is

15   that your taxes are not deducted during the weekly

16   salary, and then you --

17   Q.    Did you file a 1099 form?

18   A.    Yes, of course.

19   Q.    Personally or through an entity?

20   A.    No, I had an accountant I went to.

21   Q.    Who filed that tax return?  Was it you

22   individually or an entity?  In other words, who

23   filed the tax return?

24   A.    I didn't do it myself.  I went to an

25   accountant.

1                        N. Martinenko

2                    MR. DiGIULIO:  She doesn't

3            understand the question.

4    Q.    Who's the filer?  Was it Nino Martinenko or

5    a was it a corporation or a --

6    A.    No.  It was me.  It was me, of course.

7                    MR. DiGIULIO:  Who did you guys

8            issue the 1099 to?

9                    MR. VOLPER:  You want me to answer?

10                   MR. SEGAL:  No, I don't.

11                   MR. VOLPER:  You want me to answer?

12                   MR. SEGAL:  I don't.  I don't.

13                   Let's take a two-minute break.  But

14           I think we're almost done.

15                   (Whereupon, a recess was taken at

16           this time.)

17   Q.    When was the first time you told Nikolay

18   Volper that you weren't feeling good around that

19   Christmas holiday?

20   A.    I actually texted him.  I can look up in my

21   phone if you want, but I don't remember a date.

22   Q.    What was the rest of that --

23   A.    I texted him saying I got COVID.  And then

24   his reaction was like, Oh, that's bad, or something

25   like that.  I think nothing else.

                            81

BARKLEY
Court Reporters

1                    N. Martinenko

2    Q.    Were you ever in the restaurant prior to

3    that date with symptoms?

4    A.    No.

5    Q.    And once you felt you had the symptoms, you

6    never went into that restaurant?

7    A.    No.

8    Q.    Did you ever wear a mask in the restaurant?

9    A.    When we had to wear it, I was wearing it.

10   But there was, like, some time that it wasn't a

11   mandatory thing, so I wasn't wearing it.

12   Q.    Was anyone else in the restaurant sick, to

13   your knowledge?

14   A.    To my knowledge, it was a hostess girl and

15   me.  Nobody else really had COVID.  Hostess is

16   someone that I had basically no contact with.

17   Q.    Who is that?

18   A.    I don't remember her name.  It was a girl

19   that would just come on the busy day.  She would be

20   standing by the door, and I would be busy on the

21   floor.  So I did not have any contact with her to

22   my -- would you like to hear my opinion?  I think

23   it was a customer --

24              MR. DiGIULIO:  No.

25              THE WITNESS:  Okay.


                          82

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2                MR. DiGIULIO:  He didn't ask you.
 3                THE WITNESS:  Okay.
 4                MR. SEGAL:  Give me one second.
 5        Okay.
 6                (Whereupon, a recess was taken at
 7        this time.)
 8  Q.    Were you familiar with the vaccination law
 9  at the time you were sick in relation to the
10  hospitality industry?
11                MR. DiGIULIO:  Objection.  Don't
12        answer that.  It's irrelevant, and it's
13        invasive.
14                Do you want to call the judge to
15        ask this question?
16                MR. VOLPER:  Let's call the judge.
17        Yes.
18                MR. DiGIULIO:  Sure.
19                MR. VOLPER:  Okay.  Let's do it.
20                MR. DiGIULIO:  I'm not going to
21        call.
22                MR. VOLPER:  Call the judge.  It's
23        a law.  A law to work.  It's related to
24        labor.
25                MR. SEGAL:  Let's just call to get
```

83

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2          this resolved.  Okay?
 3                  MR. DiGIULIO:  What's your position
 4          about it's relevancy?  You should call.
 5          I'm just curious.
 6                  MR. VOLPER:  (Unintelligible) law.
 7                  MR. SEGAL:  It's related to the
 8          hospitality industry.  Employees had to be
 9          vaccinated.  It's related to, somewhat, her
10          termination.  She's saying she was
11          wrongfully terminated.
12                  MR. DiGIULIO:  No, she's not.
13          There's no claim for wrongful termination,
14          so please call.
15                  MR. VOLPER:  Is she -- if she can
16          work illegally in your opinion.
17                  MR. DiGIULIO:  Whether she can work
18          or not is actually relevant, her work
19          status.
20                  MR. VOLPER:  (Unintelligible.)
21                  (Reporter clarification.)
22                  MR. DiGIULIO:  This is off the
23          record.
24                  (Whereupon, a discussion was held
25          off the record.)
```

84

BARKLEY
Court Reporters

N. Martinenko

1

2              MR. SEGAL:  Defense is done asking

3        Nino Martinenko any questions at this

4        deposition.  And if Plaintiff's counsel

5        wants to --

6              MR. DiGIULIO:  I have one question.

7   EXAMINATION BY

8   MR. DiGIULIO:

9   Q.    So Nino, did anyone instruct you to clock

10  out for the time that you were eating a meal shift

11  during your time at 212 Steakhouse?

12  A.    No.

13              MR. DiGIULIO:  Okay.  That's it.

14        You can follow up on --

15              MR. SEGAL:  You want to follow up?

16              MR. VOLPER:  I want to say

17        something.

18              (Whereupon, a discussion was held

19        off the record.)

20  FURTHER EXAMINATION BY

21  MR. SEGAL:

22  Q.    Back on the record.  So Nino, the time

23  records reveal that sometimes you did clock in and

24  clock out during break.  Not often, but you did?

25  A.    I would clock out if I had a lunch shift.

85

BARKLEY
Court Reporters

N. Martinenko

1
2     I would clock out, take a little break.  Maybe
3     breathe some air outside, and then I would go and
4     come back.  Why would I stay clocked in if I was --
5                      (Simultaneous speakers.)
6     Q.     Who told you to do that?
7     A.     It was common sense.  I didn't need anyone
8     to tell me that.
9     Q.     No one at all told you to do that?
10    A.     No.  I just clocked out because I thought
11    it was fair to do.
12    Q.     Did other employees do that?
13    A.     I don't know.  I didn't look at what they
14    were doing?
15    Q.     Were you involved in the records?
16                   MR. DiGIULIO:  Objection.  Vague.
17          You can answer.
18    A.     I don't get the question.
19    Q.     Okay.  Didn't you see -- did you ever
20    review the time records when you were involved in
21    the payroll?
22    A.     How could I see it?
23    Q.     Printed off the machine?
24    A.     I did not have access to it.
25    Q.     So you, on your own, decided to clock in

BARKLEY
Court Reporters

 1    and clock out during your days that you had the

 2    double shift?

 3    A.     Yes.  Maybe I took it as an example from

 4    someone else prior to that.  I'm talking about

 5    years ago when I first started.  But in general,

 6    it's common sense if I'm not inside the restaurant

 7    and I'm outside taking a break, it's a common sense

 8    to clock out.  I think so, right?

 9    Q.     Did you do that all the time?

10    A.     Yes, if I was going outside the restaurant

11    and I was on a break, I was doing that all the

12    time.

13    Q.     And the 4:00 or 5:00 meal break, you never

14    did?

15    A.     No.

16                    MR. SEGAL:  No further questions.

17                    (Time Noted:  12:36 p.m.)

18

19                    _____

20                          NINO MARINENKO

21

22    Subscribed and sworn to before me

23    this _____ day of _____ 20___.

24    _____

25                    Notary Public


                              87

BARKLEY
Court Reporters