# EXHIBIT 2

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
NINO MARTINENKO, on behalf of herself and
others similarly situated,

                              Plaintiff,


           -against-      Case No:  22-CV-518


212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

                              Defendants.
------------------------------------------------x




               EXAMINATION BEFORE TRIAL of the Plaintiff

                    NINO MARTINENKO

                  December 20, 2022








TENEJA THWEATT, Notary Public
489177







**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles     (415) 433-5777 San Francisco     (949) 955-0400 Irvine          (858) 465-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose          (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez          (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn          (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------------------x
    NINO MARTINENKO, on behalf of herself and
3   others similarly situated,

4                            Plaintiff,

5
                -against-     Case No:  22-CV-518
6

7
    212 STEAKHOUSE, INC., and NIKOLAY VOLPER,
8
                             Defendants.
9   ----------------------------------------------x

10          EXAMINATION BEFORE TRIAL of the Plaintiff,

11   NINO MARTINENKO, taken by the Defendants, pursuant

12   to Court Order, held at the Law Offices of Mitchell

13   S. Segal, P.C., 137 5th Avenue, 9th Floor, New

14   York, New York 10010, on December 20, 2022, at

15   10:10 a.m., before a Notary Public of the State of

16   New York.

17
    ************************************************
18                  BARKLEY COURT REPORTERS

19

20

21

22

23

24

25

                                1

BARKLEY
Court Reporters

1    A P P E A R A N C E S:

2      JOSEPH & KIRSCHENBAUM, LLP
               Attorney for Plaintiff
3              32 Broadway, Suite 601
               New York, New York 10004
4              (212)688-5640

5      BY:     MICHAEL DiGIULIO, ESQ.
               Mike@jk-llp.com
6

7

8    LAW OFFICES OF MITCHELL S. SEGAL P.C.
               Attorney for Defendants
9              1129 Northern Boulevard, Suite 404
               Manhasset, New York 11303
10             (516)415-0100

11     BY:     MITCHELL S. SEGAL, ESQ.
               Msegal@segallaw.com
12

13

14   ALSO PRESENT:

15   NIKOLAY VOLPER, Defendant

16

17

18

19

20

21

22

23

24

25

                              2

BARKLEY
Court Reporters

1          S T I P U L A T I O N S:

2     IT IS STIPULATED AND AGREED by and between the
      attorneys for the respective parties herein, and in
3     compliance with Rule 221 of the Uniform Rules for
      the Trial Courts:

4
      THAT the parties recognize the provision of Rule
5     3115 subdivisions (b), (c) and/or (d).  All
      objections made at a deposition shall be noted by
6     the officer before whom the deposition is taken,
      and the answer shall be given and the deposition
7     shall proceed subject to the objections and to the
      right of a person to apply for appropriate relief
8     pursuant to Article 31 of the C.P.L.R.;

9     THAT every objection raised during a deposition
      shall be stated succinctly and framed so as not to
10    suggest an answer to the deponent and, at the
      request of the questioning attorney, shall include
11    a clear statement as to any defect in form or other
      basis of error or irregularity.  Except to the
12    extent permitted by CPLR Rule 3115 or by this rule,
      during the course of the examination persons in
13    attendance shall not make statements or comments
      that interfere with the questioning.

14
      THAT a deponent shall answer all questions at a
15    deposition, except (i) to preserve a privilege or
      right of confidentiality, (ii) to enforce a
16    limitation set forth in an order of a court, or
      (iii) when the question is plainly improper and
17    would, if answered, cause significant prejudice to
      any person.  An attorney shall not direct a
18    deponent not to answer except as provided in CPLR
      Rule 3115 or this subdivision.  Any refusal to
19    answer or direction not to answer shall be
      accompanied by a succinct and clear statement on
20    the basis therefore.  If the deponent does not
      answer a question, the examining party shall have
21    the right to complete the remainder of the
      deposition.

22
      THAT an attorney shall not interrupt the deposition
23    for the purpose of communicating with the deponent
      unless all parties consent or the communication is
24    made for the purpose of determining whether the
      question should not be answered on the grounds set
25    forth in Section 221.2 of these rules, and, in such

3

BARKLEY
Court Reporters

1   event, the reason for the communication shall be
    stated for the record succinctly and clearly.
2
    THAT the failure to object to any question or to
3   move to strike any testimony at this examination
    shall not be a bar or waiver to make such objection
4   or motion at the time of the trial of this action,
    and is hereby reserved; and
5
    THAT this examination may be signed and sworn to by
6   the witness examined herein before any Notary
    Public, but the failure to do so or to return the
7   original of the examination to the attorney on
    whose behalf the examination is taken, shall not be
8   deemed a waiver of the rights provided by Rule 3116
    and 3117 of the C.P.L.R, and shall be controlled
9   thereby; and

10  THAT the certification and filing of the original
    of this examination are hereby waived.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

BARKLEY
Court Reporters

```
 1   N I N O   M A R T I N E N K O,  the witness herein,
 2   having been first duly sworn by a Notary Public of
 3   the State of New York, was examined and testified
 4   as follows:
 5   EXAMINATION BY
 6   MR. SEGAL:
 7   Q.      State your name for the record, please.
 8   A.      Nino Martinenko.
 9   Q.      State your address for the record, please.
10   A.      8309 3rd Avenue, 2nd Floor, Brooklyn, New
11   York 11209.
12   Q.      My name is Mitch Segal.  I represent the
13   defendants in this matter.  Good morning.
14   A.      Morning.
15   Q.      So I'm going to ask you several questions.
16   Have you ever been in a deposition before?
17   A.      No.
18   Q.      Okay.  So I'll ask you questions.  Please
19   wait until I'm done stating the question.  You have
20   to give an audible answer, yes or no, so the
21   transcriber can report that.
22          Let me ask you a question:  Did you meet
23   with your attorney prior to this deposition?
24   A.      We met a couple of times in general.  And
25   you mean to prepare for the deposition?
```

5

BARKLEY
Court Reporters

N. Martinenko

1

2  Q.      When was that?

3  A.      No.  I'm making sure I'm getting the

4  question correctly.

5  Q.      Okay.

6  A.      Are you asking me if I met him to prepare

7  for this?

8  Q.      Yes.

9  A.      I met him about a month ago.  And he -- I

10 just -- because I wasn't familiar what it was

11 about.  He just took me through the, you know, how

12 it usually goes.  That's all.

13 Q.      Did you speak with him subsequent or after

14 the month ago about the deposition and potential

15 questions and responses?

16 A.      Not that I remember, but maybe.  I just had

17 few questions --

18 Q.      Well, it was only a month ago, so your

19 memory has -- we're going to be talking about

20 several years ago, right?

21 A.      Okay.

22 Q.      So if you can't remember 30 days ago, how

23 are you going to remember several years ago?

24 A.      No.  Well, we didn't go through questions.

25 I just had questions myself, what was it going to

6

BARKLEY
Court Reporters

N. Martinenko

1
2     be about.  And he kind of took me through the
3     process.
4     Q.      Okay.  When was the last time you did that?
5     A.      That was one and only time we did, about a
6     month ago.
7     Q.      Okay.  That's fine.  Are you able to
8     testify truthfully today?
9     A.      Yes.
10    Q.      Did you have any alcoholic beverages in the
11    last 24 hours?
12    A.      No.
13    Q.      Any drugs?
14    A.      No.
15    Q.      Are you on any prescription medications?
16    A.      Nope.
17    Q.      You said you lived -- what was the address?
18                    THE REPORTER:  8309 3rd Avenue, 2nd
19            Floor, Brooklyn, New York 11209.
20    Q.      You said second floor.  Is there an
21    apartment?
22    A.      Yes.
23    Q.      Can we have the apartment?
24                    MR. DiGIULIO:  Objection to
25            relevancy.

7

BARKLEY
Court Reporters

<pre>
 1                       N. Martinenko
 2                  MR. SEGAL:  Addresses, we need a
 3           correct address.
 4    Q.     So second floor.  What apartment number is
 5    that?
 6    A.     It's just one apartment on that floor.
 7    Q.     Okay.  That's fine.
 8           Okay.
 9           So Nino, where were you -- are you a U.S.
10    citizen?
11    A.     Yes.
12                  MR. DiGIULIO:  Objection.  You can
13           answer.
14    A.     Yes, I am.
15    Q.     And when did you come to the U.S.?
16    A.     2012.
17    Q.     And what's your educational background?
18    A.     I have a bachelor's degree on economics and
19    finances.
20    Q.     On what?  I'm sorry?
21    A.     Economics and finances.
22    Q.     Where was that?  Where did you get that?
23    A.     Back in my country, in Georgia, the
24    republic of Georgia.
25    Q.     So you're from where originally?
</pre>

8

BARKLEY
Court Reporters

N. Martinenko

A.      I am from the country Georgia.

Q.      Georgia in Russia, is that --

A.      It's not in Russia.  It's next to Russia.

                  (Reporter clarification.)

Q.      When you came to the U.S., what has been
your occupation from 2012 on?

A.      Well, I worked different places for about a
couple of months.  And then I started a server job
at the restaurant.

Q.      Okay.  So -- okay.  So a couple of places
just for a couple of months?

A.      Yeah.  Before I found where I wanted to
stay for longer than couple of months.

Q.      Okay.  And when was that?

A.      I don't understand the question.

Q.      In other words, so you did a couple -- what
were the prior jobs?

          MR. DiGIULIO:  Objection to form.
      Prior to what?

          MR. SEGAL:  The prior jobs.  She
      said she worked at three different jobs --

                  (Simultaneous speakers.)

A.      I didn't mention any job.

Q.      Okay.  So let's go through that.

9

BARKLEY
Court Reporters

N. Martinenko

Q. Where did you work first?

A. I worked for a store that would sell fur coats. I was just bag consultant -- like consulting people.

Q. And what store was that?

A. It was called Premier Fur, I think.

Q. And where was that located?

A. It was in Brooklyn on 86th Street and Bensonhurst. I don't exactly remember the address.

Q. Okay. And when did you start there?

A. I would say I started probably at, like --

MR. SEGAL: Off the record.

(Whereupon, a discussion was held off the record.)

A. Okay. Yeah, I don't exactly remember. It was probably September when I started there.

Q. Okay. Of 2012?

A. No. I'm sorry. 2013.

Q. Okay. And how long did you work there for?

A. Couple of months. I would say until November.

Q. Okay.

A. And then --

Q. Yeah. Okay. Why did you leave, or what

10

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1

2  was the --

3  A.      It wasn't enough income.  So I was looking

4  for something else.

5  Q.      And what was your next position?

6  A.      My next position was a server.

7  Q.      And where was that?

8  A.      It was a Georgian restaurant in Manhattan.

9  It's called Oda House.  O-D-A House.

10                   (Reporter clarification.)

11  A.      That's where I started working as a server.

12  Q.      And how long did you stay there for?

13  A.      Until 2015 May, I'm assuming.  Yeah, May.

14  Q.      So roughly two years or so?

15  A.      Yeah.

16  Q.      And why did you leave Oda House?

17  A.      I just did not feel good there, meaning,

18  like, certain people would not make me feel good

19  there.  So I just had to leave.

20  Q.      What does that mean exactly?

21  A.      Well, there were a couple of employees that

22  would just go gossiping.  And one of them -- I

23  don't know if it's appropriate to say.  One of them

24  had crush on me, which would really make me feel

25  uncomfortable there, so I just had to leave.

11

BARKLEY
Court Reporters

N. Martinenko

Q.      Did you report that --

A.      No.

Q.      -- to Oda House?

A.      Nobody was harassing me.  Why would I
report it?  I just decided to leave myself.

Q.      Did you sue Oda House?

A.      No.

Q.      What was your next position?

A.      My next position was a server at 212
Steakhouse.

Q.      Okay.  So let's talk about that.  When did
you start?

A.      It was -- I'm assuming the end of June or
beginning of July of 2015.

Q.      When did you complete your --

        Well, withdraw.

        When did you last work at 212 Steakhouse?

A.      I have two terms working there.  The first
time when I left 212 Steakhouse was 2018 December,
and then I got back there in 2020 -- I mean '21,
beginning.  I lasted until December '21.  It was
about New Year's when I got fired.

Q.      What was your position at 212 Steakhouse?

A.      My position was called a server.

12

BARKLEY
Court Reporters

N. Martinenko

Q.      Why do you say it was called --

A.      Because I would do more than servers would

do.

Q.      What would you do that was more than

servers do?  Well, let me -- what do servers do

normally?

A.      Well, they serve people.  They take orders,

they put that in the POS system.  They send orders.

They make sure they serve drinks.  They order

drinks for the customers.  They, you know, make

sure the food comes out on time.  They present food

to the customers when it comes out, and they check

on them if they have been enjoying the food.  And

at the end, they present the check, and they charge

their cards or they take cash (unintelligible).

                (Reporter clarification.)

Q.      What was the ending of that, they charge

their cards and what?

A.      They charge their cards or take the cash

payment depending on how they're paying.

Q.      So you did that as a server?

A.      Yes.

Q.      What else did you do?  You said you did

more than a server, so what else did you do?

13

BARKLEY
Court Reporters

N. Martinenko

1

2   A.      Okay.  Well, I also did take phone calls,

3   take reservations.  Okay.  I actually was spending

4   a lot of hours just doing that, which was not my

5   position.  I would also be in charge to, let's say,

6   order desserts to certain places where they

7   would -- you know, if I had -- if I would forget,

8   let's say, ordering desserts, and we were out of

9   desserts, I would be in trouble because that was my

10  responsibility to do --

11  Q.      Who gave you that responsibility?

12  A.      I -- I mean, there was nobody else to do

13  it, and then -- there was a girl there that would

14  do it before me, but then just because she wasn't

15  there anymore, it just automatically became my job.

16  Q.      Okay.  Let's go back.  Someone must have --

17                  (Reporter clarification.)

18  Q.      Let me ask the questions.

19                  (Reporter clarification.)

20  Q.      I'll ask the question again.

21          Who told you to order desserts?

22  A.      Imran Sajid.

23  Q.      Who?

24  A.      Imran.

25  Q.      And who is Imran?

NINO MARTINENKO

BARKLEY
Court Reporters

1

2   A.      He's the person that works there as well.

3   I don't exactly know what his position is, but he

4   acts as if he's an owner too of the restaurant.

5   Q.      You said that a prior girl was doing the

6   desserts and then you took that over.  Did someone

7   tell you to take that over?

8   A.      I just told you it was Imran.

9   Q.      And what did he tell you exactly?

10  A.      If I could start ordering desserts now that

11  the girl wasn't there anymore.

12  Q.      And how did you know how to order desserts?

13  A.      Well, he gave me a phone number, and I

14  started calling that number and ordering desserts.

15  Q.      How long did that take you?

16  A.      Depending on how busy that dessert place

17  was, it would have been ten minutes, fifteen or

18  twenty.

19  Q.      Okay.  Other than ordering dessert, what

20  else did you do that wasn't a server

21  responsibility?

22              MR. DiGIULIO:  Objection.

23          Misrepresents testimony.  You can answer.

24              THE WITNESS:  Should I answer?

25              MR. DiGIULIO:  Yes, please answer.

BARKLEY
Court Reporters

N. Martinenko

1
2    A.      Well, I also mentioned the phone calls.

3    That's not a server position.  Besides ordering

4    desserts, I would also be in charge to write

5    paychecks, like, for the -- for the other

6    employees.

7    Q.      Okay.  That's fine.

8            Let's go back to the phone calls.

9    A.      Mm-hmm.

10   Q.      How many phone calls did you take per day?

11   A.      I didn't count, but it was at least 50.

12   Q.      How long was each phone call?

13   A.      Depending on what they wanted, it would

14   have been two minutes, three minutes or more.

15   Q.      So what were your hours that you worked?

16   A.      If I was doing double, like double shift,

17   it would've been starting from 1:00 and then

18   finishing up until closing, which was never a

19   certain time because it depended what -- like what

20   was the latest reservation and what time last

21   customer would walk in, and then what time they

22   would decide to leave.  So basically, I can say it

23   was maybe until 12:00 a.m., sometimes longer.

24   Q.      What time did you come in to the

25   restaurant?

16

BARKLEY
Court Reporters

N. Martinenko

A.      If I was opening, meaning if it was a
double shift, I would have been there 11:30,
somewhere that time.  Yeah.

Q.      11:30.  So let's focus on the double shift
for a second.  So you came in at 11:30, and when
did you work until?

A.      Double shift means that I was staying there
until closing.  So it would have been 12:00 a.m.,
1:00 a.m.  I don't know.  If it was -- if we were
super lucky maybe until 11:00 p.m.  But usually
that's how long it would have been.

Q.      On average, what was it?  11:00 p.m.?

A.      Average, I would say 12:00 a.m.

Q.      And how many days -- how many days a week
did you do a double shift?

A.      Two mostly.  Two or three.

Q.      Okay.  What was it, two or three?

A.      Well, schedule would change.  So it could
have been two or three.  It wasn't same exact thing
every week.

Q.      Would you say that fifty percent of the
time, you did two or three, or was it --

A.      Fifty percent of the --

Q.      Eighty, or what do you think?

17

BARKLEY
Court Reporters

N. Martinenko

A.      I would do fifty percent of the time, it
would have been two days, double.

Q.      Was the restaurant closed during that
double shift at all?

A.      If there was no customers doing lunch
there -- which is basically -- that's how it would
go, like there were no customers -- officially we
would announce it was closed at 4:00 because that's
when the other staff would come in for the dinner
shift.  And that's when we would start preparation
for dinner.  So it was basically closed from 4:00
to 5:00.

Q.      Okay.  I'm familiar with the restaurant, as
you know.

A.      I've served you couple of times.

Q.      Yes, you did.  And it's not a busy lunch;
is it?

A.      There's basically no business for lunch, at
least for those days when I worked there.

Q.      Am I incorrect to state that lunch
wasn't -- that was always an issue, to open for
lunch or not, because it wasn't that busy?

A.      Issue --

Q.      In other words, didn't the restaurant close

18

BARKLEY
Court Reporters

N. Martinenko

1
2   sometimes for lunch, and in the beginning it wasn't

3   really open for lunch, and then it opened up for

4   lunch later, and it wasn't successful, and it

5   closed again?  Is that not the truth?

6   A.     Yeah, it was couple of times that they

7   didn't do lunch.  But then they would reopen it

8   again.  Yes.

9   Q.     Okay.  So let's focus on that for a second.

10       So during your tenure, right, how many

11   times --

12       Withdrawn.

13       During the time you worked there --

14   A.     Mm-hmm.

15   Q.     -- which was according to your complaint --

16   well, actually let's take a step back.

17       So really the years that we're talking

18   about here are two thousand -- even though you said

19   you worked from 2016 to 2018, the years we're

20   talking about are 2016 to '18, and then from '21 --

21   January '21 to December '21.  So forget about 2015

22   because that's not really applicable.  It doesn't

23   go back six years, which is the complaint's

24   statute.

25       So during 2016 to 2018, right -- which is,

19

BARKLEY
Court Reporters

N. Martinenko

1
2  I guess, three years; let's assume that for the
3  time being -- and then another year from '21 to --
4  from '21, so four years, how many months was the
5  restaurant closed for lunch?
6  A.    I can't really answer that question.  I
7  don't know exactly.
8  Q.    Can you speculate --
9              MR. DiGIULIO:  Objection.  Calls --
10 A.    I can't.
11             MR. DiGIULIO:  -- speculation.  You
12         can answer, if you can.
13 Q.    Can you guess?
14 A.    I can't.
15 Q.    To the best of your recollection, was it
16 five months, ten months, a year?
17 A.    I can't remember.  I can't answer that
18 question.  Like, I might make a mistake.  So I
19 can't answer that question.
20 Q.    That's all right.  I don't want you to make
21 a mistake.  So you don't have any recollection
22 whether the restaurant was opened or closed from
23 2016 to 2018 for lunch?
24 A.    Maybe it wasn't open all the time, but
25 most -- most of those time, it was open for lunch.

20

BARKLEY
Court Reporters

N. Martinenko

1

2   Q.    But you can't determine the amount of

3   months?

4   A.    I can't tell you exact amount of months how

5   many days it was closed or how many months.

6   Q.    Okay.

7   A.    But a lot of time, it was open, and I

8   worked.

9   Q.    But you can't tell me that either.  If you

10   don't know when it was closed, you can't tell me

11   when it was open; is that correct?

12   A.    Well, I remember working there for lunch.

13   Q.    No one's saying you didn't --

14   A.    But --

15   Q.    All I'm saying is if you can't tell me the

16   amount of months it was closed from 2016 to 2018 --

17   A.    Okay.

18   Q.    Then the reciprocal, you can't tell me when

19   it was open --

20            MR. DiGIULIO:  Objection to form.

21      No one's saying you didn't work.

22   A.    The only thing I'm saying right now is that

23   I would never think this would happen, and I didn't

24   just decide to memorize when it was open and when

25   it was closed.  So it was just --

NINO MARTINENKO

BARKLEY
Court Reporters

1

2    Q.      What do you --

3    A.      -- as a human being, I'm telling you I

4    don't remember exactly how many months it was

5    closed.  But most of it, it was open for lunch.

6    Q.      What do you mean you didn't expect this to

7    happen?  What does that --

8    A.      I mean I wasn't planning on suing anybody.

9    Why would I start remembering when was it open?

10   Q.      So what determined that you were suing?

11   A.      I'm sorry?

12   Q.      What was the decision that made you sue?

13   A.      Because it was very unfair how I got fired.

14   Q.      So it's about the firing; is that correct?

15   A.      It's about the firing, about me not getting

16   paid, whatever the labor law is about.

17                   (Simultaneous speakers.)

18   Q.      Well, just to be honest with you -- so

19   you've made statements in this complaint.

20   A.      Mm-hmm.

21   Q.      And you said it was opened, you worked this

22   time.  But if you don't remember, these statements

23   can't carry weight, so to speak.

24                   (Simultaneous speakers.)

25                   MR. SEGAL:  Objection.  There's no

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1
2         question.
3    A.    I do remember it.
4    Q.    Are these your statements as to when you
5    worked in this complaint?
6    A.    I don't understand the question.
7    Q.    Okay.  Have you read this complaint?
8    A.    Yes.
9                 MR. DiGIULIO:  Objection.  It's not
10               in evidence.  You're not showing it to her,
11               this complaint.
12   Q.    Okay.  Let's -- you want to do this?  We'll
13   do this.  Okay.  This will be Exhibit 1 for
14   defendants.
15               (Defendant's Exhibit 1, complaint,
16          was marked for identification.)
17               (Whereupon, a discussion was held
18          off the record.)
19   Q.    I show you Defendant's Exhibit 1.
20         Are you familiar with this complaint?
21   A.    I've seen it, yes.
22   Q.    Did you read it?
23   A.    I did.  It's -- yeah, I just.
24   Q.    What was the last --
25   A.    Long time ago I --

23

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

Q.      When was the last time you read it?

A.      I only read it once, and it was probably like a month and a half ago or maybe a month ago.

Q.      I'd like you to take some time and review that complaint.

A.      The whole thing?

Q.      Well, let --

A.      You want me to pay attention to the particular --

Q.      We're talking over each other.  I don't want to do that.

A.      Sorry.

Q.      That's okay.  Let's focus on -- let's focus on the facts, which is paragraph 20 --

A.      Mm-hmm.

Q.      -- until paragraph 32.  Why don't you just read those over.

A.      (Perusing.)

        Okay.

Q.      Okay.  So in anywhere on these facts, do you state that the restaurant was closed during the time that you worked for lunch?

A.      It doesn't say it here.

Q.      Just -- that's it.  Just answer the

24

BARKLEY
Court Reporters

N. Martinenko

1
2  question, please.  Okay.  And anywhere in these
3  facts, do you state that during the time period
4  that you worked, approximately 50 percent of the
5  time you did double shifts?  It's a yes-or-no
6  question.
7  A.      Can you --
8              MR. DiGIULIO:  Objection.  The
9          exhibit speaks for itself.  You can answer.
10 A.      And can you repeat your question because --
11 Q.      Sure.  Is there anywhere in this complaint
12 or these facts, the paragraphs that you just read,
13 does it state that during the time you were
14 employed, you worked double shifts, meaning the
15 restaurant was open for lunch 50 percent of the
16 time?
17             MR. DiGIULIO:  Same objection.  You
18         can answer.
19 Q.      Yes or no?
20 A.      I still -- I mean, I'm trying to understand
21 what the question is about.
22 Q.      I mean, I can't be clearer.
23 A.      Fifty percent of the time meaning -- who
24 said it was 50 percent of the time I was doing
25 double shifts?

25

BARKLEY
Court Reporters

N. Martinenko

1

2   Q.      Does it say that --

3   A.      It doesn't --

4                   (Simultaneous speakers.)

5   Q.      Because that's what you just told me.

6   A.      I told you I was doing 50 percent of --

7   Q.      You said two to three times --

8                   (Simultaneous speakers.)

9   Q.      -- per week.  Does it state that in here?

10  A.      It says here two to three lunch shift

11  lasting about two hours.  It's paragraph 24.

12  Q.      Okay.  Does it say that the restaurant was

13  closed at any time during that time period that you

14  worked?

15  A.      It doesn't say --

16  Q.      Okay.

17  A.      But it was couple of months maybe that it

18  was just closed.  Most of the time it was open for

19  lunch.

20  Q.      Well, you just said you didn't remember

21  when it was closed?

22  A.      Because it was so -- it was such a minor --

23  it was a little bit when it wasn't open.

24  Q.      So do you remember, or you don't remember?

25  A.      I remember at some point it was closed for

BARKLEY
Court Reporters

N. Martinenko

1
2   a bit for lunch.  But most of the time, it was

3   open.

4   Q.      What does for a bit mean?

5   A.      Like couple of months.

6   Q.      Do you know what year that was?

7   A.      No.  I don't remember exactly what year was

8   that.

9   Q.      Okay.  Does it state in here anywhere that

10  you ordered desserts?

11  A.      I don't think so.

12  Q.      But you read this right prior to filing?

13  A.      I didn't -- I'm repeating.  I read it once,

14  and it was probably a month ago.  And I don't

15  remember reading desserts.

16  Q.      You read this only a month ago?

17  A.      Yeah.

18  Q.      Did you read it prior to 1/20/22?

19  A.      1/20 -- what's --

20  Q.      When the complaint was filed?

21  A.      Oh, prior to that, we just spoke, me and my

22  lawyer.  And I was familiar with what was going on

23  here, but I didn't read it.

24  Q.      I'm not sure what that means, what was

25  going on here?

27

BARKLEY
Court Reporters

N. Martinenko

1

2   A.     I mean, I know what we spoke about, but I

3   didn't read the thing.

4   Q.     You didn't read the complaint prior to its

5   filing; is that correct?

6   A.     It was sent to me, and I -- I read it, but

7   I didn't really go into the details.  Like I --

8   Q.     Did you read it, or you didn't read it?  In

9   other words --

10  A.     So I didn't have a printed copy.  It was on

11  my phone.  So it was kind of impossible for me to

12  read the whole thing.  So I kind of went over it.

13  But one month ago, I read the whole thing.

14  Q.     But you didn't really read it prior to its

15  filing --

16  A.     No.

17  Q.     Is that correct?

18  A.     No.  I mean, I did read it but not

19  thoroughly.

20  Q.     Okay.  Thank you.  When you started working

21  here, was that when the restaurant first opened?

22  A.     It was open before -- before I started.

23  Q.     How many years before; do you know?

24  A.     As I know, they opened in 2014.  But I

25  wasn't there.

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

Q.      Okay.  So relatively in the beginning you

started; is that correct?

A.      Yeah, correct.  A year later, yeah.

Q.      And I'm familiar with the restaurant

because I live nearby.  It wasn't that busy; is

that correct?

A.      It was okay, I think.

Q.      Isn't it true that it took a decent amount

of time to pick up at some point?

A.      It was -- when I started, it was pretty

busy, and it got busier afterwards.  But I don't

think it was slower or bad business.

Q.      When were -- because you say you worked

until 12:00 a.m., that restaurant was never open

that late during the initial years that you worked.

So I'm curious why you say 12:00 a.m.?

A.      Restaurant being open doesn't mean that

there are no customers inside.  You might not

receive new customers at 12:00, but somebody that

worked inside the restaurant at 9:30 or 10:00 could

stay longer than 12:00 a.m.  You can't really kick

the customers out.

Q.      What time did the kitchen closed?

                MR. DiGIULIO:  Objection to form.

29

BARKLEY
Court Reporters

N. Martinenko

1

2          You can answer.

3                    (Whereupon, a discussion was held

4          off the record.)

5    A.     It was I think 10:30.

6    Q.     Okay.  So let me ask a practical question,

7    and please let me finish.  If the kitchen closed at

8    10:30 --

9    A.     Mm-hmm.

10   Q.     -- why were you there until 12:00 a.m.?

11   A.     Working at the restaurant -- I guess you

12   have never done that -- 10:30 is -- when your

13   kitchen is open until 10:30, that means if you

14   receive -- if you start serving a customer that

15   orders their food at 10:00 or 10:30, they need time

16   to finish up their meal, have their drinks.  From

17   10:30 to 12:00, how long is that?  One hour and a

18   half.  So yeah.

19   Q.     So are you telling me that when the -- if

20   the -- and by the way, when you say the kitchen

21   closes, they're done?  Does the chef leave?

22   A.     I don't know.  Chef mean, like, if the

23   kitchen is closed, we don't order more --

24                    (Simultaneous speakers.)

25                    (Reporter clarification.)

30

BARKLEY
Court Reporters

1
2  A.     Okay.  So when the kitchen is closed, we
3  sent no more food orders.  But I don't know what
4  chef doing, if he's leaving or if he's somewhere in
5  there again.  Why would I start looking for him?  I
6  know the kitchen is done, finished.
7  Q.     Since you're a server, and since I don't
8  know because I've never worked in a restaurant,
9  according to you, but I've owned probably ten, but
10 that's okay --
11              (Simultaneous speakers.)
12 Q.     Since the kitchen closed and you've served
13 the patrons, are you saying that they take an hour
14 and a half before you give them a check and leave?
15 A.     Sometimes more than that.
16 Q.     And that was from during 2015 to 2018 when
17 the restaurant first started out and it was very
18 slow?
19 A.     It wasn't very slow.
20 Q.     Oh, it wasn't?
21 A.     It wasn't.
22 Q.     Okay.  Okay.  Were you ever hanging out at
23 the bar after you served your customers?
24 A.     After the restaurant was closed, I could
25 have stayed at the bar, yeah.

BARKLEY
Court Reporters

N. Martinenko

Q.    How about from the time of 10:30 to 12:00?

A.    If I was working, I was not hanging out anywhere.

Q.    How about the time from 9:00 to 10:00 if you didn't have any tables?

A.    Can you specify what does hanging out mean at this point?

Q.    Yeah, standing at the bar?

A.    If I have nothing to do, I might stand there and talk with my coworker.

Q.    How many days a week did you work on average?

        MR. DiGIULIO:  Objection.  Asked and answered.  You can go ahead.

Q.    Go ahead, yeah.

A.    Well, five days -- five dinner shifts, plus two lunch shifts.  So I had two days off.  So basically --

Q.    What days were that?

A.    It wasn't permanent.  It was changing.

Q.    On average, any regularity?

A.    It was changing.  Mostly I would be off the beginning of week, never at the weekend.

Q.    Monday, Tuesday?

32

BARKLEY
Court Reporters

N. Martinenko

1

2  A.      Yeah, Monday, Tuesday; Tuesday, Wednesday;

3  Wednesday, Thursday, something like that.  It would

4  change.  Maybe not back to back.  Maybe Monday and

5  Wednesday.  It was never the same.

6  Q.      Do you think Wednesday and Thursday are the

7  beginning of the week?

8  A.      Did I start with Monday?

9  Q.      Please answer my question --

10             (Simultaneous speakers.)

11  A.      I started with Monday.

12  Q.      It's a yes-or-no question.

13  A.      Wednesday and Thursday is not the beginning

14  of the --

15  Q.      That's it.  That's all.  I just want

16  yes-or-no questions, please.  Okay.

17          What were you paid by the hour?

18  A.      Ten dollars.

19             MR. DiGIULIO:  Objection to the

20          form of the question.  There's no time

21          frame.  But you can answer, if you know.

22  A.      The last year -- I'm speaking about the

23  last year.  It was $10 an hour.

24  Q.      Withdrawn question.  Your attorney is

25  right.

33

BARKLEY
Court Reporters

1
2      In 2015, what were you paid by the hour?

3   A.      Five dollars an hour.

4   Q.      Five dollars an hour?

5   A.      Yes.

6   Q.      Do you have any proof that you were paid

7   five dollars an hour in 2015?

8   A.      No, because I wasn't getting any pay stubs.

9   Q.      But you only met a month ago to discuss

10  this right?

11                  MR. DiGIULIO:  Objection.

12          Harassing the witness.

13  Q.      Okay.  2016, what were you paid by the

14  hour?

15  A.      I don't exactly remember when it changed.

16  But it was -- after we started at $5 an hour and

17  probably a year later, a little more after, it was

18  7.25, I think, or 7.50.  Not sure.

19  Q.      Okay.  In 2017, what were you paid by the

20  hour?

21  A.      It remained the same for, like, until I

22  left 212 Steakhouse in 2018.

23  Q.      So from two thousand -- because you state

24  here even though you didn't read the complaint --

25  you state that you worked from 2015 to 2018, and

BARKLEY
Court Reporters

N. Martinenko

1
2    then you took time off, and then it was '21.  So
3    you're telling me from 2016, which is really the
4    only applicable period here, you earned 7.25 an
5    hour, and that never changed; is that correct?
6    A.     As far as I remember, yes, it didn't
7    change.
8    Q.     What do you mean as far as you remember?
9    A.     Again, I wasn't paid -- I wasn't shown pay
10   stubs.  So I don't know exactly how much I was
11   getting.  But it has never been --
12   Q.     Well, we'll get to that because you kind of
13   did payroll yourself, didn't you?
14   A.     I did payroll --
15                    (Simultaneous speakers.)
16                    (Reporter clarification.)
17   Q.     From 2016 to whenever you were terminated,
18   you were paid 7.25 an hour?
19                    MR. DiGIULIO:  Objection.  That
20          misstates her testimony.
21   Q.     Plus tips; is that correct?
22                    MR. DiGIULIO:  Objection.  Still
23          misstates --
24   Q.     Did you earn tips on top of 7.25 an hour?
25   A.     Yes.

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

Q.      Did you ever complain about the 7.25 to any owner or manager?

A.      No.

Q.      Did you feel that that was the correct amount of minimum wage or tip minimum wage that you should get --

A.      I never thought --

Q.      Let me finish, please.  Let's satisfy Teneja.  She's going to punch us both.  Okay.  I'm getting there.

        Did you complain to anybody about that?

A.      I didn't because I didn't know it was -- it wasn't correct or something.

Q.      Did you ever speak to any other employee about getting paid 7.25 per hour?

A.      I didn't.  At the time, I didn't.

Q.      Okay.  Well -- what do you mean at the time?  You mean you didn't?

A.      I didn't.  By that time, I didn't.

Q.      By that time, you mean during your whole employment; is that correct?

A.      No.  Can I say?

Q.      Yes, when did you --

A.      I had a conversation about not getting paid

36

BARKLEY
Court Reporters

N. Martinenko

1

2  overtime in 2021 with other coworkers.  But it

3  wasn't about an hour -- like $10 or 7.25 or

4  anything.  I just had a question, why were we not

5  getting paid overtime.

6  Q.     In what month of 2021 did you have that

7  conversation?

8  A.  --   I exactly don't remember.  It was probably

9  May -- May or maybe April.  It was not really a

10  conversation.  I just asked the question.

11  Q.     Who did you have that conversation with?

12  A.     Everyone was there, but mostly I kind of

13  had a conversation -- I kind of asked that question

14  to Sasha, which is Alexander Rinkovski (phonetic).

15  Q.     Who?

16  A.     Alexander Rinkovski.

17  Q.     And who is he?

18  A.     He's also a server.

19  Q.     Alexander Mikovski [sic]?

20  A.     Rinkovski.

21  Q.     Rinkovski.  And you just asked about

22  overtime?

23  A.     Yeah.

24  Q.     What did he say?

25  A.     He said he didn't know if we were supposed

37

BARKLEY
Court Reporters

N. Martinenko

1

2   to get any overtime at all.

3   Q.    Were there ever any times since the kitchen

4   closed at 10:30 where you left before 12:00 a.m.?

5   A.    Well, could have been a couple of cases,

6   maybe if it was a slow night, very slow, and we had

7   to close a bit earlier.

8   Q.    Would you call that restaurant a busy

9   restaurant during the whole time you worked or slow

10  restaurant or --

11  A.    It's a busy restaurant.

12  Q.    It's a busy restaurant.  Okay?

13  A.    Dinner is busy.  I would say that.

14  Q.    Okay.  Let's focus on your tips now.

15        So you worked five days per week generally,

16  right?

17  A.    Mm-hmm.

18  Q.    Well, most the time, actually, five days

19  per week.

20        How much tips did you earn per week?

21  A.    It's -- it's never the same number.  It

22  just changes.

23  Q.    I understand.

24  A.    So I can't really give you exact number.

25  But it would have been somewhere from 900 to 1,200

38

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1

2       per week.  Maybe little less than (unintelligible).

3       Q.     I'm sorry?

4       A.     Maybe slightly less, but you know it was

5       generally...

6       Q.     So on average for the five days -- like 200

7       and change per day; is that right?  Is that fair?

8       A.     Yup.

9       Q.     Now, were those credit card tips or cash

10      tips?

11      A.     Credit card tips.

12      Q.     What about cash tips?

13      A.     We had some which was --

14                      (Simultaneous speakers.)

15      Q.     But you're not including that in there; is

16      that correct?

17      A.     No.  That's the amount that would go on my

18      paycheck.

19      Q.     Okay.  How much do you think you earned in

20      cash tips?

21      A.     I don't remember that exactly.  But it

22      wasn't much.

23      Q.     Okay.  Did you ever keep any --

24             Withdrawn.

25             We'll get back to that.  Okay.

BARKLEY
Court Reporters

N. Martinenko

How did you determine -- how did the tip
process work at that restaurant?

A.      Tip process meaning how did we split?

Q.      Let me -- I'll withdraw the question.  I'll
state it differently.  That wasn't a good question.

Yeah.  So was there a process by which --
well, let's start from the beginning.  Were tips
shared at the restaurant?

A.      Yeah.

Q.      Who did you share the tips with, the other
servers?

A.      Other servers, runners and bussers and
bartender.

Q.      And how was that determined?

A.      Servers and the bartender would get one
point.  Bussers would get half a point, and I'm
assuming runners was point 6, I think, point 6 or
point 7.

Q.      I'm sorry.  Server and bartenders would get
one point?

A.      Yeah.

Q.      Runners would get what?

A.      Bussers would get half a point, and
runners, I think it was point 6.

40

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

Q.      Point six?

A.      Point six, I think.  Or point 7, but mostly it's six.

Q.      And the bartender?

A.      One point.

Q.      So everybody's tips were compiled at the end of the night?

A.      Mm-hmm.

Q.      In 2016 -- what time was that done every night?

A.      After the restaurant was closed. Everyone -- every customer would leave after that.

Q.      And who controlled that process?

A.      Okay.  So we would keep all our receipts at us during the night.  And then at the end, every single server would process their own -- count their own tips in total.  There was like this little paper that we would write down the numbers of tables and how much tip it came -- like how much they tipped and then total of the tip.

So every single server had the total of how much tips they made.  And then we would put this together, we would calculate, and according to how many points was on the floor, we would split it.

41

BARKLEY
Court Reporters

N. Martinenko

Q.      Was there one person in particular that
controlled that process, or was it a communal
thing?

A.      Well, everyone was doing their own tips.
But at the end we would do, like, total.  It could
be me or Sasha or someone else.  It depends on who
worked or who was willing to do it.

Q.      Were cash tips included in that process?

A.      Cash tips would go, you know, together on
the table.  And we would split it the same way, you
know, with the points system.

Q.      Let me ask you a question.  So if you're
telling me that you got 900 to 1,200 per week but
it was just credit card tips, why are you not
including the cash tips in that analysis?  Because
you said it was only credit cards?

                MR. DiGIULIO:  Objection to form.

        You can answer, if you know.

A.      I thought you were asking me about the
paychecks.  That's why I answered you --

Q.      No.  Well, let's go back to the question.

A.      Mm-hmm.

Q.      How much -- my question was how much in
tips do you earn per week?  Let me finish.  You

BARKLEY
Court Reporters

1                               N. Martinenko

2     told me 900 to 1,200.  I said, Is that cash or

3     credit card?  You said, Credit card.  Why don't you

4     give me the real number including cash?

5     A.        Okay.  Well, cash wasn't really much, so I

6     would say 150 a week total.

7     Q.        Okay.  So now it's 1,050 to 1,300 is what

8     you're saying?

9     A.        Yeah.  Including cash, yes.

10                        (Whereupon, a discussion was held

11            off the record.)

12                        (Whereupon, a recess was taken at

13            this time.)

14    Q.        In your opinion, how many customers, during

15    the five days you served, paid in cash?

16            Well, withdraw that question.

17            How about this:  In your opinion --

18                        (Whereupon, a discussion was held

19            off the record.)

20    Q.        So in your opinion, how many tables did you

21    serve during five days?

22    A.        Oh, that's -- I can't say really number.

23    How many tables during the week I served?

24    Q.        Yeah?

25    A.        I think -- oh, god.  I have to, you know,

                                43

BARKLEY
Court Reporters

1
2  kind of re-imagine.

3  Q.    I'll withdraw the question.  How about the

4  -- let's do it this way.  Were you assigned a

5  certain -- not because I know nothing about the

6  restaurant business, as you said, but how many

7  tables were you assigned?  Were you assigned

8  certain tables so --

9  A.    There were sections.  Okay.  So one

10 section, let's say, would have, like, seven

11 tables -- six, seven, maybe more if it was super

12 busy.  And well, let's say I had to help out, like,

13 another server.  I might have taken one table from

14 their section too.  So it's just -- you know, it

15 would have been six, seven tables in my section,

16 maybe eight.

17 Q.    How many sections were there?

18 A.    One, two -- like depending on how many

19 servers were there.  Let's say if it was three, it

20 was one section, the second one, and the one in the

21 back.  So it would be three sections.  Yeah.

22 Q.    How many tables were there?  Do you know?

23 A.    In each section?

24 Q.    No, in the restaurant.

25 A.    Total.  I don't remember the number of

BARKLEY
Court Reporters

N. Martinenko

1
2    tables (unintelligible).

3                  (Reporter clarification.)

4    A.      I don't remember exact number of tables.

5    Q.      When you served --

6            Withdrawn.

7            Did a runner ever come to you and ask you

8    what table gets this?  Were they ever confused as

9    far as the food that was ordered?

10   A.      No.  Runner had a ticket that would say --

11   Q.      And that had a table number on it, right?

12   A.      Yes.

13   Q.      And you don't know the number of tables in

14   the whole restaurant?

15   A.      I know -- I don't know how many tables are

16   there because also tables work in a way where you

17   can split them apart and put them together.  Okay.

18   So I knew the table numbers, but I don't know how

19   many are there, you know.

20   Q.      That's fair.  Let's focus on the evenings

21   that you worked, all right?

22   A.      Okay.

23   Q.      So you worked five days, and you had

24   roughly six to seven tables per day?

25   A.      That's not true.

BARKLEY
Court Reporters

N. Martinenko

Q.       In the section --

(Simultaneous speakers.)

Q.     How many rounds, so to speak, occurred each night?  In other words, how many tables turned over?  Was it once, twice, three times?

A.       Twice, I would say.

Q.       Twice.  Okay.  That's fine.

And did -- were the reservations consistent with that?  We're going to turn over each table two times.  Let's make it a 7:00, make it at 9:00. Whatever it was?

A.       Yeah.  We didn't really have a person who would kind of, like, assign the reservations at that point, like, to be smoothly transitioned to a second turn.  But we tried our best to do it that way.

Q.       That's fine.  So if there were two times, and let's take -- let's just choose the number six. But I know you said six or seven.  I'm not trying to confuse you.  Let's use six.

That's twelve tables a night, right?

A.       Mm-hmm.

Q.       That's sixty tables for the nights you worked?

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

A.      Mm-hmm.

Q.      Just dinners.  Of those (unintelligible),
60 tables, how many paid in cash, in your opinion?

A.      Approximately -- because lately most people
paid with cards, and we were not happy about that
either, but that's how it goes so.  I would say
maybe six or seven throughout the week.

Q.      So ten percent roughly?

A.      Yeah.

Q.      What was the average check?

A.      I -- okay.  Again, this restaurant has very
expensive items on the menu.  So depending on --
it's just really hard to say.  Like what's the
average.  I would say -- let's say 200.

Q.      Per person or total?

A.      No, like per tab.

Q.      Okay.

A.      But it's only because I'm thinking about
those two-tab tables that would try to order, like,
less expensive things.  And let's say their bill
was 120, but then there is another table that would
order something that would cost them 600.  So I'm
just, kind of, like, balancing it out and saying
200.

47

NINO MARTINENKO

BARKLEY
Court Reporters

1

2    Q.     Two hundred to me seems on the low end for

3 that menu.

4    A.     No, I'm saying average. Like...

5    Q.    Well, what was the -- just refresh my

6 recollection. Not that it's that pertinent. But

7 the combination with the wagyu beef and this and

8 that, how much did that cost? Do you remember?

9    A.     Um --

10    Q.     That steak platter, I don't remember

11 (unintelligible) --

12                (Reporter clarification.)

13    Q.     Okay. I'm sorry.

14         How much -- to the best of your

15 recollection, how much did the steak platter with

16 the wagyu beef and the different kind of

17 combination items cost?

18    A.     That wagyu beef platter is $225 with three

19 different slices of wagyu on it. But it doesn't

20 mean that everybody gets it.

21    Q.     I understand. And that was for one person,

22 correct?

23    A.     Mostly it would be shared between two

24 people.

25    Q.     Okay. The tables that were in your

BARKLEY
Court Reporters

N. Martinenko

section, were they two-tops or four-tops?

A.      Mixed.  Both.  Again, sections would change.  So it's not the same thing.

Q.      I could do the math, but let's move on.

While you were working at 212 -- that's the defendant.  I'll just call it 212 for purposes of our conversation or discussion today at the deposition -- did you work anywhere else?

A.      No.

Q.      You never had another job during the day, night, or evening while you were -- during the times you stated you worked here, had any other employer?

A.      There was this one situation when I was coming back to 212.  In 2021, I had another job that I was, like, slowly, kind of, like, moving from there to 212.  So --

Q.      You're talking in and about --

A.      2021, yes.  That's when I kind of had, like, the other job.  But I've never had both restaurants on the same day, like, I had to run there and come here.  No, it was always, like, scheduled in a way where I would be on time in both places, and it was just for a little bit.  Then I,

49

BARKLEY
Court Reporters

N. Martinenko

1

2  you know, quit there, and I moved here, and I

3  didn't have any other job.

4  Q.     So at some point, you did have another job

5  during the transition period; is that correct?

6  A.     Yup.

7  Q.     And how long do you think that was?

8  A.     Maybe like two months.

9  Q.     And that was in 2021?

10  A.     Yeah.

11  Q.     The cash tips you received, did you ever

12  report those as income?

13           MR. DiGIULIO:  Objection.  Invasion

14       of privacy.  Irrelevant.

15           MR. SEGAL:  It's not irrelevant.

16           MR. DiGIULIO:  How is it relevant?

17           MR. SEGAL:  Cash tips go into the

18       tip (unintelligible).

19           MR. DiGIULIO:  We're not having any

20       allegations that there's misappropriated

21       tips here.

22           MR. SEGAL:  (Unintelligible) it's

23       misappropriated because you're talking

24       about nonpayment of minimum wage and

25       overtime.  The cash tips accord go into the

50

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1
2   minimum wage to see if they paid minimum

3   wage or overtime.

4             MR. DiGIULIO:   The allegations

5   (unintelligible) --

6                  (Reporter clarification.)

7             MR. SEGAL:   This is not a

8   judgement.   This is a complaint.   It's an

9   allegation.   So I can ask that question.

10            MR. DiGIULIO:   All right.   Go

11  ahead.

12  A.    What was the question again?

13  Q.    The question was:   Did you ever report as

14  income the cash tips that you received?

15  A.    No.

16  Q.    Did you ever --

17        Withdrawn.

18        Do you know that you're required to report

19  that?

20  A.    I did not.

21  Q.    Did you ever tell management or ownership

22  of the cash tips that you received?

23  A.    Tell, like -- tell meaning, like, to let

24  them know that I had cash tips today, every day?

25  Q.    Yes.

51

BARKLEY
Court Reporters

N. Martinenko

1

2  A.      No.

3  Q.      How were you paid your -- how were you paid

4  your wages, by check or cash?

5  A.      By check.

6  Q.      From the beginning of the time that you

7  worked until the end?

8  A.      Yes.

9  Q.      And those checks were handwritten checks or

10 payroll checks?

11 A.      Handwritten checks that would come with a

12 paper --

13 Q.      A pay stub?

14 A.      Pay stub, yeah.

15 Q.      So you received a pay stub during all the

16 time you worked?

17 A.      Not all the time.  Only on 2021.

18 Q.      Oh, okay.  So from 2016, which is the time

19 period we're dealing with, to 2018, you did not

20 receive a -- let's call it a pay stub?

21 A.      No.

22 Q.      What did you receive from 2016 to 2018?

23 A.      Only handwritten paycheck.

24 Q.      Okay.  And then in 2021, you received a

25 payroll check, not a handwritten check?

52

BARKLEY
Court Reporters

N. Martinenko

A.        Handwritten check and a pay stub printed.

Q.        Okay.  In 2016 to 2018, were your --

          Withdrawn.

          Did you know the hours that you worked from

2016 to 2018 on a weekly basis?

                    (Simultaneous speakers.)

Q.        I'm sorry.

A.        I didn't track them.  Like, I didn't

memorize the hours.  But I did work a lot,

meaning --

Q.        When you got the --

A.        I would clock in and clock out.

Q.        We'll get to that.

A.        Yeah.

Q.        When you got your check, did you look at

it?

A.        Well, I would look at the amount.  But what

else --

Q.        Did you quantify that it made sense with

the hours that you worked?

A.        I did not.  Because there was nothing to

look at.

Q.        But you just mentioned that you kind of

knew the hours you worked, right?

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1

2      A.      Well, I knew approximately how much time I

3      spent in the restaurant for the whole week.  But I

4      couldn't count it because they have us clock in and

5      clock out, and they know it better than me.  So I'm

6      trusting them.  They writing the checks.

7      Q.      Let's go to, now, your -- your other

8      services, because according to you, you did a lot.

9      So did you do a payroll?

10     A.      Only on 2021, and I didn't do a payroll.  I

11     was just writing checks.

12     Q.      When?

13     A.      On 2021.

14     Q.      Well, how were you writing checks?  The

15     payroll company wrote the checks in 2021.

16              MR. DiGIULIO:  Objection.

17              Mischaracterizes the testimony.  You can

18              answer.

19     A.      Okay.  Paychecks were handwritten.  They

20     would do -- whoever the person that was doing the

21     payroll, calculating tips, deducting taxes and all

22     that, it was someone else, not me.  But then this

23     finished up paperwork would be sent to me so that I

24     have it.  When it's time to pay, I would just have

25     the checkbook, which I would write myself, with the

54

BARKLEY
Court Reporters

N. Martinenko

1
2  amount and the name of the employees.  I didn't do
3  a payroll.  I was just writing checks.
4  Q.    Okay.  And when was that, during --
5  A.    2021.
6                (Simultaneous speakers.)
7  Q.    I'm sorry?
8  A.    2021.
9  Q.    That's it?
10 A.    Maybe couple of times before, but it wasn't
11 consistent.  Yeah.
12 Q.    You had access to the office, right?
13 A.    Everyone did.
14 Q.    You had access to the checkbook, was that
15 correct?
16 A.    Everyone did.
17 Q.    You had access to the tip sheets; is that
18 correct?
19 A.    Everyone did.
20 Q.    I'm just asking about you.
21 A.    Yes.
22 Q.    Did you take payroll information and make
23 copies from that office?
24 A.    No.
25 Q.    You didn't?

55

NINO MARTINENKO

BARKLEY
Court Reporters

1                           N. Martinenko

2    A.      I didn't.

3    Q.      Did you take tip sheets and make copies?

4    A.      No.

5    Q.      You didn't?

6    A.      I didn't.

7    Q.      You're under oath, by the way.

8    A.      So?

9    Q.      And your attorneys showed us that at the

10   last deposition.

11   A.      But I didn't --

12                   MR. DiGIULIO:  Objection.  That's a

13            misrepresentation (unintelligible).

14                   MR. SEGAL:  You can object.

15   Q.      Were any tip sheets done for lunches?

16   A.      If there were any customers, yeah.  But if

17   there wasn't, then no.

18                   MR. SEGAL:  We can take a break for

19            three minutes or so.

20                   (Whereupon, a recess was taken at

21            this time.)

22                   (Defendant's Exhibit 2, tip

23            declaration, was marked for

24            identification.)

25                   (Defendant's Exhibit 3, daily tips,

                              56

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2           was marked for identification.)
 3                 (Defendant's Exhibit 4, time
 4           brackets, was marked for identification.)
 5  Q.      Showing you Defendant's Exhibit 2.  Do you
 6  know what that is?
 7  A.      Yeah, it's a weekly tips sheet.
 8  Q.      And were you involved in creating that
 9  sheet?
10  A.      Not the template.  But, you know, I
11  could -- I was involved putting numbers down, yes.
12  Q.      So this was for the week of 7/8 to 7/11/21,
13  correct?
14  A.      Yeah.
15  Q.      Okay.  Were you in control of that sheet?
16  A.      Again, I did not create the template, but
17  everybody who was finishing up the dinner shift,
18  whoever was calculating the tips for the day at the
19  end, they would write down the amount under -- on
20  each name so...
21  Q.      Did you provide that sheet to your
22  attorneys at some point?
23  A.      I did provide payroll, like, a pay stubs
24  that I had received.  I don't remember.  I might
25  have.  But I don't think so.  I don't think I sent
```

N. Martinenko

1

2   it to them.

3   Q.      Well, that's an exhibit that was provided

4   by your attorney.

5   A.      Okay. So I guess I sent it to them, yeah.

6   Q.      So how did they get that?

7   A.      Well, for me to -- okay.  For them to

8   calculate the tips for the week, I had to take a

9   picture of the -- of this on a Sunday night.   It

10  would have been me or Sasha or somebody.  So, like,

11  we were supposed to take a picture of it and send

12  it to Imran, who, by himself, would send it to

13  somebody else who was in charge to create the

14  payroll.  So it was in my phone.

15  Q.      That's not my question.  My question was

16  how did your attorneys receive that sheet?  Was

17  that from you?

18  A.      I sent it to them.  How else?

19  Q.      Was that -- did you take that from the

20  office, the restaurant's office?

21  A.      I had it in my phone already long time ago.

22  Q.      Do you have pictures of all the weekly

23  sheets in your phone?

24  A.      The ones that I sent to Imran, yes.

25  Q.      Did everybody take pictures of  that?

58

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1
2      A.      Yes.

3      Q.      All the waiters -- all servers?  Excuse me.

4      A.      Yeah.  I mean, sometimes maybe busboys or

5      runners -- because it was right there in the

6      drawer.  It was for people to see, like, how much

7      are they making so...

8      Q.      Let's look at the next exhibit, Exhibit 3

9      which is...

10     A.      This one.

11     Q.      Now, this one doesn't look like a picture.

12     A.      Okay.

13     Q.      This you one looks like a form -- a copy of

14     a form.

15     A.      Okay.

16     Q.      Did you supply that form to your attorneys?

17     A.      I don't think so.

18     Q.      No?

19     A.      It's not -- I didn't have it.

20             MR. DiGIULIO:  You guys produced

21         that.

22             MR. SEGAL:  Oh, we produced that?

23             MR. DiGIULIO:  We put the Bates

24         stamp numbers and the defendant's names

25         (unintelligible) --

BARKLEY
Court Reporters

1                N. Martinenko

2           (Simultaneous speakers.)

3              MR. SEGAL:  All right.  Withdraw

4       the question.  Okay.  That's okay.  We have

5       others.

6  Q.    Can I see Exhibit 4 for a second.

7       So I'll show you Defendant's Exhibit 4, and

8  I refer you to Page 3.  Can you tell me what that

9  is?

10  A.    It's not something that came from me for

11  sure.  But I'm assuming it's clock-in and

12  clock-out, right?

13          (Simultaneous speakers.)

14  Q.    So what's the top date that you see there?

15  A.    Which -- hold on.  What do you mean top

16  date?

17  Q.    On Page 3, so --

18  A.    The top date mean- --

19  Q.    Time in, what does it say?

20  A.    4:22.

21  Q.    Right?

22  A.    Right.  Okay.

23  Q.    And the time out?

24  A.    11:47.

25  Q.    Okay.  And the restaurant, as you stated,

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1

2   is closed from 4:00 to 5:00.  Did you clock in and

3   clock out during that time period?

4   A.     Wait.  If I go there for dinner time and

5   I'm preparing restaurant to be open at 5:00, when I

6   go at 4:00, I clock in, and then I start working,

7   right?

8   Q.     Is there a meal break at any time?

9   A.     Not really.  I mean, they would provide

10  food, but there was no break specifically --

11  Q.     What time did that occur?  Sorry.

12              (Simultaneous speakers.)

13  A.     It would be somewhere -- it would be

14  somewhere, like, before we opened up.  Like, 15

15  minutes early.  Like, let's say 4:40, 4:45, that

16  was when we would get the meal to eat and then get

17  ready to work.  But there was no particular break

18  for it.

19  Q.     Well, you weren't working during that time

20  period were you?

21  A.     Well, we were eating.  Yeah.

22  Q.     Well, I understand that.  But you were

23  eating?

24  A.     And?

25  Q.     You didn't clock in and clock out during

BARKLEY
Court Reporters

N. Martinenko

that meal break?

A.      Okay.  So let me put the -- most of the

time when the meal was ready, we were also, like,

about to open up.  So I -- a lot of times I had to

eat my meal inside the kitchen because there were

already clients -- customers inside the restaurant.

So, like, why would I clock out and clock in if I'm

biting a meal and then I'm going and serving a

customer, so...

Q.      Did you sit and eat the meal?

A.      Sometimes if they prepared it on time,

meaning, like, if there was time for me to sit,

yes.

Q.      What time did the restaurant open up for

dinner?

A.      5:00.

Q.      5:00?

A.      Yes.

Q.      So there wasn't any customers from 4:00 to

5:00, was there?

A.      Yes.

Q.      So -- and that's when the meal was served;

is that correct?

A.      Meal wasn't served on time always.

62

BARKLEY
Court Reporters

N. Martinenko

Q.     Well, it wasn't served at 6:00, was it?

A.     No, but it was served sometimes, like, five minutes to 5:00, maybe at 5:00, so we already had doors open for the customers.

Q.     Sometimes or always?

A.     Sometimes.

Q.     But what does "sometimes" mean?

A.     I mean like two, three times a week at least.

Q.     So you're stating that the meal would -- was served at five to 5:00 two or three times a week?

A.     Yeah.  No, I mean -- I'm not saying at 5:00 exactly.  It was like close to 5:00.  So there was no time for me to sit down.  Not only for me but anybody.

Q.     Let's look at this page for a second.

A.     Mm-hmm.

Q.     How many days are on this page?

A.     On the whole page?  Do you want me to count it?

Q.     I'll count for you.  How is that?  One, two, three, four, five, six, seven, eight, nine; ten.  One, two, three, four, five, six, seven,

63

BARKLEY
Court Reporters

1                        N. Martinenko

2      eight, nine; twenty.  One, two, three, four, five,

3      six, seven, eight, nine; thirty.  One, two, three,

4      four, five, six, seven, eight, nine; forty.  So I

5      got 46 days.

6      A.      Okay.

7      Q.      A month and a half roughly.  Okay.

8              Of the 46 days, how many days does the last

9      column show over eight hours?

10                     MR. DiGIULIO:  Objection.

11              Misstates the document.  Every entry isn't

12              a distinct day.  But you can answer the

13              question.

14     A.      Okay.  So --

15                     MR. SEGAL:  Wait, what?  Excuse me?

16                     MR. DiGIULIO:  So there are times

17              for instance --

18                     MR. SEGAL:  It's only when it's

19              over 12:00 that's (unintelligible).

20              They're all the same days.  And I believe

21              that only happened...

22                     MR. DiGIULIO:  You're right.

23                     MR. SEGAL:  -- on one day.

24     A.      Okay.  What's the question?

25                     MR. SEGAL:  Can you repeat the

                              64

BARKLEY
Court Reporters

N. Martinenko

1
2       question?

3                   (Whereupon, the record was read by

4       the reporter.)

5   A.      It shows three -- four.

6   Q.      Let's look.  So the first one is on 4/10;

7   is that correct?

8   A.      Yes.

9   Q.      Actually I take that back.  4/9, I'm sorry.

10          How many hours -- we'll go back to that.

11  So 4/9, 5/7, 5/15.  So of 46 days, four of them,

12  less than ten percent, shows that you're entitled

13  to any of time --

14                  MR. DiGIULIO:  Objection.

15  Q.      Is that correct?

16                  MR. DiGIULIO:  Misstates the

17          document.  You can answer the question.

18                  (Simultaneous speakers.)

19  A.      We are only underlining one particular day.

20  But then if we count five shifts together where

21  there are so many days where it's over seven

22  hours --

23  Q.      We're talking about the document.  Let's

24  focus on this.  I'm not asking you your whole --

25                  (Simultaneous speakers.)

65

BARKLEY
Court Reporters

N. Martinenko

1

2   Q.    Let's focus on that, and please just answer

3   my question.

4   A.    Okay.  I'm trying.

5   Q.    Well, answer it.  It's not that difficult.

6       So four days out of 46 days, there's the

7   minimum overtime.  And the latest you've clocked

8   out -- the only other time is two hours over, if

9   that's correct.  And by the way, did you clock in

10  any time for lunch during these 46 days?

11         MR. DiGIULIO:  I'm going to object

12      to the statements made.  And they

13      misrepresent what overtime is.  But you can

14      answer the question.

15  A.    What I'm seeing here is that this is a

16  time -- the season of the year when the restaurant

17  is the slowest.  So I obviously was not really

18  staying that long.

19  Q.    March, April, and May?

20  A.    Yes, sir.  And also like -- that's pretty

21  much it.  And the reason I'm not clocked in for

22  lunchtimes here is that this is kind of -- like,

23  the time when I was transmitting from the previous

24  job to here, and then I started taking lunch

25  shifts.

66

BARKLEY
Court Reporters

N. Martinenko

Q.      And so in your opinion, the end of March to
the beginning of June is the slowest time?

A.      Yes, sir.

Q.      Okay.  Do you know what spread of hours is
by the way?

A.      "Spread"?  You can explain if you'd like.

Q.      No.  Just do you know what it is?

A.      I don't know.

Q.      Okay.  Because you mentioned it in your
complaint.  So I would assume that you knew what it
was.  But you don't?

A.      Spread of hours?

Q.      Yes.

A.      Well, I'm not sure.  Yeah, I'm kind of --

Q.      That's okay.

A.      -- guessing.

Q.      Please just answer the question.

        And would you say that -- well, in your
opinion what are the busiest months?

A.      Busy starts in September, October.
November, December.  These are, like, very busy
times, somewhat busy.  January gets a little
slower...

Q.      Okay.  So let's turn your attention to

BARKLEY
Court Reporters

N. Martinenko

1

2  Page 4.

3  A.      Mm-hmm.

4  Q.      And why don't we go to -- well, that's

5  interesting.

6          So let's look at -- let's go with 9:24 on

7  Page 4 where it says 7:58, right?  And let's count

8  some days here.  So one, two, three, four, five,

9  six, seven, eight, nine, ten, eleven, twelve,

10 thirteen, fourteen, fifteen, sixteen, seventeen,

11 eighteen.  So there's eighteen days on this page.

12         And one, two, three, four, five, six,

13 seven, eight, nine, ten.  One, two, three, four,

14 five, six, seven, eight, nine, ten,

15 (unintelligible.)

16                 (Reporter clarification.)

17                 (Whereupon, a discussion was held

18     off the record.)

19 Q.      So there's 48 days on Page 5 of 5, and

20 we're looking at 18, Page 4 of 5, which, according

21 to you, is the busiest time period?

22 A.      I think you're missing 9/23.  That also --

23 Q.      You want to include that?  We can include

24 that.

25 A.      Isn't it September though?

68

BARKLEY
Court Reporters

N. Martinenko

1

2  Q.      Yeah.  So let's make it 19.  That's fine.

3          So of these 19 days -- well, you want me to

4  include eight hours and one minute, I

5  (unintelligible).  Of these 19 days -- one, two,

6  three, four, five, six, seven -- only eight days

7  are over eight hours; is that correct?

8  A.      Are we just looking at this page, right?

9               MR. DiGIULIO:  I don't know.

10              THE WITNESS:  Because I don't know.

11          This is half of October.  This is half of

12          September.  So I don't know.

13              MR. VOLPER:  (Unintelligible.)

14  Q.      We can play this game all day long, but the

15  busiest time period, according to you, maybe some

16  days you've worked over eight hours.  But if we add

17  up the weeks, I don't think there's any overtime on

18  it.

19              MR. DiGIULIO:  Objection to the

20          form of the question.  Again, it misstates

21          the overtime requirements (unintelligible).

22          You can answer.

23              MR. SEGAL:  No, I agree with that.

24          I'd rather do the weekly to be honest with

25          you, but I'm just going through.

69

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

Q.      So you say you worked every week over 40
hours, but does this indicate that?

                    MR. DiGIULIO:  Objection.  This
        misstates what's written in the complaint.

            You can answer if you know.

A.      I would not like to answer that.  The
numbers --

                    (Reporter clarification.)

A.      I'm not understanding because the numbers
speak --

Q.      Well, you have to answer.

A.      Answer what?

Q.      Doesn't it indicate different than what you
stated in the complaint?

A.      I don't think so.

Q.      How is that?

A.      That's my opinion.

Q.      Do you want to go through the numbers?

A.      No.

Q.      Okay.  Is it your opinion, or is it based
on the time in and time out?

A.      Well, my opinion comes out of the numbers
that I see here.

Q.      Well, then let's do that, because I don't

BARKLEY
Court Reporters

N. Martinenko

1

2    see that.  So show me -- show me that you worked in

3    excess of 40 hours, and this is just one random

4    time sheet.  We can do it all day long.  Show me

5    where you worked in excess of 40 hours, which you

6    stated in your complaint from Page 3 to Page 6

7    or 5?

8    A.     Where -- are we on Page 4 now?

9                   (Simultaneous speakers.)

10                  MR. DiGIULIO:  Objection to the

11           form.

12   A.     I think we were counting September, and you

13   were putting me back to Page 3, which is, I think,

14   June or July.  So if we are counting September,

15   right here; 11 hours and 40 minutes, 7 hours and 58

16   minutes, 8 hours and 1 minute, 13 hours, and 11

17   hours plus minutes.  It already indicates it's

18   over -- way over 40 hours.  So I don't want to talk

19   about this because numbers are here.

20   Q.     No, it's really not.  What about the next

21   page?  You said every week.

22                  MR. DiGIULIO:  Objection.  That

23           mischaracterizes the complaint.

24                  MR. SEGAL:  How does it

25           mischaracterize the complaint?

BARKLEY
Court Reporters

N. Martinenko

          MR. DiGIULIO:  Look at the
     complaint.  It says, "regularly worked."
     You said "every week."

          MR. SEGAL:  This is not regularly
     at all.

          MR. DiGIULIO:  Sure.  Forgery.  Go
     for it.

          MR. SEGAL:  What?

          MR. DiGIULIO:  Continue.

Q.    Do you have a good relationship with
Nikolay?

A.    I did.

Q.    What happened with that relationship?

A.    I don't know.  He knows better.

Q.    Well, I'm asking you, not him?

A.    Well, I was very respectful.  But then, you
know, just because I got sick, he was really mad at
me, and then it went south, our relationship.

Q.    When you say you got sick, what do you mean
by that?

A.    I was infected with COVID.

Q.    When did that happen?

A.    In December, closer to Christmas.  I don't
exactly remember the date.

72

BARKLEY
Court Reporters

N. Martinenko

Q.      Did you go for a COVID test?

A.      Yes, I did.

Q.      Were you still working --

         Withdrawn.

         Were you still working at the restaurant
when you got COVID?

A.      When I learned I had COVID, I didn't go to
the restaurant.  Before I worked there, yes.

Q.      Did you have any signs or symptoms when you
were at the restaurant prior to you learning that
you had COVID?

A.      No.

                MR. DiGIULIO:  Objection to the
         relevancy of the question.

                MR. SEGAL:  It's relevant.

                MR. DiGIULIO:  How is it relevant?

                MR. SEGAL:  Because it affects her
         employment at the restaurant, and it
         affected the restaurant.  The restaurant
         had to close due to her --

                MR. DiGIULIO:  You withdrew the
         allegations.  Are you going to bring them
         up now again?

                MR. SEGAL:  Yeah, I'll bring them

                          73

BARKLEY
Court Reporters

N. Martinenko

1
2          up --

3                    MR. DiGIULIO:  He, under oath --

4                    (Simultaneous speakers.)

5                    MR. VOLPER:  I don't withdraw

6          anything.

7                    MR. DiGIULIO:  You testified under

8          oath that you did withdraw those claims.

9                    MR. VOLPER:  No, we never -- we

10         said we're going to sue in a different

11         court.

12                   MR. DiGIULIO:  All right.  Well,

13         then we're not going to answer any

14         questions about this.  It's a discovery to

15         another pending action.

16                   MR. VOLPER:  Yeah, but the law

17         required she to be fully vaccinated in

18         order to work.  So it's relevant to any

19         labor-related cases.  It's a law --

20                   MR. DiGIULIO:  Please instruct your

21         client not to speak to me.

22                   MR. SEGAL:  Well, you asked him a

23         question.

24                   (Simultaneous speakers.)

25                   MR. VOLPER:  It's a law.  She have

74

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2           to (unintelligible).
 3                   MR. SEGAL:  Well, let's everybody
 4           chill out.
 5                   MR. DiGIULIO:  No.  I'm not going
 6           let you ask her about this.  It's an
 7           invasion of privacy, and it's irrelevant.
 8                   MR. SEGAL:  It's not.  It's related
 9           to the restaurant.  It was a Cuomo law.
10           She had to get vaccinated.
11                   MR. DiGIULIO:  Your employer had to
12           enforce Cuomo law.  We're not going to
13           answer this.
14                   MR. VOLPER:  I'm not enforcement
15           agency, my friend.  I'm not enforcement
16           agency.
17                   MR. DiGIULIO:  Oh, you didn't
18           enforce it?
19                   MR. VOLPER:  I'm not a enforcement
20           agency.  It's my responsibility --
21                   (Simultaneous speakers.)
22                   MR. SEGAL:  If we have to call the
23           judge, we'll call the judge.  Let me ask
24           the questions.
25                   MR. VOLPER:  It's my
```

NINO MARTINENKO

BARKLEY
Court Reporters

1                          N. Martinenko

2              responsibility --

3                     (Simultaneous speakers.)

4                     MR. SEGAL:  Nikolay, let me ask the

5              questions.

6                     MR. VOLPER:  Call the judge.

7                     MR. SEGAL:  If I have to, I will.

8              You want to call him right now?

9                     MR. DiGIULIO:  I don't.  I'm

10             instructing her not to answer questions

11             about -- related to COVID.

12                    MR. VOLPER:  Let's do it.

13                    MR. SEGAL:  Okay.  You want to do

14             this?

15                    MR. DiGIULIO:  I don't.

16                    MR. SEGAL:  Let me ask a couple of

17             other questions.  Let's see.  Okay?  Let's

18             take it --

19    Q.    Talk to me about your -- what happened, how

20    were you terminated from the restaurant?

21    A.     I was terminated over phone that I was not

22    supposed to come back after -- actually it was,

23    like, I literately had to take these words out of

24    his mind -- mouth, because he wasn't telling me

25    that I was fired.  He was just lying to me that,

                          76

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1

2  oh, it's not busy now.  You can stay home.  Then I

3  had to tell him that it wasn't true because I could

4  see the reservation -- there are a lot of

5  reservations.  It's not slow.  And then at the end,

6  I finally got him to say, you know what, I don't

7  need you anymore.  You're fired.  So that's how I

8  got fired.

9  Q.     If you weren't at the restaurant, how did

10  you see the restaurant?

11  A.     Well, I worked.  After I recovered from the

12  COVID, I worked two shifts.  And then I could see

13  the reservation.

14  Q.     When did you get COVID?  Do you remember

15  the exact day?

16  A.     I don't remember the day, but it was like a

17  mid-December, like closer to Christmas so...

18  Q.     Okay.  And when you had COVID, you didn't

19  come into the restaurant?

20  A.     I didn't.

21  Q.     And then when you came back that one day,

22  you were done with COVID?

23  A.     Yes.

24  Q.     Okay.  And after -- and what was that, that

25  day?

NINO MARTINENKO

N. Martinenko

1

2   A.      I'm not sure.  I might be -- it would be a

3   mistake.  But I think the last time I worked was

4   December 28, or 27.  28, I think.

5   Q.     And then is there a schedule that you

6   looked at and saw you weren't on on the 29th, or

7   how did that --

8   A.      I'm assuming I was just informed over the

9   text message to, you know, like that I was supposed

10  to go in work.

11  Q.      By the way, I never asked you this

12  question.  In 2018, how did you leave the

13  restaurant?

14  A.      I just had another job offer and I just

15  ended.

16  Q.      What job offer was that?

17  A.      It was another restaurant job.

18  Q.      Is that the same restaurant you mentioned?

19  A.      Which did I mention?

20  Q.      That you were working at both places at one

21  time?

22  A.      Oh, no.  It was the different one.

23  Q.      Okay.  And why did you leave that

24  restaurant?

25  A.      I couldn't get used to environment.  It

78

BARKLEY
Court Reporters

<pre>
 1                    N. Martinenko
 2   was, like, very, kind of, like, ethnic racist kind
 3   of environment.
 4   Q.     What kind of restaurant is that?
 5   A.     It's called Nusr-Et Steakhouse.
 6   Q.     Nusr-Et --
 7   A.     Nusr-Et.  Nusr-Et is the name of the
 8   Turkish Salt Bae chef.
 9   Q.     Where is it located?
10   A.     It's on 53rd and 5th Avenue, I think.  It's
11   like an old China Grill.
12   Q.     Oh, the old China Grill location?
13   A.     Yes.
14   Q.     Did they terminate you, or you left on your
15   own?
16   A.     I was going to leave, but then they
17   terminated too.  Like I was -- it was a
18   termination.  But actually, I was going to put in
19   my two weeks that day, but they were --
20   Q.     What was the basis of that termination?
21   A.     They didn't really have any reasons.  They
22   just -- they said that they were overstaffed and
23   they didn't need me.
24   Q.     Did you file a lawsuit against them?
25   A.     No.
</pre>

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1
2          (Whereupon, a discussion was held
3      off the record.)
4  Q.      When you first started working with the
5  restaurant, after your year-end wage statement, did
6  you receive a 1099 or a W-2?
7  A.      Are we talking about 212 Steakhouse?
8  Q.      Yeah.  I forgot about -- we're past the
9  other restaurant.
10 A.      At the end of the year?
11 Q.      Yes.
12 A.      The tax season, yeah, I got the 1099 form.
13 Q.      Do you know what a 1099 form is?
14 A.      I know that it -- what I know about 1099 is
15 that your taxes are not deducted during the weekly
16 salary, and then you --
17 Q.      Did you file a 1099 form?
18 A.      Yes, of course.
19 Q.      Personally or through an entity?
20 A.      No, I had an accountant I went to.
21 Q.      Who filed that tax return?  Was it you
22 individually or an entity?  In other words, who
23 filed the tax return?
24 A.      I didn't do it myself.  I went to an
25 accountant.

BARKLEY
Court Reporters

N. Martinenko

2           MR. DiGIULIO:  She doesn't

understand the question.

Q.    Who's the filer?  Was it Nino Martinenko or

a was it a corporation or a --

A.    No.  It was me.  It was me, of course.

           MR. DiGIULIO:  Who did you guys

issue the 1099 to?

           MR. VOLPER:  You want me to answer?

           MR. SEGAL:  No, I don't.

           MR. VOLPER:  You want me to answer?

           MR. SEGAL:  I don't.  I don't.

           Let's take a two-minute break.  But

I think we're almost done.

           (Whereupon, a recess was taken at

this time.)

Q.    When was the first time you told Nikolay

Volper that you weren't feeling good around that

Christmas holiday?

A.    I actually texted him.  I can look up in my

phone if you want, but I don't remember a date.

Q.    What was the rest of that --

A.    I texted him saying I got COVID.  And then

his reaction was like, Oh, that's bad, or something

like that.  I think nothing else.

BARKLEY
Court Reporters

N. Martinenko

Q.     Were you ever in the restaurant prior to that date with symptoms?

A.     No.

Q.     And once you felt you had the symptoms, you never went into that restaurant?

A.     No.

Q.     Did you ever wear a mask in the restaurant?

A.     When we had to wear it, I was wearing it. But there was, like, some time that it wasn't a mandatory thing, so I wasn't wearing it.

Q.     Was anyone else in the restaurant sick, to your knowledge?

A.     To my knowledge, it was a hostess girl and me.  Nobody else really had COVID.  Hostess is someone that I had basically no contact with.

Q.     Who is that?

A.     I don't remember her name.  It was a girl that would just come on the busy day.  She would be standing by the door, and I would be busy on the floor.  So I did not have any contact with her to my -- would you like to hear my opinion?  I think it was a customer --

MR. DiGIULIO:  No.

THE WITNESS:  Okay.

82

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

MR. DiGIULIO:  He didn't ask you.

THE WITNESS:  Okay.

MR. SEGAL:  Give me one second.
Okay.

(Whereupon, a recess was taken at
this time.)

Q.     Were you familiar with the vaccination law
at the time you were sick in relation to the
hospitality industry?

MR. DiGIULIO:  Objection.  Don't
answer that.  It's irrelevant, and it's
invasive.

Do you want to call the judge to
ask this question?

MR. VOLPER:  Let's call the judge.
Yes.

MR. DiGIULIO:  Sure.

MR. VOLPER:  Okay.  Let's do it.

MR. DiGIULIO:  I'm not going to
call.

MR. VOLPER:  Call the judge.  It's
a law.  A law to work.  It's related to
labor.

MR. SEGAL:  Let's just call to get

83

BARKLEY
Court Reporters

N. Martinenko

1
2      this resolved.  Okay?

3              MR. DiGIULIO:  What's your position

4      about it's relevancy?  You should call.

5      I'm just curious.

6              MR. VOLPER:  (Unintelligible) law.

7              MR. SEGAL:  It's related to the

8      hospitality industry.  Employees had to be

9      vaccinated.  It's related to, somewhat, her

10     termination.  She's saying she was

11     wrongfully terminated.

12             MR. DiGIULIO:  No, she's not.

13     There's no claim for wrongful termination,

14     so please call.

15             MR. VOLPER:  Is she -- if she can

16     work illegally in your opinion.

17             MR. DiGIULIO:  Whether she can work

18     or not is actually relevant, her work

19     status.

20             MR. VOLPER:  (Unintelligible.)

21             (Reporter clarification.)

22             MR. DiGIULIO:  This is off the

23     record.

24             (Whereupon, a discussion was held

25     off the record.)

84

NINO MARTINENKO

BARKLEY
Court Reporters

1          N. Martinenko

2                    MR. SEGAL:  Defense is done asking

3          Nino Martinenko any questions at this

4          deposition.  And if Plaintiff's counsel

5          wants to --

6                    MR. DiGIULIO:  I have one question.

7     EXAMINATION BY

8     MR. DiGIULIO:

9     Q.    So Nino, did anyone instruct you to clock

10    out for the time that you were eating a meal shift

11    during your time at 212 Steakhouse?

12    A.    No.

13                   MR. DiGIULIO:  Okay.  That's it.

14         You can follow up on --

15                   MR. SEGAL:  You want to follow up?

16                   MR. VOLPER:  I want to say

17         something.

18                   (Whereupon, a discussion was held

19         off the record.)

20    FURTHER EXAMINATION BY

21    MR. SEGAL:

22    Q.    Back on the record.  So Nino, the time

23    records reveal that sometimes you did clock in and

24    clock out during break.  Not often, but you did?

25    A.    I would clock out if I had a lunch shift.

                              85

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1
2    I would clock out, take a little break.  Maybe

3    breathe some air outside, and then I would go and

4    come back.  Why would I stay clocked in if I was --

5                    (Simultaneous speakers.)

6    Q.      Who told you to do that?

7    A.      It was common sense.  I didn't need anyone

8    to tell me that.

9    Q.      No one at all told you to do that?

10   A.      No.  I just clocked out because I thought

11   it was fair to do.

12   Q.      Did other employees do that?

13   A.      I don't know.  I didn't look at what they

14   were doing?

15   Q.      Were you involved in the records?

16               MR. DiGIULIO:  Objection.  Vague.

17        You can answer.

18   A.      I don't get the question.

19   Q.      Okay.  Didn't you see -- did you ever

20   review the time records when you were involved in

21   the payroll?

22   A.      How could I see it?

23   Q.      Printed off the machine?

24   A.      I did not have access to it.

25   Q.      So you, on your own, decided to clock in

86

BARKLEY
Court Reporters

1    and clock out during your days that you had the

2    double shift?

3    A.      Yes.  Maybe I took it as an example from

4    someone else prior to that.  I'm talking about

5    years ago when I first started.  But in general,

6    it's common sense if I'm not inside the restaurant

7    and I'm outside taking a break, it's a common sense

8    to clock out.  I think so, right?

9    Q.      Did you do that all the time?

10   A.      Yes, if I was going outside the restaurant

11   and I was on a break, I was doing that all the

12   time.

13   Q.      And the 4:00 or 5:00 meal break, you never

14   did?

15   A.      No.

16                    MR. SEGAL:  No further questions.

17                    (Time Noted:  12:36 p.m.)

18

19   _____

20                    NINO MARINENKO

21

22   Subscribed and sworn to before me

23   this _____ day of _____ 20___.

24   _____

25                    Notary Public

87

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                      I N D E X

 2

 3    WITNESS            EXAMINATION BY        PAGE

 4    Nino Martinenko    Mr. Segal             5, 85

 5                       Mr. DiGiulio          85

 6

 7                       EXHIBITS

 8    DEFENDANT'S        DESCRIPTION           PAGE

 9    1                  Complaint             23

10    2                  Tip declaration       56

11    3                  Daily tips            56

12    4                  Time brackets         57

13

14           (Exhibits retained by Mr. Segal.)

15

16

17

18

19

20

21

22

23

24

25
```

NINO MARTINENKO

BARKLEY
Court Reporters

C E R T I F I C A T E

I, TENEJA THWEATT, hereby certify that the Examination Before Trial of NINO MARTINENKO was held before me on the 20th day of December, 2022; that said witness was duly sworn before the commencement of her testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein; that the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of January, 2023.

_____
TENEJA THWEATT

NINO MARTINENKO

BARKLEY
Court Reporters