# EXHIBIT 3

Page 1

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - - - - -x
4    NINO MARTINENKO, on behalf of herself and
     others similarly situated,
5
                    Plaintiff,
6
            -against- CASE NO: 22-CV-518
7
8    212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

                    Defendants.
9
     - - - - - - - - - - - - - - - - - - -x
10
                    32 Broadway
11                  New York, New York
12                  October 6, 2022
                    10:40 a.m.
13
14
15       DEPOSITION of NIKOLAY VOLPER, the
16   Defendant in the above-entitled action,
17   held at the above time and place, taken
18   before Dikila Bhutia, a Shorthand Reporter
19   and Notary Public of the State of New
20   York, pursuant to the Federal Rules of
21   Civil Procedure, order and stipulations
22   between Counsel.
23
24           *       *       *
25

Page 2

1 APPEARANCES:
2
3   JOSEPH &KIRSCHENBAUM, LLP
    Attorneys for Plaintiff
4     32 Broadway
      New York, New York 10004
5
    BY: MICHAEL DiGIULIO, ESQ.
6       DENISE SCHULMAN, ESQ.
7
8
    LAW OFFICES OF MITCHELL S. SEGAL P.C.
9   Attorney for Defendant
      1129 Northern Boulevard, Ste 404
10    Manhasset, New York 11030
11  BY: MITCHELL SEGAL, ESQ.
12
.13
            *   *   *
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       STIPULATIONS
2     IT IS HEREBY STIPULATED AND AGREED, by
3 and among counsel for the respective
4 parties hereto, that the filing, sealing
5 and certification of the within deposition
6 shall be and the same are hereby waived;
7     IT IS FURTHER STIPULATED AND AGREED
8 that all objections, except as to form of
9 the question, shall be reserved to the
10 time of the trial;
11    IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be signed
13 before any Notary Public with the same
14 force and effect as if signed and sworn to
15 before the Court.
16          *   *   *
17
18
19
20
21
22
23
24
25

Page 4

1 N I K O L A Y   V O L P E R, the Witness
2 herein, having first been duly sworn by
3 the Notary Public, was examined and
4 testified as follows:
5 BY
6 THE COURT REPORTER:
7     Q.   Please state your name for the
8 record.
9     A.   Nikolay Volper.
10    Q.   Please state your name for the
11 record.
12    A.   2447 44 Street, Astoria, New
13 York, 11103.
14 EXAMINATION BY
15 MR. DiGIULIO:
16    Q.   Good morning, Mr. Volper.
17    A.   Good morning.
18    Q.   My name is Mike DiGiulio.  I am
19 an attorney with the law firm of Joseph &
20 Kirschenbaum.  I represent the plaintiff
21 in the lawsuit against yourself and the
22 212 Steakhouse Incorporated.  Thank you
23 for being here today.
24    A.   Thank you very much.
25    Q.   I will be referring to the 212

Page 5

1           N. VOLPER
2 Steakhouse Incorporated as 212 Steakhouse.
3 Do you understand this?
4     A.   Yes.
5     Q.   Have you ever been deposed
6 before?
7     A.   In the past?
8     Q.   Yes.
9     A.   What kind of -- can you be more
10 specific?
11    Q.   Have you ever been deposed in a
12 deposition?
13    A.   Yes.
14    Q.   How many times?
15    A.   In any business or specifically
16 for 212 Steakhouse?
17    Q.   In any business.
18         MR. SEGAL:  He is just saying if
19 you are familiar with the process.
20    A.   Yes.
21    Q.   Do you have a sense of how many
22 times you have been deposed?
23    A.   Two or three times.
24    Q.   As you know, from the two or
25 three times, I am going to ask you some

2 (Pages 2 - 5)

Page 6

1        N. VOLPER
2 questions today.
3    A.   Yes.
4    Q.   The court reporter will take
5 down everything we say to each other
6 because the court reporter is transcribing
7 in this deposition. It is important that
8 you give verbal response to all the
9 questions. The court reporter cannot
10 record nods or gestures. Do you
11 understand this?
12    A.   Yes.
13    Q.   The court reporter has sworn you
14 in. You are now answering all questions
15 under oath. Do you understand that you
16 have the same obligation to tell you the
17 truth and are subject to the same
18 penalties of perjury as if you were
19 testifying in court?
20    A.   Yes.
21    Q.   If you don't understand my
22 questions, please let me know and I will
23 rephrase it. If you answer a question, I
24 will assume you understood it. Do you
25 understand this?

Page 7

1        N. VOLPER
2    A.   Yes.
3    Q.   Please let me finish asking the
4 question before you answer even if you
5 think you know what I am going to ask.
6 This way, the court reporter can get
7 everything down.
8    A.   Sure.
9    Q.   If you need to take a break at
10 any time, just let me know. I just ask
11 that if a question is pending, you answer
12 the question before you take a break. Do
13 you understand this?
14    A.   Yes.
15    Q.   Similarly, you may talk to your
16 lawyer before a question is asked and
17 after you have answered a question but not
18 while a question is pending. Do you
19 understand that?
20    A.   Can you repeat?
21    Q.   Sure.
22        You may talk to your lawyer
23 before a question is asked or after you
24 have answered it, but not while a question
25 is pending.

Page 8

1        N. VOLPER
2    A.   Okay.
3    Q.   Do you understand that?
4    A.   Yes.
5    Q.   Similarly, during a deposition
6 your attorney may object to my questions.
7 However, unless he specifically instructs
8 you not to answer the question, you must
9 answer the question. Do you understand
10 that?
11    A.   Yes.
12    Q.   Are you currently taking any
13 medications or drugs that may impair your
14 ability to testify truthfully today?
15    A.   I don't believe so.
16    Q.   Is there any other reason you
17 may not be able to testify truthfully
18 today?
19    A.   I don't believe so.
20    Q.   Are you currently taking any
21 medications that may impair your memory?
22    A.   My medical record is not going
23 to be discussed.
24    Q.   I am asking if you are on a
25 medication that will affect your --

Page 9

1        N. VOLPER
2    A.   I am not medical personnel. I
3 am not medical trained so I cannot really
4 answer that question. Different
5 medication for different, different
6 people. It is very --
7    Q.   In your opinion --
8    A.   I cannot say --
9    Q.   Let me just ask a question.
10 Okay.
11        In your opinion is there any
12 reason that your memory may be impaired
13 today?
14    A.   I cannot answer that question
15 because different medication, they have
16 different effect different period of time.
17    Q.   Do you have any reason to
18 believe that your memory may be impaired
19 today?
20    A.   Do I have any reason to believe?
21    Q.   Yes.
22    A.   Well, I don't think so but we
23 will try.
24    Q.   Great. Thank you.
25    A.   You are welcome.

3 (Pages 6 - 9)

1          N. VOLPER
2    Q.   Without revealing any
3 attorney-client privilege you have had
4 what, if anything, did you do to prepare
5 for this deposition?
6    A.   Nothing.
7    Q.   You haven't done anything?
8    A.   To prepare -- not really.
9    Q.   Did you meet with your attorney?
10   A.   Yes.
11   Q.   When did you meet with your
12 attorney?
13   A.   Like two or three days ago.
14   Q.   Did you meet in person?
15   A.   Yes.
16   Q.   Where did you meet?
17       MR. SEGAL:  Excuse me.  We did
18 not meet in person.
19       THE WITNESS:  Sorry.  I
20 apologize.  We were supposed to meet
21 in person but we meet via Zoom.  You
22 see, my memory may be already affected
23 -- some medications.
24       MR. SEGAL:  Let's try to answer
25 the questions.

1          N. VOLPER
2       THE WITNESS:  Yes.
3    Q.   How long was that meeting?
4    A.   Very brief.
5    Q.   Was it half an hour?
6    A.   I think it was less than that.
7    Q.   Less than that?
8    A.   Yes.
9    Q.   Did you review any documents
10 during the meeting?
11   A.   No.
12   Q.   Have you talked with anyone else
13 besides your attorney about this
14 deposition?
15   A.   Besides attorney -- well, the
16 staff obviously, the 212 Steakhouse
17 because I have been served so they ask
18 questions what is going on.  I said we
19 cannot --
20   Q.   Besides your attorney, did you
21 tell anyone about this deposition today?
22   A.   The deposition today?
23   Q.   Yes.
24   A.   No, no.  I'm sorry.  I
25 misunderstand the question.

1          N. VOLPER
2    Q.   It's okay.
3       You are testifying today on
4 behalf of the corporation, 212 Steakhouse
5 Incorporated, correct?
6    A.   Correct.
7    Q.   We are going to start with this
8 exhibit.
9       MR. DiGIULIO:  I am going to ask
10 this to be marked Exhibit 1.
11       (Whereupon, notice of deposition
12    was marked as Defendant's Exhibit 1
13    for identification as of this date by
14    the Reporter.)
15   Q.   Sir, have you seen this document
16 before?
17   A.   I believe that's the -- notice
18 of deposition, correct?
19   Q.   Correct.  It is the notice of
20 deposition for 212 Steakhouse
21 Incorporated.
22   A.   Yes, I believe so.
23   Q.   Please take a look at pages 2
24 through 4 under the section matters
25 designated for deposition.  Please review

1          N. VOLPER
2 all of those matters?
3    A.   Can we stop --
4    Q.   Take your time.  Pages 2 through
5 4 for all of the matters designated for
6 deposition.
7    A.   Okay.  I am ready for question
8 No. 1.
9    Q.   Have you been designated to
10 testify about all of these topics on
11 behalf of 212 Steakhouse Incorporated?
12   A.   Yes.
13   Q.   Are there any topics on this
14 list for which you are not prepared to
15 testify today?
16   A.   From 1 to 4?
17   Q.   Pages 2 through 4 which is No.
18 1 through 22.
19   A.   That's a lot of questions but
20 let's go one by one.  22 questions.
21       MR. SEGAL:  Can you repeat the
22    question for him?
23       MR. DiGIULIO:  Sure.
24   Q.   Are there any topics on that
25 that list, 1 through 22, for which you are

4 (Pages 10 - 13)

Page 14

N. VOLPER

1      N. VOLPER
2 not prepared to testify about today?
3      A.   Just give me a second. I have
4 to review them before answering the
5 question.
6      Q.   Please.
7      A.   Okay. I was not really involved
8 in 212 Steakhouse for many years
9 especially the pandemic. Some of the
10 questions I see like plaintiff's work
11 schedules and hours worked, I don't have
12 knowledge of it.
13      Q.   Which number are you referring
14 to?
15      A.   No. 2.
16      Q.   Plaintiff's work schedule and
17 hours worked?
18      A.   Yes. Because basically, they
19 did it himself, the staff did himself. In
20 the last three years I have been just like
21 few times there. I have medical reasons.
22 Because of the COVID, I have four of the
23 five things medical that is not
24 recommended to get COVID.
25      Q.   Aside from No. 2, are there any

Page 15

1      N. VOLPER
2 other issues designated for deposition
3 that you are not prepared to testify about
4 today?
5      A.   I don't remember No. 5.
6      Q.   Anything else?
7      A.   No. 6. No. 7. I cannot give a
8 definite answer to all these questions.
9 No. 8, 9. No. 11 is terminated by PO
10 system. No. 12. They did it themselves.
11 I don't understand No. 13. No. 17, I have
12 little bit knowledge. No. 18, I don't
13 completely understand the question. I
14 would appreciate it if you can find a
15 different way to ask. 19, same thing. I
16 need No. 20 to be specified in different
17 way. I'm not sure what it is.
18      MR. SEGAL:  We will take five
19 minutes.
20      MR. DiGIULIO:  Okay.
21      (Whereupon, a short recess was
22 taken.)
23      MR. DiGIULIO:  Back on the
24 record.
25      Q.   Mr. Volper, what is 212

Page 16

1      N. VOLPER
2 Steakhouse Incorporated?
3      A.   It is a restaurant.
4      Q.   Is the 212 Steakhouse
5 Incorporated a company that owned the
6 restaurant?
7      A.   It is a restaurant. 212
8 Steakhouse is corporation.
9      Q.   Does the corporation own a
10 restaurant in Manhattan?
11      A.   Yes. 212 Steakhouse.
12      Q.   Does the entity 212 Steakhouse
13 Incorporated own anything else besides the
14 restaurant?
15      A.   No.
16      Q.   What is your relationship with
17 212 Steakhouse the corporation?
18      A.   I am the owner. I formed the
19 corporation.
20      Q.   Does anyone else own shares in
21 the corporation?
22      A.   Well, in the past we have some
23 sales which -- legally I'm not sure how
24 the answer to this. They transferred
25 something and they backed up from the

Page 17

1      N. VOLPER
2 deals. So I am not really sure how that's
3 being treated but we can look at the tax
4 returns because I can't remember.
5      Q.   In your knowledge, has anyone
6 else at any point besides you owned a
7 share in 212 Steakhouse?
8      A.   That's why I have to review the
9 agreement. I don't want to answer about
10 14, 15 pages contract. I don't remember.
11      Q.   What contract are you talking
12 about?
13      A.   Sales contract.
14      Q.   Sales contract?
15      A.   For 212 Steakhouse.
16      *MR. DiGIULIO:  We will ask that
17 212 Steakhouse produce all sales
18 contracts that exist.
19      Q.   I believe you testified you
20 opened 212 Steakhouse?
21      A.   Correct.
22      Q.   When did you open it?
23      A.   I believe it was 2013 but we
24 start operate 2014.
25      Q.   That you stopped operating in

1         N. VOLPER
2   2014?
3      MR. SEGAL:  Started.
4      Q.   Started?
5      A.   Yes, yes.  We formed the
6   corporation in 2013 but it takes time to
7   open, construction, permits and
8   everything.
9      Q.   Great, okay.
10         Prior to opening 212 Steakhouse
11  did you have experience in the restaurant
12  business?
13     A.   No.
14     Q.   No?
15     A.   No.
16     Q.   Have you owned any other
17  restaurants before?
18     A.   No.
19     Q.   What is the restaurant's
20  address?
21     A.   316 East 53 Street.  New York,
22  New York 10022.
23     Q.   Has the restaurant always been
24  located at this location?
25     A.   Yes, sir.

1         N. VOLPER
2      Q.   What kind of restaurant is it?
3      A.   It is a 212 Steakhouse.
4      Q.   Does the restaurant specialize
5   in Kobe beef?
6      A.   Yes.
7      Q.   What is Kobe beef?
8      A.   Kobe beef is basically Wagyu
9   beef from Japan which is very exclusive.
10  And yeah, it is one of the premium steak
11  meat.
12     Q.   Does the Kobe beef come from
13  Japan?
14     A.   Yes.
15     Q.   Does the restaurant sell halal
16  meat?
17     A.   Yes.
18     Q.   What is halal meat?
19     A.   What is halal meat?
20     Q.   Yes.
21     A.   Halal meat is it needs halal
22  certification to become a halal meat.
23     Q.   Does the halal meat at the
24  restaurant come from Canada?
25     A.   I believe so.

1         N. VOLPER
2      Q.   In the restaurant how many
3   customers does the restaurant seat inside?
4      A.   How many seatings inside -- I
5   can image about eighty.
6      Q.   Eighty?
7      A.   Yes.
8      Q.   How many tables is that?
9      A.   If you divide by two so around
10  forty tables.
11     Q.   Before March 2020 when COVID
12  came, did the restaurant have outdoor
13  seating?
14     A.   Before the 2020?
15     Q.   Yes.
16     A.   No.  It was not allowed.
17     Q.   Does the restaurant have outdoor
18  seating now?
19     A.   No.
20     Q.   No?
21     A.   No.
22     Q.   Okay.  You said the restaurant
23  opened up in 2014; is that correct?
24     A.   Correct.
25     Q.   From 2014 to March of 2020 when

1         N. VOLPER
2   COVID came to New York, what were the
3   restaurant's hours of operation?
4      A.   All depends.  I mean, it have to
5   terminate because during the pandemic
6   limited hours so it was closed.
7      MR. SEGAL:  Before, before.
8      A.   Before the pandemic usually
9   evenings only.
10     Q.   Evenings only?
11     A.   Yes.
12     Q.   So about what time did the
13  restaurant open?
14     A.   I think as far as I remember
15  like 4:00 or 5:00.
16     Q.   What time did it close?
17     A.   We close usually when the last
18  customer leaves like maybe around 11:00.
19     Q.   Did the restaurant serve lunch?
20     A.   Lunch?
21     Q.   Yes.
22     A.   We serve -- not in the
23  beginning.  In the beginning we no serve
24  lunch.  Just barely.  We tried few times.
25  It was not very successful.  Then the

Page 22

1          N. VOLPER
2 pandemic come. I don't think we don't
3 sell lunch, only delivery. Right now we
4 are selling lunch.
5    Q.   Right now?
6    A.   Recently, yes.
7    Q.   I want to ask you about before
8 the pandemic.
9    A.   Yes, sir.
10   Q.   Your testimony is -- withdrawn.
11         In 2016 which is before the
12 pandemic, did the restaurant serve lunch?
13   A.   2016?
14   Q.   Yes.
15   A.   I don't remember.
16   Q.   You don't remember?
17   A.   No.
18   Q.   Okay. I believe you said that
19 the restaurant tried to serve lunch a few
20 times before the pandemic?
21   A.   Correct.
22   Q.   What does that mean?
23   A.   That means we try like month or
24 two and then we stopped because it was not
25 successful, we lose money. So we try

Page 23

1          N. VOLPER
2 again. We changed menu, we tried
3 different concept.
4    Q.   Do you remember when you tried
5 to have serve lunch, what time the
6 restaurant opened during that period?
7    A.   I believe it was 12:00.
8    Q.   Before March 2020 the restaurant
9 tried a number of times to serve lunch
10 throughout the years?
11   A.   Yes.
12   Q.   When they did try, you opened
13 the restaurant for customers that knew; is
14 that accurate?
15   A.   It is accurate, yes.
16   Q.   How did the hours change for the
17 restaurant during the initial COVID
18 shutdown period in March of 2020?
19   A.   You are talking about when the
20 pandemic started?
21   Q.   Right when it hit.
22   A.   So as you know, there was -- we
23 was completely shut down in the beginning.
24   Q.   For how long?
25   A.   For how long -- because depends

Page 24

1          N. VOLPER
2 on the -- I cannot really answer
3 completely like exact dates, what periods.
4 We have limited capacity, completely
5 shutdown, or delivery only, or outdoor
6 only. Depends on this period, but to give
7 exactly dates and months -- because we was
8 limited from the New York State.
9    Q.   I understand.
10        Let's talk about the different
11 phases if you will. Initially you were
12 shut down for a period and the restaurant
13 did not operate; is that correct?
14   A.   I think we have only delivery.
15   Q.   Okay. During the initial
16 shutdown you still maintained a takeout or
17 delivery option for the restaurant; is
18 that correct?
19   A.   I think like -- just give me a
20 second. I think it was like few months.
21 Then it was losing money. Then I think we
22 shut down for like -- it is tough for me
23 to determine a period but we stopped this
24 and we continued this. I remember because
25 limitation from the New York State. I

Page 25

1          N. VOLPER
2 remember some of them -- which they don't
3 allow indoor dining, only outside dining.
4 We build outside dining.
5    Q.   When did you build outdoor
6 dining?
7    A.   During that period of time but I
8 don't have specific dates because I was
9 not involved. As I mentioned, during the
10 pandemic especially I avoid because I was
11 scared catching COVID.
12   Q.   Who was in charge at the
13 restaurant during this period?
14   A.   During this period most of the
15 like staff including plaintiff was in
16 charge. They did their own scheduling,
17 you know, shifts. They calculate the
18 tips. Pretty much everything was between
19 the staff because I was absent. I was
20 afraid during the --
21   Q.   During the initial COVID
22 shutdown you let the staff of the
23 restaurant manage the operations of the
24 restaurant?
25   A.   Correct.

7 (Pages 22 - 25)

Page 26

```
 1          N. VOLPER
 2    Q.   Was there anyone else?
 3         MS. SCHULMAN: Let's take a
 4    short break.
 5         THE WITNESS: Thank you.
 6         (Whereupon, a short recess was
 7    taken.)
 8         MR. DiGIULIO: Back on the
 9    record.
10    Q.   I believe you testified that the
11    restaurant currently does not have outdoor
12    dining; is that right?
13    A.   Currently, no.
14    Q.   When did the restaurant stop
15    having outdoor dining?
16    A.   Maybe like around a year ago.
17    Q.   About the fall of 2021?
18    A.   As far as I remember, yes.
19    Q.   What are the current hours of
20    operation for the restaurant?
21    A.   The current noon.
22    Q.   Is that noon?
23    A.   Noon, yes. Noon until we have
24    customers -- usually it is like 11:00.
25    Q.   Is that five days a week --
```

Page 27

```
 1          N. VOLPER
 2    strike that.
 3         Is that seven days a week?
 4    A.   Yes.
 5    Q.   How long has that been the
 6    restaurant's hours of operation?
 7    A.   We just recently opened lunch.
 8    Let me see. I will try to remember.
 9    Maybe like few months back, like four to
10    six months, something like that.
11    Q.   What is the lounge?
12         MR. SEGAL: He said lunch.
13         THE WITNESS: Sorry. My English
14    is not very proficient.
15    Q.   It's okay. Prior to four to six
16    months ago?
17    A.   Again, I cannot just give exact
18    date but that's my best -- best of my
19    knowledge.
20    Q.   When the restaurant closed
21    initially in March of 2020, did the
22    restaurant continue to employ
23    front-of-house staff?
24    A.   Not that I remember because it
25    was shut down.
```

Page 28

```
 1          N. VOLPER
 2    Q.   And then when the restaurant
 3    opened back up and had outdoor dining, did
 4    the restaurant hire new front-of-house
 5    staff?
 6    A.   Yes.
 7    Q.   Were the individuals who were
 8    working before rehired?
 9    A.   We contact all individuals that
10    they want to come back. Some of them,
11    they don't want to come back.
12    Q.   Who did you rehire when you
13    reopened for outdoor dining?
14    A.   Uh --
15         MR. SEGAL: For outdoor dining?
16    A.   Okay. Outdoor specifically.
17    Q.   There is a period I believe the
18    restaurant was open just for outdoor
19    dining?
20    A.   As far as I remember was
21    Lychezar Lazarov. I think --
22    Q.   What position did they hold?
23    A.   Like waiter. I think that
24    period of time if I am not mistaken,
25    Dagmara was coming. Also Alexander -- I
```

Page 29

```
 1          N. VOLPER
 2    forget his last name.
 3    Q.   He was a waiter?
 4    A.   Yes.
 5    Q.   Another Alexander. So they both
 6    Alexander, Rynkovsky I believe.
 7    Q.   You said there were some
 8    employees that you contacted you didn't
 9    want to come back; is that right?
10    A.   We contacted all of them, but
11    some they don't even reply to us.
12    Q.   Do you remember who?
13    A.   Do I remember who -- no. I
14    mean, I know the Chef Nelson. No. Pretty
15    much -- I don't remember who exactly in
16    that period of time.
17    Q.   But Chef Nelson didn't come
18    back?
19    A.   Chef Nelson didn't come back.
20    Q.   About how many individuals chose
21    not to come back?
22    A.   I cannot speculate but maybe
23    about five, six, something like that. We
24    are not big operation.
25    Q.   This is five, six employees that
```

8 (Pages 26 - 29)

1        N. VOLPER
2  counts both the back of the house and the
3  front of the house?
4     A.   Maybe little bit more in front
5  of the house.
6     Q.   So seventy ten?
7     A.   Something like that, yes, in
8  that range.
9     Q.   Do you have a title for your
10 role at the restaurant?
11    A.   Official title?
12    Q.   Yes.
13    A.   Not really.
14    Q.   How often are you at the
15 restaurant?
16    A.   In the last -- during the
17 pandemic not very often. Not very often
18 at all.
19    Q.   Before the pandemic how often
20 were you at the restaurant?
21    A.   Like monthly or weekly or --
22 maybe like five to seven times a month,
23 something like that.
24    Q.   When you were at the restaurant
25 what did you do?

1        N. VOLPER
2     A.   What I do in the restaurant?
3     Q.   Yes.
4     A.   Well, I want to make sure the
5  service is good like, you know, basically
6  we have all the vendors like -- prepare,
7  the food is good, everything is in the
8  menu. I want to make sure the staff is
9  like, you know, will follow the -- follow
10 any COVID restrictions and policies
11 because that was pretty strict. We have
12 to make sure we don't violate any policy
13 related to COVID imposed by the New York
14 State.
15    Q.   Before COVID happened that
16 wasn't something you did, right?
17    A.   Before COVID, no, no.
18    Q.   Before COVID, that was my
19 question. What did you do at the
20 restaurant besides the things you just
21 testified about?
22    A.   Yeah, some of those things.
23    Q.   You instruct certain employees
24 about how to do their job?
25    A.   Yes.

1        N. VOLPER
2     Q.   During COVID did you go to the
3  restaurant at all?
4     A.   Not much, not really much
5  because again, I was afraid.
6     Q.   When did you start going back to
7  the restaurant regularly?
8     A.   Well, I start going basically
9  like more often because it was getting
10 busy in the month of December because
11 that's our busiest time. Then many --
12 yeah, that was like the most time.
13    Q.   Is this December of 2020?
14    A.   Yeah, that was December of 2020.
15 Yes, I believe so. I started to be there
16 more often because the restaurant is
17 getting busier. I think we went to fifty
18 percent capacity or something. I don't
19 remember exactly. Then was a lot of
20 restrictions. I want to make sure
21 mandatory vaccination for employees.
22 Complying with the laws, I want to make
23 sure everything is okay because of that.
24    Q.   After you returned to be at the
25 restaurant more regularly, how often where

1        N. VOLPER
2  you at the restaurant?
3     A.   Pretty much every other day.
4     Q.   Before COVID you were there five
5  to seven times a week and when you came
6  back --
7     A.   Five to seven times a week you
8  said?
9     Q.   A month you said, right?
10    A.   Not even that. Very brief.
11 Three, four times maybe.
12    Q.   But more recently starting in
13 December of 2020 you were there every
14 other day?
15    A.   Yeah. For the reason I already
16 described.
17    Q.   Do you still go to the
18 restaurant about every other day?
19    A.   Right now?
20    Q.   Yes.
21    A.   Yes. Right now, yes. I am
22 fully vaccinated. I feel much more
23 comfortable to go there, yes.
24    Q.   Are you the ultimate decision
25 maker at the restaurant?

9 (Pages 30 - 33)

N. VOLPER

1
2    A.   Yes.
3    Q.   Do you hire employees?
4    A.   I hire some employees, yes.
5    Q.   Which employees have you hired?
6    A.   Recently or during the --
7    Q.   During the entire time if you
8 can please name some employees that you
9 have hired?
10   A.   Okay.
11       MR. SEGAL:  Objection.  You can
12   answer.
13   Q.   You can answer.
14       MR. SEGAL:  You can answer.
15   A.   As far as I remember -- let's
16 see.  Dagmar for sure because that's
17 pretty much recently, Chef Nelson.  He is
18 no longer with us but -- let's see.  I
19 believe Alexander Rynkovsky.  Yeah, I am
20 pretty sure -- again.  Long time ago.
21 Yeah, probably few more people, yes.
22   Q.   Do you fire employees?
23   A.   Yes.
24   Q.   Did you fire the plaintiff, Ms.
25 Martinenko?

N. VOLPER

1
2    A.   Yes.
3    Q.   Who replaced Nino Martinenko
4 after she was fired?
5    A.   Who replaced -- because it was
6 getting like more busy so basically we
7 have few additional employees.  No
8 specific somebody to be at her place.  It
9 is just we started to be busy.
10   Q.   Did you these additional people?
11   A.   Let me think.  I don't believe I
12 did.
13   Q.   Who did then?
14   A.   Basically, the staff.  I
15 remember one particular case.  Actually,
16 yes, yes.  For sure I have a person.  It
17 is a lady.  Her name is -- I am bad with
18 names.  Hailey.  I hired her.
19   Q.   What position was Hailey?
20   A.   Front of house.
21   Q.   Server, waiter?
22   A.   Yeah, yeah.  Front of house.
23   Q.   Do you have the authority to
24 discipline employees?
25   A.   Yes.

N. VOLPER

1
2    Q.   You mentioned the employee
3 Alexander Rynkovsky?
4    A.   Yes.
5    Q.   Is he server at the restaurant?
6    A.   Yes.
7    Q.   Was he ever promoted to captain?
8    A.   Rynkovsky, no.  Alexander, I
9 think Alex -- or something like that was
10 promoted to captain.
11   Q.   What is a captain?
12   A.   Captain is like basically a
13 person who is little bit higher level.  As
14 long as my basic knowledge of that is with
15 high level above waiter or waitress which
16 is more professional, more taking care of
17 service, make sure service is good.
18 Basically like more professional, person
19 with lot of years of experience and
20 knowledge.
21   Q.   Did you promote this person
22 Alexander, the other Alexander to captain?
23   A.   Yes.
24   Q.   You did?
25   A.   Yes.

N. VOLPER

1
2    Q.   Okay.  Was this person ever
3 demoted back to being a server?
4    A.   Yes.
5    Q.   Why was he demoted?
6    A.   I'm not sure demoted.
7       MR. SEGAL:  You made him a
8    captain.  Did you push him back down
9    to being just a front-of-house waiter?
10   A.   Yes.  I'm sorry, I didn't
11 understand the question.
12   Q.   It's okay.
13       Why did you do that?
14   A.   Why?
15   Q.   Yes.
16   A.   Because there was a specific
17 case that bring to my attention that he is
18 flirting with one of the girls.  In my
19 opinion that was not very professional so
20 I demoted him, yes.
21   Q.   Aside from this person, have you
22 ever disciplined any other employee at the
23 restaurant?
24   A.   Yes, of course.  Maybe I
25 suspended like a few days or anything like

10 (Pages 34 - 37)

1         N. VOLPER
2 that. Depends on the nature.
3     Q.   Who sets the employee salaries
4 at the restaurant?
5     A.   Who set the employee salary?
6     Q.   Yes.
7     A.   Well, the tip employees or, you
8 know, obviously the New York State set up
9 requirements.
10    Q.   You paid tip employees minimum
11 wage for tips to service workers?
12    A.   Yes.
13    Q.   And that was the entire time the
14 restaurant was open?
15    A.   The entire time, yes, as far as
16 I remember.  I mean, it is very long
17 period of time but as far as I remember.
18    Q.   Who set the employees schedules
19 at the restaurant?
20    A.   Most of the time they did
21 themselves.
22    Q.   Who set the back of house
23 salaries?
24    A.   Who set the back of house
25 salary?

1         N. VOLPER
2     Q.   Yes.
3     A.   Me obviously, because they vary.
4 They are not like required -- minimum wage
5 can be much more.
6     Q.   You made those decisions what
7 people will be paid?
8     A.   Yeah.  I mean, most of the time.
9 Sometimes the chef take that decision.
10 When I was absent the chef hire people,
11 you know.  Chef Nelson will hire, you
12 know, he decided based on the knowledge of
13 the skills.
14    Q.   Who sets the employee schedules
15 at the back house?
16    A.   Not me.  No, it was not me.  Not
17 me.  Basically the chef.
18    Q.   Can you approve an employee's
19 request for time off?
20    A.   Yes.
21    Q.   Did you, in fact, do that?
22    A.   Yes.  I did few times.  Yes.
23    Q.   If you are at the restaurant and
24 you tell an employee to do something, they
25 have do do it, right?

1         N. VOLPER
2     A.   I mean, if it is -- not
3 everything they have to do.  What is
4 appropriate.
5     Q.   Fair enough.
6         But if it is within the scope of
7 their job duties you tell them to do what
8 they have to do, correct?
9     A.   Correct.
10    Q.   Who is responsible for running
11 payroll at the restaurant?
12    A.   Who is responsible -- most of
13 the staff determine to do their own
14 especially in the last few years like
15 payroll records and all this stuff, tips.
16 I was not engaged in that at all.
17    Q.   How is payroll run?
18    A.   What do you mean?
19    Q.   How are the employees paid?
20    A.   They are paid by check,
21 deduction from the --
22    Q.   You testified that the
23 front-of-house gets paid tip credit
24 minimum wage, correct?
25    A.   I assume, yes.

1         N. VOLPER
2     Q.   That's an hourly wage, right?
3     A.   Yes.
4     Q.   All the front-of-house employees
5 gets paid --
6     A.   Hourly plus tip.
7     Q.   How does the restaurant keep
8 track of the hours that the employees
9 work?
10    A.   We have a POS system basically
11 checking the hours.
12    Q.   The restaurant requires the
13 employees to clock in and out?
14    A.   Correct.
15    Q.   What does the restaurant do with
16 those time records?
17    A.   They are in the system.  We just
18 use them.
19    Q.   Do you use them to calculate how
20 much to pay each employee?
21    A.   It is not set up like that, how
22 much to pay.  Only time records.
23        MR. SEGAL:  What he is asking is
24    those hours, do you use those to
25    calculate their weekly pay?

11 (Pages 38 - 41)

N. VOLPER

1
2      THE WITNESS:  Correct.  I'm
3  sorry.
4      MR. SEGAL:  That's why I am
5  helping.
6    Q.  What is that process?  Who takes
7  the time records from the POS system?
8    A.  Most of the time like the staff,
9  they determine and, you know, they did it.
10  I was absent as I mentioned.  I was not
11  involved in all this stuff.  That's
12  including Nino Martinenko by the way.  She
13  writes her own checks, determined her own
14  hours.  There was trust in employees.  I
15  didn't have really doubt somebody cheat on
16  the hours, or tips, or anything like that.
17    Q.  Who would take the time records
18  out of the POS system in order to
19  calculate how much to pay the employees?
20    A.  Depends who is there, you know.
21  I don't know exactly.  Depends who is
22  there.
23    Q.  Is there anyone else besides an
24  employee of the restaurant that is
25  involved with making sure the employees

N. VOLPER

1
2  get paid?
3    A.  Yes.  Yes, of course.
4    Q.  Who?
5    A.  A friend of mine.
6    Q.  Who is that?
7    A.  His name is Imran?
8    Q.  What is his role?
9    A.  He is helping me basically to
10  do, you know, we involved in different
11  things with him.  Basically, I was really
12  afraid to go to the restaurant during that
13  period of time and he helped me a lot in
14  terms of sometimes delivery, sometimes,
15  you know, for whatever to do,
16  communication.
17      MR. SEGAL:  Let's try to answer
18  the question.  He is asking about
19  payroll.  He is asking who calculates
20  the time sheets.
21      THE WITNESS:  It is --
22      MR. SEGAL:  Is Imran doing it,
23  is someone else doing it?
24      THE WITNESS:  It is automatic
25  calculation by the payroll system.

N. VOLPER

1
2  Once you set up the hours, it is
3  automatic document.  So now employees,
4  they have to provide tips, like
5  everybody collect tips.  I'm not sure
6  if they provide tips credits, tip
7  employees.  Yes, that's the way.
8      MR. SEGAL:  Who is writing the
9  checks?
10      THE WITNESS:  The checks, I am
11  writing.  Most of the employees write
12  checks.  Nino Martinenko also write
13  her own check or Alexander.  I can't
14  remember.
15    Q.  Has the restaurant ever used ADP
16  or payroll service to process the payroll?
17    A.  No.  We using like accounting
18  company.
19    Q.  Sure.  What accounting company?
20    A.  It is Crow; C-R-O-W, something.
21      MS. SCHULMAN:  With N?
22      THE WITNESS:  I don't think.
23  C-R-O-W.
24    Q.  Is this accounting company
25  involved with the weekly issuance of

N. VOLPER

1
2  checks?
3    A.  Correct.
4    Q.  What is your understanding of
5  Crow's involvement with making sure that
6  the restaurant pays --
7    A.  Basically, they determine
8  deduction New York State.  The deduction
9  required by law, they have to take from
10  the payroll checks.  Insurance, pension
11  something, New York State.  The deduction
12  basically.
13    Q.  Does someone at the restaurant
14  send the time records to Crow in order for
15  Crow to calculate how much the employee
16  earns and how much the deductions are?
17    A.  Correct.
18    Q.  Who sends the time records to
19  Crow?
20    A.  Most of the time I believe was
21  Imran.
22    Q.  Is Imran responsible for taking
23  the time records from the restaurant,
24  sending it to Crow and managing the
25  issuance of the checks of the restaurant?

12 (Pages 42 - 45)

Page 46

1        N. VOLPER
2    A.  Most of the time, yes.
3  Sometimes other people was involved.
4    Q.  Who signs, I believe you
5  testified to this but does 212 Steakhouse
6  pay its employees by handwritten check
7  from a checking account?
8    A.  Correct.
9    Q.  Is that Bank of America account?
10   A.  Yes.
11   Q.  Has that been the case from 2016
12  to the present?
13   A.  I believe so.  Maybe different
14  accounts but I think still was the same
15  bank.
16   Q.  Who writes the checks?
17   A.  As I mentioned in my previous
18  testimony few seconds ago, most of the
19  time the staff did including Nino
20  Martinenko.
21   Q.  How do they now how much to
22  write on the check?
23   A.  They have basically access to
24  everything so -- the POS system.  They can
25  calculate the hours, you know, the tips.

Page 47

1        N. VOLPER
2  That's pretty much it.
3    Q.  Who signs the checks?
4    A.  I already respond.  Most of the
5  time the staff did.
6    Q.  The staff would sign the check
7  on behalf of you --
8    A.  Sometimes Imran, sometimes
9  Alexander.  I was pretty much not signing.
10   Q.  Who has authority to sign checks
11  on behalf of 212 Steakhouse Incorporated?
12   A.  Like, I mean what kind of
13  authority?  Nino Martinenko have my verbal
14  authority but not anything in paper or
15  anything like that.
16   Q.  Can you sign checks on behalf of
17  212 Steakhouse Incorporated?
18   A.  Yes.
19   Q.  Did you give the authority to
20  sign checks on behalf of 212 Steakhouse
21  Incorporated to these other employees?
22   A.  Correct.
23   Q.  Does the restaurant maintain
24  personnel files for employees?
25   A.  I think we -- by personnel file

Page 48

1        N. VOLPER
2  you mean like their Social Security or
3  driver's license something like that?
4    Q.  Do you maintain a collection of
5  documents that respond to each of the
6  employees of the restaurant?
7    A.  Like what kind of -- like
8  driver's license or?
9    Q.  Any documents related to the
10  employees.
11   A.  I think we may have few.
12   Q.  Where are they kept?
13   A.  In the restaurant but I'm not
14  sure if -- I looked the last time and I
15  don't find anything.  So far not
16  successful to believe to find like
17  personnel -- like personnel documentation.
18   Q.  Are the ones that the restaurant
19  maintains kept in paper copies?
20   A.  Different documents, they are
21  pretty much in paper.  That includes
22  invoices from vendors, tips credit.
23  Pretty much everything in paper, yes.  All
24  different documents in paper, yes.
25   Q.  Does the restaurant have an

Page 49

1        N. VOLPER
2  office?
3    A.  Like we have like a small room
4  inside the restaurant.
5    Q.  What is in the office in the
6  small room?
7    A.  We have safe deposit box.  We
8  have a small desk.  We have a computer.
9  You know, normal like pens, papers, normal
10  office stuff.
11   Q.  For any personnel files that the
12  restaurant maintains, who is in charge of
13  maintaining them?
14   A.  Basically, they did it.  I was
15  not involved in that.  Like collecting any
16  -- or maybe I was involved in the
17  beginning maybe seven, eight years
18  ago or six and a half years ago.  But I
19  don't remember being very involved.  I
20  think the staff just -- somebody usually
21  gives tasks to somebody can you please
22  collect the papers.  One of the staff
23  tasks to collect everybody -- like because
24  become a law.  Everybody have to be
25  vaccinated in order to work in the

13 (Pages 46 - 49)

N. VOLPER

1       N. VOLPER
2   hospitality industry. I give a lot of
3   tasks to her to collect from everybody the
4   vaccination records to make sure they are
5   all eligible to work under the current
6   state law.
7       Q.   From 2016 to the present, has
8   the restaurant had any managers?
9       A.   I don't believe so, no. I think
10  we may have, maybe in the beginning.
11  Maybe like 2014 but -- no, I don't believe
12  so. No, I don't remember. We have maybe
13  like a week or two, something like that
14  because it was like out of money so we
15  cannot really afford management salaries.
16      Q.   I believe you testified about an
17  individual named Imran Sajid, correct?
18      A.   Yes.
19      Q.   Does he work for the restaurant?
20      A.   He helped me but not really he
21  didn't join salary.
22      Q.   Is he an investor in the
23  restaurant?
24      A.   No.
25      Q.   Does he have an ownership stake

N. VOLPER

1       N. VOLPER
2   in the restaurant?
3       A.   No.
4       Q.   As you sit here today, is it
5   your understanding that he has an
6   ownership stake in the restaurant?
7       A.   Who?
8       MR. SEGAL: Imran.
9       Q.   Imran?
10      A.   I have to look the records but I
11  don't think so he is in my returns, no.
12      Q.   You don't think so?
13      A.   No, because I have like few
14  other businesses. I am overwhelmed. I
15  can't remember everything.
16      Q.   That's fine. I want to know
17  what your understanding is right now.
18      A.   Yes.
19      Q.   And your understanding is I
20  believe you testified he does not own any
21  part of the restaurant, correct?
22      A.   I testified I don't remember
23  because I have to look like the tax
24  returns specialist, PA. I have to take a
25  look and let you know.

N. VOLPER

1       N. VOLPER
2       THE WITNESS: But I think we
3   provided that, Mitch. I think we
4   provided that.
5       Q.   That's fine.
6       Who are Mr. Sajid's duties and
7   responsibilities with respect to the
8   restaurant?
9       MR. SEGAL: How do you spell his
10  last name?
11      MR. DiGIULIO: I believe it is
12  S-A-J-I-D.
13      MR. SEGAL: I-M-R-A-N?
14      MR. DiGIULIO: Yes.
15      Q.   What are his duties and
16  responsibilities with respect to the
17  restaurant?
18      A.   His duties like he give me a
19  favor. He is not on salary or anything.
20  He doesn't have specific duties like you
21  have to do this every day, you have to do
22  this. He is just helping me.
23      Q.   How does he help you?
24      A.   How he helps me?
25      Q.   Yes.

N. VOLPER

1       N. VOLPER
2       A.   Like, you know, sometimes
3   delivery, make deliveries, pick up
4   products, whatever we need. You know, all
5   these. Sometimes helps set up. He was
6   running, helping me with social media,
7   posting, running all this stuff. I
8   remember. Because he was very -- like he
9   is very knowledgeable in technology so
10  when we change menus, he put new prices in
11  wine and, you know, stuff like that.
12      MR. DiGIULIO: Can we take a
13  five minute break?
14      THE WITNESS: Of course.
15      (Whereupon, a short recess was
16  taken.)
17      MR. DiGIULIO: Back on the
18  record.
19      Q.   When did Imran get involved with
20  helping you with the restaurant?
21      A.   He got involved like pretty much
22  early in the opening. Maybe like a year
23  or two later or something like that, or
24  six months or something like that.
25      Q.   What are the back of house

Page 54

1        N. VOLPER
2 positions at the restaurant?
3    A.   Back of the house?
4    Q.   Yes.
5    A.   Do you mean the kitchen?
6    Q.   Yes.
7    A.   Oh, okay. We have a chef
8 obviously, we have sous chef, line cooks,
9 standard stuff.
10    Q.   Chefs, sous chefs, line cooks.
11 Any other positions?
12    A.   Dishwasher.
13    Q.   How many chefs does the
14 restaurant employ at a time?
15    A.   Single one.
16    Q.   How many chefs has the
17 restaurant employed since 2016?
18    A.   Like title chef, maybe like two
19 or three, something like that.
20    Q.   Who is the first chef?
21    A.   Nelson.
22    Q.   When did he stop becoming the
23 chef?
24    A.   Pretty much immediately.
25    Q.   When did he stop?

Page 55

1        N. VOLPER
2    A.   Stop, okay. I think he stopped
3 when the pandemic hit.
4    Q.   Since the pandemic who is the
5 next chef that the restaurant hired?
6    A.   Well, basically we don't really
7 hire like a real chef for few reasons. We
8 cannot really find staff in the kitchen.
9 Most of them like sous chefs. We cannot
10 really find staff to work in the kitchen.
11 We have very, very, very big issues
12 especially in the back house. I have
13 certain point maybe one or two people for
14 maybe for weeks but not really like a chef
15 but like try to, you know, help us. It
16 was extremely tough. So right now I don't
17 really have chef position, position. I
18 have person like who is, you know, taking
19 more responsibility of the kitchen.
20    Q.   Right now the restaurant doesn't
21 have a chef?
22    A.   We have person who is you can
23 technically say chef.
24    Q.   Who is that person?
25    A.   His name is Franco.

Page 56

1        N. VOLPER
2    Q.   Franco?
3    A.   Yes.
4    Q.   What are the job duties of the
5 chef?
6    A.   Job duties is like ordering
7 food, supervising stuff, training, stuff.
8    Q.   Who decides the chef's pay?
9    A.   I did.
10    Q.   What is the current chef's pay?
11    A.   What is the current chef's pay?
12    Q.   Yes.
13       MR. SEGAL:  Objection, but you
14 can answer.
15    A.   I believe it is like $1,600
16 something like that.
17    Q.   For how --
18    A.   Weekly.
19    Q.   You pay the chef weekly?
20    A.   Correct.
21    Q.   Not by the hour, correct?
22    A.   We pay weekly $1,600.
23    Q.   Was that the chef's salary since
24 2016?
25    A.   No, no. But we have no choice.

Page 57

1        N. VOLPER
2 Now we have to pay more money.
3    Q.   I believe you said there is sous
4 chefs; is that correct?
5    A.   Correct.
6    Q.   What are the job duties of the
7 sous?
8    A.   Sous chef is basically same
9 duties like line cook, but they are more
10 specialized more fine dining. It is for
11 the -- not like -- it is more premium
12 dining. It is not like diner. They are
13 more knowledge than regular line cook.
14    Q.   What do the line cooks do?
15    A.   Line cooks is basically the, in
16 our case it is basically like very simple
17 tasks like opening oysters, do salads,
18 stuff like that.
19    Q.   And the sous chefs are more
20 technical?
21    A.   Correct.
22    Q.   Are the sous chefs paid by the
23 hour?
24    A.   Correct.
25    Q.   And the line cooks are paid by

15 (Pages 54 - 57)

1        N. VOLPER
2  the hour?
3     A.   Correct.
4     Q.   How many sous chefs does the
5  restaurant employ at one time?
6     A.   It is very hard to determine for
7  few reasons. Especially in the last few
8  years opening, closing is 25 percent, 50
9  percent, not able to find staff.
10  Sometimes we are very low, maybe only two
11  three people. Sometimes we have four,
12  five people. But it is -- it is very
13  depends on our needs and our ability to
14  find personnel.
15     Q.   Before COVID before 2020, how
16  many sous chefs would the restaurant
17  employ at a time?
18     A.   Usually like two.
19     Q.   How many line cooks does the
20  restaurant employ?
21     A.   Line cooks?
22     Q.   Yes.
23     A.   One or two.
24     Q.   And before COVID, was that the
25  same?

1        N. VOLPER
2     A.   Before COVID?
3     Q.   Yes.
4     A.   Pretty much the same, yes.
5     Q.   You said they are both paid by
6  the hour, correct?
7     A.   Correct.
8     Q.   What is the pay rate for say a
9  sous chef?
10     A.   I don't remember right now but
11  obviously they are much higher than the
12  minimum wage. So maybe range from 17, 18
13  to 22, 23.
14     Q.   Does the restaurant maintain
15  some kind of records that the shows how
16  much the sous chef was being paid?
17     A.   Yes, of course. We give like
18  weekly payroll.
19     Q.   You give pay stubs?
20     A.   Correct.
21     Q.   Is that the same for the line
22  cooks?
23     A.   Correct.
24     Q.   Does the restaurant, you said
25  dishwasher is the last position?

1        N. VOLPER
2     A.   Correct.
3     Q.   How many dishwashers does the
4  restaurant have?
5     A.   Usually just one.
6     Q.   Just one?
7     A.   Yes.
8     Q.   And they work seven days a week?
9     A.   No, no. Sometimes the line
10  cooks step up when we are not so busy so
11  -- because, you know, we have to save
12  money. Sometimes line cook slash
13  dishwasher. Sometimes they step up and --
14  even the chefs doing sometimes like, you
15  know. I just have one chef or one sous
16  chef and we have only one reservation,
17  even chef and sous chef putting some, you
18  know, clean dishes.
19     Q.   The dishwasher is paid by the
20  hour, correct?
21     A.   Yes.
22     Q.   What is the dishwasher's hourly
23  rate?
24     A.   (No verbal response.)
25     Q.   Do you know?

1        N. VOLPER
2     A.   I imagine something like --
3        MR. SEGAL: Don't imagine. Do
4  you know? Yes, I know or No, I don't
5  know.
6     A.   No, no.
7     Q.   Is the dishwasher's hourly rate
8  written down somewhere in the restaurant?
9     A.   In the POS system, yes.
10  Automatic.
11     Q.   Does the restaurant issue pay
12  stubs for the dishwashers?
13     A.   Yes.
14     Q.   The tips position at the
15  restaurant are the servers, the bussers,
16  the food runners, and the bartender; is
17  that correct?
18     A.   Correct.
19     Q.   Those are the front-of-house
20  positions?
21     A.   Yes.
22     Q.   And also the captain when there
23  was a captain; is that right?
24     A.   Yes, of course.
25     Q.   All of those are the

16 (Pages 58 - 61)

1          N. VOLPER
2 front-of-house positions, right?
3    A.   Yes, sir.
4    Q.   How many servers does the
5 restaurant employ?
6    A.   Varies. Depends.
7    Q.   Currently how many?
8    A.   Currently?
9    Q.   Yes.
10   A.   I believe four servers, two
11 bartenders.
12   Q.   How many work per shift?
13   A.   How many work per shift?
14   Q.   Yes.
15   A.   I'm sorry. I don't understand
16 the question.
17   Q.   On any given night how many
18 servers are working in the dinner shift?
19   A.   Friday and Saturday are the most
20 busy obviously so pretty much everybody is
21 there. Like slow days, like maybe one or
22 two.
23   Q.   Did the restaurant employ a
24 server named Cora Bethea (ph) this year?
25   A.   Cora --

1          N. VOLPER
2    Q.   Do you know if the restaurant
3 employed a person named Cora Bethea this
4 year?
5    A.   No, I don't know.
6    Q.   Do you know whether she worked
7 -- withdrawn.
8          Did the restaurant employ a
9 server named Lucia Ross Gizburt (ph) this
10 year?
11   A.   Doesn't ring a bell.
12   Q.   What are the names of the four
13 current servers that are working at the
14 restaurant?
15   A.   Current?
16   Q.   Yes.
17   A.   It is Alexander, Rivaldo,
18 Luccio, Oscar.
19   Q.   How many runners does the
20 restaurant employee at a time?
21   A.   Usually one per night or two.
22 Depends how busy we are.
23   Q.   One or two per night. How many
24 at a given time does the restaurant
25 employ?

1          N. VOLPER
2    A.   At a given time, most of the
3 time like one or two.
4    Q.   What are the runners' job
5 duties?
6    A.   Runners?
7    Q.   Yes.
8    A.   Well, they help with running the
9 food, pick up the food from the station,
10 bring the food to the table. If anything
11 like any dishes picked up, change dishes.
12 Stuff like that.
13   Q.   How many bussers does the
14 restaurant employ?
15   A.   Pretty much the same thing; one
16 or two.
17   Q.   What are the busser's
18 responsibilities?
19   A.   They stay more front of the
20 house putting water, changing glasses, you
21 know, bring new silverware if changing
22 between courses, stuff like that.
23   Q.   How many bartenders does the
24 restaurant employ at a time?
25   A.   Usually it is one.

1          N. VOLPER
2    Q.   How many bartenders work in the
3 restaurant now?
4    A.   Now I think two part-time.
5    Q.   Who are they?
6    A.   I believe her name is Hailey and
7 Taylor or something like that.
8    Q.   Hailey is the person you
9 mentioned before who you interviewed and
10 hired?
11   A.   Yes, sir.
12   Q.   What are the job duties of the
13 bartenders?
14   A.   Job duties like -- because we
15 have like a pool house, we basically try
16 to engage everybody because of pool house.
17 So, you know, but like the major major
18 thing is the bartenders to make drinks or
19 pour cocktails, but they are not
20 absolutely to do this. Sometimes they
21 serve food in the bar, you serve food.
22 Pretty much main main is to fill any
23 alcohol, beverage. They can serve. They
24 can pick up plates, glass. Depends which
25 section maybe we need help. Because we

17 (Pages 62 - 65)

Page 66

```
 1          N. VOLPER
 2  are pool house, we try to help each other
 3  front of the house always.
 4     Q.   Who are the current bussers that
 5  are employed at the restaurant?
 6     A.   The current?
 7     Q.   Yes.
 8     A.   What's his name --
 9     Q.   If you don't know, that's okay.
10     A.   I don't know but I can provide
11  information if you need.
12     Q.   Who are the current runners at
13  the restaurant?
14     A.   I can provide that information.
15     Q.   You don't know right now but you
16  can provide information?
17     A.   I can, yes.
18     Q.   That's fine.
19         The plaintiff, Nino Martinenko,
20  worked at the restaurant as a server,
21  correct?
22     A.   Yes.
23     Q.   Ms. Martinenko as a server had
24  the same job duties as all the other
25  servers, correct?
```

Page 67

```
 1          N. VOLPER
 2     A.   Yes, sir.
 3     Q.   I believe you testified Ms.
 4  Martinenko helped with payroll; is that
 5  correct?
 6     A.   Correct.
 7     Q.   What did she do to help with
 8  payroll?
 9     A.   Like calculation, write down
10  checks, issue to people.
11     Q.   Did any other servers help with
12  that as well?
13     A.   I believe Alexander, other
14  Alexander also did that duties.
15     Q.   They are both servers?
16     A.   Yes.
17     Q.   Ms. Martinenko worked for the
18  restaurant during two separate periods,
19  correct?
20     A.   Correct.
21     Q.   She began working for you in
22  June of 2015, correct?
23     A.   I mean, I don't remember exactly
24  when but if that's what she said.
25     Q.   She worked until 2018; is that
```

Page 68

```
 1          N. VOLPER
 2  correct?
 3     A.   I believe so, yes.
 4     Q.   She came back from work at the
 5  restaurant from early 2021 to December of
 6  2021, correct?
 7     A.   I believe that's accurate.
 8     Q.   And plaintiff, Dagmara Huk,
 9  worked as a restaurant as a bartender,
10  correct?
11     A.   Yes.
12     Q.   And her job duties as a
13  bartender was the same as any other
14  bartender at the restaurant, right?
15     A.   Basically, we have the same duty
16  as everybody else.  Order, bring the food,
17  everything like -- it was like pool house.
18  It is not like specifically.
19     Q.   Before we talked about the POS
20  system where the restaurant keeps track of
21  employee's time; is that correct?
22     A.   Yes, sir.
23     Q.   And so from 2016 to now the
24  restaurant required all of its employees
25  to clock in and clock out; is that
```

Page 69

```
 1          N. VOLPER
 2  correct?
 3     A.   Pretty much as far as I am
 4  aware, yes.  I'm not sure about the shifts
 5  but, you know.
 6     Q.   In terms of front-of-house
 7  employees, when the restaurant did operate
 8  with the lunch shift, I believe you
 9  testified that the restaurant opened for
10  the customers at noon, correct?
11     A.   Correct.
12     Q.   What time did the servers have
13  to arrive at the restaurant?
14     A.   They usually arrive like maybe
15  like fifteen minutes to thirty minutes
16  earlier.
17     Q.   What do they do between that
18  time and noon?
19     A.   What they did?
20     Q.   Yes.
21     A.   I mean, they make sure
22  everything is set up correctly.  Tables,
23  missing any glasses, silverware polish,
24  like preparation for lunch.
25     Q.   Is that called side work in the
```

18 (Pages 66 - 69)

Page 70

1        N. VOLPER
2 industry?
3        MR. SEGAL: Objection.
4    A.   No, no.
5    Q.   What is side work?
6    A.   Side work is not related to food
7 industry.
8    Q.   I'm sorry. I didn't understand
9 you.
10   A.   Side work is not related to the
11 food industry. As a waiter you have to
12 make sure the tables are set up, the
13 glasses are set up, the right silverware
14 is there, we have napkins folded, you
15 know, preparation before any food
16 services.
17   Q.   What time did the runners have
18 to arrive at the restaurant?
19   A.   They usually arrive like I
20 believe 4:00.
21   Q.   Does the restaurant have any
22 runners for the lunch shift?
23   A.   Most of the time we don't
24 because we have only one or two tables so
25 it is not necessary. The wait staff

Page 71

1        N. VOLPER
2 prefer not to do that because you have to
3 share the tip with somebody else. They
4 want to keep everything for themselves.
5    Q.   Were bussers assigned to lunch
6 shift when there was a lunch shift?
7    A.   I don't remember unless there
8 was an event where more people are
9 involved.
10   Q.   What about bartenders?
11   A.   Bartenders as I mentioned
12 before, we are like-- pretty much
13 everybody knows serving and bartender. So
14 some of the bartenders was also to take
15 care of the service. We was pool house so
16 pretty much everybody how to do. Even
17 servers, they know how to do the bartender
18 jobs.
19   Q.   If a runner or busser or
20 bartender did work a lunch shift, they
21 would have clocked in before that shift,
22 correct?
23   A.   They are supposed to, yes.
24   Q.   Most of the time when the
25 front-of-house employee worked a lunch

Page 72

1        N. VOLPER
2 shift they also worked a dinner shift; is
3 that right?
4    A.   Sometimes, yes.
5    Q.   Is that called a double?
6    A.   This is called -- can you be
7 specific? What do you mean by double?
8        MR. SEGAL: What the gentleman
9 is asking is that you have a lunch
10 shift, right?
11       THE WITNESS: Okay.
12       MR. SEGAL: And that's from --
13       THE WITNESS: 12:00.
14       MR. SEGAL: 12:00. But they
15 came half an hour or fifteen minutes
16 early?
17       THE WITNESS: Okay.
18       MR. SEGAL: Till when? When did
19 that lunch time --
20       THE WITNESS: Depends. It
21 depends. Sometimes they go early
22 because they get tired.
23       MR. SEGAL: Roughly what is
24 lunch? 12:00 to 1:00, 12:00 to 2:00?
25       THE WITNESS: Oh, the lunch

Page 73

1        N. VOLPER
2 time?
3        MR. SEGAL: Yes.
4        THE WITNESS: It can be up to
5 3:00. 4:00. Lunch is open until
6 around 4:00. After that we serve
7 dinner.
8    Q.   Does the restaurant close in
9 between lunch and dinner shift?
10   A.   No.
11   Q.   So it is open from noon until
12 when it closes?
13   A.   Yes, sir.
14   Q.   If an employee works both the
15 lunch shift and dinner shift, works from
16 when the restaurant opens until later, do
17 they work straight through or do they get
18 a break?
19   A.   Well, I think -- I cannot really
20 say that because I was not there. Usually
21 when I see like recently, they take maybe
22 half an hour break or something,
23 cigarette, walking. That's my current
24 experience during the short period of time
25 right now. In the past, I'm not really

19 (Pages 70 - 73)

Page 74

```
1           N. VOLPER
2  sure.
3     Q.   When is that break that you see
4  people doing that?
5     A.   Whenever they did, when there is
6  no people in the restaurant they can take
7  a break or somebody else come to the
8  restaurant like let's say about 4:00.
9     Q.   Do you instruct front-of-house
10 employee who is taking a break to clock in
11 and clock out when they come back in and
12 they are done taking the break?
13    A.   I don't remember.
14       MR. SEGAL: Do they?
15       THE WITNESS: I don't believe I
16   require that. I don't know. I don't
17   think they did that.
18    Q.   If a front-of-house employee
19 only worked the lunch shift, when did that
20 shift typically end?
21    A.   Most of the time they work more
22 than the lunch shift.
23    Q.   I understand. Did sometimes
24 they only worked a lunch shift?
25    A.   Probably maybe 5:00, 6:00,
```

Page 75

```
1           N. VOLPER
2  something like that. But most of the time
3  they worked after.
4     Q.   For front-of-house employees who
5  only worked the dinner shift, what time
6  were they required to get to work?
7     A.   Usually 4:00. Sometimes they
8  come early.
9     Q.   What time does the dinner shift
10 end?
11    A.   It is not like specific time.
12 Usually 10:30, 11:00.
13    Q.   What time does the kitchen
14 close?
15    A.   We close depends on the day. I
16 believe around 10:00. Some days 10:30.
17    Q.   10:00 during the week and 10:30
18 on Friday and Saturday?
19    A.   Yes, yes. It used to be 9:45.
20 Then because -- we changed when we see
21 people wants to come late at night you
22 opened maybe fifteen minutes more, the
23 hours.
24    Q.   The servers are required to work
25 until the last customer finishes their
```

Page 76

```
1           N. VOLPER
2  meal and leave, correct?
3     A.   They are not required. Like
4  let's say if it is only one table left and
5  you have three servers, some of them can
6  go home.
7     Q.   Is that the case throughout the
8  day? If there is not enough customers
9  would the restaurant sometimes cut
10 someone's shift and they can go home?
11    A.   Most of the time they figure out
12 themselves. I may cut sometimes. Maybe,
13 maybe a few times in this period of time
14 when I figure out myself if we are not
15 busy. We don't need all this stuff. But
16 most of the time they did it themselves
17 like I don't want to stay here for $10
18 more and they go early.
19    Q.   For the back-of-house
20 employees, for the times when the lunch
21 was being served, what time are the
22 back-of-house employees required to
23 arrive?
24    A.   Back-of-house employees you mean
25 the kitchen staff?
```

Page 77

```
1           N. VOLPER
2     Q.   Yes.
3     A.   They usually arrive like also
4  thirty minutes before 12:00, around 11:30
5  something like that.
6     Q.   How many back-of-house employees
7  work the lunch shift?
8     A.   Just one most of the time.
9     Q.   Would that be the chef?
10    A.   No. It varies. It varies. When
11 the chef is off, you have like sous chef.
12 Most of the time it is not very busy in
13 the lunch so we don't require many people
14 at the time.
15    Q.   So most of the time the
16 back-of-house employees who works a lunch
17 shift also works the dinner shift?
18    A.   Most of the time, yes.
19    Q.   Did they work straight through
20 or did they get a break?
21    A.   Pretty much the same. If
22 somebody comes like, they usually come
23 2:00, they taking breaks. We are very
24 like -- we limit to when it is not busy.
25 So pretty much they make their own
```

20 (Pages 74 - 77)

Page 78

1       N. VOLPER
2 decisions when they want to go to break.
3 We are not -- we don't enforce that like
4 you have to do this from this time to this
5 time.
6    Q.   Okay. For the back-of-house
7 employees who are assigned just to a
8 dinner shift, what time are they required
9 to arrive?
10   A.   Sometimes 2:00, sometimes 4:00.
11 It depends on the reservations and
12 preparation time.
13   Q.   Is it different positions are
14 required to arrive at different times or
15 why would it shift from 2:00 to 4:00?
16   A.   Because if we are like too busy,
17 like from the previous day we have certain
18 reservations where we require more
19 preparation of the food, then they come
20 maybe two hours early to prepare for
21 service.
22   Q.   Between 2:00 and 4:00 depending
23 on how busy the restaurant is, what time
24 do they work until?
25   A.   When does the shift end?

Page 79

1       N. VOLPER
2       MR. SEGAL: Objection. Asked
3    and answered.
4    Q.   You can answer.
5    A.   Can you repeat? What did you
6 say? I get confused.
7    Q.   When the back-of-house employees
8 worked at dinner shift, when does the
9 shift end?
10   A.   Depends on what time we are
11 busy. Usually after 9:45, 9:30 the staff
12 cleaning up. Usually 10:30, 11:00,
13 something like that.
14       MR. DiGIULIO: The next stretch
15    is going to be a bunch of documents so
16    we can take a lunch break.
17       (Whereupon, a short recess was
18    taken.)
19       MR. DiGIULIO: Back on the
20    record.
21       (Whereupon, Bates D1216 to D1254
22    was marked as Defendant's Exhibit 2
23    for identification as of this date by
24    the Reporter.)
25    Q.   These are documents your

Page 80

1       N. VOLPER
2 attorneys produced in this litigation.
3    A.   Okay.
4    Q.   They are produced without Bates
5 numbers. Plaintiff's counsel put these
6 Bates numbers on the document for
7 identification. They are at the bottom
8 right-hand corner. For the record, they
9 are Bates stamped D1216 through D1254.
10       MR. SEGAL: Hello. One second.
11 Off the record.
12       (Whereupon, an off-the-record
13    discussion was held.)
14       MR. DiGIULIO: Back on the
15    record.
16    Q.   Just to be clear, this is
17 Exhibit 2. It is marked Bates D1216 to
18 D1254. These are the plaintiff Nino
19 Martinenko's time records from the
20 restaurant, correct?
21    A.   Yes.
22    Q.   And the restaurant paid Nino
23 Martinenko for the hours reflected in
24 these records, right?
25    A.   Correct. Plus tips.

Page 81

1       N. VOLPER
2    Q.   Did you give these documents to
3 your attorney?
4    A.   Yes. I believe I gave to him,
5 yes.
6    Q.   How did you obtain them?
7    A.   How?
8    Q.   Yes.
9    A.   Through the POS system.
10   Q.   Are all the time records for all
11 of the restaurant's employees kept in the
12 POS system?
13   A.   Yes.
14   Q.   And you have access to that?
15   A.   Yes.
16   Q.   Going back to 2016, correct?
17   A.   Most likely, yes.
18   Q.   These are from 2016?
19   A.   I don't see.
20   Q.   Top left corner.
21       MR. SEGAL: Top left corner.
22   A.   It is on top. Okay. Yes.
23   Q.   You are able to pull the time
24 records for all employees from 2016 to
25 present, correct?

21 (Pages 78 - 81)

Page 82

N. VOLPER

1
2    A.   Yes.
3    Q.   You can put that to the side for
4  now.
5        (Whereupon, Bates D1212 to D1215
6    was marked as Defendant's Exhibit 3
7    for identification as of this date by
8    the Reporter.)
9        MR. DiGIULIO:  For the record,
10    this is marked Exhibit 3.  These
11    documents your attorney produced in
12    this litigation.  They were produced
13    without Bates so we Bates stamped them
14    ourselves.  Bates D1212 through 1215.
15    We will send it to you.
16    Q.   These are Dagmara Huk's time
17  records from the restaurant, correct?
18    A.   Correct.
19    Q.   The restaurant paid Ms. Dagmara
20  for the hours reflected in these records,
21  correct?
22    A.   Correct.
23    Q.   These time records begin in 2020
24  and go through 2021, correct?
25    A.   It says the years.  I don't see

Page 83

N. VOLPER

1
2  it.
3    Q.   Ms. Huk, her employment ended
4  last year, correct?
5    A.   Correct.
6    Q.   If you go to the final page
7  D1215, September 24th is the last entry?
8    A.   Yes.
9    Q.   That would be September 24,
10  2021?
11    A.   Yes.
12    Q.   Working on our way backwards
13  from there, these time records cover the
14  span of 2021 into the fall and late summer
15  of 2020?
16    A.   Okay.
17    Q.   We can put that to the side for
18  now.
19    Q.   Is the pay period for the
20  restaurant Monday through Sunday?
21    A.   Monday through Sunday, correct.
22    Q.   And has it been Monday through
23  Sunday from 2016 to the current date?
24    A.   Correct.
25        (Whereupon, Bates D934 to D1012

Page 84

N. VOLPER

1
2    was marked as Defendant's Exhibit 4
3    for identification as of this date by
4    the Reporter.)
5        MR. DiGIULIO:  These documents
6    are produced by you in this litigation
7    and we have put Bates stamp numbers on
8    them.  For the record, what's been
9    marked as Exhibit 4 is Bates D934
10    through D1012.
11    Q.   Are these the pay stubs that the
12  restaurant issued to the plaintiff, Nino
13  Martinenko?
14    A.   Yeah, looks like.
15    Q.   These pay stubs were prepared by
16  the accounting company Crow; is that
17  correct?
18    A.   Yes.
19    Q.   Where is Crow located?
20    A.   I think they moved back to New
21  Jersey.  They used to be in Astoria,
22  Queens.
23    Q.   When did the restaurant begin
24  using Crow to use pay statements?
25    A.   I think it was before the

Page 85

N. VOLPER

1
2  pandemic.
3    Q.   What does the restaurant send to
4  Crow every week in order for them to
5  calculate the pay stubs?
6    A.   Well, I guess we put on the POS
7  system the hours and then the tips -- the
8  tips during that period of time usually
9  Monday through Sunday.
10    Q.   Does the POS system contain the
11  hourly rate of pay for each employee?
12    A.   I believe so, but I'm not
13  hundred percent sure.
14    Q.   Is this information sent
15  electronically to Crow every week?
16    A.   I'm not aware how it is sent.
17    Q.   Who sends it?
18    A.   Well, most of the time either
19  employee or Imran.
20    Q.   Do they e-mail it to Crow?
21    A.   I have no idea.
22    Q.   Even before 2020 you were not
23  involved in that transaction?
24    A.   No.
25    Q.   How does the restaurant receive

22 (Pages 82 - 85)

1          N. VOLPER
2 the pay stubs from Crow?  Vie e-mail?
3     A.   I guess he prints statements
4 like this.
5     Q.   Crow e-mails the statements to
6 the restaurant?
7     A.   To me, I never e-mail it so I
8 don't know.  Can be to employee or to
9 Imran.  I have no idea how transmitted but
10 to me directly, no.
11    Q.   Is there a specific person at
12 Crow that the restaurant works with?
13    A.   Yes.
14    Q.   Who is that person?
15    A.   Ebed.
16    Q.   Can you spell that?
17    A.   E-B-E-D, I believe.
18    Q.   Does Ebed have a last name?
19    A.   I don't remember.
20    Q.   Have you worked with Ebed?
21    A.   Yes.
22    Q.   When you work with him, do you
23 call him on the phone?
24    A.   Yes.
25    Q.   Do you e-mail him?

1          N. VOLPER
2     A.   Yes.
3     Q.   What do you e-mail him about?
4     A.   Like different aspects of the
5 company because I have few more companies.
6 Some of them, you know, different e-mails
7 and stuff like that.
8        MR. SEGAL:  Focus on this
9     company.
10    Q.   Do you have the physical address
11 for the company?
12    A.   Not in front of me.
13    Q.   Do you have access to it?
14    A.   Correct.
15    Q.   If we ask for it you can provide
16 it to us at some point?
17    A.   Yes.
18    Q.   What city in New Jersey is it
19 in?
20    A.   He recently moved so I think
21 Elizabeth. I'm not sure.
22       *MR. SEGAL:  I will tell you
23    what, we will get it.
24       MR. DiGIULIO:  Thank you.
25    Q.   Do these pay stubs accurately

1          N. VOLPER
2 reflect what the restaurant paid to Ms.
3 Martinenko during the pay period listed
4 here?
5     A.   I assume.  I mean, I don't
6 calculate the -- I don't calculate weekly.
7 I never been involved in that.
8     Q.   Do you have any reason to
9 believe that these do not accurately
10 reflect what Mr. Martinenko's pay was?
11    A.   I'm sorry.  Can you repeat the
12 question?
13    Q.   Do you have any reason to
14 believe that these wage statements do not
15 accurately reflect Mr. Martinenko's pay?
16    A.   I believe they are accurate.
17       (Whereupon, Bates Plaintiff's 25
18    to 43 was marked as Defendant's
19    Exhibit 5 for identification as of
20    this date by the Reporter.)
21    Q.   These are documents that are in
22 Nino Martinenko's possession.  For the
23 record, they are marked Bates 25 through
24 43.  Please take a look at the first
25 document pages plaintiff's 25 through 28.

1          N. VOLPER
2 Let me know if you know what these
3 documents are.
4     A.   What should I do?
5     Q.   On this first page on
6 plaintiff's 25, have you seen this
7 document before?
8     A.   This particular document, no.
9     Q.   Are you familiar with this type
10 of document?
11    A.   I am familiar.
12    Q.   What type of document is this?
13    A.   This is basically tracking like
14 hours and tips.
15       MR. SEGAL:  Go to the first
16    page.
17    A.   Yes.
18    Q.   Is this a document that is used
19 for the restaurant?
20    A.   Correct.
21    Q.   Who created this document?
22    A.   Like every week or in general
23 who create this document?
24    Q.   In general.
25    A.   I don't remember who created

23 (Pages 86 - 89)

1          N. VOLPER
2 this document.
3     Q.   Were you involved in the
4 creation of the document?
5     A.   I don't remember.  That's many
6 years ago.
7     Q.   How is the document used?
8     A.   We have like, I guess they have
9 a lot of printouts and then they put
10 information.
11    Q.   The first page right here on
12 plaintiff 25 has a list of individuals and
13 space for the signature.  Do you see that?
14    A.   Yes.
15    Q.   At the top the statement reads,
16 this document states that I have been paid
17 for this following dates, July 19th
18 through July 25, 2021.  Correct?
19    A.   Correct.
20    Q.   Did the restaurant require the
21 individuals to sign a document like this
22 when they received their pay?
23    A.   Sometimes we have issues like I
24 don't get a check for that period of time.
25 So I guess that's one of the reasons to

1          N. VOLPER
2 keep like more closely for the record.
3     Q.   Does the restaurant maintain
4 records like this that have signatures of
5 employees who receive their checks?
6     A.   I believe we have some records,
7 yes.
8     Q.   When did the restaurant start
9 inputting this system?
10    A.   I don't remember.  I don't
11 remember.
12    Q.   Where are the signed copies of
13 these documents kept?
14    A.   The signed document of this
15 (indicating)?
16    Q.   Yes.
17    A.   Well, this is one of the copies.
18 I guess that's never been signed.  I think
19 we should ask the staff where they keep
20 them because usually they handle all this
21 stuff.
22    Q.   Are these type of documents --
23    A.   The plaintiff.
24    Q.   Are these documents kept in the
25 office of the restaurant?

1          N. VOLPER
2     A.   Also.
3     Q.   Is there anywhere else that the
4 documents are kept?
5     A.   I don't believe so.
6     Q.   These documents were in Nino
7 Martinenko's possession.  Do you know how
8 she got them?
9     A.   No idea.
10    Q.   Do you know who sent them to
11 her?
12    A.   I don't believe who sent any
13 documents like that.  Probably she got bit
14 from the office or something.
15    Q.   Let's turn to the next page
16 plaintiff 26.  What is that document?
17    A.   The way I see it, that's
18 reflecting the dates, the hours, and the
19 tips.  Not including cash tips.  Including
20 the meal but not including the cash tips.
21    Q.   This tip is only for credit card
22 tips?
23    A.   Yes.
24    Q.   Who prepared this?
25    A.   This specific one, I have no

1          N. VOLPER
2 idea.
3     Q.   Who is in charge of generally
4 preparing this document?
5     A.   The staff.  Sometimes Imran do
6 it.
7     Q.   Are these documents saved
8 electronically anywhere?
9     A.   I don't believe so, no.  I don't
10 believe.
11    Q.   But the document was printed
12 out, right?  There is no handwritten --
13    A.   Looks like a printout, yes.
14    Q.   On this document, are the people
15 listed above the word kitchen halfway
16 down, are these the front of house
17 employees who worked on the week of
18 July 19th to 25th in 2021?
19    A.   The kitchen staff?
20    Q.   Above the kitchen?
21    A.   Looks like the front of house
22 staff, yes.
23    Q.   Under the top line where it says
24 hours, there is a number of hours each
25 person worked?

24 (Pages 90 - 93)

Page 94

1         N. VOLPER
2    A.   Looks like, yes.
3    Q.   Where did the numbers come from?
4    A.   I guess from the POS system.
5    Q.   What is the name of the POS
6  system?
7    A.   Lavu, I think.
8    Q.   I believe you said the numbers
9  under the tip line are the credit card
10  tips?
11   A.   I believe, yes.
12   Q.   Where do those numbers come
13  from?
14   A.   From the employee. They fill it
15  up daily how much money they make in
16  credit card tips.
17        MR. SEGAL: Stop. Credit card
18  tips come from when they give --
19        MS. SCHULMAN: Let him answer.
20        MR. SEGAL: He said cash.
21   Q.   For credit card tips, where do
22  these numbers come from?
23   A.   They are coming from the --
24  let's say that night Alexander Rynkovsky
25  worked, he fills up a form how much cash

Page 95

1         N. VOLPER
2  -- I mean no cash, tips on credit card he
3  made.
4    Q.   There is a form they fill out
5  per night if they have the tips for credit
6  cards?
7    A.   Yes.
8    Q.   The amounts are every shift that
9  they worked added up for the week?
10   A.   Correct, correct.
11   Q.   Who does that math?
12   A.   Staff.
13   Q.   What do the numbers under meal
14  prep mean?
15   A.   Meal prep is like daily you are
16  allowed to charge $3 tip I guess. Let's
17  say from 3:00 to 4:00. We cook for them,
18  meal preparation like -- what is the --
19        MS. SCHULMAN: Family meal.
20   A.   Yes.
21   Q.   You charge them, is that 12
22  hours or $12?
23   A.   For the total we charge $3 per
24  day. If they work four days, they charge
25  12. For five days, we charge 15.

Page 96

1         N. VOLPER
2    Q.   I am going to go through the
3  names here. Perez Everardo, what position
4  is he?
5    A.   He is front of house.
6    Q.   Alexander Rynkovsky?
7    A.   Front of house.
8    Q.   What is asterisk next to his
9  name?
10   A.   No idea.
11   Q.   Is he a captain?
12   A.   No.
13   Q.   Samuel Garcia, what position is
14  he?
15   A.   I think is food runner.
16   Q.   Javier Clemente?
17   A.   Either food runner or busser.
18   Q.   Hector Conoz?
19   A.   I don't remember this guy. He
20  is a food runner or busser.
21   Q.   Below the word kitchen these are
22  the employees who worked in the back?
23   A.   Yes.
24   Q.   Under the hours is the hours
25  that they worked?

Page 97

1         N. VOLPER
2    A.   Correct.
3    Q.   And under total is the total
4  amount of money they were paid for the
5  week?
6    A.   Yes.
7    Q.   Why is the meal prep listed for
8  the front of house not the back of the
9  house?
10   A.   Because by law we cannot charge
11  kitchen staff. That's why. Somebody work
12  in the kitchen, you cannot charge.
13   Q.   What position is Pedro Morales
14  in?
15   A.   Line cook?
16   Q.   Carlos Chusan?
17   A.   Line cook also.
18   Q.   Daniel Bonilla?
19   A.   Line cook.
20   Q.   Gonzalez Amaro?
21   A.   I don't recall this guy. Maybe
22  dishwasher.
23   Q.   Abel?
24   A.   Maybe dishwasher.
25   Q.   Rami Lucera?

25 (Pages 94 - 97)

N. VOLPER

1
2   A.   Line cook.
3   Q.   Turn to next Page 2, plaintiff
4 27 to 28.  Do you know what these
5 documents are?
6   A.   Time cards.
7   Q.   These are the time cards who
8 worked from July 19th to July 25, 2021?
9   A.   Yes.
10   Q.   If you turn to the next page
11 plaintiff's 29, if you go to the last name
12 on this list Alessandro Arduini, what was
13 their position?
14       MR. SEGAL:  We provided that
15   information.  Objection.
16   A.   I cannot recall.  Oh, bartender.
17   Q.   He is a bartender?
18   A.   Yes.
19       MR. SEGAL:  I gave you the names
20   which I didn't have to.
21       MS. SCHULMAN:  This is off the
22   record.
23       (Whereupon, an off-the-record
24   discussion was held.)
25       MR. DiGIULIO:  Back on the

N. VOLPER

1
2   record.
3   Q.   If you go back to Exhibit 4
4 which is plaintiff Nino Martinenko's pay
5 stubs?
6   A.   Okay.
7   Q.   Please take a look at these pay
8 stubs.  They are only from 2021.
9   A.   Let me take a look.  They are
10 2022 also.
11   Q.   Correct.
12       Did the restaurant issue pay
13 stubs to plaintiff Ms. Martinenko in 2016
14 and 2018?
15   A.   2016 to 2018?
16   Q.   Yes.
17   A.   Not sure.
18   Q.   Did you look for those pay
19 stubs?
20   A.   Yes.
21   Q.   Where did you look?
22   A.   Looked in the office and
23 restaurant, in the basement.
24   Q.   Did you ask Crow if they had
25 records of that?

N. VOLPER

1
2   A.   Crow was -- nobody was involved
3 in 2016 with us.
4   Q.   Crow came after 2016 at some
5 point, correct?
6       MR. SEGAL:  Asked and answered.
7   I think he said after the pandemic.
8       MS. SCHULMAN:  No, he didn't.
9   A.   I can't give exactly the dates.
10 I'm sorry. I don't know.  When I don't
11 know, I don't know.
12   Q.   Did you ask Crow if they had
13 records of Nino Martinenko's pay stubs
14 from 2018?
15   A.   We asked for all the records.
16   Q.   That Crow have?
17   A.   That they have to give us, yes.
18   Q.   How did you get the pay stubs
19 that you had?
20   A.   They sent to me.
21   Q.   Ebed?
22   A.   Ebed or his brother, I don't
23 remember who it was.
24   Q.   He sent them to you because you
25 asked?

N. VOLPER

1
2   A.   Yes.  We asked the documents.
3   Q.   Before Crow was involved, did
4 the restaurant issue pay stubs?
5   A.   Before Crow was involved, no.
6       (Whereupon, Bates D871 to 933
7   was hereby marked as Defendant's
8   Exhibit 6 for identification, as of
9   this date.)
10   Q.   This is marked Exhibit 6.  This
11 document is produced by plaintiff in this
12 litigation.  We Bates stamped them.
13 Exhibit 6 is Bates D871 through 933.
14 Please take a look at these documents.
15 Are these the checks that you issued to
16 plaintiff, Dagmara Huk?
17   A.   Yes.
18   Q.   Did you make these images?
19   A.   Absolutely not.
20       MR. SEGAL:  Do you mean did he
21   copy the checks?
22   Q.   Did you make this document, the
23 images of the check?
24   A.   Yes.
25       MR. SEGAL:  Objection. Can you

26 (Pages 98 - 101)

N. VOLPER

1   rephrase the question please? Make
2   means create. Do you mean did he copy
3   the checks?
4       A.   Let me explain. I am going to
5   explain. I take copies of this checks
6   from the bank. That's it. I don't make
7   it. I make the copy.
8           MS. SCHULMAN: So you took, the
9   bank statements included a photocopy
10  of the check, correct?
11          THE WITNESS: Correct.
12          MS. SCHULMAN: And to put this
13  document Exhibit 6 together, you
14  pulled out from the bank statement the
15  pictures of Dagmara's check and put
16  them on one page to make copy?
17          THE WITNESS: Correct.
18      Q.   We will mark this as Exhibit 7.
19          (Whereupon, Bates D883 to D933
20  was marked as Defendant's Exhibit 7
21  for identification as of this date by
22  the Reporter.)
23      Q.   Again, these are documents
24  defense has produced in this litigation.

N. VOLPER

1   We Bates stamped them. They are Bates
2   D883 through 933. Are these the pay stubs
3   that the restaurant issued to the
4   plaintiff, Dagmara Huk?
5       A.   Yes.
6       Q.   Do these pay stubs accurately
7   reflect the amounts the restaurant paid to
8   Ms. Huk for that pay period?
9       A.   I was not involved, but I assume
10  that they are accurate.
11      Q.   For these pay statements, did
12  you ask Crow to give them to you so you
13  could give them to your attorney?
14      A.   Correct.
15      Q.   Have all of the pay stubs that
16  the restaurant issued to the
17  front-of-house employees contain the same
18  category of information as are in these?
19      A.   Correct.
20      Q.   And all the pay stubs that the
21  restaurant issued to the back-of-house
22  employees also contained the same
23  information?
24      A.   Only the chef, I don't think so

N. VOLPER

1   because of the salary position.
2       Q.   The back of house doesn't
3   include tips, correct?
4       A.   The kitchen, no.
5       Q.   So to the extent that these wage
6   statements reflect tips, the back of house
7   doesn't have that, correct?
8       A.   No, they don't do.
9       Q.   That's the only difference?
10      A.   Yes. They don't collect tips.
11      Q.   When the restaurant issues these
12  pay stubs they give the pay stubs to the
13  employees in paper form or electronic?
14      A.   We give them in paper form like
15  this together with a check.
16      Q.   Before the restaurant started
17  issuing these paper pay stubs before Crow
18  got involved, did the restaurant provide
19  any documents that showed the pay rates
20  and the hours worked?
21      A.   Yes. Hours. We put in the
22  system how many hours and stuff like that.
23  As you can see the document that you
24  showed me before with all this stuff, they

N. VOLPER

1   are required to sign.
2       Q.   Just to pull up Exhibit 6 or 5.
3   These documents are from July of 2021,
4   right?
5       A.   I have to take a look again.
6       Q.   Sure.
7       A.   This particular July, yes.
8   July 19th to July 25, 2021.
9       Q.   That document does not say how
10  many hours they worked, correct, first
11  page plaintiff 25?
12      A.   This page?
13      Q.   Yes.
14      A.   Here, no. We give the rest of
15  the employees so they can review. That's
16  why we separate the hours, we separate
17  tips, deductions so they can review this
18  information is correct.
19          MS. SCHULMAN: Before Crow got
20  involved, did the employees have to
21  sign a document like plaintiff 25 when
22  they received their check?
23          THE WITNESS: Like this?
24          MS. SCHULMAN: Like the first

27 (Pages 102 - 105)

N. VOLPER

1   N. VOLPER
2   page.
3       THE WITNESS: Yes.
4       MS. SCHULMAN: And then the
5   second page of Exhibit 5, Plaintiff's
6   Exhibit 26, was this document, this
7   type of document provided to the
8   employees?
9       THE WITNESS: Correct.
10      MS. SCHULMAN: Were they given a
11  copy or were they shown a copy?
12      THE WITNESS: I don't remember
13  that, but they obviously have all the
14  information. By signing here, they
15  check everything in the back which is
16  correct. They compare the tips, they
17  compare the hours. If they see any
18  discrepancy, we was aware of that.
19      MS. SCHULMAN: Before Crow was
20  involved, did the documents provided
21  that was like plaintiff's 26 contain
22  the same category of information that
23  are listed on plaintiff's 26?
24      THE WITNESS: Can you be more
25  specific?

1   N. VOLPER
2       MS. SCHULMAN: We are looking at
3   plaintiff's 26. For front of house it
4   was name, hours, tips, and meal prep.
5       THE WITNESS: Okay.
6       MS. SCHULMAN: Prior to Crow
7   being involved, is that the same
8   information that was provided to the
9   front-of-house employees with their
10  paychecks?
11      THE WITNESS: Yes. It is the
12  same information provided for review,
13  for them to review.
14      MS. SCHULMAN: Let's go back to
15  plaintiff's 26. Again, I am asking
16  about the time period before Crow was
17  involved. Is the document that was
18  shown, the back of house when they got
19  their pay, did it contain their names,
20  their hours worked, and their total ---
21      THE WITNESS: Yes, exactly the
22  same the way it is.
23      MS. SCHULMAN: So this type of
24  document, plaintiff's 26, which was
25  shown to employees when they got their

1   N. VOLPER
2   pay before Crow was involved contained
3   exactly the same type of information?
4       THE WITNESS: Correct.
5       Q.  Is there a set pay date at the
6   restaurant?
7       A.  Usually Friday.
8       Q.  And that's every week?
9       A.  Yes.
10      Q.  Has that ever changed?
11      A.  Ever changed?
12      Q.  Yes.
13      A.  I don't believe so, no. Pretty
14  much it is the standard.
15      Q.  If you can turn to Exhibit 7 on
16  the page marked D883, the first page?
17      A.  Okay.
18      Q.  This pay period is from
19  August 24, 2020 through August 30, 2020,
20  correct?
21      A.  Yes.
22      Q.  Next to that it says the pay
23  date is August 30, 2020, correct?
24      A.  Yes. That's the way it says
25  here.

1   N. VOLPER
2       Q.  But the pay date could not have
3   been August 30, 2020, right?
4       A.  I don't remember. Usually
5   supposed to be Friday. Yes, it cannot be.
6   We pay like the following week.
7       Q.  The front-of-house employees
8   sometimes work more than forty hours a
9   week, right?
10      A.  Rarely.
11      Q.  But it does happen, right?
12      A.  Sometimes happens.
13      Q.  When front-of-house employees
14  work more than forty hours a week the
15  restaurant pays them the same rate for all
16  their hours, right?
17      A.  I'm not sure. Let me check.
18      Q.  Let's look at Page 887 in
19  Exhibit 7.
20      A.  Which one?
21      MR. SEGAL: 887.
22      Q.  Bottom right.
23      A.  Okay.
24      Q.  This is pay period between
25  October 12, 2020 through October 18, 2020.

28 (Pages 106 - 109)

Page 110

```
1              N. VOLPER
2  If you look down on the hours for Ms. Huk,
3  she worked 43 hours and 15 minutes,
4  correct?
5     A.  Yes. That's the POS shows.
6     Q.  And she was paid $10 per hour
7  for all 43 hours and 15 minutes, right?
8     A.  Yes.
9     Q.  She was not paid time and a half
10 for the hours over forty that she worked,
11 correct?
12    A.  Looks like she wasn't paid.
13    Q.  Isn't it true that the
14 restaurant did not actually pay the
15 front-of-house employees time and a half
16 for overtime?
17       MR. SEGAL: Objection.
18       MS. SCHULMAN:  You can answer.
19    Q.  You have to answer.
20    A.  So is it true what?
21    Q.  Isn't it true that the
22 restaurant does not pay front-of-house
23 employees time and a half for hours worked
24 over forty?
25    A.  I don't know if it is true or
```

Page 111

```
1              N. VOLPER
2  not but this particular one, looks like it
3  is not done correctly.
4     Q.  Let's look at a different
5  example then.  We can look back to Nino
6  Martinenko's time records.  I believe it
7  is Exhibit 4.  If you could turn to page
8  D948.
9     A.  Thank you.
10    Q.  Ms. Martinenko's worked during
11 this pay period 45 hours 29 minutes,
12 correct?
13    A.  That is being reflected here.
14    Q.  Yes.  And that's for one week's
15 worth of time, correct?
16    A.  Yes.
17    Q.  And she was paid $10 an hour for
18 all 45 hours, right?
19    A.  Yes.
20    Q.  She was not paid any overtime,
21 correct?
22    A.  In this particular, no.
23    Q.  Do you have any time in which
24 plaintiff was paid overtime?
25    A.  Not sure about it.
```

Page 112

```
1              N. VOLPER
2     Q.  This is Exhibit 8.
3        (Whereupon, Plaintiff's 1
4     through 24 was marked as Defendant's
5     Exhibit 8 for identification as of
6     this date by the Reporter.)
7     Q.  These documents were in
8  plaintiff's possession.  They are marked
9  Plaintiff's 1 through 24.
10    A.  Okay.
11    Q.  Are these pay stubs that the
12 restaurant issued to various employees?
13    A.  Yes.
14    Q.  And these are all front-of-house
15 employees, correct?
16    A.  I don't check all of them but
17 no, I don't think so.  Maybe.
18    Q.  On the first page plaintiff's 1
19 is a pay stub for Alexander Rynkovsky for
20 March 28, 2021, correct?
21    A.  Correct.
22    Q.  He worked 53 hours and
23 16 minutes, correct?
24    A.  Correct.
25    Q.  He was paid $10 an hour for all
```

Page 113

```
1              N. VOLPER
2  53 hours, correct?
3     A.  Yes. Looks like.
4     Q.  If you go to the next page,
5  Edwardo Perez on plaintiff's 2.  This was
6  pay date March 28, 2021.  He worked
7  48 hours and 54 minutes that week,
8  correct?  It is on the back.
9     A.  Yes.
10    Q.  And he was paid $10 an hour for
11 each of those hours, correct?
12    A.  Correct.
13    Q.  And he was not paid time and a
14 half for overtime, correct?
15    A.  Correct.
16    Q.  Back-of-house employees, kitchen
17 employees at the restaurant they sometimes
18 work more than forty hours a week,
19 correct?
20    A.  Sometimes, yes.
21    Q.  Does the restaurant pay them
22 time and a half for every hour over forty?
23    A.  I hope so.
24    Q.  Do you know if the restaurant
25 pays --
```

29 (Pages 110 - 113)

Page 114

```
1            N. VOLPER
2    A.  I'm not sure.
3    Q.  Do you have any documents that
4  show that the restaurant pays time and a
5  half for employees who work in the kitchen
6  for overtime?
7    A.  Not that I know of.
8    Q.  Would it be reflected in the pay
9  statement?
10   A.  In the pay statement?
11   Q.  Yes.
12   A.  Should be.
13   Q.  And you have access to these pay
14 statements?
15   A.  Front or back?
16   Q.  Back-of-house employees?
17   A.  I do, yes.
18   Q.  Do you know what spread-of-hours
19 pay is?
20   A.  No idea.
21   Q.  Do you know the restaurant is
22 required to pay employees an extra hour
23 minimum wage for any work day that lasts
24 more than ten hours?
25   A.  Basically, I don't handle all
```

Page 115

```
1            N. VOLPER
2  this stuff. I pass the information to the
3  accountant. I don't produce any of this
4  statement.
5    Q.  The restaurant does not pay
6  spread-of-hours premium to any of its
7  employees, correct?
8    A.  I have no idea. I am not aware.
9      MR. DiGIULIO:  Let's take five.
10     THE WITNESS:  Sure.
11     (Whereupon, a short recess was
12 taken.)
13     MR. DiGIULIO:  Back on the
14 record.
15     Can we have this marked?
16     (Whereupon, wage notice document
17 was marked as Defendant's Exhibit 9
18 for identification as of this date by
19 the Reporter.)
20   Q.  This is a blank form wage notice
21 document from the New York Department of
22 Labor. It is Exhibit No. 9. Have you
23 ever filled out and given this type of
24 document to any kind of of your employees?
25   A.  Yes.
```

Page 116

```
1            N. VOLPER
2    Q.  When did you do that?
3    A.  When did you do that?
4    Q.  When?
5    A.  Different time periods.
6    Q.  Did you keep the documents that
7  you gave them?
8    A.  Some of them I have, yes.
9    Q.  You have kept some of them?
10   A.  Yes.
11   Q.  Where are they?
12   A.  Most likely in the office.
13   Q.  Did you give this filled out
14 document to plaintiff, Nino Martinenko?
15   A.  I have no idea.
16   Q.  Did you give one of these
17 documents to Dagmara Huk?
18   A.  No idea. Most likely not.
19   Q.  Which employee did you give this
20 document to?
21   A.  By names?
22   Q.  Yes.
23   A.  I mean, I can provide that
24 information but I don't have in front of
25 me.
```

Page 117

```
1            N. VOLPER
2    Q.  If you didn't give this document
3  to Nino Martinenko or Dagmara Huk, why do
4  you believe you gave it to other
5  employees?
6    A.  Why do I believe?
7    Q.  Yes.
8    A.  Because it was done.
9    Q.  Why did you not give it to
10 Dagmara?
11   A.  I never say I don't give it to
12 Dagmara. I said I don't remember giving
13 it to her or to Nino.
14   Q.  Which person at the restaurant
15 gave the filled out form to the
16 restaurant's employees?
17   A.  Which person?
18   Q.  Yes.
19   A.  Me.
20   Q.  You did?
21   A.  Yes.
22   Q.  Who filled out the form when you
23 gave it to the employee?
24   A.  Well, they fill up and sign this
25 portion, signature and stuff.
```

30 (Pages 114 - 117)

Page 118

```
1            N. VOLPER
2     Q.  Who fills out the employer
3  information in No. 1?
4     A.  This I did.
5     Q.  And you filled out No. 3, 4, 5,
6  6, 7?
7     A.  Yes. The rest is from them.
8     Q.  Can you give us the name of a
9  single employee that you gave a filled out
10 version of this copy to?
11    A.  Not at this moment.
12    Q.  Do you recall when you gave this
13 filled out document to any employer?
14    A.  Depends on the period of time.
15    A.  Can be three months ago, can you
16 four months ago.
17    Q.  Do you recall giving this filled
18 out document four months ago to an
19 employee?
20    A.  To employee?
21    Q.  Yes.
22    A.  Let me -- I think I gave to
23 Hailey, the bartender.
24    Q.  Did you provide this document to
25 any employee before 2022?
```

Page 119

```
1            N. VOLPER
2     A.  Before 2022?
3     Q.  Yes.
4     A.  I'm not a hundred percent sure
5  if I did or not.
6     Q.  Why did you begin giving the
7  filled out documents to employees?
8     A.  Why?
9     Q.  Yes.
10    A.  Because I guess it is required.
11    Q.  When did you begin?
12    A.  Notice of acknowledgement.
13    Q.  When did you become aware of the
14 requirement?
15    A.  When I become aware -- we have,
16 I think something in the past which I
17 cannot locate, like employee this --
18 usually like employees, they know if they
19 work in the restaurant they are getting
20 tips, there is a possibility of tip to
21 employees. They are required to fill form
22 27, I believe which are cash report form.
23 I believe the plaintiffs filled up that
24 form which is required to fill every
25 month.
```

Page 120

```
1            N. VOLPER
2     Q.  When did you become aware of the
3  requirement to give this?
4     A.  Which one? This one?
5     Q.  Yes.
6     A.  I became aware of this
7  requirement, I cannot give you specific
8  time time period but I was aware of this
9  requirement since we have one case which I
10 cannot locate, somebody -- employee's
11 record of this form, I was penalized of
12 that.
13        THE WITNESS:  Can I add
14 something?
15        MR. SEGAL:  No.
16        THE WITNESS:  Okay. I am not
17 allowed.
18        (Whereupon, Bates D1 to D6 was
19 marked as Defendant's Exhibit 10 for
20 identification as of this date by the
21 Reporter.)
22        MR. DiGIULIO:  This is
23 Exhibit 10. This document is produced
24 by defendants. This is Bates stamped
25 D1 through D6.
```

Page 121

```
1            N. VOLPER
2     Q.  Are these the tax documents
3  issued to Nino Martinenko and Dagmara Huk?
4     A.  I cannot confirm hundred percent
5  but looks like the documents.
6         MR. SEGAL:  Can you wait for him
7  to ask you a question?
8         THE WITNESS:  Yes. He did ask.
9         MR. DiGIULIO:  I did ask him a
10 question.
11    Q.  So the first D1, D2, D3, are
12 these 1099 that the restaurant issued to
13 Nino Martinenko?
14    A.  This looks like 1099 form, yes.
15    Q.  The next page is D4 which is a
16 W-2 for 2021 for plaintiff Dagmara Huk; is
17 that correct?
18    A.  I'm sorry. Which one?
19    Q.  D4 is a W-2 that the restaurant
20 issued to Dagmara Huk in 2021, correct?
21    A.  Yes. Looks like, yes.
22    Q.  D5 is a W-2 from 2020 for Ms.
23 Huk, correct?
24    A.  2020?
25    Q.  Yes.
```

31 (Pages 118 - 121)

Page 122

1        N. VOLPER
2    A.   Yes.
3    Q.   And then the last D6 is W-2
4 issued to the plaintiff, Nino Martinenko,
5 correct?
6    A.   Yes.
7    Q.   For the first three pages of the
8 1099, who prepared these 1099s for the
9 restaurant?
10   A.   Who prepared them -- I guess it
11 was prepared by CPA.
12   Q.   Who is the CPA for the
13 restaurant?
14   A.   At that time I don't remember
15 who is it. It can be the same company.
16   Q.   Same company as Crow?
17   A.   Yes. It is 2016. It is very
18 long time ago. I don't remember all this
19 stuff.
20   Q.   You paid the plaintiff, Ms.
21 Martinenko, on a 1099 for 2016, 2017,
22 2018, right?
23   A.   Yes.
24   Q.   Did the restaurant pay all of
25 its employees 1099 for these years?

Page 123

1        N. VOLPER
2    A.   I don't have records in front of
3 me but for sure Nino Martinenko, yes.
4    Q.   When did the restaurant begin
5 paying its employees on W-2?
6    A.   When?
7    Q.   Yes.
8    A.   Three or four years ago.
9    Q.   Is it when the restaurant began
10 working with Crow?
11   A.   Yes.
12   Q.   Before Crow, was the restaurant
13 issuing 1099 for its employees?
14   A.   That's why I said I'm not
15 hundred percent sure. It is long time
16 ago. The way I look here, Nino Martinenko
17 was issued 1099 for 2016, 2017.
18   Q.   Do these documents accurately
19 reflect the wages and tips that these
20 plaintiffs received from the restaurant in
21 the respective years?
22   A.   I have to look into that records
23 but -- I have to look into that records.
24 I don't know if that's correct or not.
25 Most likely it is correct. Maybe it is

Page 124

1        N. VOLPER
2 missing cash -- cash tips which Nino
3 Martinenko failed to provide on the form
4 27, I believe so. That maybe is missing.
5 Yeah.
6    Q.   Did you gather these tax
7 documents for this litigation?
8    A.   Do I what?
9    Q.   Did you gather them and give
10 them to your attorney?
11   A.   This one?
12   Q.   Yes.
13   A.   I believe so, yes.
14   Q.   Where did get it from?
15   A.   I get it from the -- my records.
16 I looked at my records and gave it to
17 them.
18   Q.   Where are the records?
19   A.   In the office.
20   Q.   On the computer?
21   A.   Some of them on the computer,
22 some of them on paper.
23   Q.   Do you have other 1099s and W-2s
24 that the restaurant issued to its
25 employees?

Page 125

1        N. VOLPER
2       MR. SEGAL:  Objection.
3    Q.   You can answer.
4       THE WITNESS:  I stay with the
5 objection.
6       MR. SEGAL:  You have to answer.
7       THE WITNESS:  I have to answer?
8       MR. SEGAL:  Yes.
9       THE WITNESS:  Doesn't work like
10 court?
11      MR. SEGAL:  No.
12   A.   Can you repeat the question?
13   Q.   Sure.
14      MR. DiGIULIO:  Can you read back
15 the question?
16      (Whereupon, the referred to
17 question was read back by the
18 Reporter.)
19   A.   We have issued. Some of them
20 like contractors, or cleaning services, or
21 anything like that.
22      MR. SEGAL:  It is a yes or no
23 question.
24   A.   To employees, most likely yes.
25   Q.   Do you have 1099s or W-2s that

32 (Pages 122 - 125)

```
1              N. VOLPER
2 the restaurant issued to the back-of-house
3 employees?
4    A.   Kitchen staff?
5    Q.   Yes.
6    A.   Do I have them?
7    Q.   Yes.
8    A.   Not sure. If I have them or
9 not, not sure. Not sure.
10   Q.   Does the restaurant require new
11 hires to fill out tax documents?
12   A.   Yes.
13   Q.   Does the restaurant require new
14 employees to fill out W-4 99s?
15   A.   Yes.
16   Q.   Does the restaurant require new
17 employees to fill out W-9s?
18   A.   What is W-9? It is a tax form
19 required by the -- I think so, yes.
20   Q.   Does the restaurant maintain the
21 filled out W-4s 99s?
22   A.   I hope so, yes. But I never
23 looked for that. I hope so.
24   Q.   Does your accountant have copies
25 of the W-2s and 1099s that are issued to
```

```
1              N. VOLPER
2 the front and back-of-house employees?
3    A.   I believe so.
4         (Whereupon, D1093 to D1194 was
5    marked as Defendant's Exhibit 11 for
6    identification as of this date by the
7    Reporter.)
8    Q.   This is for you, Mr. Volper.
9    A.   Yes, sir.
10   Q.   These are documents that the
11 defense produced in this litigation. They
12 were produced without Bates so the
13 Exhibit 11 is marked Bates D1093 through
14 1194.
15   A.   Correct.
16   Q.   These are the 2016 tax returns
17 for the restaurant. Is this document the
18 2016 tax returns for 212 Steakhouse
19 Incorporated?
20   A.   Correct.
21   Q.   To the best of your knowledge,
22 are these tax returns accurate?
23   A.   To the best of my knowledge,
24 yes, it is accurate.
25   Q.   If you turn to the second page
```

```
1              N. VOLPER
2 D1094?
3    A.   Okay.
4    Q.   On the bottom it says pay
5 preparer use only. Print type preparer's
6 name. Ebed Rada (ph). Is that the Ebed
7 you were speaking about earlier?
8    A.   Correct.
9    Q.   2016, he was with the firm Tax
10 Zone; is that correct?
11   A.   Looks like.
12   Q.   On page 191 gross receipts or
13 sales. It says the restaurant had over
14 $1.3 million in sales, correct?
15   A.   What was the question?
16   Q.   1094, on that page on line 1C,
17 top line on the right in the column?
18   A.   Okay.
19   Q.   It says the restaurant had over
20 $1.3 million in sales, correct?
21   A.   Yes.
22   Q.   To the best of your knowledge
23 that's accurate?
24   A.   Yes.
25   Q.   Line 8t where it says salaries
```

```
1              N. VOLPER
2 and wages?
3    A.   Huh-huh.
4    Q.   Tax returns state that the
5 restaurant paid no salary or wages. Do
6 you see that?
7    A.   Yes.
8    Q.   But you had employees in 2016,
9 correct?
10   A.   Correct.
11   Q.   If you turn to page 13, D1105 on
12 the bottom right.
13   A.   Okay.
14   Q.   This is under the schedule of
15 other deductions. It provides restaurant
16 spent $362,657 to independent contractors;
17 is that correct?
18   A.   Yes.
19   Q.   Who are your independent
20 contractors?
21   A.   Who they are?
22   Q.   Yes.
23   A.   Like I mentioned before, can be
24 some kind of -- Nino Martinenko was --
25   Q.   Paid that way?
```

33 (Pages 126 - 129)

N. VOLPER

1
2    A.   Yes.
3    Q.   Is this the way that the
4  restaurant paid its employees in 2016?
5    A.   Employees and independent
6  contractors, yes.
7    Q.   Front-of-house staff were paid
8  this way, correct?
9    A.   Yes.
10   Q.   And the back-of-house staff too?
11   A.   I can't recall that.
12   Q.   So the restaurant issued 1099s
13 for the front-of-house staff in 2016,
14 correct?
15   A.   Most likely.
16   Q.   Do you have all the 1099s that
17 the restaurant issued from the 2016 to the
18 present?
19   A.   I hope so.
20   Q.   If you flip back a few pages to
21 D1101 schedule K1, bottom right corner?
22   A.   Yes.
23   Q.   Under Section E on the left-hand
24 side of the page it says the shareholder's
25 name, Nikolay Volper. That's you,

N. VOLPER

1
2  correct?
3    A.   Yes.
4    Q.   Under F it says shareholder's
5  percentage of stock ownership for tax year
6  is a hundred percent, correct?
7    A.   Yes.
8    Q.   So in 2016 you owned hundred
9  percent of the restaurant, correct?
10   A.   Yes.
11   Q.   Moving forward, if the tax
12 return for the restaurant says that the
13 shareholder's percentage of the stock was
14 a hundred percent and your name is under
15 A, that reflects that you were a hundred
16 percent of the shareholder of the
17 restaurant, correct?
18   A.   Under what? The same column?
19   Q.   Yes.
20   A.   I don't know if it says that or
21 not.
22   Q.   If it says that, that would mean
23 you were one hundred percent owner of the
24 stock of the company, right?
25   A.   Yes.

N. VOLPER

1
2    Q.   Why did the restaurant pay the
3  front and back-of-house staff on the 1099
4  in 2016?
5    A.   Why?
6    Q.   Yes.
7    A.   I was under tremendous pressure
8  financially.
9        MS. SCHULMAN: Why did that
10   pressure result in you paying the
11   front and back of house 1099 rather
12   than W-2?
13       THE WITNESS: Because we were
14   losing money, a lot of money.
15       MS. SCHULMAN: And it would be
16   more expensive if you paid them on
17   W-2?
18       THE WITNESS: Pretty much.
19       MS. SCHULMAN: Because you have
20   to pay more in taxes?
21       THE WITNESS: I don't know what
22   I have to pay but -- yeah. Some of
23   the employees, they want 1099.
24       (Whereupon, Bates D1135 to D1173
25   was marked as Defendant's Exhibit 12

N. VOLPER

1
2  for identification as of this date by
3  the Reporter.)
4    Q.   For the record, these are tax
5  documents produced by the defense in this
6  litigation. They are Bates stamped D1135
7  through D1173. These are the 2017 tax
8  returns for 212 Steakhouse Incorporated.
9    A.   Okay.
10   Q.   If you look at on the second
11 page, D1136 line 1A, it says the gross
12 receipt for sales is over $1.5 million,
13 correct?
14   A.   Yes.
15   Q.   Sir, the restaurant had over
16 $1.5 million in revenue in 2017, correct?
17   A.   Correct.
18   Q.   Page 2 line 8 for under salary
19 and wages, tax returns state that the
20 restaurant paid no salary or wages,
21 correct?
22   A.   Yes.
23   Q.   In this year the restaurant paid
24 all its front and back-of-house employees
25 in 1099, correct?

34 (Pages 130 - 133)

Page 134

1    N. VOLPER
2    A.   Correct.
3    Q.   Okay. If you look at page D1143
4  in the right-hand corner, this reflects
5  you owned hundred percent of the company
6  in 2017, correct?
7    A.   Correct.
8       (Whereupon, Bates D1174 to D1211
9    was marked as Defendant's Exhibit 13
10   for identification as of this date by
11   the Reporter.)
12   Q.   For the record, this is marked
13  Exhibit 13. It is tax returns produced by
14  the defendants. It is Bates D1174 through
15  D1211. The plaintiffs have Bates stamped
16  them. Is this the document the 2018 tax
17  returns for 212 Steakhouse Incorporated?
18   A.   Yes.
19   Q.   On the first page line one A for
20  gross receipts of sales it says the
21  restaurant had over $1.6 million in sales,
22  correct?
23   A.   Correct.
24   Q.   So the restaurant had over 1.6
25  million in revenue in 2018, correct?

Page 135

1    N. VOLPER
2    A.   Revenue or sales?
3    Q.   Gross revenue, $1.6 million,
4  correct?
5    A.   Yes.
6    Q.   On line 8 salary and wages it
7  states that the restaurant paid no salary
8  or wages in 2018, correct.
9    A.   Correct.
10   Q.   The restaurant paid all front
11  and back of house employees on 1099,
12  correct?
13   A.   Correct.
14   Q.   If you look at D1181, this
15  reflects you were the sole owner of the
16  corporation that year, correct?
17   A.   Huh-huh.
18      MS. SCHULMAN: Instead of
19   huh-huh you should say yes.
20   A.   Yes. Yes.
21      MR. DiGIULIO: Can we have this
22   marked?
23      (Whereupon, Bates D1013 to D1053
24   was marked as Defendant's Exhibit 14
25   for identification as of this date by

Page 136

1    N. VOLPER
2    the Reporter.)
3       MR. DiGIULIO: These are
4    documents produces by defense without
5    Bates but the plaintiffs have Bates
6    stamped these documents D1013 through
7    1053.
8    Q.   Are these the 2019 tax returns
9  for 212 Steakhouse Incorporated?
10   A.   Correct.
11   Q.   If you go to the third page
12  D1015 line 1A. For gross receipts or
13  sales it says the restaurant had over $1.6
14  six million in sales, correct?
15   A.   Yes.
16   Q.   The restaurant had over $1.6
17  million in gross revenue in 2019, correct?
18   A.   Gross sales.
19   Q.   Yes.
20   A.   Okay.
21   Q.   On line 8, here it says that the
22  salaries and wages paid by 212 Steakhouse
23  Incorporated was $248,780?
24   A.   Correct.
25   Q.   Now, if you go to D1025 bottom

Page 137

1    N. VOLPER
2  right, D1025. It is about ten pages from
3  where we were.
4    A.   Okay.
5    Q.   Under the schedule deduction it
6  provides the restaurant spent $238,635 on
7  independent contractors, correct?
8    A.   Yes. It says like that.
9    Q.   In 2019 did the restaurant start
10  the year paying the front the
11  back-of-house staff on 1099 and switch to
12  W-2?
13   A.   Yes.
14   Q.   Do you know when in 2019 that
15  shift happened?
16   A.   No, I don't know.
17   Q.   When that shift happened, were
18  all the front and back-of-house employees
19  moved from 1099 to W-2 at the same time?
20   A.   I hope so, yes. I was not
21  taking care of it.
22      (Whereupon, Bates D1054 to D1092
23   was marked as Defendant's Exhibit 15
24   for identification as of this date by
25   the Reporter.)

35 (Pages 134 - 137)

1    N. VOLPER
2    Q.   This is Exhibit 15. Again,
3 these are documents produced by defense to
4 plaintiff without Bates numbers.
5 Plaintiffs have Bates stamped D1054
6 through D1092. Are these the 2020 tax
7 returns for 212 Steakhouse Incorporated?
8    A.   Correct.
9    Q.   If you turn to the third page
10 D1056 line 1A for gross receipts of sales
11 that the restaurant had over $800,000 in
12 sales in 2020, correct?
13   A.   Correct.
14   Q.   So the restaurant had over
15 $800,000 in gross revenue in 2020,
16 correct?
17   A.   Correct.
18   Q.   Line 8 for wages, on this
19 document it states that the restaurant
20 paid $183,659 in wages, correct?
21   A.   That's what it says, yes.
22   Q.   Were all the front and
23 back-of-house staff paid on W-2s in 2020?
24   A.   I believe so.
25   Q.   From all tax returns we just

1    N. VOLPER
2 went over from 2016 to 2020, who signs tax
3 returns for the corporation?
4    A.   I sign them.
5    Q.   Are these the tax returns that
6 you signed and submitted to the
7 government?
8    A.   Yes.
9    Q.   Defendants have not produced any
10 tax returns --
11        MS. SCHULMAN: Off the record.
12        (Whereupon, an off-the-record
13   discussion was held.)
14        MR. DiGIULIO: Back on the
15   record.
16   Q.   The defendants have not produced
17 tax returns for 2021. Has the restaurant
18 filed its 2021 tax returns?
19   A.   Not yet. We have an extension.
20   Q.   When do you plan on filing your
21 tax returns?
22   A.   I want to make sure everything
23 is correct and do it soon.
24   Q.   Were your 2021 sales higher than
25 they were in 2020?

1    N. VOLPER
2    A.   I don't have the calculation
3 yet.
4        (Whereupon, Bates D1255 to D1381
5   was marked as Defendant's Exhibit 16
6   for identification as of this date by
7   the Reporter.)
8    Q.   This is Exhibit 16. These are
9 documents that the defense have produced
10 in this litigation. They were not Bates
11 so plaintiff's counsel have provided Bates
12 numbers. The numbers on this exhibit are
13 D1255 through 1381. Are these tip sheets
14 from the restaurant?
15   A.   Correct.
16   Q.   Who created the template for
17 these sheets?
18   A.   I don't remember. It is many
19 years ago.
20   Q.   When was the template created?
21   A.   I don't remember. Since the
22 beginning I guess.
23   Q.   Since the beginning?
24   A.   Yes. I don't know this
25 particular one, but we have this since the

1    N. VOLPER
2 beginning.
3    Q.   Who filled out these sheets?
4    A.   This is strictly filled out by
5 employees.
6    Q.   Does the restaurant have one of
7 these sheets per shift?
8    A.   Every single day you need to
9 have that.
10   Q.   Do they have a separate one if
11 they have a lunch shift?
12   A.   Usually, yes. One is like
13 individual person.
14        MR. SEGAL: He is asking if
15   there is two tip sheets per sheet.
16        MS. SCHULMAN: Is there one tip
17   sheet per shift? If there is a lunch
18   and dinner shift on the same day, are
19   there two tip sheets per day?
20   A.   Yes. There are two tip sheets.
21   Q.   Do these tip sheets accurately
22 reflect the amounts of tips each employee
23 received on any given shift?
24   A.   In terms of the credit card
25 tips, yes. I don't see here cash tips

36 (Pages 138 - 141)

1         N. VOLPER
2  being reflected.
3     Q.  Are these the tip sheets that
4  you referred to earlier that are used to
5  calculate the total tips that each
6  employee receives per week?
7     A.  Yes, except the cash tip. It
8  does not reflect in the calculation.
9     Q.  Okay. The defendants produced
10 these documents in this litigation. Who
11 from the restaurant collected these
12 documents to give to your attorney?
13    A.  This particular one?
14    Q.  Yes.
15    A.  I did.
16    Q.  You did?
17    A.  Yes.
18    Q.  Where were they?
19    A.  Those are in the restaurant.
20 Whatever I find, I passed it to my
21 attorney.
22    Q.  Have you produced all the tip
23 sheets that are in your possession?
24    A.  What I find so far, I produced
25 it.

1         N. VOLPER
2     Q.  Where did you find these
3  specific ones?
4     A.  I mentioned. In the office.
5     Q.  In the office?
6     A.  Yes.
7     Q.  Are there other tip sheets in
8  the office?
9     A.  I don't believe so, but can be
10 other place in the restaurant because we
11 have like documents here, documents there
12 (indicating) but very old documents. I
13 looked -- so far was not there but
14 whatever I find, I produced.
15    Q.  These tips sheets are from --
16    A.  2021.
17    Q.  These tip sheets are from
18 various days in 2021, correct?
19    A.  Let me look through all of them
20 briefly.
21    Q.  Please.
22    A.  No. I see 2020 here. 2021,
23 2020.
24    Q.  If you see 2020, please
25 identify.

1         N. VOLPER
2     MR. SEGAL:  D13.  To be honest
3  with you, might be a typo.
4     Q.  Does the restaurant have tip
5  sheets from before 2021?
6     A.  Yes. Do I have them personally?
7     Q.  Does the restaurant have them?
8     A.  Let me revise my answer. I try
9  to locate. Whatever I locate, I gave to
10 my attorney. Do I keep the same system in
11 place since we opened, yes. Just to make
12 sure it is clear.
13    Q.  Where do the employees put the
14 tip sheets after they are prepared?
15    A.  They put like a book for them.
16 We call it book, like employees book.
17 They put in one of the shelves, special
18 shelf where they put whatever documents,
19 tips.
20    Q.  What happens to these records?
21    A.  What happens to this record?
22    Q.  Yes.
23    A.  Well, I don't know what
24 happened. Past records --
25    MR. SEGAL:  Once it goes in the

1         N. VOLPER
2  folder, where does it go next?
3     THE WITNESS:  This?
4     MR. SEGAL:  Yes.
5     A.  It goes to another form where
6  employment -- the credit card tips plus
7  hours -- and submitted to CPA. You have
8  to calculate hours plus tips, credit card
9  tips. I don't see reflect any cash tips
10 here. They don't declare.
11    Q.  Does the restaurant still use
12 these type of tip sheets?
13    A.  Yes, sir.
14    Q.  And so do you have these tip
15 sheets from 2022?
16    A.  2022-- yes, I do. Current one
17 you mean for last two, three months --
18 yeah, yeah. We have.
19    (Whereupon, Bates Plaintiff 44
20 to 59 was marked as Defendant's
21 Exhibit 17 for identification as of
22 this date by the Reporter.)
23    Q.  Exhibit 17 are documents that
24 are in plaintiff's possession. Bates
25 range from Plaintiff 44 through Plaintiff

37 (Pages 142 - 145)

Page 146

1         N. VOLPER
2 59. Please take a look. Do you know what
3 they are, Mr. Volper?
4     A.   Yes. This looks like by date by
5 employee, like how much they make on
6 credit card tips on this particular day.
7     Q.   Are these weekly tip sheets that
8 the restaurant keeps?
9     A.   Yes.
10    Q.   Who creates these documents?
11    A.   We create for long time. I
12 don't know. Maybe some of the employees
13 or me.
14    Q.   Does the restaurant keep these
15 records?
16    A.   We have some records, yes.
17    Q.   They are in paper form?
18    A.   Yes, yes. They are in paper
19 form. Same form like this but, you know,
20 original, not copies.
21    Q.   When did the restaurant begin --
22    A.   This is 2017, correct?
23    Q.   Yes.
24        When did the restaurant begin
25 using weekly tip sheets like this?

Page 147

1         N. VOLPER
2     A.   Probably most likely since the
3 beginning.
4     Q.   Is the restaurant in possession
5 of those weekly tip sheets?
6     A.   Current one, I am not too sure.
7 The past one, maybe destroyed. Whatever I
8 have, I provide. This is 2017, 2019. I'm
9 not sure if I have all the years.
10    Q.   Where does the restaurant keep
11 weekly tip sheets currently?
12    A.   In our office.
13    Q.   In your office?
14    A.   Yes.
15        MR. DiGIULIO: Let's take five
16 minutes.
17        (Whereupon, a short recess was
18 taken.)
19        MR. DiGIULIO: Back on the
20 record.
21    Q.   Mr. Volper, you produced 212
22 Steakhouse Incorporated Bank of America's
23 bank statement, correct?
24    A.   Correct.
25    Q.   And that is 212 Steakhouse's

Page 148

1         N. VOLPER
2 only bank account, correct?
3     A.   Yes.
4     Q.   That you produced statements
5 for?
6     A.   Yes.
7     Q.   And the statements that you
8 produced were from July 2016 to the end of
9 2021, correct?
10    A.   I want to take a look. Which
11 statement?
12    Q.   The ones that you produced in
13 this litigation.
14    A.   Yes.
15    Q.   How did you go about collecting
16 the bank statements for the production in
17 in this litigation?
18    A.   Bank online.
19    Q.   What did you do online to get
20 the statements?
21    A.   It is available for certain
22 period of time.
23    Q.   You downloaded from your account
24 online?
25    A.   Yes.

Page 149

1         N. VOLPER
2     Q.   And you gave it to your
3 attorney?
4     A.   Yes.
5     Q.   When did you go about collecting
6 that information?
7     A.   When?
8     Q.   Yes.
9     A.   I think it was like two, three
10 months ago I sent information to my
11 accountant.
12    Q.   How long did it take you to pull
13 out the bank statements?
14    A.   I print and then I have to
15 download and send to him -- maybe like two
16 or three hours.
17    Q.   Do you have access to the bank
18 statements from this year, from 2022?
19    A.   Yes.
20        (Whereupon, bank statements were
21 marked as Defendant's Exhibit 18 for
22 identification as of this date by the
23 Reporter.)
24    Q.   This is marked No. 18. Few
25 examples of some of the bank statements

38 (Pages 146 - 149)

Page 150

1        N. VOLPER
2 you produced in this litigation. These
3 documents were produced without Bates
4 stamps so we have Bates numbered them.
5 This is three months worth of statements
6 here. November 2020, July 2021, December
7 2021. Bates D525 through 544, D709
8 through 734, and D847 through D870. First
9 batch of pages Bates D525 through 544.
10 Are these the Bank of America bank
11 statements for the restaurant for
12 November 2020?
13     A.   This is November 1st to 30th,
14 yes, 2020.
15     Q.   If you look on page D5 through 7
16 which is the 13th page in through D54,
17 these are images of checks that restaurant
18 issued, correct?
19     A.   Correct.
20     Q.   So you have produced bank
21 statements from earlier, as early as
22 July 2016 that don't have images of the
23 checks?
24     A.   Huh-huh.
25     Q.   Are you able to access images of

Page 151

1        N. VOLPER
2 the checks prior to November 2020?
3     A.   No. I tried. I requested.
4     Q.   How did you request images of
5 the checks?
6     A.   By phone.
7     Q.   What did they tell you?
8     A.   They said they are going to send
9 it but there is no images. When I go
10 online, I see there is images for only
11 certain period of time. After that the
12 images don't appear.
13     Q.   The person you spoke to said
14 they would send you images?
15     A.   Which person?
16     Q.   Did you call Bank of America?
17     A.   I called Bank of America. I say
18 certain statements, there is no images.
19 They said this is different service or
20 something, but I request and they never
21 sent.
22     Q.   Did they tell you they were
23 going to send you images?
24     A.   Yes, but they never did.
25     Q.   And so --

Page 152

1        N. VOLPER
2     A.   Actually, they sent but there is
3 no images. I know you guys asked for that
4 but I was not able to in the past
5 statements to generate that report.
6     Q.   Before Bank of America had or
7 saved the images of the check, did 212
8 Steakhouse write down who the checks were
9 written to based on the check number?
10     A.   Yes. We have, but we keep like
11 -- because the employees did it most of
12 the time, they just put the check and then
13 another side they don't put who it is to.
14 So when you have to check -- this is the
15 most accurate information.
16     Q.   I understand at the time there
17 are images. Before there were images, is
18 there any record for which check went to
19 which person?
20     A.   No. I was not able to figure
21 out or I was not able to find that
22 information. There is two parts. When
23 the check is gone, you know, the original
24 check, the second part they don't fill it
25 up. So I don't know -- this particular

Page 153

1        N. VOLPER
2 check let's say Check 3053, who it belongs
3 to, if it is vendors, electrical,
4 insurance.
5     Q.   How was the restaurant able to
6 issue 1099s for employees, for staff?
7     A.   How it was issued?
8     Q.   Yes.
9     A.   Based on the past. As I
10 mentioned before, you can access certain
11 period of time but you cannot go --- I
12 think it is like one year or eighteen
13 months. At that time it was available but
14 when you put three months back, they are
15 not there anymore.
16     Q.   So at the time the restaurant
17 issued 1099s for the front and
18 back-of-house employees --
19     A.   We have that information
20 available in the system.
21     Q.   On your system or the Bank of
22 America?
23     A.   Bank of America system.
24     Q.   Does the restaurant use
25 QuickBooks?

39 (Pages 150 - 153)

Page 154

1        N. VOLPER
2    A.   No.
3    Q.   Are some of the checks issued
4 here, are they checks for employees'
5 paychecks?
6    A.   Some of the them they are for
7 different, different vendors --
8 electrical, can be many things.
9    Q.   All of these checks were checks
10 that were cashed that month; is that
11 correct?
12   A.   Yes.  If they show here, I
13 guess.  Is the back image say anything
14 about the cash?  I guess they are cashed
15 because they appear in the system.  They
16 are being cashed.
17   Q.   Earlier in this case the
18 restaurant had to provide plaintiff with
19 list for front-of-house employees that
20 were employed on or after January 20, 2019
21 so the plaintiffs can send a notice of the
22 lawsuit.  Do you recall this?
23   A.   Yes.
24   Q.   Who prepared that list?
25   A.   I prepared the list.  Generate

Page 155

1        N. VOLPER
2 from the POS system.  It was very
3 difficult to prepare that list.  I think
4 you asked for like the since the very
5 beginning.
6    Q.   I am only asking about the list
7 that we received May 5, 2022 which is
8 called the 216B list.  It is only the
9 front-of-house employees from
10 January 2019, so three years ago.  Do you
11 recall preparing that specific list?
12   A.   Yes.
13   Q.   How did you prepare it?
14   A.   I have to go to the POS system
15 to generate that records.
16   Q.   You were in the POS system to
17 figure out who worked in the restaurant
18 over the last three years?
19   A.   Yes.
20   Q.   Did you rely on any other
21 information?
22   A.   Not really because everybody is
23 supposed to be in there.
24        (Whereupon, 216B list was marked
25 as Defendant's Exhibit 19 for

Page 156

1        N. VOLPER
2 identification as of this date by the
3 Reporter.)
4    Q.   This is Exhibit 19.  This is the
5 list of front-of-house employees that your
6 attorney provided the plaintiff.  He gave
7 this to us on May 5, 2022.  Is this the
8 list you were just discussing that you
9 used the POS to determine?
10   A.   Yes.
11   Q.   How did you determine the start
12 dates on this list?
13   A.   So, how I determine the start
14 date?
15   Q.   Yes.
16   A.   I start by like the requested
17 dates to pull the list.  Requested back
18 dates to the current.
19   Q.   In the POS system does it say
20 the start dates of these employees?
21   A.   I think you have to go -- yes, I
22 think so.  When you go to the pay period
23 it is going to see when getting the first
24 -- the log in.
25   Q.   How did you determine the end

Page 157

1        N. VOLPER
2 dates?
3    A.   Same way.  When the log-in
4 stops, that means they are not there
5 anymore with the company.
6    Q.   After you generate this list
7 from the POS system, did you check any
8 other documents to make sure this is
9 accurate?
10   A.   No, I don't.
11   Q.   This was given to us on May 5,
12 2022.  You will see the first, I am going
13 to go through and ask if these people are
14 currently working at the restaurant?
15   A.   Okay.
16   Q.   Is Alexander Rynkovsky still
17 working there?
18   A.   Yes.
19   Q.   Is Everado Perez still working
20 there?
21   A.   Yes.
22   Q.   Samuel Garcia?
23   A.   Yes.
24   Q.   Javier Clemente?
25   A.   Yes.

N. VOLPER

1
2    Q.   Is Dierdre Cora Bethea still
3  working there?
4    A.   I don't think so, no.
5        MR. SEGAL:  That was mentioned
6  earlier that you said you didn't
7  recognize.
8    A.   Oh. I know why.
9    Q.   She is a bartender looks like?
10   A.   No, no. I was away for like
11 four, five months January until May --
12   Q.   Does she still work there?
13   A.   I don't think I ever meet her.
14 She stopped January. Looks like she
15 stopped January 2022. I was not there,
16 yeah. That's why I cannot recall. I was
17 not there, yes.
18   Q.   Bonafacio Ramos?
19   A.   I don't believe so, no.
20   Q.   You don't believe they are
21 working there?
22   A.   I cannot recall. I can't.
23   Q.   Oscar Bravo Morales?
24   A.   I think so he is still with us,
25 yes.

N. VOLPER

1
2    Q.   Luis Fernandez?
3    A.   I think he is still with us.
4    Q.   If we look back at the tip
5  sheets Exhibit 16, on the first page D1255
6  this is a tip sheet from May 28th of 2021.
7    A.   Correct.
8    Q.   The first name is Sasha. Sasha
9  worked on May 2021, correct?
10   A.   They create all this short names
11 and you put all the information -- so, I
12 think he called himself Sasha.
13   Q.   Paco?
14   A.   Paco is Everado Perez. That's
15 the way he calls himself.
16   Q.   Sammy is a runner?
17   A.   Who is Sammy -- oh, oka. Yeah,
18 Sammy is a runner.
19       MR. SEGAL:  Is that Samuel
20 Garcia?
21       MS. SCHULMAN:  Don't lead him
22 with the answer.
23       THE WITNESS:  No, no. He is not
24 helping. I am just bad with the
25 names.

N. VOLPER

1
2    Q.   Is Sammy represented on this
3  list?
4    A.   I don't know. I stopped to go
5  after my birthday -- in fact -- yeah.
6    Q.   This list is supposed to cover
7  all the front-of-house employees in the
8  past three years?
9    A.   As you can see, they called them
10 different names.
11   Q.   I understand. Do you know who
12 Sammy is?
13   A.   Sammy, I think is the food
14 runner.
15   Q.   To your knowledge is Sammy --
16   A.   Yes. Samuel Garcia is the
17 runner, yes.
18   Q.   Do you know who Davey (ph) is?
19   A.   Probably Javier Clemente. I
20 don't know.
21   Q.   You don't know who Davey is?
22   A.   This is not the correct name.
23   Q.   I understand that. I don't want
24 you to guess who is on the list. You
25 don't know who Davey is?

N. VOLPER

1
2    A.   No, I don't know who Davey is.
3  I don't know their nicknames.
4    Q.   Can you turn to D1257?
5    A.   Same document?
6    Q.   Yes. Next page.
7        MR. SEGAL:  Next page.
8    Q.   1257. May 30, 2021.
9    A.   Yes, sir.
10   Q.   We have busser Javier. Do you
11 know who Javier is?
12   A.   Yes. Looks like this is the
13 same person. They call themselves
14 differently here. I think that's Javier.
15 This is something. What's his name --
16 yes, Javier Clemente. But they call
17 themselves different names here.
18   Q.   If you go to D1261, few more
19 pages down. It is June 3, 2021.
20   A.   Yes, sir.
21   Q.   We have Ilya (ph). Do you know
22 who that is?
23   A.   No idea. This is like sometimes
24 we get people to help us. This maybe from
25 outside vendors, even any member from

41 (Pages 158 - 161)

1        N. VOLPER
2  waitress, bartender, cook, we call when we
3  have problems with the staff we call
4  special service and we get people.
5     Q.   Do you sometimes get runners in
6  that regard?
7     A.   Also. You see I was not there.
8  I stopped going after pretty much end of
9  the month.
10    Q.   Is Ilya reflected on the 216B
11 list to your knowledge? Do you know?
12    A.   I don't know how they call
13 themselves. That's the problem.
14    Q.   You don't know?
15    A.   No.
16    Q.   Next is JC on the same page. Do
17 you know who JC is?
18    A.   Where is it?
19    Q.   Right here (indicating).
20    A.   I don't know that. Maybe
21 Clemente.
22    Q.   Further down is busser, Danny or
23 what appears to be Danny. Do you know?
24    A.   Not that I know.
25    Q.   You don't know?

1        N. VOLPER
2     A.   Not that I know. I can't read
3  that name.
4     Q.   JC you said was Javier. But
5  Javier is down here and he is a busser,
6  right?
7     A.   This is really difficult for me
8  to understand because they put their
9  nicknames.
10    Q.   I understand.
11    A.   I don't know.
12    Q.   Do you know what these names
13 refer to specifically?
14    A.   I'm not sure if I know because I
15 cannot recognize.
16    Q.   That's fine. If you don't know
17 that's fine but you need to say you don't
18 know as opposed to guessing.
19    A.   I don't know. I don't know. I
20 may not -- I may not know.
21    Q.   D1268. This is June 10, 2021.
22 Below the busser is G. Carlos. Do you
23 know who G. Carlos is from?
24    A.   That maybe something like
25 temporary, maybe one or two days.

1        N. VOLPER
2     Q.   Do you know if G. Carlos is on
3  the 216B list?
4     A.   Because we have like a lot of --
5  my staff they have a lot of friends. They
6  just call them hey, can you help us here
7  for one day. So they are not like really
8  consider like employee.
9     Q.   My question is only if that
10 person is on the list?
11    A.   I cannot. I don't know.
12    Q.   Okay. You don't know. That's
13 fine.
14    A.   I don't know. I don't know.
15    Q.   Let's keep going. D1311 is
16 June 16, 2021. Bottom right.
17    A.   Okay.
18    Q.   Do you know who BGC is?
19    A.   No, I don't know.
20    Q.   Do you know if they are on that
21 list?
22    A.   No.
23    Q.   D1332 is April 3, 2021. We have
24 Velente. Do you know who Velente is? Is
25 he a runner?

1        N. VOLPER
2     A.   I think it was like one or two
3  days come like overtime.
4     Q.   Is that person listed on the
5  216B list?
6     A.   As employee -- no, he is not
7  listed as employee because he was not
8  really employee.
9     Q.   But he worked in the restaurant
10 at least on April 3, 2021?
11    A.   Yes, looks like. If it is in
12 there, that means he worked.
13    Q.   D1355 is from April 30, 2021.
14 Do you know Toko's full name; T-O-K-O?
15    A.   Paco, Paco
16    Q.   T-O-K-O is Paco?
17    A.   That maybe the same. P-O-K-O.
18 I am pretty sure about that.
19    Q.   Last one May 7, 2021 which is
20 D1362. Do you know who GF is?
21    A.   That maybe something --- GF, that
22 maybe --
23    Q.   Do you know who GF is?
24    A.   No. Maybe some temporary
25 employee like we call to help.

1          N. VOLPER
2     Q.   There are at least some people
3  who worked front of house who worked in
4  2021 who aren't on that list, correct?
5     A.   Let me make clear to your
6  statement.  As employee, they are not
7  because they need to be on certain amount
8  of time.  So -- we call other help.  Let's
9  say we are short of staff because we have
10  a completely disaster finding employees
11  during the certain days so we call some
12  people to help us.
13     Q.   Did the restaurant pay these
14  people directly?
15     A.   We pay them, yes.
16     Q.   Did you pay in the same way that
17  you paid the regular employees?
18     A.   To be on a payroll?
19     Q.   Yes.
20     A.   Yeah, yeah.
21     Q.   You paid the temporary workers
22  the minimum wage rate plus tips as you
23  paid the normal front-of-house workers?
24     A.   Correct.
25     Q.   Did the temporary co-workers

1          N. VOLPER
2  clock in and out?
3     A.   I believe so.  I hope so.  I
4  don't know.  Maybe not.  They maybe not
5  clock in and clock out because they not
6  appear on the system I guess.  They just
7  give us like -- I work from 1:00 until
8  5:00.  That was it.
9     Q.   Are you aware that after you
10  produced this list, 216B list, the judge
11  ordered the restaurant to provide a list
12  of all the restaurant's front-of-house and
13  back-of-house employees from January 2016
14  to the present.  Are you aware of that?
15     A.   Yes.
16        (Whereupon, redacted list was
17     marked as Defendant's Exhibit 20 for
18     identification as of this date by the
19     Reporter.)
20     Q.   This is marked Exhibit 20.  Is
21  this the list of all front and
22  back-of-house employees from January 20,
23  2016 to the present with the names
24  redacted that you produced to your
25  attorney?

1          N. VOLPER
2     A.   I think it is additional to this
3  list as far as I see it.  It is
4  combination of this and this I guess.
5     Q.   Your attorney produced this
6  document to plaintiff's attorney on
7  August 19, 2020.  Did you participate in
8  in creating this list?
9     A.   Yes.
10     Q.   How did you participate in
11  creating the list?
12     A.   By pulling from the POS system.
13     Q.   Did anyone else help you create
14  the list?
15     A.   I don't remember somebody
16  helping me.
17     Q.   Besides POS, did you rely on any
18  other documents to create this list?
19     A.   No.
20     Q.   When you gave this list to your
21  attorney, did it include the employees's
22  names?
23     A.   Yes.
24     Q.   Top half of the list, from the
25  top to where it says 2021 October, 2022

1          N. VOLPER
2  February server, this is the same list as
3  the 216B list, correct?
4     A.   This list?
5     Q.   Yes.
6        MS. SCHULMAN:  We are comparing
7  Exhibit 19 to Exhibit 20.
8     A.   I assume it is the same but the
9  name has been taken here, correct?
10     Q.   Correct.
11     A.   My question is do the top 24
12  entries reflect the same individuals from
13  the 216B list as in the class list?
14     A.   I hope so.
15     Q.   All of these individuals on the
16  top on the class list were front-of-house
17  employees, correct?
18     A.   Which individuals?
19     Q.   Top 24 that are all in bold.
20  Server, runner, busser, bartender.  Do you
21  see that?
22     A.   Yes.
23     Q.   The only people that are on this
24  list Exhibit 20 who are not on Exhibit 18
25  are the back-of-house employees listed in

43 (Pages 166 - 169)

1          N. VOLPER
2 the bottom eight rows, correct?
3    A.   Can you repeat the question?
4 I'm sorry.
5    Q.   Sure. The only people that are
6 on this list in Exhibit 20 which is the
7 class list who are not on Exhibit 19 which
8 is the 216B list are the last eight lines,
9 correct?
10   A.   Yes.
11   Q.   Isn't it true that the
12 restaurant had some front-of-house
13 employees who worked between January 20,
14 2016 and January 9, 2019 but were not
15 employed by the restaurant after
16 January 20, 2019?
17   A.   Is it -- can you repeat again?
18 I'm sorry.
19   Q.   Sure. Isn't it true that the
20 restaurant had some front-of-house
21 employees who worked between January 2016
22 and January 2019 but did not work after
23 January of 2019?
24   A.   I'm sorry. You need to repeat
25 again. I am getting tired.

1          N. VOLPER
2      MR. DiGIULIO: Do you want a
3 break?
4      THE WITNESS: I am getting
5 tired.
6      MR. SEGAL: I can rephrase it
7 differently.
8    Q.   Did the restaurant employee
9 front-of-house employees that worked
10 before 2019 but that didn't work after
11 2019?
12   A.   I don't understand.
13   Q.   Let's look at Exhibit 17 which
14 is Plaintiff 0044. For instance, this is
15 a tip sheet from a week in March of 2017,
16 correct?
17   A.   Correct.
18   Q.   If you look at Exhibit 19, there
19 is someone on this tip sheet named Kelsey,
20 correct?
21   A.   Yes.
22   Q.   As a server, right?
23   A.   Yes.
24   Q.   Kelsey is not on 216B list,
25 correct?

1          N. VOLPER
2    A.   Kelsey was there for a very
3 short period of time. I don't know. The
4 system doesn't generate that record looks
5 like. Yeah, looks like the system did
6 something wrong.
7      MS. SCHULMAN: Just try and
8 answer the question.
9    Q.   Is Kelsey on that list?
10   A.   No.
11   Q.   Miguel further down as a runner
12 that worked in March of 2017. Is Miguel
13 on that list?
14   A.   I cannot determine but looks
15 like not.
16   Q.   Did the restaurant employ Miguel
17 in 2019?
18   A.   Probably he can be like
19 temporary something or can be employee.
20   Q.   What about Noel below Miguel?
21 Did the restaurant employee Noel in 2017?
22   A.   I know Noel. He start like very
23 first in the beginning. Maybe when I put
24 the -- generate the report because he was
25 like sixteen or something, maybe the

1          N. VOLPER
2 system doesn't reflect on sixteen and
3 seventeen.
4    Q.   Is Noel on this list which is
5 Exhibit 19?
6    A.   I don't see here.
7    Q.   Below that on Exhibit 17 you
8 have Tristan. Do you see that?
9    A.   Tristan was not working -- 17?
10 Which one?
11   Q.   Did the restaurant employ
12 Tristan in March of 2017?
13   A.   I have no idea.
14   Q.   He is on this tip sheet,
15 correct?
16   A.   Looks like Tristan is not here,
17 yes.
18   Q.   And is he not on the 216B list,
19 right?
20   A.   No.
21   Q.   Luis, busser on plaintiff's 44
22 Exhibit 17?
23   A.   I have no idea.
24   Q.   You see Luis here on Exhibit 19
25 started in February 2022, correct? Is it

44 (Pages 170 - 173)

Page 174

```
1         N. VOLPER
2  the same --
3     A.   I have no idea if it is the same
4  or not.
5     Q.   Isn't it true that Stefana
6  Manzana was a server at the restaurant?
7     A.   Stefana Manzana -- something
8  ring a bell. Yeah, maybe she was like a
9  week or two or something like that.
10    Q.   Do you recall what year she
11 worked?
12    A.   No. I think it was -- I think
13 it was before the pandemic I believe so.
14    Q.   Isn't it true that Luis Quizphi,
15 Q-U-I-Z-P-H-I, was a busser?
16    A.   Yes.
17    Q.   And he worked at the restaurant
18 from --
19    A.   He worked like very early.
20 Yeah, it is true.
21    Q.   Is he included in Exhibit 20?
22    A.   No, because -- he was involved
23 in another lawsuit.
24        MR. SEGAL: I don't know why it
25 was put --
```

Page 175

```
1         N. VOLPER
2        THE WITNESS: Yes, that's why.
3     Q.   Isn't it true that Noel was a
4  runner at the restaurant?
5     A.   Noel was a runner, yes. I
6  remember Noel very well.
7     Q.   Are they included in the
8  Exhibit 20?
9     A.   His real name is not -- I have
10 to look at Exhibit 19. I think you asked
11 me that question already.
12    Q.   Is Noel included in Exhibit 19?
13    A.   No.
14    Q.   Isn't it true that Lucia Bonzia
15 (ph) --
16    A.   She was also very briefly there.
17    Q.   She worked as a bartender?
18    A.   She worked as a bartender and
19 moved to different city. She was like
20 week or two or something like that. Some
21 of the people were week or two. Some two
22 days, some one day. They don't like the
23 place so -- they was in the system, I
24 guess.
25    Q.   Isn't it true that Alina was a
```

Page 176

```
1         N. VOLPER
2  server at the restaurant?
3     A.   Alina?
4     Q.   Yes.
5     A.   I don't remember the name Alina
6  to be a server.
7        MR. SEGAL: Is that on the list?
8        MR. DiGIULIO: No, I am just
9  asking.
10    A.   No, I don't remember.
11    Q.   You don't remember if she worked
12 at the same time that Nino Martinenko
13 worked?
14    A.   I don't remember. I don't
15 remember Alina as a server.
16        MS. SCHULMAN: Do you remember
17 Alina in a different position?
18    A.   If I am not mistaken we have a
19 host for short period of time also.
20    Q.   Is there a host position at the
21 restaurant?
22    A.   Sometimes when we need it, when
23 we have like busy. Sometimes I host.
24 Some friend of mine, we host.
25    Q.   Is the host paid the same hourly
```

Page 177

```
1         N. VOLPER
2  wage as front of house?
3     A.   We don't have a daily host.
4     Q.   When the restaurant does have a
5  host, are they paid the same as
6  front-of-house employee?
7     A.   They are not officially. They
8  are like event hosts. They are not
9  official employees. They are like event
10 hosts. We have like a lot of people like
11 bartenders, kitchen, different -- big
12 problem finding employees so they are
13 basically not our employees. They are
14 through agency.
15    Q.   I believe you mentioned someone
16 name Luciano was a server at the
17 restaurant?
18    A.   Luciano?
19    Q.   Yes.
20    A.   What is the last name?
21    Q.   I don't know. Is it true that
22 the restaurant employed a server named
23 L-U-C-I-A-N-O?
24    A.   We have a Luciano but his name
25 is -- this one (indicating).
```

45 (Pages 174 - 177)

Page 178

N. VOLPER

2  Q.  This is Exhibit 19?
3  A.  Yes.
4  Q.  Which one?
5  A.  Lychezar Lazarov.
6  Q.  Did the restaurant hire a server
7  named Dave in 2016?
8  A.  I don't recall.
9     MR. SEGAL:  These names are
10  coming up from plaintiff?
11    THE WITNESS:  Definitely.
12    MR. SEGAL:  I need two minutes.
13    MR. DiGIULIO:  Sure.
14    (Whereupon, a short recess was
15  taken.)
16    MR. DiGIULIO:  Back on the
17  record.
18  Q.  Can you look at Exhibit 5?
19  A.  Yes, sir.
20  Q.  On the second page which is
21  Plaintiff's 26, bottom section where it
22  says kitchen there are six names, correct?
23  A.  Correct.
24  Q.  All six individuals worked in
25  the kitchen in July of 2021, correct?

Page 179

N. VOLPER

2  A.  For this particular days, yes.
3  They worked July 19th to 25th, but the
4  other time, they weren't.
5  Q.  But they did work at the
6  restaurant during this period?
7  A.  In this particular July 19th to
8  257, yes.
9  Q.  I believe you testified
10  previously each of their respective
11  positions.  Do all of these individuals
12  still work at the restaurant?
13  A.  Amaro, Lazero, I don't think so.
14  Gonzalez, I don't think so.
15  Q.  Gonzalez, Amaro, and Abel?
16  A.  Carlos, I don't think so.  No.
17  Q.  Pedro still works there?
18  A.  Yes.
19  Q.  Daniel still works there?
20  A.  Yes.
21  Q.  And Rami still works there?
22  A.  No.  He is not.
23  Q.  Does Gonzalez still work there?
24  A.  Gonzalez was like part-time
25  employee, not even employee.  He comes to

Page 180

N. VOLPER

2  help us.  We called him a few times to
3  help us because it was short of staff.
4  Q.  If you go back to Exhibit 20
5  which is the class list?
6  A.  Okay.
7  Q.  If you look at the bottom of the
8  list there are only two individuals listed
9  who worked in 2021, correct, if you look
10  at the third and fourth from the bottom?
11  A dishwasher and a cook are listed.
12  A.  There are no names.
13  Q.  They are redacted, right?
14  A.  Yeah, but there are names
15  Exhibit 19.  I cannot figure out.
16    MS. SCHULMAN:  Wait for him to
17  get through the question.
18  Q.  These bottom eight individuals
19  have no names.  I don't know the names.
20  All we have is the date when they started
21  when they ended, and their position down
22  at the bottom.  This is the back-of-house
23  people.
24  A.  Okay.
25  Q.  My question to you is on the

Page 181

N. VOLPER

2  class list Exhibit 20, there are only two
3  individuals listed who worked in the back
4  of house in 2021; is that correct?
5  A.  (No verbal response.)
6  Q.  These two individuals started in
7  2021 and August 2020 and who are current?
8  A.  I have to see the names
9  otherwise --
10  Q.  Are there only two current
11  back-of-house employees, correct, on this
12  list?
13  A.  Yes, looks like only two.
14  Q.  You confirmed on Plaintiff 25
15  that there were six individuals working in
16  the back of house on this week alone,
17  correct?
18  A.  As I mentioned before they
19  worked but they are not employees.  They
20  are temporary.  Woe had to call them.  In
21  the pandemic it was extremely difficult to
22  find people.
23  Q.  According to the class list
24  Exhibit 20, the restaurant had employed
25  only eight individuals in the back of

46 (Pages 178 - 181)

Page 182

```
1          N. VOLPER
2 house since January of 2016; is that
3 correct?
4    A.   Can you show me here?
5    Q.   Yes (indicating). There are
6 only eight individuals.
7    A.   Yes.
8    Q.   Did the restaurant employ a chef
9 named Nelson?
10   A.   Yes.
11   Q.   When did he work at the
12 restaurant?
13   A.   Beginning.
14   Q.   Is he included on this list?
15   A.   Which list?
16   Q.   Exhibit 20.
17   A.   I have no idea.
18        MR. SEGAL: Do you mean exhibit
19 --
20        MR. DiGIULIO: 20. There are no
21 names on Exhibit 20. Let's move on.
22   Q.   Going back to the bank
23 statements which is Exhibit 18, the bank
24 statement?
25   A.   Correct.
```

Page 183

```
1          N. VOLPER
2    Q.   If you go to D709, these are the
3 bank statements for July of 2021, correct,
4 for the restaurant?
5    A.   July 2021, that's correct.
6    Q.   If we go to D730 these are
7 images of checks written from the
8 restaurant?
9    A.   Correct.
10   Q.   I am going to point out to you
11 specific checks.
12   A.   Please.
13   Q.   Abel Mendoza?
14   A.   Okay.
15   Q.   Is that his paycheck? Check No.
16 11142. Do you see the check on the top
17 left?
18   A.   Correct.
19   Q.   Is that his paycheck?
20   A.   This is temporary worker as
21 well. We call them when we need him.
22 Looks like this is pay out check.
23   Q.   And you paid him directly,
24 correct?
25   A.   Correct.
```

Page 184

```
1          N. VOLPER
2    Q.   Did he work as a chef?
3    A.   No. He doesn't work as a chef.
4 We called him as help, to help us in
5 kitchen.
6    Q.   He worked in the kitchen?
7    A.   Correct.
8    Q.   How long did he work for the
9 restaurant?
10   A.   Maybe like -- I don't remember
11 how long but not long.
12   Q.   Is this person Abel Mendoza
13 included in Exhibit 20 on the class list
14 as the back-of-house employee?
15   A.   No, because he was not employed.
16 He was temporary worker to help us.
17 During the pandemic we called lot of
18 people just to help us.
19   Q.   Do the temporary back-of-house
20 employees do the same work as the
21 full-time employees?
22   A.   Same work?
23   Q.   Yes.
24   A.   There in the kitchen, you know,
25 whatever we need they do. I don't know
```

Page 185

```
1          N. VOLPER
2 the same work or not, that's why we called
3 them. As you know, during the pandemic
4 everyone knew you cannot find people to
5 work.
6        MS. SCHULMAN: The temporary
7    back-of-house employees, you called
8    them when you are short of staff to
9    fill in for the missing staff.
10       THE WITNESS: Yes.
11       MS. SCHULMAN: And the temporary
12   front-of-house you called them to help
13   when you were missing front-of-house
14   staff?
15       THE WITNESS: Correct.
16       MS. SCHULMAN: So they are just
17   filling in.
18       THE WITNESS: Correct, so they
19   can operate the business.
20   Q.   Do you pay these temporary
21 workers directly?
22   A.   Yes. We issue checks directly.
23   Q.   I am going to show you a bank
24 statement marked D859. It says
25 December 2021. On the top left corner
```

47 (Pages 182 - 185)

1          N. VOLPER
2 there is a check marked 9593 Vikash Patel.
3 Do you see that?
4     A.   Yes.
5     Q.   Who is Vikash Patel?
6     A.   Vikash Patel was the potential
7 buyer for the restaurant like I mentioned
8 before. We have agreement to take over
9 the restaurant. He took certain period of
10 time. He put deposit towards the
11 transaction, the buyout. This is when I
12 start to refund his money back.
13    Q.   This is document D540 from
14 November of 2020 for the restaurant. Do
15 you see that?
16    A.   Yes.
17    Q.   This is a check issued to
18 Anthony Mendiola (ph). Number of the
19 check is 10387. Who is Anthony Mendiola?
20    A.   He was working in the kitchen.
21    Q.   What was his position?
22    A.   Chef I think. I believe he was
23 chef for small period of time.
24    Q.   Is he included on the class list
25 Exhibit 20?

1          N. VOLPER
2     A.   I have no names here so I
3 cannot --
4     Q.   There is only one chef lited,
5 correct?
6     A.   That can be him or somebody
7 else. When I have no names, I cannot
8 confirm it is on the list or not.
9     Q.   This is Defendant's
10 Exhibit 8630, bank statement from December
11 of 2021. Name of the check is Florentino
12 Matta (ph). Check No. 11811. Who is
13 Florentino Matta?
14    A.   I believe that's also a
15 temporary worker because of the amount.
16    Q.   Did he work in the back of
17 house?
18    A.   He was just called to help us,
19 yes.
20    Q.   Let me go to page Defendant's
21 Exhibit 860, also December of 2021. Name
22 on this check is Jermaine Gambiagi (ph),
23 Check No. 11712.
24    A.   Can I take a look?
25    Q.   Please.

1          N. VOLPER
2     A.   That can be some kind of vendor
3 because of the amount. I cannot -- maybe
4 we paid because we need lot of repairs.
5 That can be third-party contractor or
6 something because of the amount.
7     Q.   We have D733 which is from
8 July 2021. This is a check to Mitchell
9 Sawyer 11229. Do you know who Mitchell
10 Sawyer is?
11    A.   Yes, I know. He is handling the
12 social media.
13    Q.   He handles your social media?
14    A.   Yes.
15       MR. SEGAL: I have to take this
16 call.
17       (Whereupon, a short recess was
18 taken.)
19       MR. DiGIULIO: Back on the
20 record.
21    Q.   This is page D723 which is from
22 July of 2021. It is a check for Oliver
23 Morales. Check 11060. Would is Oliver
24 Morales?
25    A.   Independent contractor.

1          N. VOLPER
2     Q.   What does he for the restaurant?
3     A.   Photos.
4     Q.   He takes photos?
5     A.   Yes.
6     Q.   D866. This is from December. I
7 am going to refer the witness to D866
8 which is a bank statements from
9 December 2021. This is a check to Richard
10 Francisco Garcia. Check No. 11844. Who
11 is Richard Francisco Garcia?
12    A.   Which one?
13    Q.   Richard Francisco Garcia.
14    A.   Looks like some kind of vendor.
15 Can be construction.
16    Q.   Do you see 4 in the bottom
17 corner, dishwasher?
18    A.   Okay.
19    Q.   Is Richard Francisco Garcia a
20 dishwasher that worked at the restaurant?
21    A.   We may call temporary, yes. I
22 cannot see the name. What is that --
23 okay.
24    Q.   Last one is D540 is from
25 November 2020. Check is to Ryan Kemp.

48 (Pages 186 - 189)

Page 190

1           N. VOLPER
2  Check No. 10386.
3     A.  He was temporary chef.
4     Q.  How long did he work for the
5  restaurant?
6     A.  For a few months.
7     Q.  Before 2016 did the restaurant
8  take any steps to ensure that the pay
9  practices of the restaurant were in
10 compliance with federal and New York law?
11    A.  Before 2016?
12    Q.  Yes.
13    A.  If we complied with federal?
14    Q.  Did the restaurant take any
15 steps to ensure that the restaurant's pay
16 practices were in compliance with New York
17 and the federal wage law?
18    A.  Which period of time?
19    Q.  Before 2016?
20    A.  I guess we pay by 1099. I don't
21 know if that counts.
22    Q.  I am asking about affirmative
23 steps that you or the people who worked
24 for the restaurant took?
25    A.  I'm not familiar with all the

Page 191

1           N. VOLPER
2  restaurant laws, labor laws. I can't
3  answer correctly on that question. I will
4  tell you what has been done.
5     Q.  Did you consult with anyone to
6  determine whether the restaurant's pay
7  practices were in compliance with the law?
8     A.  No.
9     Q.  Did you do any research on your
10 own to determine whether the pay practices
11 of the restaurant were in compliance?
12    A.  No. That's my first restaurant
13 so not much experience there.
14    Q.  Before the restaurant what did
15 you do?
16    A.  Before the restaurant?
17    Q.  Yes.
18    A.  Like I do many different things
19 which is -- how is this relevant to the
20 labor department lawsuit?
21        MS. SCHULMAN: You have to
22 answer the question.
23        MR. SEGAL: Objection, but you
24 can answer.
25    A.  I do many different things. I

Page 192

1           N. VOLPER
2  play poker. I play basketball. I go on
3  vacation --
4        MS. SCHULMAN: What did you do
5  for a living before you opened the
6  restaurant? Can I just ask, what did
7  you do for a living before you opened
8  212 Steakhouse?
9        THE WITNESS: I played poker.
10       MS. SCHULMAN: Was that your
11 main source of income?
12       THE WITNESS: Yes.
13       MS. SCHULMAN: Did you have any
14 other business before you opened 212
15 Steakhouse?
16       THE WITNESS: I have import
17 export business in the past. I have
18 e-commerce business in the past.
19    Q.  Before you opened 212 Steakhouse
20 did you ever have employees before?
21    A.  Not really, no.
22    Q.  Are you aware that most hourly
23 workers have to be paid time and a half
24 for hours worked?
25    A.  Yes, sir. Now I am aware of

Page 193

1           N. VOLPER
2  that, yes.
3     Q.  When did you become aware of
4  that?
5     A.  Being -- I cannot tell you
6  exactly the date and time. Sorry.
7     Q.  Did you know that in 2016?
8     A.  I cannot tell you the. Most
9  likely I don't, because we used 1099 form
10 so.
11    Q.  Did the restaurant ever seek
12 legal advice about the requirements for
13 paying tipped employees pursuant to a tip
14 credit?
15    A.  No.
16    Q.  Has the restaurant been
17 investigated by the state or federal
18 department of labor?
19    A.  We were audited but not
20 investigate. Investigate is like
21 basically -- I don't know how to determine
22 the word investigate.
23    Q.  You were audited by the tax
24 authority?
25    A.  By the department of labor.

49 (Pages 190 - 193)

Page 194

```
1          N. VOLPER
2   Q.  Federal or state?
3   A.  New York State.
4   Q.  New York State?
5   A.  Correct.
6   Q.  What was the outcome of that
7  investigation?
8   A.  Outcome?
9   Q.  Yes.
10   A.  Like, they asked us to provide
11  all the documents.  They gave me
12  penalties.
13       MS. SCHULMAN:  When was that
14  audit?
15       THE WITNESS:  This was like
16  before the pandemic.
17       MS. SCHULMAN:  Do you have any
18  documents relating to that audit?
19       THE WITNESS:  Do I have
20  documents -- yes.
21       MS. SCHULMAN:  What did you have
22  to pay penalties for?
23       THE WITNESS:  I don't know.  I
24  know I have to pay penalty.  Exactly
25  for what --
```

Page 195

```
1          N. VOLPER
2       MS. SCHULMAN:  Do you recall
3  what violations --
4       THE WITNESS:  I don't know.  I
5  don't know.  It was some kind of
6  violation.
7   Q.  Prior to this lawsuit has the
8  restaurant of been sued?
9   A.  Yes.
10   Q.  How many times?
11   A.  Like, we have been sued by
12  vendors few times.  We have a very tough
13  time in the beginning so we lost a lot of
14  money.  We have been sued by employees.
15  Obviously now is another case.
16   Q.  Are you aware of the lawsuit
17  Luis Quizphi verses 212 Steakhouse?
18   A.  Yes, sir.
19       (Whereupon, complaint was marked
20  as Defendant's Exhibit 21 for
21  identification as of this date by the
22  Reporter.)
23   Q.  Is this the lawsuit you are
24  referring to in this complaint?
25   A.  Yes.
```

Page 196

```
1          N. VOLPER
2   Q.  That was filed against you in
3  December of 2018, correct?
4   A.  Yes.
5   Q.  Is that when you first became
6  aware of Mr. Quizphi's allegations?
7   A.  Little bit later because it
8  takes time to be served.
9   Q.  What did you do in response to
10  these allegations?
11   A.  What I did?
12   Q.  Yes.
13   A.  I mean, I hired a lawyer.
14   Q.  Did you change the pay practices
15  of the restaurant at all?
16   A.  Yes.
17   Q.  How did you change them?
18   A.  Payroll and payroll records and
19  -- et cetera.
20   Q.  Before this lawsuit?
21   A.  Before the lawsuit, yes.  No, I
22  think it was maybe after the lawsuit.  I
23  don't remember, but maybe after the
24  lawsuit.
25   Q.  I am a little confused by what
```

Page 197

```
1          N. VOLPER
2  changed after this lawsuit.  You said the
3  payroll records.  How did the payroll
4  records change?
5   A.  How they changed?
6   Q.  Yes.
7   A.  Well, after I was aware what I
8  need to be done, I start to do it
9  correctly.
10       MS. SCHULMAN:  What specifically
11  did you change about your pay
12  practices in response to this lawsuit?
13       THE WITNESS:  I mean I stopped
14  to, you know  -- I put everybody on
15  the payroll.
16       MS. SCHULMAN:  It was in
17  response to that lawsuit that you put
18  everyone on payroll?
19       THE WITNESS:  Yeah, afterwards I
20  was aware that I made mistake here.
21       MS. SCHULMAN:  Did you make any
22  changes with respect to your payroll
23  practices in response to this lawsuit
24  other than putting the workers on
25  W-2s?
```

50 (Pages 194 - 197)

Page 198

1          N. VOLPER
2          THE WITNESS:  As far as I
3   remember, that was like pretty much --
4   pretty much it.
5     Q.   How did the case resolve?
6     A.   We settled.
7          (Whereupon, D1454 to D1462 was
8     marked as Defendant's Exhibit 22 for
9     identification as of this date by the
10    Reporter.)
11    Q.   This is not Bates stamped but
12  they are marked D1454 through 1462.  Are
13  these time records from Mr. Quizphi?
14    A.   Yes.
15    Q.   Did you produce these records in
16  the prior lawsuit with Mr. Quizphi?
17    A.   I believe they are documents
18  requested.
19    Q.   Did you also produce them during
20  the lawsuit with Mr. Quizphi back in 2018?
21    A.   During the lawsuit --
22         MR. SEGAL:  In other words, did
23    you provide this information to Mr.
24    Quizphi when they asked for demands
25    related to it?  Was this provided to

Page 199

1          N. VOLPER
2   the plaintiff in the other lawsuit?
3          THE WITNESS:  Yes.
4     Q.   Did you produce anything else to
5   the plaintiff in the prior lawsuit besides
6   these records?
7     A.   No.  Whatever documents
8   required.
9     Q.   Did you produce anything else?
10    A.   I don't remember.  Whatever they
11  required, we produced.
12    Q.   Did the plaintiff in the other
13  lawsuit produce any records to you?
14    A.   I don't believe we required any
15  documents as far as I remember.
16         (Whereupon, complaint was marked
17    as Defendant's Exhibit 23 for
18    identification as of this date by the
19    Reporter.)
20    Q.   Are you aware of the lawsuit
21  Julio De La Luz Flores verses 212
22  Steakhouse?
23    A.   Yes.
24    Q.   This is the complaint filed in
25  New York Court County Supreme, Exhibit 23.

Page 200

1          N. VOLPER
2   Is this the complaint filed against you by
3   Mr. De La Luis Flores?
4     A.   Correct.
5     Q.   And how did this case resolve?
6     A.   It was settled.
7     Q.   Did you change any of the pay
8   practices at the restaurant as a result of
9   this lawsuit?
10    A.   I don't remember in this
11  particular case.
12         (Whereupon, D1426 to D1453 was
13    marked as Defendant's Exhibit 24 for
14    identification as of this date by the
15    Reporter.)
16    Q.   These are documents marked
17  Exhibit 24.  They are produced by the
18  defendants in this litigation that were
19  not Bates.  We Bates stamped them D1426
20  through 1453.  Are these the time records
21  for Mr. De La Luz Flores?
22    A.   Yes.  Looks like time records,
23  yes.
24    Q.   And did you produce these
25  records to that plaintiff in that lawsuit?

Page 201

1          N. VOLPER
2     A.   Correct.  Yes, we did.
3     Q.   Did you produce any other
4   records in that lawsuit with Mr. De La Luz
5   Flores?
6     A.   We may, but I still don't
7   remember.  I don't remember what else was
8   produced.
9     Q.   Did you produce Mr. De La Luz
10  Flores's wage statements in that lawsuit?
11    A.   Wage statements -- I don't
12  remember.
13    Q.   Pay stubs?
14    A.   I don't remember.
15    Q.   You don't remember?
16    A.   No.
17    Q.   Did Mr. De La Luz Flores produce
18  any records to you in that lawsuit?
19    A.   No.
20    Q.   Besides these two lawsuits, are
21  you aware of any complaints that any
22  employee made about not being paid
23  lawfully at the restaurant?
24    A.   I don't believe so.
25    Q.   At the beginning of this case

51 (Pages 198 - 201)

Page 202

1        N. VOLPER
2   you asserted a counterclaim against Nino
3   Martinenko in which you blamed her for the
4   restaurant shutting down; is that correct?
5     A.   Correct.
6     Q.   And you subsequently withdrew
7   that claim, correct?
8     A.   I don't understand that word.
9     Q.   Did you drop that claim?
10    A.   Yes.
11    Q.   Have you dropped that claim
12  against Nino Martinenko?
13    A.   Yes.
14       MR. DiGIULIO: Let's take five
15    minutes.
16       (Whereupon, a short recess was
17    taken.)
18       MR. DiGIULIO: Back on the
19    record.
20    Q.   In the two lawsuits that we
21  talked about, were you deposed in either
22  of them?
23    A.   Deposed?
24    Q.   Yes.
25    A.   I believe so, yes.

Page 203

1        N. VOLPER
2       MR. SEGAL: I don't think so. I
3    am trying to think. Who were the
4    attorneys?
5       MS. SCHULMAN: It is on the --
6       (Whereupon, an off-the-record
7    discussion was held.)
8     Q.   For the record, were you deposed
9   in either of the previous lawsuits we
10  discussed?
11    A.   No.
12    Q.   When you were discussing the
13  temporary workers the restaurant used, was
14  that in terms of time period only after
15  the COVID that the restaurant used
16  temporary workers?
17    A.   You mean during the COVID?
18    Q.   During COVID.
19    A.   During COVID, after the COVID.
20  We are still COVID so --
21    Q.   Prior to March 2020 did the
22  restaurant use temporary workers?
23    A.   Yes.
24    Q.   Yes, you did use them?
25    A.   Yes, yes.

Page 204

1        N. VOLPER
2     Q.   The restaurant used them from
3   the beginning?
4     A.   Yes. We used from the
5   beginning. Some kind of services,
6   bartender something when we have events we
7   use.
8     Q.   Do you know Imran's address?
9     A.   No. I know he recently moved
10  but I don't know his address.
11    Q.   When you collected documents for
12  this litigation, did you ask Imran to give
13  you any documents?
14       MR. SEGAL: Can I ask a
15    different question?
16       MR. DiGIULIO: No. Let him
17    finish.
18    A.   I don't know. I was not in very
19  good stage, you know. I can't remember.
20    Q.   Did Imran help you collect any
21  documents for this litigation?
22    A.   I don't remember.
23    Q.   You don't remember?
24    A.   I don't want to go through my
25  medical records but -- I am still under --

Page 205

1        N. VOLPER
2     Q.   This is Exhibit 2. I am going
3   to show you D1216. This is Nino
4   Martinenko's time records.
5     A.   Okay.
6     Q.   If you see on February 7th of
7   2016, Nino Martinenko clocked in at
8   11:18 a.m. Is that right?
9     A.   That's in the morning, correct?
10    Q.   Yes. That would be a time when
11  the plaintiff Nino Martinenko worked the
12  lunch shift, correct?
13    A.   Correct.
14    Q.   When the time record shows
15  front-of-house person clocking in in the
16  morning, does that mean there was a lunch
17  shift that day?
18    A.   That's correct. The way I see
19  it here, nobody like counted the lunch
20  breaks.
21    Q.   February 21st, same page you can
22  see she clocked in at 11:14 a.m., clocked
23  out at 3:03, clocked back in at 3:12 p.m.
24    A.   Okay. That maybe only one day.
25  In general.

1         N. VOLPER
2         MR. DiGIULIO:  We are done.
3    Thank you.
4         MR. SEGAL:  Couple of quick
5    questions.
6    EXAMINATION BY
7    MR. SEGAL:
8         Q.   You mentioned earlier today that
9    the employees had a break of thirty
10   minutes.  Was that their meal break or the
11   meal break was in addition to that other
12   thirty minute break?
13        A.   No.  Meal, they usually -- when
14   they eat they don't -- it is not like a
15   meal break.  They usually like during the
16   shifts, they take -- in between the lunch
17   shift and dinner shift they take a break.
18   They go outside, have coffee, whatever
19   they decide to do.
20        Q.   But that's in addition to the
21   thirty minute break; is that correct?
22        A.   Correct.
23        Q.   Imran was not an employee of the
24   restaurant, was he?
25        A.   No.

1         N. VOLPER
2         Q.   Was he ever paid by the
3    restaurant?
4         A.   No.
5         Q.   You mentioned that he helped you
6    with some things in the restaurant.  Was
7    that the extent of his involvement in the
8    restaurant?
9         A.   Correct.
10        Q.   You mentioned that the
11   restaurant was open seven days
12   approximately from 12:00 to 11:00?
13        A.   Correct.
14        Q.   Just as Nino Martinenko checked
15   out at 3:00, do other servers, some of the
16   people at lunch leave prior to the dinner
17   shift?
18        A.   Yes.  Pretty much that's like a
19   procedure.  They want to take some break
20   between the lunch and the dinner shift,
21   yes.
22        Q.   The accountant firm listed on
23   the tax returns called Tax Zone, is that
24   the same firm as Crow?  Did they change
25   their name to Crow?

1         N. VOLPER
2         A.   I believe so, yes.
3         Q.   The tip records that you
4    provided to the plaintiffs and that we
5    went through today, those were only the
6    credit card tips; is that correct?
7         A.   Correct.
8         Q.   And the responsibility of the
9    employees is to tell you what cash tips
10   they make on a daily basis or at the end
11   of the week; is that correct?
12        MS. SCHULMAN:  Objection.
13        Q.   You can answer.
14        A.   That's correct.  They need to
15   fill up, I believe some kind of form.
16        Q.   You don't have the amounts that
17   they made in cash; is that correct?
18        A.   I don't remember.  They never
19   reported to me.
20        Q.   Isn't it true that if your
21   minimum wage somehow did not equal, the
22   tip minimum wage somehow did not equal the
23   correct minimum wage because the credit
24   card and the tip minimum wage did not
25   equal the regular minimum wage, it still

1         N. VOLPER
2    might have if you had the cash tips; isn't
3    that true?
4         A.   True.
5         Q.   When you opened up the
6    restaurant you said it was your first
7    endeavor in the restaurant hospitality
8    industry?
9         A.   Yes, sir.
10        Q.   You hired accountants, correct?
11        A.   Correct.
12        Q.   Did you rely on those
13   accountants to provide you information
14   related to the FLSA and the New York labor
15   laws?
16        A.   Yes.
17        Q.   Did you believe that they were
18   following those labor laws when they
19   reported wages and salary the way they did
20   to you?
21        A.   I believe.  I was not, you know,
22   aware of many details.
23        Q.   As you stated earlier today, you
24   did have two prior lawsuits and you had a
25   labor audit.  At any time prior to those

53 (Pages 206 - 209)

Page 210

```
1          N. VOLPER
2  actions and audit and thereafter, have you
3  ever willfully tried to violate the FLSA
4  or the New York labor laws?
5          MR. SEGAL: Objection.
6     Q.  You can answer.
7     A.  Can you explain wilfully?
8     Q.  Wilfully means on purpose to
9  screw the employees?
10    A.  No, no.
11    Q.  In street language?
12    A.  No.
13    Q.  You mentioned throughout your
14 deposition testimony today that you
15 thought, when counsel was asking you about
16 personnel files and records, you indicated
17 that you thought you might have some in
18 the office but isn't it true that you
19 searched all your areas in the office as
20 well as the restaurant for records when I
21 requested them?
22         MR. SEGAL: Objection.
23    A.  Yes, true.
24    Q.  Do you believe there are any
25 files or records that you did not provide
```

Page 211

```
1          N. VOLPER
2  that are in your possession?
3          MR. DiGIULIO: Objection.
4     A.  I don't believe so.
5          MR. SEGAL: What is the
6  objection? Leading?
7          MR. DiGIULIO: Form.
8     Q.  Did you ever get trained in the
9  POS system?
10    A.  No.
11    Q.  Do you think you know all its
12 features?
13    A.  I don't believe so because they
14 are constantly updated, all these
15 features.
16    Q.  You testified that you gave
17 access to the office vie checkbooks to
18 employees; is that correct?
19    A.  Correct.
20    Q.  And you stated that you can't
21 find a lot of your files; is that correct?
22    A.  Correct.
23    Q.  Is it possible your employees
24 took these files?
25         MS. SCHULMAN: Objection.
```

Page 212

```
1          N. VOLPER
2     Q.  You can answer.
3     A.  Very possible, yes.
4     Q.  Plaintiff had some papers that
5  she produced today, correct?
6     A.  Correct.
7     Q.  Is it possible that plaintiff
8  destroyed or took away your other files?
9          MS. SCHULMAN: Objection.
10    A.  Possible.
11         MR. SEGAL: No further
12 questions.
13 EXAMINATION BY
14 MS. SCHULMAN:
15    Q.  You testified you relied on the
16 accountant you had when you first opened
17 the restaurant. Who was that accountant?
18    A.  I assume it was -- because when
19 I look now the tax returns, I think it was
20 the same people but different name.
21    Q.  You have always used Ebed as the
22 restaurant's accountant?
23    A.  Yeah. Ebed or Ali. They
24 changed companies I guess.
25    Q.  Did you have any communications
```

Page 213

```
1          N. VOLPER
2  with those accountants about the
3  requirements of how to pay your employees?
4     A.  Like I mean they ask me, you
5  know, they ask me like -- I have to
6  provide like employees' names, Social
7  Security, address, date of birth. They
8  request for some information that I have
9  to provide to be put into the payroll
10 system.
11    Q.  Did they ever give you any other
12 information about the legal requirements
13 with respect to your employees?
14    A.  No, no.
15         MS. SCHULMAN: Thank you.
16         THE WITNESS: Thank you.
17         [TIME NOTED: 5:45 p.m.]
18 _____
19              NIKOLAY VOLPER
20
21 Subscribed and sworn to before me
22 this __ day of _____, 2022.
23 _____
24              Notary Public
25
```

54 (Pages 210 - 213)

Page 214

```
 1          I N D E X
 2    WITNESS   EXAMINATION BY   PAGE
 3    NIKOLAY VOLPER  MR. DIGIULIO    5
 4        MR. SEGAL        206
          MS. SCHULMAN     212
 5
 6      E X H I B I T S
 7    DEFENDANT'S  DESCRIPTION        PAGE
 8    Exhibit 1  notice of deposition  12
 9    Exhibit 2  Bates D1216 to D1254  79
10    Exhibit 3  Bates D1212 to D1215  82
11    Exhibit 4  Bates D934 to D1012   84
12    Exhibit 5  Plaintiff's 25 to 43  88
13    Exhibit 6  Bates D871 to D933    101
14    Exhibit 7  Bates D883 to D933    102
15    Exhibit 8  Plaintiff's 1 to 24   112
16    Exhibit 9  wage notice document  115
17    Exhibit 10  Bates D1 to D6       120
18    Exhibit 11  Bates D1093 to D1194  127
19    Exhibit 12  Bates D135 to D1173  133
20    Exhibit 13  Bates D1174 to D1211  134
21    Exhibit 14  Bates D1013 to D1053  135
22    Exhibit 15  Bates D1054 to D1092  137
23    Exhibit 16  Bates D1255 to D1381  140
24    INDEX CONTINUED
25
```

Page 215

```
 1          I N D E X
 2      E X H I B I T S
 3    DEFENDANT'S  DESCRIPTION        PAGE
 4
 5    Exhibit 17  Plaintiff 44 to 59   145
 6    Exhibit 18  bank statements      150
 7    Exhibit 19  216B list            156
 8    Exhibit 20  redacted list        167
 9    Exhibit 21  complaint            195
10    Exhibit 22  D1454 to D1462       198
11    Exhibit 23  complaint            199
12    Exhibit 24  D1426 to D1453       200
13
14    Attorney has retained all exhibits.
15
16      REQUESTS
        PAGE  LINE
17
        17    16
18      87    22
19
20
21
22
23
24
25
```

Page 216

```
 1       CERTIFICATION
 2
 3   I, DIKILA T. BHUTIA, a Notary Public for
 4   and within the State of New York, do
 5   hereby certify:
 6   That the witness whose testimony as
 7   herein set forth, was duly sworn by me;
 8   and that the within transcript is a true
 9   record of the testimony given by said
10   witness.
11   I further certify that I am not related
12   to any of the parties to this action by
13   blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15   IN WITNESS WHEREOF, I have hereunto set
16                        October, 2022.
17
18
19   DIKILA T. BHUTIA
20
21        *   *   *
22
23
24
25
```

Page 217

```
 1       ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
 2
         CASE NAME: NINO MARTINENKO VS. 212
 3   STEAKHOUSE INCORPORATED
         DATE OF DEPOSITION: 10/6/2022
 4   WITNESS' NAME: NIKOLAY VOLPER
 5   PAGE/LINE(S)/  CHANGE      REASON
 6   ___/___/_____/_____
 7   ___/___/_____/_____
 8   ___/___/_____/_____
 9   ___/___/_____/_____
10   ___/___/_____/_____
11   ___/___/_____/_____
12   ___/___/_____/_____
13   ___/___/_____/_____
14   ___/___/_____/_____
15   ___/___/_____/_____
16   ___/___/_____/_____
17   ___/___/_____/_____
18   ___/___/_____/_____
19
20   _____
          NIKOLAY VOLPER
21
     SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS_____DAY
     OF_____, 2022.
23
24   NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____
```

55 (Pages 214 - 217)